**EXHIBIT C**

**In The Matter Of:**

*GLACIER BEAR RETREAT, LLC, ET AL. v.*
*MATT DUSEK and RACHEL DUSEK*

---

*DEPOSITION OF MATTHEW DUSEK*
*July 5, 2022*

---

*Hazlett Reporting & Legal Video Services*
*140 Second Avenue West, Suite B*
*Kalispell, Montana 59901*
*Phone (406) 752-4645*
*deposheri@gmail.com ~ kalispellcourtreporter.com*

Original File 070522md.txt
**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

Cause No. CV 22-19-M-KLD

GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,

Plaintiffs/Counterclaim Defendants,

vs.

MATT DUSEK AND RACHEL DUSEK,

Defendants/Counterclaimants.

DEPOSITION OF MATTHEW DUSEK
July 5, 2022

Pursuant to Notice and the Federal Rules of Civil Procedure, this deposition was taken by at Plaintiffs and Counterclaim Defendants at 530 West 19th Street, Whitefish, Montana, at 9:07 a.m., before Sheri J. Hazlett, Registered Professional Reporter and Notary Public of the State of Montana.



A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFFS AND COUNTERCLAIM DEFENDANTS:

FRED SIMPSON, ESQ.
Jenks & Simpson, P.C.
1821 South Avenue West
Suite 204
Missoula, Montana 59801
fsimpson@jenkssimpson.legal

APPEARING ON BEHALF OF THE DEFENDANTS/COUNTERCLAIMANTS:

SHANE P. COLEMAN, ESQ.
Billstein, Monson & Small, PLLC
1555 Campus Way
Suite 201
Billings, Montana 59102
shane@bmslawmt.com

MARK V. ANDERSON, ESQ. (VIA VIDEOCONFERENCE)
Handler Thayer, LLP
191 North Upper Wacker Drive
Suite 2300
Chicago, Illinois 60606
manderson@handlerthayer.com

ALSO PRESENT:

RACHEL DUSEK
GAIL GOODWIN
DARRYL SLATTENGREN



I N D E X


| EXAMINATION | | PAGE |
|---|---|---|
| BY MR. SIMPSON | | 4 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 3 | Defendants' Responses to Plaintiffs' First Combined Set of Discovery Requests, 4-14-22 | 10 |
| 4 | Email, Matt Dusek to Ruccolo, 10-29-21; Email, Ruccolo to Matt Dusek, 10-29-21, Bates Nos. Dusek000391 and Dusek000392 | 15 |
| 5 | Letter, Haines to Darkenwald, 10-6-21, Bates No. Dusek000087 | 27 |
| 6 | Email, Matt Dusek to Palleschi, 10-5-21, Bates No. Dusek000086 | 28 |
| 7 | String of emails, 10-12-21, Bates No. Dusek000117 | 66 |
| 8 | String of emails, 10-12-21, Bates Nos. Dusek000120 and Dusek000121 | 66 |
| 9 | String of emails, October 2021, Bates Nos. Dusek000243 and Dusek000244 | 72 |
| 10 | String of emails, 10-14-21, Bates Nos. Dusek000243 and Dusek000244 | 129 |




MATTHEW DUSEK,
being first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

**EXAMINATION**

**BY MR. SIMPSON:**

Q Good morning. Would you please state your full name and address.
**A Sure. Matt Dusek -- Matthew Dusek. And my address is 1816 Oak Knoll Drive, Belmont, California.**
Q How would you like me to address you today?
**A Matt.**
Q We met briefly before your deposition started. I'm sure you've had a chance to discuss with your attorney the process and what the ground rules are, but I'd like to just go over some basics so that you and I are operating on the same page.
As you can see, we have a court reporter. She is taking down everything that's said during your deposition verbatim. She'll be preparing a transcript afterwards for you to review and sign. It's important that you and I not speak over each other so that she can do her job and wind up with a clean transcript. So if you can wait until I'm done asking the questions before you answer, that will make her job easier.
**A Okay.**

**came from us.**
Q She has not seen the buy-sell agreement?
**A That's correct. Nobody has seen the buy-sell agreement outside of the parties involved.**
Q Do you recall --
**A And, obviously, legal counsel.**
Q Sure. And I understand that.
Do you recall any specific conversations with Nicole from the time that you had the inspection done until the time that she sent you this email?
**A I don't.**
Q And when I say "the inspection," I mean the inspection that resulted in the Inspection Notice, which listed the nine conditions.
**A Right. I think that -- you know, and this is -- I don't recall a specific conversation, but I think that in the course of trying to understand the relationship between Inspection Notices and the work to be completed and release of contingencies and so forth, that there would have been general context, in terms of there are some items that we'd be interested in having resolved. I don't remember discussing them in detail, mostly because I don't recall any of them being just pertinent to anybody except us and the sellers.**
Q I believe this is the only email that you



produced from Nicole.
**A I believe there was one other.**
Q There may have been one other at the beginning with her referral to Scott.
**A That's right.**
Q Are you --
**A An email to us connecting us with the Scott. Sorry to interrupt.**
Q I appreciate that. I guess the question is, were there any other written exchanges with Nicole that haven't been produced?
**A Not that I'm aware of, no. Not on the subject of this property.**
Q At one point during his deposition, Scott testified that you had had a prior bad experience with a dual-agency real estate relationship.
**A This is an example of something Scott was mistaken about.**
Q Was Scott's testimony on that incorrect?
**A It was.**
Q Do you have any idea what he may have been referring to?
**A I'm not sure. This was the only dual-agency relationship we've ever been in.**
Q Had you had any prior real estate transactions



that had ended up in either a lawsuit -- you said no prior lawsuits -- but had left you with a bad taste in your mouth?
**A No, there weren't any that left us with a bad taste in our mouth. We had experience previously with making inquiries about properties and asking about just, you know, things that the sellers were aware of that needed to be addressed and asking of the, you know, selling agents, you know, similar -- inquiries about the state of the property and being informed that, Everything's great; oh, there's a little bit of glazing in that window; that's the only thing. And then under investigation later, there proved to be far more that needed to be done.**
Q Do you recall having any discussion with Scott Darkenwald or Tracy Rossi about that topic?
**A Oh, yeah. I talked with Scott about that. Some of this was just trying to be helpful in explaining why I was asking some of the questions that I was asking. You know, Please tell me, you know -- makes it sound like I was deposing him -- but, Scott, you know, are there any complexities in this transaction that we should be aware of before we start looking at it?**
Q When did that discussion with Scott occur?
**A Oh, that was probably our second conversation**



**ever. First conversation after Nicole's referral.**
Q Prior to signing the buy-sell?
**A That's correct.**
Q What did Scott tell you, to the best of your recollection?
**A It's when we discussed the water-rights issue -- the well-related permitting.**
Q And what did Scott tell you about that?
**A Scott said that there was a well on the property, that it had been put in place -- from memory, so I'm not firm on the detail, but from memory -- something like 2014, and that it was thought to have been permitted. But it turned out not to be permitted, and that was something that the sellers were actively working on.**
**And we said, Okay, well, that's certainly an important issue, and we would want a contingency in place to cover that. We want that done before any transaction would close.**
**He said, Yeah. That's not gonna be a problem.**
Q Anything else in that initial discussion with Scott where you told him about your prior experience buying property with things that weren't disclosed? Did he bring anything else up?
**A We spoke about dual agency in that conversation. I don't recall -- I had asked questions during that**

Page 29

Q After your email exchange or your email to Matthew of October 5, 2021, did you have any further written or verbal discussions with him regarding the transaction?
**A Regarding the transaction, I think only to let him know that wasn't moving forward so we didn't need to deal with some of the financial matters. Adjacent to the transaction, we discussed just how it would fit into the financial picture, but that's not about the transaction, per se.**
Q Do you mean how it would fit in if it had closed?
**A That's correct.**
Q If the court says that you have to close on the transaction, is that something that's still financially viable for you?
**A Yes, it is.**
Q Do you believe that Mr. Palleschi has any other information about the reasons why you decided not close?
**A I don't think so. Beyond there were contingencies in place, and we're looking at it.**
Q You didn't discuss the contingencies or the inspection results with him?
**A No.**
Q The next individual listed in answer to

Page 30

Interrogatory No. 3 is Scott Robinson. Who is Scott, and what is his role?
**A Scott is legal counsel, also who we had been working with prior to this matter.**
Q Where is Scott based?
**A That's a good question. I always think of him as based out of Wyoming, and I'm not sure if he's based out of Colorado or Wyoming.**
Q Do you know the name of the firm that Scott is with?
**A It's BHGR, and I think that's Berg Hill something something, which is about as well as I can do with any law firm most of the time.**
Q Is Scott a person you intend to call as a witness at the trial?
**A He's not.**
**MR. COLEMAN:** We would assert the privilege as to any substantive communications.
Q (BY MR. SIMPSON) Did you consult with Scott regarding the -- I'm not asking you what he told you -- but did you consult with Scott regarding the buy-sell agreement?
**A I'm sorry. I don't -- I'm not sure if I understand what would violate privilege, and I don't know if I'm even able to inquire of Shane about that.**

Page 31

Q Well, let me ask it this way, did you provide Scott with a copy of the buy-sell agreement before you signed it? He'll object if he doesn't want you to answer that.
**MR. COLEMAN:** You can go ahead and answer that question.
**A No, not prior to signing it.**
Q (BY MR. SIMPSON) Did you provide Scott with a copy of the buy-sell agreement after you signed it but before you decided that you weren't going to close?
**MR. COLEMAN:** Go ahead.
**A Yes.**
Q (BY MR. SIMPSON) Did Scott provide you with legal advice -- I'm not inquiring as to what that advice was -- but did he provide you with legal advice with respect to your rights and duties under the agreement?
**MR. COLEMAN:** You can answer yes or no.
**A Yes.**
**MR. SIMPSON:** And, again, so the record is clear, you assert the privilege as to what the advice was that Mr. Robinson provided; is that correct?
**MR. COLEMAN:** We do. We don't intend to call him as a witness or rely on an advice-of-counsel claim.
Q (BY MR. SIMPSON) I guess you've listed him as a

Page 32

witness. Is there any information you provided -- you haven't listed him as a witness. You've listed him -- well, a witness with knowledge.
**A Yeah. And I don't -- just to -- I'm sorry. Let me let you finish your question. I didn't mean to interrupt.**
**MR. SIMPSON:** I guess, Counsel, do you intend amend this to state that he's no longer a witness?
**MR. COLEMAN:** You know, we're happy to amend. The same is gonna be the answer with respect to Mark Anderson, a little bit different.
We read "witness" to be very broad. We may or may not call any of these folks. I'm telling you we're not going to call either of the lawyers. But they're people with knowledge. I mean, I am too. Maybe I should have been listed there. Maybe the plaintiffs should have been listed there, too. We read it broadly and didn't want to hide the ball on anything.
**A I was concerned not to obscure on that, and I was uncertain what to do with legal representation. Obviously, legal representation has knowledge, and I think I focused on the knowledge part and didn't think as hard about the significance of the word "Witnesses."**
Q (BY MR. SIMPSON) And I believe I know the answer to this already, but Mr. Anderson -- Mark Anderson,

who's also listed there, he's also an attorney with whom you've consulted at some point in time regarding this transaction?
A **That's correct.**
Q Is there anyone else who comes to mind, as you sit here now, who may have knowledge of the reasons why you decided not to close on the buy-sell agreement?
A **No.**
Q Do you recall during Mr. Darkenwald's deposition where he testified that he went through the agreement -- the buy-sell agreement in detail with you before you signed it?
A **Yes.**
Q Do you agree with his testimony on that point?
A **To a certain extent. And I don't recall off the top of my head if he said line by line or somebody else said line by line. We went through it. There wasn't sufficient time to go through everything line by line, of course. But we absolutely went through the agreement together.**
Q Tell me again what your college degree is in.
A **Philosophy.**
Q So you at least had an opportunity to read it?
A **Uh-huh.**
Q Correct?



A **Yes. I'm sorry. Yes.**
Q Did you have questions about any of the terms of the buy-sell agreement that you ran by Scott?
A **Yeah. We spoke about a variety of points in the buy-sell agreement.**
Q Would it be helpful if we looked at it?
A **Incredibly.**
**MR. SIMPSON:** Let's just take a short two-minute break here.
(Recess taken 9:55 a.m. to 10:12 a.m.)
Q (BY MR. SIMPSON) Back on the record here, Matt. During the break your counsel had an opportunity to obtain Scott Darkenwald's file, which we previously labeled as Exhibit 1 during Scott's deposition. And I wanted to ask you about the buy-sell agreement and your discussion with Scott where you went over the agreement and, if you had questions, what questions you asked of him before signing this.
A **Okay.**
Q First of all, are you at Pages 78, GSIR SDT -- I believe it's 078 through 087.
A **Okay. Unfortunately, the GSIR page labeling overlaps with the seller's initials text, but I can see the last page is 087 and the previous page to the beginning is 077; so yes.**



Q Is that document, in fact, the buy-sell agreement that you and Rachel signed with Gail and Darryl?
A **I'm gonna check. I believe the answer is yes. Yes.**
Q And you signed this on October 5, 2021, correct?
A **That's correct.**
Q Prior to signing this buy-sell agreement, had you submitted another buy-sell to Gail and Darryl?
A **We had signed and submitted one to Scott.**
Q And that was for a lesser purchase price?
A **That's correct. That was for [redacted]. And it wasn't clear to us, based on Scott's deposition, if he ever actually brought that offer forward. We intended for it to be brought forward, and it sounded like it was, but in his deposition, he didn't seem to recall it.**
Q Before signing the buy-sell agreement of October 5, 2021, that you have in front of you, did you, in fact, discuss with Scott any questions or concerns you had about the agreement?
A **Sure.**
Q Do you recall any of those questions --
A **Yes.**
Q -- or concerns?
A **I'm sorry. I was just looking at it, and maybe the best way to do it is to go through the agreement**



**sequentially.**
Q Certainly.
A **One of the questions we asked -- and could only really rely on him -- was to make sure that the legal description of the property contained all of the parcels involved. And he said that he double-checked it, and that was the case.**
**We had discussed the parties to the agreement and making sure that we had the ability to assign the contract to some other entity. One of the reasons we discussed that was because further in the contract there was what looked like language relating to the limitation of assignment, and we wanted to make sure that those two weren't at odds.**
**One of the issues that came up in discussing this with him was the title company. We had established with Scott that we were going to use Fidelity Title, and when he presented the document to us, it had a different title company named. And he didn't bring that to our attention, and we had to catch that and inquire about it.**
Q And Fidelity Title, in fact, was the title company that was used?
A **Yeah. He informed us that he had changed it because it was -- he changed it to a title company that the sellers preferred, and we were open to that and**

discussing it. The problem was that he changed it without informing us that he changed it, and we had to catch it and wanted to know what else we had not caught or might not catch along the way. But we did change it back. He said that's what he preferred, that Fidelity was what he preferred. We said what we care about is that it's a reputable company that has sufficient resources to indemnify if there are any problems.

We did talk extensively about the contingencies. Maybe I'll just highlight that for the moment and return to it.

We talked about under the conveyance there was the warranty deed. We, of course, don't know much about the intricacies of deeds, but we had heard previously that a general warranty deed was what we should seek. And so we had discussed it in passing. It sounded -- I believe that's something that he had put in there anyway, but it was something that I recall discussing with him.

I recall discussing the mineral rights just as curiosity, because it just always seems like an interesting point, but it wasn't something that we dwelled on.

In terms of the fees, our experience in California was that the way various fees are handled varies even county by county, and so the -- we deferred to



Scott on what was appropriate here, but that our opinion was anything in doubt we should just request be equally shared on fairness.

Q When you say "fee," are you talking about the closing fee?

A Yeah, closing fee and I think -- I don't recall what the other kinds of fees are that come up in the course of closing a real estate transaction. But just in general that -- of course, you know, we're not looking to reinvent the wheel and tell Flathead County what its business is, but if there's anything in doubt, we're happy to split fees.

Had inquired about special-improvement districts and association special assessments. I didn't expect that there were any. I don't know anything about it. Just looking for any gotchas -- anything that I -- anything that's like, Oh, that's an extra quarter percent on top of the -- given the scale of the transaction involved, little fees could amount to big differences.

When we saw the radon-disclosure statement, we discussed wanting to make sure that we did a radon inspection for the property. I believe I had asked him if radon was generally an issue that surfaced in the properties that he had sold around here. It didn't sound like it was a big deal. He said, Abundance of caution;



we'll just make sure that gets tested. But it wasn't dwelled on heavily either.

We discussed remedies not in great detail. He certainly called our attention to the buyers' and sellers' remedies.

Q Before you signed?

A Yep, before we signed.

Time is of the essence. We discussed the fact that -- and this came up in some of our exchanges back and forth -- inquiring about the dates involved. Scott set the various dates throughout the contract. What we were interested in was signaling that we were able to move quickly, but that we weren't in a particular rush, and that we wanted to make sure there was sufficient time permitted.

For instance, because Rachel and I tend to be -- you know, we try to be thorough; we try to go through everything; so we spent a little more time looking at the contract. I think Scott was trying to get that done faster. So I had indicated to him, Hey -- we had put down a response date in the original contract -- and said, I don't want to shortchange the sellers on time to respond; so we want to honor time is of the essence, but, you know, we also want to give people sufficient time to do what needs to be done; we're not trying to squeeze anybody.



Commission, I think I brought up to Scott on more than one occasion -- I was -- you know, and it probably came out previously -- I was concerned to make sure that Nicole Ruccolo didn't get overlooked as things proceeded. So I wanted to double-check with him again that whatever was registered for Glacier Sotheby's, to make sure the funds proceeded to her, that that was in place. And he assured me that it was.

That may have also surfaced -- also or surfaced in the -- discussing the relationship-confirmation section where Scott and Tracy are listed.

Q Tell me, if you will, what discussions you had with Scott or Tracy about the meaning of "dual agency."

A Sure. And I'll cover -- the conversations with Tracy were fairly minimal. I think we only spoke with her by phone when Scott was out of town. Scott was out of town after we and the sellers had signed the offer letter -- or the offer agreement. We were under contract; then Scott had to go out of town; so Tracy helped out with the earnest money and how to get the funds deposited with the title company. And then I think the only other time we spoke with Tracy was at the property.

With Scott we talked about the dual agency, and just if you could restate the question one more time so I don't lose sight of it.

Q Sure. What did Scott tell you about the nature of the dual-agency relationship?

A **Sure. So we didn't discuss dual agency itself in great detail. Rachel and I had -- you know, first myself, separately, and then Rachel, when she had her first conversation with Scott together with me, the three of us discussed it some more.**

**We were concerned about, you know, the obvious conflict of interest that could arise with dual agency and how to limit that, that, you know, we had been advised that Scott was the person to talk to here. You know, he was -- for lack of a better, you know, term, he was the guy, you know, sort of the Iron Horse person and did the -- a lot of the high-value transactions.**

**Looking back on it, I think what a lot of the dual-agency discussion wound up being was, Let me tell you stories about the dual-agency work that I've done in the past and how we're all friends now, and it all came out well, happily.**

**You know, of course, we talked about confidentiality and, you know, sort of what he called the "Chinese firewall" between parties, you know, which I took to be, you know, talking about the so-called Chinese walls inside investment banks and commercial banking operations. I took the spirit of what he was trying to say, but those**



**actually involve isolation of the respective departments and ensuring no communication could would flow through; so it's a little more difficult if there's, you know, one person who has all that info.**

**Does that answer your question?**

Q I think so. Based on what you learned in reviewing the file that Glacier Sotheby's produced and listening to Scott's deposition, do you believe he shared any confidential information with my clients that he wasn't supposed to?

A **I know he did.**

Q What do you believe that he did?

A **We had had a conversation on the 25th of October about where Rachel and I stood with regard to purchasing the transaction and some concerns we had and that we were contemplating terminating the transaction and wanted to review with him, as our agent. But I prefaced the conversation by saying, We need to be really especially clear right now that I'm asking you, as our buyers' agent, to discuss this with us and advise us of where we stand and how to proceed with this.**

**And he subsequently -- first of all, he assured us, Yes, that's the case, and the Chinese firewall is in place and so on and so forth. And on the 28th -- bear with me, that's from memory. But in subsequent**



**conversation a few days later -- I believe it was on the 28th -- he had told me by text that, you know, he absolutely had done that and he had had that confidentiality in place, and he didn't discuss anything with the sellers. I think he said with Gail specifically.**

**But then on the 30th, he told me, No. I told Gail about that conversation, because you said that I could; you know, told Gail that you were ready to move forward and close, because you said that I could, which to me was absurd, A, because that wasn't the case, and, B, Gail had no knowledge, as far as I understood, that we were contemplating terminating at that point, because we wanted to actually be able to do the contemplating itself. And so why would Gail need to be informed that that wasn't happening if she didn't know in the first place that it was happening?**

**Does that answer your question?**

Q I think so. There's a lot there, though, that I would like to break down into various discrete pieces.

A **You bet.**

Q How many conversations did you have with Scott on October 25?

A **I think a few. In my mind, it's sort of one continuous conversation, but, you know, like we just broke, there were breaks to discuss matters. For**



**instance, when Scott told us some of his thoughts on it, he said that he wanted to go talk with the head of his firm.**

Q Tom Burk?

A **I believe so. And I would say that's a conclusion I pieced together. He may have said it, but I don't recall him saying it. But I've certainly learned since that Tom Burk is the name of the head. And the legal counsel for the firm, which I would take to be Mr. Purdy. Is that right?**

Q Jamie Bowditch?

A **Sorry. Jamie Bowditch. Too many names. Jamie Bowditch. That's right.**

Q As I recall Scott's deposition testimony about the conversations that you and he had on October 25, he described -- the way he described it was that you said that you and Rachel were weighing your options as to whether you wanted to proceed. Do you recall that testimony?

A **I recall his characterizing it, and I recall his characterizing it fairly poorly. The specifics, I would need to refer -- I would actually need to refer to the transcript from the deposition.**

Q What's the best of your recollection as to what you told Scott on the 25th?

A The thrust of it was that we were seriously considering terminating the agreement. It was more than a weighing of the options. We had not settled that that's what we were going to do. And we had concerns.

We wanted -- you know, sort of the -- on a couple of occasions -- a few different occasions, you know, I stressed to Scott we wanted all this to play out in good faith. We didn't want to short-circuit any efforts, but we also didn't want to prevent the sellers from being able to go find their best buyer, if we weren't it. And so we were considering terminating the agreement at that point.

Q Let me --

A Go ahead.

Q Unless there's a lot more to it --

A No, no. Obviously, I was trying to think back to the time.

Q Do you recall telling Scott the reasons why you were considering terminating the agreement?

A No. It's sort of an interesting feature of it. I didn't really get the opportunity to discuss the whys. So Scott's attitude changed instantly. He was very -- he was very kind throughout, and he was very affable in all of our interactions with him, and in that conversation you would have thought I ran over the man's dog. He suddenly



became very disagreeable with us over it, which was shocking, because he's our agent -- he's our agent, too. I'm not suggesting he's exclusively our agent, but he's also our agent.

And, you know, as I say, we wanted to discuss sort of holistically where does this stand. And in spite of the fact that even that morning he was talking to us about our contingencies, in that conversation he suddenly denied that we had any contingencies available to us.

Q Let's back up, then, to the morning where you said you were discussing contingencies with him. What was that discussion?

A Sorry. I think it was by text or email. Most likely text, because mostly it was by text.

He had referenced how we were proceeding with the contingencies, and, you know, I think it was in reference to the various remediation work and so forth. I think on the 25th -- on the 25th I think it was the case that the mold remediation was finishing up. I know we hadn't received the mold report yet, but I think remediation was concluding, and some of the other work had been accomplished and was soon to be accomplished. I think it was sort of a general comment about, Things were coming along well.

He had pushed on a couple or a few occasions to



try to accelerate closing, and we'd sort of gently rebuff and say, We're not opposed to closing early, A, if we proceed to closing, and, B, if everything is in place on our end, that we need to make sure that any entities are in place to take ownership, that we've settled on how to do that and so forth. He knew that. I think he had referenced that on the morning of the 25th, from memory.

Q And then during the conversation or conversations -- to bring us back up to later in that day -- you told Scott you were considering terminating the agreement, and --

A Yes.

Q -- I believe you testified earlier that you didn't feel like you had a good opportunity to tell him the reasons why.

A Because he moved into more what -- you know, what I took to be a defensive posture, suggesting this was something that was counter to what he wanted.

Q Did he tell you he believed that the contingencies had expired at that point?

A He did.

Q And what was your response to that?

A I said, "No, Scott. If the wind blows wrong across the property, we have an out," remember? Because we had spoken at length -- I said we would no doubt return



to the contingencies. We had spoken at length about the contingencies we wanted to have in place in this agreement. And his words to us were -- you know, after we had put this all together, and in particular with the personal-visitation contingency -- his exact words were, "If the wind blows wrong across the property, you're out."

And so it had not even entered our minds on the 25th that there would not be contingencies available to us, and we did not believe that it was the case, that there were not contingencies available to us. The word he used was that the contingencies had been "forfeited" in serving the Inspection Notice.

Q Before we go back into your discussion with Scott about the contingencies and your understanding of those when the contract was signed, was there a discussion with Scott on the 26th where you told him you were going to proceed to closing?

A We were going to proceed toward closing, which is to say we were going to continue forward -- we still -- you know, pending all the work that was ongoing. We needed to review the mold report. We needed to see everything was finished up. We needed to do a final review.

I think this was one of the things, you know, again, like with repeatedly discussing with us moving up

**bloom; throw things against the wall and see what sticks, because it doesn't harm you if you're wrong and you can reverse out of it anyway.**
**And if there's high risk and no reversibility, that's the area where you must proceed with extreme caution. You have to think it over diligently and do all of your work, because you won't be able to correct it afterwards, and it's going to cost you significantly.**
**And then there's this middle ground, right, where you're sort of trading off; well, how much is at stake, and how reversible is it?**
**So optionality has to do with the reversibility portion of it. You know, we can have -- just points in the decision tree; there's a fork in the road, you go this way or that way, and optionality means you don't have to commit up front to how everything is going to turn out.**
**So the optionality would be -- you know, conditioning the sale of the property on various contingencies being met means we can proceed with an evaluation of purchasing the property if these things happen, without committing to purchasing the property.**
**And, you know, reminding him on the phone because I -- you know, our subjective experience might be different than Scott's subjective experience as it relates to the property. We had not seen the property. You know,**



**if it were some residential house in the nearby subdivision, we would go look at it and determine is it something we want to put an offer in on.**
**This was a case where we are talking about a -- what to us was a very expensive proposition on a property we had never seen, and so we needed to make sure that we would have the ability to behave as though seeing it for the first time before putting in an offer. You know, he was encouraging us to put in the offer with this optionality, with this reversibility in place, and we said it has to be like going to see the property.**
**So this was the reason that we put in the personal-visitation contingency with him. This was very important to us, that that's the thing that allows us to go see the property, and, as he described it, likening it to couples walking around it and feeling like if they can imagine a life there; that's the reversibility.**
**The other things were, you know, does the foundation have cracks in it; is the roof falling down; is radioactive gas emanating up from the soil? Obviously, you check those things.**
Q The list of inspection contingencies that starts on Page 3 and continues on to Page 4, from Lines 151 where it starts with "Home/Property Inspection Review and Approval of Protective Covenants," and then it goes on to



Page 4, Line 169, which concludes, "Inspection/testing for methamphetamines," that was a list that you and Scott worked on together to make sure it was complete?
**A That's not my recollection. My understanding of this is that this is a list of example inspections that could be completed. The language in the inspection contingency says, "This agreement is contingent upon buyer's acceptance of any property conditions that buyer deems appropriate, including, but not limited to, any inspections or advice listed below." So I don't take it to be the case that this was a list that we put together.**
**Now, Scott may have put this together. I don't know where these came from. I took it to be the case that these were part of the standard Montana buy-sell, but if you want to correct me on that --**
Q I want to know your understanding -- what your understanding was at the time. And certainly -- did you consider this list to be fairly exhaustive of the different conditions or inspection contingencies that you wanted to have reviewed?
**A It did, for the inspection contingency, seem to cover it. There were other things that we wanted to include, and so those got included in the additional -- there were a couple blanks for "This agreement is contingent upon," et cetera, and then continuing into the**



**"Additional Provisions."**
Q And that's on Page 5 of --
**A Sorry. That's Page 5 of 10. Sorry to interrupt.**
Q Line 242 through to 247, correct?
**A Yeah. I was looking at 232 to 247.**
Q Where the seller is going to mark the corner pins, and there's discussion about all well-related permitting, well-log recording, and associated water rights to be in place?
**A That's correct. The corner pins was an interesting one, because it seemed like it was very important to Scott to put that in. We didn't -- we certainly didn't reject it; that's fine. It would be useful to know.**
**On our residence there's -- one of our neighbors is like, Hey, you know, I think your neighbor has their fence on your yard.**
**Oh, that's interesting. Okay, good to know.**
**But Scott thought the corner pins was important. But we cared about the well and the personal visitation.**
Q I want to go back to our discussion, Matt, about your review and understanding of the -- these are the paragraphs on Page 4 of 10, starting at Lines 171 and 180.
**A Yes.**

Q I think you testified earlier this morning that you read those and came to an understanding about those before signing the agreement at the time?

**A I had read those.**

Q And is your understanding of what those clauses mean now different than what your understanding was at the time that you signed this?

**A I don't think that it varies significantly. I think that, of course, I've had the opportunity to scrutinize these because it's disputed. I always want to understand if there's, you know, sort of a different read, Gosh, did I get it wrong? But no, I think that my understanding is much the same as it was then.**

**I think one thing that -- one thing that I noted, Scott would often talk about -- it was almost as though in his mind the only contingencies were the inspection contingencies, so that, for instance, the Inspection Notice relates to inspection contingencies; it has nothing to do with the financing contingency -- not that we had a financing contingency -- but that certainly doesn't impinge on the title contingency. And Scott would sometimes be fast and loose with the language, you know, where he'd just say, You got this inspection period. Like, Well, yes, and we have additional contingencies as well.**



Q You mentioned a title contingency just now. Was that -- at the end of the day, was there any defect or problem with the title that caused you not to close?

**A There was nothing about the title that caused us not to close. There was a question about the title that, I think, has come up since, which is just that it wasn't -- it wasn't clear to us, throughout, who held title, but that was not -- we didn't rely on the title contingency, and we were advised that the -- I don't know if I can . . .**

Q You learned from Scott at some point after the buy-sell was signed, but before you decided to terminate the transaction, that it was actually held by Glacier Bear Retreat, LLC?

**A I'm sorry. Could you repeat question?**

Q Sure. At some point after you signed the buy-sell agreement, but before you sent the letters saying, We're going to terminate this agreement, Scott advised you that the property was owned by Glacier Bear Retreat, LLC?

**A I inquired; I believe Scott responded that it was.**

Q And then you received the preliminary title commitment, which also identified Glacier Bear Retreat, LLC, as the owner?



**A We received the title commitment. I believe what you said is true, and I don't believe we took note of who the owner was at the time. It was not something that we terminated over. It was just something that has come up since.**

Q I want to ask your understanding about the paragraph beginning at Line 171 on Page 4 of the buy-sell. And it says, "Unless buyer" -- that's you -- "delivers written notice of buyer's disapproval of the property conditions on or before" -- it says in paren -- "notice date" -- close paren -- "10/26/2021 at 5:00 p.m. Mountain Time, this inspection contingency shall be of no further force and effect. If buyer disapproves of the property condition, buyer should deliver written notice to the seller" -- that's Gail and Darryl -- "or the seller's broker/salesperson on or before the date specified above together with a copy of ONLY" -- and that's in caps -- "that portion of the inspection or report upon which the disapproval is based. Buyer shall also state whether buyer elects to immediately terminate the agreement or negotiate a resolution of the conditions noted. If buyer elects to negotiate a resolution of the conditions noted, then notice must contain all of buyer's objections and requested remedies."

Did I read that correctly?



**A Yes, you did.**

Q You had the property inspected by D. Quinn Construction, Inc.

**A Yes.**

Q That occurred on or about October 12, I believe. Is that right?

**A That sounds approximately correct, yeah.**

Q I know Mr. Quinn's report is in here. If you need to refer to it, you certainly can. But after you received Mr. Quinn's report, as I understand it, Scott prepared and you signed -- you and Rachel signed -- an Inspection Notice, correct?

**A Yes.**

Q And did the Inspection Notice, then, note all your items of disapproval of the property?

**A It noted all of our items of disapproval with the property based on the D. Quinn Construction inspection, the homesite property inspection. As it turned out, that also was all of our inspection-contingency defects.**

Q The list of inspection contingencies that we've been discussing, Matt, that start on Page 3 of Line 151 and right on to Page 4 through Line 169 -- I guess it didn't include your -- specifically include your right to visit the property in person. It lists the home/property

inspection. It lists, among other things, water rights, legal advice, those kinds of things, correct?
A **Yes, it does. I'm sorry. The water rights?**
Q And I'll direct you to --
A **Yeah, direct me to it.**
Q -- Page 4, Line 166.
A **Yeah, water rights is listed in there. The access to the property is listed in there as well. We had called out, as separate contingencies, the items that we were concerned with separating from the inspection contingency. So I just wanted to make note of that. The --**
Q So --
A **Go ahead.**
Q Go ahead. I didn't want to interrupt.
Scott -- I believe he testified that he provided you -- and we can refer to this -- he provided you on or about October 12, via email, information that the water rights were resolved. Do you recall that testimony?
A **I don't recall him saying "resolved" specifically, and if he did, please show it to me. I recall him saying that -- there was something to the effect of, Good news, water rights are recorded. Something like that.**
Q Matt, I'm handing you what I've labeled as



Exhibit 7.
(Exhibit 7 marked.)
Q (BY MR. SIMPSON) Do you recall receiving -- do you know what this email is or what this exhibit is?
A **I know what this email is.**
Q What is this?
A **This email is an email from Scott to myself and Rachel, cc'g Tracy Rossi, forwarding a chain of emails from Gail and from the Montana government with an attachment that includes -- from my recollection, this isn't in the exhibit -- my recollection is the attachment was the abstract for the well rights, the provisional permit.**
Q At any time before you -- up until you sent the letters on October 30 saying you were terminating, did you seek advice from anybody as to the water rights attendant to the property other than Scott?
A **Other than Scott, no.**
Q Just so our record is complete, Matt, I'm gonna hand you what I'm now labeling as Exhibit 8.
(Exhibit 8 marked.)
Q (BY MR. SIMPSON) Do you recognize this document? It looks to be a little bit of a redundancy --
A **It's funny because I thought -- I had in my mind that there was that redundancy, and you confirmed it.**



**Yeah, minutes later the same thing. Slightly different text. Still both water rights are recorded. He said he let the title company know.**
Q Did you, after receiving these emails from Scott on October 12 -- and I believe you said that one of them contained the water-rights abstract document, correct?
A **I think that both of these did. Am I incorrect? They both have the same attachment.**
Q Did you receive any additional documentation concerning water rights for the property before you sent the termination letters on October 30?
A **No.**
Q So the extent of the water-rights documentation that you received, you'd received by October 12, 2021; is that correct?
A **I believe that's correct.**
**MR. SIMPSON:** Let's take a very short break.
(Recess taken 11:08 a.m. to 11:29 p.m.)
Q (BY MR. SIMPSON) Matt, during the break I had an opportunity to locate what I believe was the water-rights documentation that Scott Darkenwald emailed to you in October 2012. Those were Exhibits 7 and 8 that we were just looking at. And if you can turn to GSIR SDT 551 through 554, that would be helpful.
**MR. SIMPSON:** And, again, this is part of



Exhibit 1, for the record.
A **Okay.**
Q (BY MR. SIMPSON) Do you recognize that document? Does it have handwriting on the first page?
A **It does. I recognize it, minus the handwriting, from my records. My records don't have the handwriting. And I do recognize the handwriting from the Glacier Sotheby's production.**
Q Do you understand that to be Scott Darkenwald's handwriting?
A **I understand it to be.**
Q Did you receive the general abstract, which is GSIR 551 and 552, from Scott on October 2012 -- I'm sorry, October 12, 2021?
A **Yes. I received the general abstract. I did not receive any further documentation. I didn't receive the well-log report.**
Q For the record, the well-log report is GSIR 553, 554; is that right?
A **That's right.**
Q Did you receive any other water-rights documentation from Scott, other than the general abstract, at any time?
A **No, not to my knowledge.**
Q As I understand it, this general abstract was

first page, the second page -- I believe all three pages, those were new. You had not seen those until this lawsuit?
**A I believe that's true. I'm trying to look -- yes, the permit to appropriate water is different from the general abstract, yes. The general abstract, to the best of my recollection, is the only document that I had received.**
Q Okay. And so this Exhibit 9 was -- I think we're clear on this. This was new to you, something that my client produced after the lawsuit was filed, not something you and Rachel had seen prior to the lawsuit?
**A I believe that's true.**
Q Did you consult with anybody, other than Scott, about the buy-sell agreement before you signed it -- before you and Rachel signed it?
**A No, I don't believe so.**
Q And we may have covered that earlier, but I wanted to make sure that Scott was your sole reference point for questions about what the agreement included and what it meant before you signed it?
**A Yes, I believe that is true. We regarded Scott as the expert in this matter, and he was going to guide us through what we needed to do and needed to avoid.**
Q At any time before today, had you ever had any



conversation, either by phone, in person, in any form with Gail or Darryl?
**A No.**
Q This is the first time you've --
**A This is the first time we've met or conversed. Gail had sent a nice letter that we had said we wanted to respond to. It was one of the reasons why I sent the letter to the sellers as well. You know, just -- you know, in much the same way that it would feel like breaking up by text message, just -- obviously, it wasn't an actual phone call, but I wanted to actually make some effort to connect in the same way that Gail had made effort to connect.**
Q That was another letter of October 30 --
**A That's correct.**
Q And you sent that through Scott?
**A I sent that to Scott to -- and requested that he send it to Gail as-is, unmodified. And my understanding -- and I believe this was something that -- actually, I know this was something that we had discussed with Scott -- because of the, you know, connection that we discovered -- the mutual background that we discovered along the way, that Scott had apprised me that, you know, Gail had been involved in a conservation organization that I'm involved in. I was guided by Scott that it was**



**appropriate to send all communication through him.**
Q One of the things Scott testified about at his deposition was that he understood you to say that you and Rachel had received advice from people that you were paying too much for the property. Do you recall that testimony?
**A I recall that testimony. I don't think that was accurate, either.**
Q Had you consulted with anybody, other than Scott, about how much you were paying for the property?
**A No.**
Q No?
**A No, not about this property, no.**
Q Do you have any idea how that understanding developed in his head? Do you think there was a miscommunication there, or you just have no idea where he came up with that?
**A I think Scott drew conclusions based on other things. There were other properties that we were investigating, looking at. There -- yeah.**
**And I think that sometimes he would lean too heavily on his circle of experts and say, Well, you know, it's the case because I asked five people that I regard highly.**
**And like, I also have friends and people I**



**regard highly, Scott.**
Q You didn't go around talking to friends or other folks outside the transaction about, Is this too much?
**A No. Because for one thing nobody knew what we were spending on this property. We specifically avoid trying to overshare financial information with our friends and family. We just heard about trouble that it causes. And so it's not -- it just doesn't seem like an appropriate question. How would anybody else know? There is definitely -- yeah, no.**
Q I want to -- since we're on this topic -- have you refer back to Exhibit 6. And this is your email to Matthew Palleschi.
**A Yeah.**
Q And midway down there, you say, "We're under contract on that inholding in Glacier National Park. We have a three-week contingency period; so there's still time to find out if this is a garish overspend should you turn up somebody who can shed light on an appropriate price." And then in paren, "We've been working channels on our end, too."
**A Yeah.**
Q What did you mean by that?
**A What we were trying to find out was how do you -- this was a specific question for Matt -- the**

**question of comps, how do you do comps on a property that -- you know, like, obviously, every property is unique in its way, but how do you think about a National Park property? You know, what do you do for an inholding? It turns out that it's -- like you don't just go look at recent sales in Zillow.**

**And so we were hoping that Matt would be able to -- because he works, you know, with a bunch of clients who conceivably could know -- could turn somebody up who could help guide us on how do you think about comparables on unique properties like a property inside Glacier. That's what that referred to.**

Q Did you have any success tracking down additional information in that regard?

**A Only my own. I found some information on sales and just contests between the National Park Service and the federal government in Grand Teton National Park. I discovered a property listing -- I don't even remember the time frame, but there was a property listing for property inside the gate of Yosemite. Yeah, Matt was not able to turn anything up.**

Q Did Scott tell you somewhere around the outset of this whole course of events that there really were no comparable sales to refer to for this?

**A Yeah. He said that -- we quibbled over it. He**



**said that just -- like, You're relying on an overly precise definition of comparable.**

Q As I understood your testimony a minute ago, you didn't really find anything that you thought you could analogize pricewise to this property?

**A In terms of National Park sales. So Scott and I talked about -- and, you know, I say "we talked about." This was my pressing him that there must be some way to think about what an appropriate price is at which a seller would sell and a purchaser would purchase, because if uniqueness alone is sufficient, then the price would be arbitrarily high or not. So one of the things you turn to is what are other sorts of properties that people will purchase with that kind of money, you know, the purchase price involved.**

**So we talked about comparables a lot. It just didn't prove terribly, you know, germane in the end; we agreed to a price, and that was the end of that.**

Q At the end of the day, did price factor into your decision to send the letter terminating the agreement?

**A It wasn't something we relied on in terminating the agreement. The only extent to which it factored in was, you know, as I said in the response to interrogatories, Do we want to disregard our concerns and**



**waive the contingencies? At that price, no. And so, you know -- and we just stepped aside so that the sellers could get that price from somebody who was willing to take that on.**

Q So if we go back to Exhibit 1 -- and this is the buy-sell -- and maybe the better thing to do here is let's talk about how the transaction progressed. After you signed the buy-sell, as I understand it, you and Rachel hired D. Quinn Construction to go do a property inspection.

**A That's correct.**

Q They do the inspection; they provide you with a report, correct?

**A That's correct.**

Q That was their findings of, Here are the conditions of the property, some of which you may have concerns about, others of which are satisfactory?

**A Right. The so-called inspection report, something like that.**

Q And after you get that -- I'm sorry.

After you receive Quinn's inspection report, you, with Scott's assistance -- and I assume he did most of the work -- but you prepare an Inspection Notice that you and Rachel signed, correct?

**A That's correct.**



Q And for your reference, this is in Exhibit 1, Page No. GSIR SDT 108 and 109.

**A Okay. I have it.**

Q And those are your initials at the bottom of Page 1, and then your signature is on the second page. Is that correct?

**A That's correct.**

Q And you've dated it October 15, 2021, correct?

**A That's correct.**

Q As I understand it, the -- well, there are nine conditions noted on this Inspection Notice.

**A Yes, I believe that's correct.**

Q And those were pulled directly from Quinn's report, right?

**A Yes.**

Q And, for instance, where it says on GSIR Page 109 at Line 56, it says Page 12, Section 2, Item 13, "Drainage, gutter to be extended to shed water away from foundation."

**A Yes.**

Q That's something that had been noted in Mr. Quinn's report, and you said, This is something we want fixed?

**A Scott said, This is something we want fixed, and we said, Okay.**

**contingency and the personal-visitation contingency.**
Q Where do you derive that -- from the agreement that you had until October 30 to deliver written notice about the personal inspection of the property?
**A In the description of contingencies, Line 132. So that paragraph -- that paragraph describes the methods, for lack of a better word, for operating the contingencies. And it describes conditions such as that the party that requested the contingency needs to send notice, and that it needs to happen to the other party or the party's representative, and that it needs to happen by 5:00 p m. -- before 5:00 p.m. Mountain Time on the release date of the contingency. And there is no release date on that contingency, as there's no release date on other contingencies, such as the financing or the first part of the appraisal contingency.**
Q Financing and appraisal were not contingencies that were applicable to this agreement?
**A That's correct. I'm simply saying that this is in keeping with my understanding of other elements of the contract, that there are -- this is answering your question like, why did I believe that it was within bounds to serve notice on the 30th; why did I believe that? Do I have that question correct?**
Q Yes.



**A Because there is no release date on that contingency. That contingency was put in place to be our bulwark, that, you know, we needed to be able to go look at the property, evaluate the property as though we were seeing it for the first time and putting forth an offer. And that -- this was the thing, in my mind, that satisfied Scott's claim that if the wind blows wrong across the property, we're out. That's how we know if the wind blows wrong across the property, is we go and look at it. So it was important that the contingency had teeth. So there was no release date; so it had not lapsed yet.**
Q Will you agree with me that with respect to water rights, your inspection contingency date was October 26, 2021, at the latest, given the rights as mentioned at Line 166 on Page 4? And, again, I'm not asking for your legal opinion, because I know you're not a lawyer; I'm just asking for your understanding.
**A My response -- and I don't know if this will require some teasing out -- is, you know, my opinion is that all well-related permitting, well-log recording, and any associated water rights to be in place before closing has a release date of 11-3-2021.**
Q Are you aware of any facts that the well-related permitting, well-log recording, and any associated water rights were not in place by the time you sent the letter



on October 30?
**A I believe it's the case that the well-related permitting was only provisional, that it was not all well-related permitting; it was only provisional permitting that was completed. We hadn't received notice of any further permitting work, and we had concerns about it.**
Q Your two letters of October 30, 2021 -- let me pull those out so that we're talking about the same documents here. Do you have two or three volumes for Exhibit 1 in Scott's deposition?
**A I have two volumes if these are both Exhibit 1. Is that right?**
Q Yes. Can you turn to the -- it's gonna be near the tail end of Volume 2.
**MR. SIMPSON:** And for page reference number, we're still on Exhibit 1 for the record, and we're looking at GSIR SDT 1297 and 1298.
**A Okay. Yes, I'm there.**
Q (BY MR. SIMPSON) Those are both letters of October 30, 2021, from you and Rachel to Scott Darkenwald, correct?
**A Yes, that's correct.**
Q Those were two letters that you sent to Scott by email on October 30, 2021?



**A Yes, that's right. They were PDF attachments to an email -- two separate emails.**
Q First of all, why did you send two letters which are slightly different in text?
**A I was trying to determine what the clearest fashion was to separate two different issues. And I thought it would be a confusing letter if everything was listed together -- hoping brevity would tease them apart -- that on the one hand, there was the existing matter of the Notice of Release of Contingencies that Scott and Tracy had sent to us. And I wanted to respond to that email and that request; I wanted to do so formally, because this was, obviously, going to be a defining moment in the contemplated transaction, saying that we're not going to release those contingencies.**
**And I wanted that letter to, you know, sort of explain, you know, in particular with regard to the -- to cover in particular with regard to the ongoing inspection-report remedies, that we're not going to release that contingency, and our understanding as a result of that is that the contract is terminated separately. And so that was -- just to be clear -- that was the 1298 letter.**
Q Page 1298?
**A 1298. We are declining to sign the Notice of**

Q Makes sense.
**A It makes sense. We talked about it a little bit. I had a conversation in which I told him, We don't want to nickel and dime the sellers over like small-ball items here; we're concerned about the big stuff.**
**And Scott said, These are all things that they have to fix no matter who they sell it to. Like, Okay. And -- go ahead. Sorry.**
Q At the top of Page 109, at Line 54, there's a line that says, "Buyer elects to negotiate the items of disapproval described above and offers the following resolution: Seller, at seller's expense, to remedy the following," and then it contains the nine different conditions.
**A Yes.**
Q And it continues after that list of nine conditions, "If seller and buyer agree to the remedies specified above, this document shall constitute an amendment to the buy-sell agreement referred to above and shall be an integral part of this transaction. Seller shall complete all agreed-upon resolutions to the conditions and problems identified above by 5:00 p.m., Mountain Time, on November 5, 2021," correct?
**A That's correct.**
Q And, in fact, then you signed it on the 15th;



Gail and Darryl sign it on October 17th, and then this document is returned to you on or about October 17, correct?
**A I believe that turns out to be correct.**
Q In any event, by at least the 18th of October, you had this signed -- fully signed Inspection Notice back from Gail and Darryl?
**A Yes. And do you happen to have -- just to confirm the date on which it was sent back to us, do you happen to have Scott's email to us handy? This was the OPD email.**
Q You bet. We're also in Binder 1 of Exhibit 1. This is GSIR 377.
**A Yes. Nothing new in here. I see it.**
Q And that email exchange of --well, it looks like it's an email from Gail to Tracy and Scott of the 17th. And then there's an email from Scott, apparently, to you on October 18 at 1:20 p.m., and that's the email, in fact, where this fully executed Inspection Notice was returned to you?
**A Yes, that's right. That's how it turns out. We didn't know that, because it was in the disclosures, and Scott said nothing new in here; so we didn't scrutinize it.**
Q There was no question that you received the



fully signed Inspection Notice?
**A I know now that we did.**
Q What was your understanding of what signing -- both parties signing this Inspection Notice meant with respect to the inspection contingencies in the buy-sell agreement?
**A My understanding -- and so like I'm not --**
Q I know you're not a lawyer, and I'm not asking for a legal conclusion. I want to know your --
**A That's fair. I wanted to -- sorry to interrupt.**
Q That's the question.
**A It's all prefaced by saying my understanding of it was driven by reading the text in the documents. So I understood it to be an extension -- you know, an amendment to the contract. I understood it to say, In lieu of terminating the agreement because of the defects, we would like these things to be fixed as a necessary condition to proceed with the contemplated purchase. I didn't understand it to be a sufficient condition.**
Q What do you mean by that?
**A In order to contemplate going forward, we would need to do at least these things. I understood, as the language, I think, in the buy-sell agreement describes, that there would be no further requests on these matters, apart from what was described, but that that is not the**



**complete list of all possible things that ever might come up under the contingencies of the buy-sell agreement. The buy-sell agreement itself seems to contemplate the existence of multiple notices.**
Q Show me where in the buy-sell you gathered that understanding from.
**A Sure.**
Q That's back to approximately Page 78 or 79?
**A Line 171 -- this is on Page 4 of 10 of the buy-sell agreement, 171, "Unless buyer delivers written notice(s)."**
Q And that was, "Written notice of disapproval on or before October 26, 2021, at 5:00 p.m. Mountain Time --
**A That's correct.**
Q -- "this inspection contingency shall be of no further force and effect."
**A That's correct.**
Q Other than the Inspection Notice, did you deliver any written notice of disapproval of any other condition of the property?
**A Not of the inspection contingency, not in service of the inspection contingency.**
Q Were there any other --
**A We had other contingencies, and we delivered the notice on the 30th on the well-related permitting**

mold-conducive conditions still in the walls. And basically about, How do we know; how do we gain confidence in this? And he suggested reinspection six months down the road was the way to address that.

We had asked, What does that mean in the meantime, like during the next six months? He had indicated for most people probably -- it was difficult to say definitively -- but probably no difficulty for most people, but for allergy sufferers it could be an issue.

Q Do either you or Rachel suffer from mold allergies?

A We've just suffered from general allergies at different times. In the Midwest I was plagued by them. Since coming to California, I'm much improved. Rachel didn't really have trouble in the Midwest. Since coming to California, she's had a worse time with it.

The property wasn't intended to be strictly for us; it was also to be, you know, for hosting family and friends. Rachel comes from a large family.

Q Do any of those folks, to your knowledge, suffer from mold allergies?

A Difficult to know. Some of them I know suffer from allergies for sure. You know, one of my best friends growing up was horrendously plagued by allergies.

Q How long did your conversation with Mr. Quinn



last at that point?

A I'm not sure that I know how long that conversation went on. Maybe 20 or 30 minutes. I'm not positive.

Q Did you take any notes of that call?

A No.

Q Did you then have a conversation with Scott Darkenwald about the Quinn report -- the mold report?

A Yes, shortly thereafter. Same day.

Q Same day, the 27th?

A Same day. And, you know, I don't have, you know, any information at hand, but I would surmise within a couple of hours.

Q If you would turn to Page -- this is, again, Exhibit 1 in that binder you're in, and this is Page 056. I think it's just two pages beyond where you're at.

A Yes.

Q Do you recall Scott testifying about the notation he made on Page 1 --

A I do.

Q -- or the first page of this copy of the mold report, "All okay per Matt and Rachel - 10-28-21"?

A Yes.

Q Do you have any understanding of why he wrote that there?



A I could only guess.

Q What do you recall telling Scott during your conversation with him about the mold report?

A The things that I relayed to you -- related to you. He mentioned the same in his deposition, the six-month retesting, the allergy issues.

Hazarding a guess, I think this is another case where, on the 28th, we were going through the checklist of all of the things and where everything stood. And Scott had asked us for final review, because on the 28th specifically -- 27th, I think everything was wrapping up. We had the mold report. We had the reinpspection. Scott said, All the work is complete, right. The remedies, according to Scott, all the progress timelines were done, and it was time to do a final review and make decisions.

And so we went through them together, and -- you know, Scott said I went through with my red marker and highlighter and walked through all the points. We did indeed do that together.

He said, Get together with your -- he said advisor, but I think he meant Scott Robinson or something -- do a final review and make sure there are no objections.

And we said, Okay. Yeah. We understand everything that's in here. We're going to go look at it



and think it over and make a decision.

Q Was the mold report the straw that broke the camel's back, if you will?

A Well, it was all of the items we mentioned together. I think that any one of them, you know, was sufficient to terminate, but all of them together, we sort of looked at it that -- and maybe by way of context, I led off with conversations with Scott saying, I love Glacier National Park. It would be nice to be the person who doesn't care the most in this, but, you know, I'm -- I like the idea a lot, and so I need to -- we need to put in place contingencies to make sure I protect myself from myself.

And in the final review, we just looked at the issues we had raised along the line. We had raised the issue of the road noise. That was one of the first conversations I had with Scott, was trying to understand the property itself. And, you know, what we were after sort of in the grand scheme of things -- you know, just put together your perfect list -- we'd find a place on the lake looking out at the mountains inside Glacier National Park. If it's not that, well, it should be tranquil; it should be serene; it should be forested, and so forth. And I asked about the road noise, and he said there wasn't any. In the final moment, there's road noise.

We had talked about the mold throughout, the fact that it was a deal breaker, especially for Rachel. It needed to be like it was never there. And we worked on that throughout, and in the final analysis, there were still the spore content in the air and the moisture retention. The moisture retention had been specifically called out as a thing that needed to be remediated.

And then there was the water-rights issue, and there was the provisional nature of the permit, and there was the -- what's the word? -- the priority date of the permit. And we had been under the understanding from him that the permit was going to reflect the existing rights that had been in place. We didn't want to wind up with, you know, an illegal source of water. And in the end there were questions about that.

So all of those together, we just did the assessment, like it's a big sum of money to spend overlooking all the concerns that we set up front -- you know, sort of set the conditions up front that all this must be done to satisfaction for us to feel comfortable proceeding. It's a bad time to overrule yourself on what those concerns are.

Q When you spoke with Mr. Quinn -- let me ask you this first, did you have any -- how many conversations did you have with either David Quinn or anybody else from



D. Quinn Construction?

A I believe the only conversation I ever had with anybody from D. Quinn Construction was David Quinn on the 27th. I believe that's the case.

Q Did you ask Mr. Quinn in that conversation on the 27th any questions about anything stated in his reinspection report? Not the mold report but the separate reinspection report.

A I don't believe it was a conversation to cover the reinspection report. I don't think we talked about that except insofar as the two were coincident -- the moisture retention and the mold. The other things were, to the best of my recollection, just not a point -- you know, insulation -- well -- yeah, the insulation was fine, as far as we know. We already covered the gutter extension and the stair railing.

There was a question about the conduit. I think, you know, on our visitation we had noted that one of the conduit extensions had been repaired and one of them had been missed. Not a big deal. Just something like, Oh, you know, either if somebody is coming back through to fix it, let's catch that, or we'll do it later.

Q Actually, let's look at -- back at the Inspection Notice, which is -- you're close to it. It's Page 109.



A There we go.

Q So we're on Exhibit 1, Page GSIR 109. Let's look at each of those items. The first is, "Drainage - gutter to be extended to shed water away from foundation." At the end of the day whether that was -- looked in great shape or not, that was not an issue for you --

A That's correct.

Q -- in proceeding?

Next one is "Siding Condition - remedy to suggestions in inspection report, cosmetics to be in matching condition to rest of house. Cory Rensmon at Advanced Restoration to complete work." To your knowledge, was that done satisfactorily?

A To my knowledge, that was done satisfactorily.

Q The next item it says, "Flashing - remedy to suggestion in inspection report, cosmetics to be in matching condition to rest of the house. Cory Rensmon at Advanced Restoration to complete the work." Same question, was that satisfactorily remedied?

A To my knowledge, that was remedied satisfactorily.

Q Next one, "Evidence of moisture - remedy to suggestion in inspection report. Cory Rensmon at Advanced Restoration to complete work." What about that?

A I don't believe that was remedied



satisfactorily.

Q What is your understanding of that based on?

A My understanding is based on David Quinn's mold report.

Q What about -- I think I know the answer, but, "Mold buildup, all mold to be remediated and pass a clearance test. Cory Rensmon at Advance Restoration to complete work." Same question as to that one?

A I don't believe that was satisfactorily completed.

Q Next item, "Stairs - railing in guest house to be installed with esthetically pleasing and up to code new railing."

A I believe that was completed, and satisfactorily is probably the question. But we did not rely on that; that's not the basis for terminating.

Q What about the next item, "Valley flashing - noted wiring to be installed in conduit and capped in specified areas by licensed electrician"?

A I believe that was addressed satisfactorily with the caveat that we had spotted one area. And I'm not sure if that was later addressed or not.

Q Next one is, "Insulation - appropriate insulation to be blown in by Cory Rensmon at Advanced Restoration to complete work."

A **I believe that was completed satisfactorily.**
Q The last one is, "Evidence of leakage - noted leaking waste pipe to be remedied."
A **My understanding is that was also completed satisfactorily.**
Q The next few lines in this Inspection Notice say, "If the seller and buyer agree to the remedies specified above, this document shall constitute an amendment to the buy-sell agreement referred to above and shall be an integral part of this transaction. Seller shall complete all agreed-upon resolutions to the conditions and problems identified above by 5:00 p.m., Mountain Time, on November 5, 2021."
Did I read that correctly?
A **You did.**
Q With respect to the two items you've noted from this that you believe were not completed satisfactorily, evidence of moisture and mold buildup, was there a reason why you didn't give notice to Gail and Darryl through Scott that, Hey, they need to fix these two, and they've got until November 5 to get it done?
A **My understanding -- it was sort of twofold. My understanding was that all of the work was completed and Scott was pushing us to make a final decision. Right at the end -- and this may have been on the 28th -- but right**



**at the end, Scott informed us for the first time that there was time pressure on Gail's part. He had mentioned throughout like, Hey, if we can move it forward, that would be great.**
**We understood from Scott that the sellers were relocating their lives to the U.S. Virgin Islands, and there were other possible sales in the works; but for the first time then, he mentioned to us that there was actually time pressure on getting the decision made on this particular property. And so we made our decision, you know, on the basis of that information.**
**I also understand from the buy-sell agreement that the resolution date of October 29 at 5:00 p.m. is a date by which written satisfaction and, you know, resolution of the noted items needed to be achieved or else the agreement was terminated.**
**And based on everything that we had seen at that point so far, we didn't think that the right move was to drag things out and, you know, sort of chance whatever else the sellers had in their lives on the hope that maybe these things would come together for us.**
**And as we already said, the road noise from the personal inspection and the water rights sort of -- in totality all of these things together would have meant we would have been leading them on saying, Well, what about**



**this thing -- like if they addressed that item, there would still be these other items; so it would be disingenuous to say, Go fix this just so we can -- you know, I don't know what, like give the appearance that there's a point to it -- a further point to it.**
Q I want to take you back to the buy-sell. And, again, this is on Page -- gosh, I wish these were easier to read -- I think it's 081. It's Page 4 of 10 of the buy-sell agreement.
A **I have it.**
Q And starting on Line 176, "If buyer elects to negotiate resolution of the conditions noted, the notice must contain all of buyer's objections and requested remedies." Did I read that correctly?
A **You did.**
Q Do you understand that the "notice" referred to in that sentence is the Inspection Notice that we've been reading?
A **I do.**
Q And would you agree with me, then, that the next line, 180, in Page 4 of 10 in the buy-sell, "If the parties enter into a written agreement in satisfaction of the conditions noted," that, again, that "written agreement" is the Inspection Notice, is it not?
A **I would not. I don't agree with that.**



Q What do you think that means?
A **I think that there's the Inspection Notice that governs the informing of the seller about the items which we disapproved. I believe there's the Inspection Notice that inventory specifically what those items are and what should be done to resolve them. And then there's the resolution paragraph that describes how we agree that those items have been, in fact, resolved.**
Q Did you ever discuss your understanding -- your interpretation of that provision with Scott?
A **Yes.**
Q And was Scott's opinion materially different than yours?
A **At select times, but not all the time.**
Q Okay. Tell me when it was not.
A **It was not when we discussed possible termination on the 25th and then a little bit on the 26th.**
Q Your interpretation was different than his on the 25th?
A **Yes, that's right. He surprised us on the 25th by stating that in his view, the Inspection Notice created a forfeiture of all -- sorry -- of all contingencies in the buy-sell agreement, which we flat-out reject.**
**But we also don't believe that it constituted a forfeiture of all of the inspection contingency either,**

Page 113

**that there actually must be resolution, that there must be written satisfaction of resolution, and that we would need to withdraw in writing our disapproval of the conditions noted by the resolution date. And Scott just talked in circles around that. But the language looks plain to me.**
**And just to complete the thought, thereafter, once we said we -- you know, Okay, let's proceed towards closing and see how the rest of the items are resolved -- this is subsequent to the 26th -- he resumed his conversations with us about contingencies and the resolution of those contingencies again.**
Q What did he say at that point?
A **You know, he had said -- I think I mentioned -- actually, maybe that was on the 25th. I would have to refer to the text conversations between us.**
**But I believe he was alluding generally -- you know, we can go through the text conversations to find it, but my recollection is that there was language to the effect of, With the reinspection report or with the mold -- you know, Cory's final mold remediation, one of those, this would mark the completion of your contingencies; can we get together to -- you know, can we have a phone call to discuss and see where things stand? Something to that effect. I apologize. That's not verbatim.**

Page 114

Q Did Scott tell you during your conversation on the 25th that if you terminated the agreement at that point that -- if you were considering doing that, you should contact your attorneys first?
A **Yeah. When we were talking on the 25th, Scott suggested that given that we had a difference of opinion on this, that I talk to my guy, and that he was going to run it up the chain at Glacier Sotheby's.**
Q And you understood that to mean "your guy," being a lawyer?
A **Yeah.**
Q As I understood it, he was pretty firm in his opinion that he thought that your time to raise another contingency had expired by that date?
A **He was firm that we had no contingencies, and we described a variety of reasons that that made no sense; including his own behavior; including the fact that we had gone to great lengths and considerable expense to come visit the property and look at it on the 19th when, according to what Scott was suggesting now on the 25th, it was a contingency that, according to him, was forfeited on the 17th.**
Q When you signed this and when -- I'm sorry. When Gail --
A **Yes.**

Page 115

Q -- and Darryl signed this?
A **And I'm saying on the 17th. We were talking about in terms of the 15th, our delivery of the inspection report. But, yes, I think technically it would have been, you know, according to his position, when Gail signed it and Darryl signed it.**
**And Scott became flustered, because he said, No, no. You served your Inspection Notice after you visited the property.**
**And we said, No. Look at the dates. It was before we visited the property. Wouldn't you -- you know, as our agent, as the buyers' agent, wouldn't you discuss with us, Scott, the very important matter of forfeiting all contingencies if that were true? It's just simply not true. But if you thought it were, you should talk with us about it.**
**And he had no conversation.**
Q Do you recall Scott's testimony that after you visited the property, you were more excited about the transaction than you were before you visited the property?
A **I remember that testimony.**
Q Do you agree or disagree with that testimony?
A **I disagree with that testimony.**
Q Tell me why.
A **We discussed with Scott that there were certain**

Page 116

**matters that were, you know, sort of better than we expected them to be and certain matters that were worse than we expected them to be; matters related to the house notwithstanding the mold, but just that -- he had sort of -- Scott would often refer to the Iron Horse properties, and some of this was in relation to just how do we think about pricing and whatnot. So he had sort of maybe made it seem like the house was -- like don't focus on the house.**
**We thought the house was, you know, a nice -- you know, like especially if it was being used as a family retreat, vacation rental; it was a nice house. The property was worse insofar as what we were looking for, you know, again, the road noise and so forth. I think Scott might have been confused by the excitement that I especially have -- I set foot in Montana; I set foot in Glacier National Park; I become ecstatic.**
Q Did you ask Scott if he had any explanation for why there was more road noise than you anticipated when you visited?
A **I said, We talked about this.**
**And he said, I never noticed it before. Now that you say it, yeah, but maybe because it's fall and there aren't leaves on the trees, and maybe it will be better during the summer.**

**I was like, What? When the 3 million visitors hit?**
Q At any time did anyone make you aware that there was road construction going on on Camas Road when you were visiting?
**A Not to my recollection. And to be clear, the noise that we noticed when -- we had walked around the property with Scott and Tracy. Eventually Scott and Tracy left, and Scott suggested we remain on the property and walk around and just take it all in.**
**We were standing on the front porch and heard the first vehicle drive by -- first that we were paying attention to -- and we saw it drive by. You could see it sort of blinking through the trees. We were like, Oh, no. How did we not notice that? Now that we're standing there looking at it, it's obvious.**
**And, you know, subsequent vehicles -- this wasn't jackhammers and forklifts and, you know, whatever, front loaders. This was just regular vehicle traffic.**
Q I think one of the things you mentioned at some point -- maybe it was in a letter or earlier in your testimony -- was that it wasn't on the lake. You were aware that it wasn't on the lake --
**A I was completely aware it was not on the lake. None of this was conditioned on it being on the lake.**



**We were talking about -- in the alternative to something like that, what would -- sort of painting a picture for each other. He's telling us about the property. We were telling him what kind of thing we're imagining and looking for.**
**As I mentioned, we had just come cross other properties in looking at various properties with Nicole Ruccolo that look great -- and, you know, to be clear, different things matter to different people, but for us looking at these properties that seemed great, you know, the beautiful house somewhere in California, but it's right adjacent to a highway, or there's a highway in the distance, but you have the constant background drone of traffic. For us sort of trying to imagine our version of an idyllic retreat, that wasn't the right thing.**
**MR. SIMPSON:** Let's take a short break.
(Recess taken 2:10 p.m. to 2:26 p.m.)
Q (BY MR. SIMPSON) Matt, prior to the break, do you remember when I asked you about, you know, which of the conditions in the inspection report you believe had been fixed correctly, and there were two: the mold and the evidence of moisture?
**A In the Inspection Notice we went through, and this was also in reference to the items in the reinspection report.**



Q Yes. And we went through the list in the Inspection Notice, and the first one that you said there was a problem with was Section 5, Item 19, "Evidence of moisture, remedy to suggestion in inspection report. Cory Rensmon at Advanced Restoration to complete work."
**A Yes.**
Q And my understanding is you're saying that wasn't done correctly?
**A That's my understanding from the mold report.**
Q So I want to -- first I want to turn your attention to Page 384 of Exhibit 1, which is in the same book you're in right now, Volume 1. Are you on Page 383?
**A I'm on 383 at this moment.**
Q 383 has Section 5 of -- this is Mr. Quinn's initial inspection report, right?
**A Okay.**
Q So we've got Section 5. Turn the next page, please, to 384, which says, "Item 19, evidence of moisture," and it says "Attention," and then it discusses what needs to occur there, right?
**A Yes.**
Q And that is -- Item 5 means -- or the item we just looked at in the inspection notice, right?
**A Yes, I think so.**
Q Okay. Now if you would, please, turn to the



second binder, and I'm gonna direct you to the reinspection report. Please turn to Page 731.
**A It must be in the first one. Okay.**
Q You're on GSIR 731?
**A Okay.**
Q And do you see -- there's a hole punch there, but if you follow the sequential numbers down the left-hand column, you get to what should be 19. There's a hole punch that says, "Evidence of moisture." Do you see where --
**A I see it.**
Q What does it say next to that?
**A "Satisfactory."**
Q And then if you'd read what's in the following column?
**A It says, "Note evidence of moisture and water stains located main closet level under the stair area during the original inspection as been corrected and was dry at time of inspection with the flashing and siding issue having been corrected."**
Q Would you agree with me that at least Mr. Quinn believed that that item in the Inspection Notice was satisfactorily resolved?
**A I don't know what to make of that. I'm confused by the two Quinn reports now.**

Q Tell me what part is confusing you.
A **That it's at odds with what the mold report says.**
Q Where in the mold report does it say that this was not satisfactorily resolved?
A **Are you able to direct me to the mold report in the binder?**
Q I am. GSIR 056.
A **Okay. Thank you. On Page 058, Page 3 of the report, this is Section 3.1, "Living area" about two-thirds of the way down that paragraph in the bolded text, "Also, note based on the visible observations and moisture readings, it appears that the upper stairwell interior drywall is still retaining excess absorbed moisture from a past ongoing water intrusion which could also contain microbial growth."**
Q Did you ask Mr. Quinn if that was the same area as mentioned in the other part of the reinspection report that we just looked at?
A **I am not sure if we discussed that. I'm not sure if I was -- I was aware that there were multiple areas of moisture retention. I took them to be the same area in question.**
Q Did you ask Mr. Quinn to clarify that confusion?
A **The only clarification that I recall about that**



**was just the significance of moisture retention in a mold infiltrated area.**
Q Are you aware that mold is generally present in most buildings in Montana?
A **Is that the case?**
Q I'm wondering -- have you heard that before?
A **I don't know. I don't know if I have an opinion on most buildings having mold.**
Q Did Mr. Quinn discuss with you whether that is, in fact, the case?
A **I don't know if that's the case. It would seem like that -- if that were the case in the relevant manner, then he wouldn't have highlighted mold being present in the building in question.**
Q What did he tell you about the presence of mold in buildings in Montana, if anything?
A **I don't know.**
Q You don't recall?
A **I don't recall.**
Q Okay. Am I correct that other than the Inspection Notice, that we've talked about in some detail earlier today, you didn't send any notice of any objection to any condition in the property to Gail and Darryl prior to October 30?
A **If I understand your question correctly -- and**



**maybe I'll state it in the affirmative -- we sent an Inspection Notice to highlight our concerns about defects found during the inspection-contingency period, and then on the 30th, we sent notice of the water -- the well-related water rights contingency and the property-visitation contingency.**
Q And so between October 15, when you and Rachel signed the Inspection Notice, and October 30, when you sent the two letters to Scott by email, there were no other notices from you of any objection to any condition or circumstance concerning the property?
A **I believe that's correct.**
Q I thought that was the case.
A **I think that's the case, and I'm trying to understand your question just in case there's special significance to it. We continued to take an interest in findings. We continued to ask questions about concerns that we found along the way. And then taking all of that in totality during -- you know, at the time that Scott said, Let's review, and, you know, there's time pressure; let's make a decision, we reviewed it all, and we made a decision.**
Q I want to ask you about some of Scott's notes. And I understand, of course, you didn't write these, but I suspect you heard his discussion of them at his



deposition. And it's Pages 4 -- it starts on GSIR 427 in the binder.
A **427, you said?**
Q Yes.
A **I'm on it.**
Q In this he notes, No. 1, "Going to proceed." I take it from our earlier discussion this morning, you did not tell him -- according to your testimony, you did not tell him that you were going to proceed?
A **Proceed towards closing as opposed to terminating immediately. We're going to continue the process; we're not going to end the process, at that particular point in time. We weren't relinquishing any opportunity or any rights under the contract to continue to evaluate, and his behavior evidenced an understanding of that. He continued to bring us information about how we were doing and how the whole transaction -- contemplated transaction was doing as concerns the satisfaction of issues raised.**
Q Item No. 2 on his list says, "Flip the coin and watch the/our reaction."
A **Right.**
Q And I remember pretty distinctly his discussion of that point. But I guess I want to hear from you if you have an understanding of what he meant when he wrote that.

A I know exactly what that was. He didn't capture what that was. That was based on the -- you know, on the 25th having the concerns that we had and considering terminating; we were thinking it over.

Scott -- I told you Scott was -- he had a very abrupt change in demeanor towards us on that conversation. He got what I would characterize as a bit belligerent. He made some threatening noises. He made some threatening texts insofar as, you know, possibly legal repercussions. Made it sound like the sellers, who we didn't know, might be very litigious.

And so we were like, We better think this over really carefully. We don't want to be shaken down. We want to make good decisions on the basis of our own reasons. We also like the idea of being able to acquire a property, an inholding within Glacier National Park. That's just a magical idea, but it can't supersede all other interests.

One of the things that we did while sort of weighing the pros and cons was that we thought, Let's use an old technique for understanding your own interests -- you know, your own desires -- desires over interests -- let's flip a coin -- not to let the coin decide, not to let chance decide what to do, but to gauge your reaction to the outcome. And if you flip the coin and the coin



tells you, for instance, Go forward, but you didn't want to go forward, and you're like, Oh, man, that's not what I wanted, then you would have some information about your own mind that you were having a hard time surfacing before or vice versa.

And when we, you know, went to -- I didn't even flip a coin. I simply imagined flipping the coin and having it say, Don't go forward, and my stomach clenched, like, Man, that would be a bummer. I really like the idea of an inholding in Montana. And so I related that to Scott. This was sort of just a filling in on, you know, how we're thinking about it, why we would continue to proceed.

You know, again, at this point we had no knowledge that there was some time pressure that was, you know, pressing to move forward the closing date. And so I was just sharing with Scott -- you know, I kept trying to share with him my mind and how I was approaching the decisions around purchasing the property, just, you know, hoping that it would help him to know where we're coming from and to serve our interests as our agent. Does that make sense?

Q And that's what I had largely understood from his discussion. I didn't know whether there was a little coin toss or not. As I understand it, in your mind you



were saying, All right, heads we close, tails we walk away from this?

A As a hypothetical exercise. As a hypothetical exercise to know what it tells you about your own mind or your own heart on it. Not as a literal -- again, if there were a decision made in that moment, then in that moment Scott should send us the Notice of Release of Contingencies that he sent us later, and we can sign it all. That's just not where we were. We didn't do that.

We said -- you know, he continued to get the reports, go over the reports with us, do the full review. You know, prior to sending the letters, he was still talking -- you know, as I said, he was still sending us the information on the water rights. It was not a closed book. It was not a done deal.

Q To be clear about the water rights, though, you received that back on October 12, right?

A He sent something about it on the 28th again, if I'm remembering the date correctly. He had done some further -- sort of reaching out of, Here's some information on insurance, and here's some information on water rights; are you concerned about these? Et cetera.

Q My recollection and -- strike that.

The information that I understood that he provided, after the initial information on October 12 with



the appropriation document that you saw, was that he had checked his files and that all of them said "provisional permit."

A And just to be clear, I think the appropriation, if I've got the language right, that was the document that we didn't see. We only ever saw the abstract.

We raised questions -- I raised questions about the provisional permit, and the provisional nature of it specifically. Critically, Hey, I know what provisional means. I watch Formula 1. Nobody wants to be a provisional winner or a provisional pole-sitter. They want to know that they've got it.

And we discussed that as a potential complication on the transaction; this can't be something afterwards, after the ink is dry and the money has changed hands, that those rights expires. It can't go away; it has to be completed.

And the information he related to us was, I looked at other properties; they also have it. That doesn't answer the question. We needed to make a decision based on the information that was relayed to us, and we made -- you know, we made a decision that in totality with everything else and knowing that there was a contingency that protected us, it was too big a gamble to make; it was too big a roll of the dice.

**And there was on -- you know, two different counts -- on the mold/moisture retention and on the water rights; they were two big throws of the dice -- on top of the fact that we know from seeing it firsthand that there's traffic visibility and the noise; it's also at odds with something we had described as our interests. In totality we just can't go forward with that.**

Q Jumping back a little bit in the process here from the end, my understanding was that you were originally going to inspect the property on October 12; is that correct?

A **That's correct. Well, I mean, it was a date under discussion. We had hoped to be able to line that up, and we were not able to line that up. We were not able to get an air itinerary for then.**

**MR. SIMPSON:** Let's take a short break. I think I'm almost done.

(Recess taken 2:45 p.m. to 3:08 p.m.)

Q (BY MR. SIMPSON) Matt, back on the record here. I'm handing you what I've labeled as Exhibit 10.

(Exhibit 10 marked.)

Q (BY MR. SIMPSON) Barring some unforeseen development, this should be the last exhibit I'll be showing you today. Do you recognize the email exchange in this document?



A **Yes, I do.**

Q What is this, if you could summarize for us?

A **This is an email from me to Scott copying Rachel and Tracy, and it's an acknowledgement to Scott's answer to my question regarding the findings of mold in the initial building-inspection report. And this was in response to my prodding him, because I had asked about it once already -- I believe at -- certainly at least once -- and didn't get a response. And so I followed up to make sure, because the findings of mold on the property, as I mentioned earlier, were a big concern, because we had talked about it in the hypothetical following the Montana State disclosure about mold.**

Q On October 14, when Scott does respond, among other things he tells you that Cory's the guy who's recommended to do the mitigation work and he guarantees his work.

A **I see, yes.**

Q I guess my point was you were aware, at least, that Scott was telling you that Cory's mold-remediation work was guaranteed?

A **Yes. I now understand your question about any, you know, evidence that Cory guaranteed his work. I didn't pick up on that. And, yeah, I -- my understanding there was never a close read on this beyond, Hey, what**



**about the mold thing?**

**Yes, we're going to look at it. We have the guy. Cory is the guy. He's going to take care of everything. Everything is going to be great.**

Q Matt, have we covered all the reasons today why you and Rachel opted or decided to terminate the buy-sell agreement?

A **Is it okay if we review?**

Q Yes.

A **So there were -- high level the sale was conditioned on contingencies -- or multiple contingencies; there were three in particular that we relied on. Two of those contingencies you can think of as having two subparts. The inspection contingencies had the moisture retention and the mold. The well-related permitting had the provisional nature and the priority date. And then finally the property visitation was just -- you know, the traffic noise and visibility.**

**The completion of some of the other noted defects was purely context around, you know, level of comfort in knowing that the serious matters would be resolved adequately. We didn't try to rely on those to terminate the contract.**

**I think in my interrogatory response -- our interrogatory response, we also highlighted the fact that**



**in -- you know, in the end reviewing everything that had happened and critically because of the sort of -- after the dispute with Scott over the nature of our contingencies, he surreptitiously tried to sneak in a Notice of Release of Contingencies to us. He used language that was not -- it was indirect. He said, I have -- in fact, he said, I have language to send your way and have your person review. He hadn't brought it up by phone. The first we knew of the Notice of Release of Contingencies was when he sent -- when Tracy sent the document to us.**

**It wasn't the existence of a -- it wasn't the fact of there being Notices of Release of Contingencies that troubled us; that's what we expected in all this, that we had to arrive -- we had to arrive in writing a satisfaction of the resolutions, the remedies to the defects. But it was the fact that Scott denied that such a thing existed, pressured us at the end, you know, to hurry things along, make a decision, and slip that in under the wire. We reviewed the sort of deteriorating confidence in Scott over time.**

**And so, again, thinking in totality about the information we had on hand, we had known defects that we had highlighted as troublesome to us prior to, you know, the point of making our final decision. We evaluated**

**them. We had contingencies for them. We would have to contemplate moving forward in spite of them, that we would effectively waive them. We would have to do that in spite of the very high purchase price, and we would have to do that without confidence in the representation of our agent; that in the end we were not comfortable that he was actually representing us and our interests in this transaction; that in spite of earlier assurances, he was either struggling with the dual-agency conflict or just the -- you know, what the sale would mean to him personally. Incentives are powerful. And so we just couldn't overlook all of those things. I think that's a -- I think we covered most of that, but I want to make sure that I bring in the lack of confidence in Scott ultimately.**

Q Do you blame Scott for this transaction falling apart?

**A I don't blame anybody. I just think it happened. And I understand that everybody has a point of view, including me.**

Q I appreciate that.

**MR. SIMPSON:** Matt, I thank you for your time today, and I don't have any additional questions at this time.

**THE DEPONENT:** Thank you very much. Thanks,



Fred.

**MR. COLEMAN:** I don't have any questions.

(Whereupon, the Deposition of MATTHEW DUSEK concluded at 3:15 p.m., and signature was reserved.)



REPORTER'S CERTIFICATE

I, SHERI J. HAZLETT, Registered Professional Reporter and Notary Public, do hereby certify:

THAT I did report the foregoing transcript after having first duly sworn the witness to testify to the truth; and

THAT said transcript was taken at the time and place stated on the caption hereto; and

THAT the testimony of the witness was taken in shorthand by me and subsequently reduced to writing under my direction; and

THAT the foregoing is a true and correct transcription of all the testimony of said witness to the best of my ability.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal of office this 18th day of July, 2022.

SHERI J. HAZLETT, RPR and Notary Public
for the State of Montana
Residing in Flathead County
My Commission Expires 3/2/2025



AMENDMENT TO DEPOSITION FORM

Deposition of: MATTHEW DUSEK
Taken on July 5, 2022

In the Matter of GLACIER BEAR RETREAT, LLC ET AL. v. MATT DUSEK AND RACHEL DUSEK ~ Case No. CV 22-19-M-KLD

THE FOLLOWING AMENDMENTS SHOULD BE MADE:

| PAGE | LINE | SHOULD READ |
| --- | --- | --- |
| ___ | ___ | ___ |
| ___ | ___ | ___ |
| ___ | ___ | ___ |
| ___ | ___ | ___ |
| ___ | ___ | ___ |
| ___ | ___ | ___ |
| ___ | ___ | ___ |
| ___ | ___ | ___ |
| ___ | ___ | ___ |
| ___ | ___ | ___ |
| ___ | ___ | ___ |
| ___ | ___ | ___ |

___ No Amendments

I, MATTHEW DUSEK, have read the foregoing transcript of my testimony and believe the same to be true, except for the corrections noted above.

DATED this _____ day of _______________, 2022.

______________________________
MATTHEW DUSEK