**EXHIBIT E**

*Glacier Bear Retreat, LLC, et al. v*
*Matt Dusek, et al.*

---

*Scott Darkenwald*
*May 26, 2022*

---


*Charles Fisher Court Reporting*
*442 East Mendenhall*
*Bozeman, MT 59715*
*(406) 587-9016*
*maindesk@fishercourtreporting.com*



**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

GLACIER BEAR RETREAT, LLC,
GAIL L. GOODWIN and DARRYL C. SLATTENGREN,
Plaintiffs/Counterclaim Defendants,
vs.
MATT DUSEK AND RACHEL DUSEK,
Defendants/ Counterclaimants.

Cause No. CV 22-19-M-KLD

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION
OF
SCOTT DARKENWALD

BE IT REMEMBERED, that the videoconference deposition upon oral examination of Scott Darkenwald, appearing at the instance of the Plaintiffs and Counterclaim Defendants, was taken at 211 North Higgins Avenue, Suite 303, Missoula, Montana, on Thursday, May 26, 2022, beginning at the hour of 10:12 a.m., pursuant to the Federal



Rules of Civil Procedure, before Mary R. Sullivan, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public.



A P P E A R A N C E S

For the Plaintiffs/Counterclaim Defendants:
FRED SIMPSON, Esq.
Jenks & Simpson, P.C.
1821 South Avenue West, Suite 204
Missoula, Montana 59801
fsimpson@jenkssimpson.legal

For the Defendants/Counterclaimants:
SHANE P. COLEMAN, Esq.
Billstein, Monson & Small, PLLC
1555 Campus Way, Suite 201
Billings, Montana 59102
shane@bmslawmt.com



A P P E A R A N C E S

For the Deponent Scott Darkenwald:
BRETT P. CLARK, Esq.
Crowley Fleck, PLLP
900 North Last Chance Gulch, Suite 200
Helena, Montana 59601
bclark@crowleyfleck.com

**ALSO PRESENT:** Gail L. Goodwin, (Via Videoconference)
Matt Dusek, (Via Videoconference)
Rachel Dusek, (Via Videoconference)
Mark Anderson, (Via Videoconference)
Kelsey Sabol, (Via Videoconference)

I N D E X


DEPONENT: PAGE:

SCOTT DARKENWALD

Examination by Mr. Simpson................. 7

Examination by Mr. Coleman................. 125

Examination by Mr. Clark................... 265

Examination by Mr. Simpson................. 276

EXHIBITS:

Exhibit 1 File Glacier Sotheby's International produced in response to the plaintiffs' subpoena........ 17

Exhibit 2 Text messages...................... 237




S T I P U L A T I O N S

It was stipulated by and between counsel for the respective parties that the deposition be taken by Mary R. Sullivan, Freelance Court Reporter and Notary Public for the State of Montana, residing in Missoula, Montana.

It was further stipulated and agreed by and between counsel for the respective parties that the deposition be taken in accordance with the Federal Rules of Civil Procedure.

It was further stipulated and agreed by and between counsel for the respective parties and the deponent that the reading and signing of the deposition would be expressly reserved.



THURSDAY, MAY 26, 2022

Thereupon,

SCOTT DARKENWALD,

a witness of lawful age, having been sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

**MR. SIMPSON:** Would you please get a roll call of everybody that's here?

**THE COURT REPORTER:** If I could have everyone state who they are that's appearing remotely, please?

**MS. GOODWIN:** This is Gail Goodwin appearing remotely from St. John's. Thank you.

**MR. ANDERSON:** Mark Anderson appearing remotely from Chicago, Illinois.

**MR. DUSEK:** Matt Dusek appearing remotely from Belmont, California.

**MS. DUSEK:** Rachel Dusek --

**MS. SABOL:** Kelsey Sabol from Crowley Fleck appearing remotely from Helena, Montana.

**MS. DUSEK:** This is Rachel Dusek appearing remotely from Belmont, California.

EXAMINATION

**BY MR. SIMPSON:**

**Q. Good morning. Would you please state your name and business address.**



A. Scott Darkenwald. 204 Central Avenue, Whitefish, Montana.

**Q. And would you prefer that I address you as Scott? Mr. Darkenwald?**

A. Scott.

**Q. Scott, I'm Fred Simpson. I represent the plaintiffs in this case, Gail Goodwin, Darryl Slattengren and Glacier Bear Retreat, LLC. We had a -- a chance to meet briefly before your deposition, but other than that, have you and I ever spoken before today?**

A. No.

**Q. Okay. This is my opportunity on behalf of the plaintiffs to get to ask you questions about this case, find out information about this case, and -- and as well, the Duseks' counsel will have that opportunity after I'm finished.**

**To make sure that we get a good record here, there's some basic ground rules that I'd like to cover with you first. You may have already addressed these with your counsel, but I'll try to go over them briefly.**

**As you can see, our court reporter is taking down everything that's said today**

Page 37

**Does that look accurate?**
A. Yes.
**Q. What was the sale price?**
A. [redacted].
**Q. What was the amount of the earnest money that the Duseks were putting down?**
A. [redacted].
**Q. And what was their requirement with respect to -- was there financing or cash at closing?**
A. Cash.
**Q. Prior to the Duseks signing this, did you go through this document, the buy-sell agreement, with them line by line?**
A. Yes. I don't recall how we did that, whether we sent them a draft to look at or just sent them a copy for them to look through and then ask me questions on what they did or did not understand.
**Q. Do you know if the Duseks were represented by counsel at the time that they signed the buy-sell agreement?**
A. I do not believe they were, but I don't know.
**Q. Okay. Do you have a -- a practice or**

Page 38

**procedure when you've got -- when you're a buyer's agent about going through a buy-sell agreement with them before they sign it?**
A. Yes.
**Q. And what -- what is your standard practice?**
A. My standard is just to go through it with them, highlight what are, you know, sort of the critical areas, and -- and also highlight what was -- is just draft language in every buy-sell. It's standard practice for me with out-of-state buyers to recommend that they use a Montana buy-sell agreement because the court system understands the Montana buy-sell agreements, and it's much cleaner if you get into a situation like this because the Montana judicial system understands these documents, have been through them many times. And if -- For instance, if a California attorney drafts the buy-sell, it will -- it complicates the deal considerably.
**Q. Did you follow that practice with the Duseks in this case?**
A. I assume I did because I do with everybody.
**Q. Okay. Do you happen to know -- Well,**

Page 39

**first of all, is this a Montana Association of Realtors form buy-sell agreement?**
A. It is, yeah.
**Q. Do you know who drafted that?**
A. Well --
**Q. The form, not the fill-in-the-blanks part.**
A. Yeah. I have a sense that -- My understanding is that there's a committee, a forms committee, contract committee, I'm not sure what it's called. The lawyers that weigh heavy in on that are Zane Sullivan and Jamie Bowditch, and so they obviously know the documents as well as anyone.
**Q. Who actually filled in the blanks on this document with the -- who -- who came up with the information to fill in those blanks?**
A. Well, it would be in conjunction with my clients. Tracy would be doing the actual typing.
**Q. Data entry.**
A. Data entry.
**Q. Okay.**
A. I would normally be doing the -- the verbal entry.
**Q. Okay. It's a -- It's a collaboration**

Page 40

**between yourself and Tracy and then the -- the client.**
A. Whichever client I'm working with, correct.
**Q. Okay. I want to direct your attention to another copy of this buy-sell agreement, Scott, because it's got some notes on it, and it's -- it's in that same binder you're in, and it starts at page GSIR SDT 395. It's about two-thirds of the way back in that binder.**
A. Okay. I got it here.
**Q. Okay. You're at the page.**
A. Yes.
**Q. Is that your handwriting in red ink on this page?**
A. It is.
**Q. Okay. Same thing throughout this document, the handwriting in red ink is yours?**
A. Any written on any of these would be mine.
**Q. And the highlighting, is that yours as well?**
A. That's mine as well.
**MR. COLEMAN:** Can I clarify what -- when you say "this document," which pages are we

talking about? The entire Exhibit 1 or just --
**MR. SIMPSON:** 395 through 404.
**MR. COLEMAN:** Okay.
**BY MR. SIMPSON:**
**Q. Is that accurate, Scott? That's -- That's the page range that I was referring to, but I appreciate counsel's comment that we want to have a clean record here that we're looking at the buy-sell agreement on those pages.**
A. Correct.
**Q. Okay. Do you recall when you made the notations on this document?**
A. On the date that I wrote it. So I -- I put -- When I -- after I went through this particular document with Matt and Rachel on the phone, it would have been on 10/28, and then I would have made that note on there that I went through the entire contract with them.
**Q. So that's down near the end of the timeline --**
A. Right.
**Q. -- where you're talking about. Okay.**
A. Exactly.
**Q. Were -- Were some of these notes made earlier? If you look at page 395, line 29, that**



talks about the earnest money. It says [As Read]: "Received 10/6/21."
Was that made contemporaneous with their deposit of the earnest money or was that made later on, say, 10/28?
A. It probably was when we received it.
**Q. Okay.**
A. But I could have when I was going back through, you know, notes to just make it easy for myself to understand the timing. I could have inserted it then.
**Q. Okay.**
**MR. COLEMAN:** And I'll object. It doesn't say "Received" anywhere. It says R something something apostrophe capital D.
A. That's abbreviated for "received."
**MR. COLEMAN:** Is it?
A. REV --
**MR. COLEMAN:** Okay.
A. REV apostrophe D.
**MR. COLEMAN:** Okay.
**BY MR. SIMPSON:**
**Q. Okay. Is that a standard practice that you have to annotate a buy-sell like this during the course of a transaction?**



A. I annotate everything.
**Q. Okay.**
A. I have a bucket -- or a coffee mug full of highlighters and colored pens, and kind of old school, I understand, but when I have something that I want to remember, I immediately make a note. I -- That's why I print everything. I get an email, I pull it up, I hit print, walk to the printer, get the -- get it, put it in my file. If it needs a note, I put a note on it.
**Q. And you -- you don't worry about trying to save something electronically?**
A. Ever.
**Q. You're old school, you print it?**
A. I print it.
**Q. Okay.**
A. Because I know that Tracy will keep it electronically, but, you know, she wouldn't have notes like I have.
**Q. Yeah.**
A. That's why I -- I like my notes because it -- it's helpful in a situation like this.
**Q. Do you recall the Duseks asking you any questions about any of the terms of the buy-sell agreement before they signed it?**



A. Not really. Matt's very thorough, as is Rachel, and, you know, we went through it. I'm sure there were questions because they're both very thorough and ask really good questions, so I don't remember -- you know, there was no -- there were no challenges in that conversation. I mean, intellectual challenges, but we certainly would have discussed it.
**Q. Do you recall having any conversation with either Matt or Rachel before they signed the buy-sell that there was some question about -- or some issue with water rights that needed to be addressed on the property?**
A. Yes.
**Q. Tell me about that discussion.**
A. Well, Gail told me right after we had agreed to take the listing, she said -- she called me and said -- I don't -- she may have texted me, I don't remember -- and said when the well was drilled, the well log was not recorded. And so I said to her we will have to disclose that right away to whomever looks at the property.
So in the buy-sell where it talks about water rights? Where's that? On lines -- this is 399 and then lines 237 through 238, essentially,

A The thrust of it was that we were seriously considering terminating the agreement. It was more than a weighing of the options. We had not settled that that's what we were going to do. And we had concerns.

We wanted -- you know, sort of the -- on a couple of occasions -- a few different occasions, you know, I stressed to Scott we wanted all this to play out in good faith. We didn't want to short-circuit any efforts, but we also didn't want to prevent the sellers from being able to go find their best buyer, if we weren't it. And so we were considering terminating the agreement at that point.

Q Let me --
A Go ahead.
Q Unless there's a lot more to it --
A No, no. Obviously, I was trying to think back to the time.
Q Do you recall telling Scott the reasons why you were considering terminating the agreement?
A No. It's sort of an interesting feature of it. I didn't really get the opportunity to discuss the whys. So Scott's attitude changed instantly. He was very -- he was very kind throughout, and he was very affable in all of our interactions with him, and in that conversation you would have thought I ran over the man's dog. He suddenly



became very disagreeable with us over it, which was shocking, because he's our agent -- he's our agent, too. I'm not suggesting he's exclusively our agent, but he's also our agent.

And, you know, as I say, we wanted to discuss sort of holistically where does this stand. And in spite of the fact that even that morning he was talking to us about our contingencies, in that conversation he suddenly denied that we had any contingencies available to us.

Q Let's back up, then, to the morning where you said you were discussing contingencies with him. What was that discussion?
A Sorry. I think it was by text or email. Most likely text, because mostly it was by text.

He had referenced how we were proceeding with the contingencies, and, you know, I think it was in reference to the various remediation work and so forth. I think on the 25th -- on the 25th I think it was the case that the mold remediation was finishing up. I know we hadn't received the mold report yet, but I think remediation was concluding, and some of the other work had been accomplished and was soon to be accomplished. I think it was sort of a general comment about, Things were coming along well.

He had pushed on a couple or a few occasions to



try to accelerate closing, and we'd sort of gently rebuff and say, We're not opposed to closing early, A, if we proceed to closing, and, B, if everything is in place on our end, that we need to make sure that any entities are in place to take ownership, that we've settled on how to do that and so forth. He knew that. I think he had referenced that on the morning of the 25th, from memory.

Q And then during the conversation or conversations -- to bring us back up to later in that day -- you told Scott you were considering terminating the agreement, and --
A Yes.
Q -- I believe you testified earlier that you didn't feel like you had a good opportunity to tell him the reasons why.
A Because he moved into more what -- you know, what I took to be a defensive posture, suggesting this was something that was counter to what he wanted.
Q Did he tell you he believed that the contingencies had expired at that point?
A He did.
Q And what was your response to that?
A I said, "No, Scott. If the wind blows wrong across the property, we have an out," remember? Because we had spoken at length -- I said we would no doubt return



to the contingencies. We had spoken at length about the contingencies we wanted to have in place in this agreement. And his words to us were -- you know, after we had put this all together, and in particular with the personal-visitation contingency -- his exact words were, "If the wind blows wrong across the property, you're out."

And so it had not even entered our minds on the 25th that there would not be contingencies available to us, and we did not believe that it was the case, that there were not contingencies available to us. The word he used was that the contingencies had been "forfeited" in serving the Inspection Notice.

Q Before we go back into your discussion with Scott about the contingencies and your understanding of those when the contract was signed, was there a discussion with Scott on the 26th where you told him you were going to proceed to closing?
A We were going to proceed toward closing, which is to say we were going to continue forward -- we still -- you know, pending all the work that was ongoing. We needed to review the mold report. We needed to see everything was finished up. We needed to do a final review.

I think this was one of the things, you know, again, like with repeatedly discussing with us moving up

**Q. Okay. So you get the inspection report, you go over it in some detail with Mr. and Mrs. Dusek?**
A. Yeah.
**Q. I -- I'm going to take a guess here, tell me if I'm wrong, but the next thing you do is you prepare the inspection notice.**
A. Yes.
**Q. Before we get to that, did you have any communications with Gail about either your conversation with Kelly Quinn after he concluded the inspection or -- or what was in his written report?**
A. I would have only talked to Gail after -- if it was okay with Matt and Rachel. But Matt, you know, we would have gone over it. I mean, everybody knew there was mold right away 'cause they -- you know, we had to get somebody out there to address it.
**Q. The mold was not something that was obvious until you removed the insulation; is that right?**
A. Correct.
**Q. Okay. So tell me how the inspection report comes into being.**



A. Well --
**Q. I'm sorry, the inspection notice I think I'm using.**
A. Oh. After I talk with the buyer, then we agree on what we should ask the seller to remedy, and then we create the -- and I tell Tracy what to type up, and we create the inspection notice results/remedies. And that -- And then basically what that says is it says to Gail or in this case the buyer, "We as" -- or the seller, "We as the buyers are asking you to remedy the following," and so then you -- then Matt and I and Rachel agree on what needs to be remedied, we then send that off to Gail, she then -- it's up to her and us to help as -- you know, gather the -- the appropriate remediers [sic], if that's a word, and get everybody going on the remedies.
**Q. Just for ease of reference, I'm going to direct your attention, Scott, back to binder No. 1, and it's -- and we're going to look at the inspection -- the inspection notice.**
A. Okay. What number is it?
**Q. Turn, if you would, please, to page 433, and that's the start of an email exchange which includes the inspection notice and the owner's**



**property disclosure.**
A. Just excuse me one minute. I got a kink in my binder here.
You're on 433?
**Q. Right.**
A. Okay.
**Q. That has to do with the OPD.**
**MR. CLARK:** Why don't you pull that over here so he can hear you. Thanks.
**BY MR. SIMPSON:**
**Q. And I -- I think, if you look down at 435, I think it also included the pages that follow both the property disclosure statement, as well as the inspection notice.**
A. Okay.
**Q. And take a minute and thumb through that so you can familiarize yourself with those pages, Scott.**
A. Yes.
Okay. Yep, you're right. So there's the OPD, which is the Owner's Property Disclosure statement. That's what they disclosed that they know prior to the inspection.
**Q. And Gail and Darryl never saw the full inspection report during this process.**



A. Not until -- I can't remember if we were -- if I was given permission to give them the whole report or just the pages relevant to results/remedies. I'm sure it's in here somewheres --
**Q. Sure.**
A. -- which we did.
**Q. You bet.**
A. The OPD is something that the -- you know, we do a lot of Docu-Signing in this business now. The OPD, the owner property's disclosure statement, we can't help the -- the seller with that. They actually have to print that and fill it out and send it back to us because that's their disclosures. There's a subsequent document that if we know about something that's an adverse material defect that we as brokers can fill out and get into the file.
**Q. There was not one of those kinds of documents --**
A. No.
**Q. -- in this case, was there?**
A. No.
**Q. Okay. So as I understand it, the inspection notice starts on page 44 --**

A. 2.
**Q. -- 2?**
A. Correct.
**Q. How was it determined which items to include there, and starting on line 11 through line 23?**
A. That would have -- Those would have been determined in the conversation that I had with Matt, and I can't remember if Rachel was on the line. I know she knew about -- I think she was, but I -- I -- it's probably in the notes somewheres in these binders. But certainly it was with Matt where we said, "Okay, these are the things that we want to ask to have remedied."
**Q. It says, for instance -- The first one** says "Page 12, Section 2, Item 13: Drainage."
A. Right.
**Q. Was that pulled directly from the Quinn home inspection report?**
A. That -- Yeah.
**Q. Okay. Same with each of those line items.**
A. Exactly.
**Q. Okay. You discuss what to include in this "Inspection Notice Results/Remedies" with --**



**at least with Matt, possibly with Rachel, in order to compile what should go in this document.**
A. Correct.
**Q. All right. And they were in agreement with that.**
A. Correct. Yeah, they have to sign it.
**Q. And they sign it on the next page, right?**
A. Right.
**Q. And are the -- is the listing on the next page of the items to remedy, does that match what's on page 442?**
A. Yeah. Basically what page 442 is it just identifies where to find in the report what you're going to ask them on page 2. Then on page 2 you're actually asking for them to fix it, give us a credit, whatever.
**Q. If -- So you -- you prepare this. Does Tracy at your office --**
A. Mm-hmm.
**Q. -- physically type this in? Yes?**
A. Mm-hmm. Correct, yes.
**Q. And then the first step after that is to send it to Mr. and Mrs. Dusek?**
A. Correct.
**Q. They apparently signed it, it looks like,**



**by -- perhaps by DocuSign on the 15th of October of 2021?**
A. Correct.
**Q. Do they ask you any questions about this before signing it?**
A. Yes. We went through the report, talked about everything, so I'm sure that -- I don't remember what the questions were, but everything that would have ended up on this report we would have talked about.
**Q. And what does it say on line 54 on page 443?**
A. "Seller, at seller's expense, to remedy the following."
**Q. Back up one line. Maybe we're off by one.**
A. "Buyer elects to negotiate the items of disapproval described above and offers the following resolution:".
**Q. Okay. And then what's your understanding of the effect of this document on the buyer's right to back out for adverse conditions in the property?**
A. Well, it -- they can choose not to -- not to -- they can just say, you know, because the



inspection is -- we -- we think the remedies can't be remedied, they have the option to back out. In the buy -- or in the buy-sell, it says when you get to the inspection remedies, if there are issues, we have X number of days to come to a conclusion which creates this document so that both parties agree and that keeps the contract intact to go forward.
**Q. Which is, in fact, what happened here.**
A. Exactly.
**Q. Okay. So Mr. and Mrs. Dusek sign on October 15, 2021, they send it back to you or the DocuSign sends it back to you. What do you do next?**
A. Provide it to Gail.
**Q. Okay. Did you have a discussion with Gail about what was being required under this inspection notice?**
A. Absolutely.
**Q. Do you recall the substance of that conversation?**
A. She just said fix whatever needs to be fixed or we'll -- we will fix whatever needs to be fixed.
**Q. No reservation on her part to move**

**forward and get these items completed.**
A. None.
**Q. Okay. And then, in fact, did -- did she and Darryl sign this on the 17th of October, 2021?**
A. Yes.
**Q. And they returned it to you on, looks like, if we refer back to the email at the beginning of this chain, page 4 -- 433, -34 and again on 435, 436? I'm sorry, 435.**
A. So what are you -- I -- Rephrase.
**Q. Gail -- Gail sends the signed copy of the inspection notice results/remedies back to you on October 17, right?**
A. Yes.
**Q. And then your office forwarded it to Mr. and Mrs. Dusek. Right?**
A. Correct.
**Q. Okay. And did -- did the Duseks acknowledge receipt of that signed -- fully signed inspection notice?**
A. I don't know. It should be in here.
**Q. Take a look at page 377.**
A. 377?
**Q. Yeah.**
A. Oh, yeah. It says "Thanks, Scott!"



So they receive it.
**Q. And if you look at your email just below the very top, you also reference that she was holding off on sending those documents till the water rights were resolved.**
A. Right.
**Q. So at this point what was your understanding as to what Gail's responsibilities were to move forward with fixing these things?**
A. Rephrase, please? I was reading the --
**Q. Oh, sorry. Go -- Finish -- Finish reading.**
A. Well, this is just where I'm referring to the OPD, not the inspection notice.
**Q. I think it was -- I think they were both.**
A. Oh, they were both.
**Q. Yeah.**
A. But what I'm talking about in the sentence here is that they didn't have the OPD until this point in time.
**Q. This -- But this email chain also forwards -- it forwards the OPD and the inspection --**
A. Correct.
**Q. -- notice. Okay. So what's the next**



**step in --**
**MR. COLEMAN:** Counsel, I apologize. OPD is what?
A. Owner's Property Disclosure statement.
**MR. COLEMAN:** Which document number is that?
**MR. CLARK:** We were just on it a moment ago.
**MR. COLEMAN:** My suggestion, if that's easier, but I want to make sure we're talking about the right one --
**MR. CLARK:** Yeah.
**MR. SIMPSON:** It was -- Hang on. Turn to 43 --
**MR. CLARK:** 437.
**MR. SIMPSON:** --- 7.
**MR. COLEMAN:** Through 441?
**MR. CLARK:** Yes.
**MR. COLEMAN:** I -- I cut you short there, or is there an -- an addendum to that?
**MR. SIMPSON:** Let's --
**BY MR. SIMPSON:**
**Q. Scott, let's look at that --**
A. What page?
**Q. Just so we've got the -- turn to**



**page 436, and it's a little obscured on the bottom by some of the other print.**
A. I got it.
**Q. So that says "MONTANA ASSOCIATION OF REALTORS PROPERTY DISCLOSURE STATEMENT."**
A. Correct.
**Q. The next page says "OWNER'S PROPERTY DISCLOSURE STATEMENT MONTANA ASSOCIATION OF REALTORS STANDARD FORM"; is that right?**
A. Correct.
**Q. And that goes through page 441.**
A. Correct.
**Q. And so that set of documents, that's the owner's property disclosure?**
A. Correct.
**MR. COLEMAN:** So I don't mean to be pedantic. What -- What's the exact page range of what we're calling the OPD? I -- I don't --
A. It is --
**MR. COLEMAN:** I don't want to object on form if I can avoid it.
A. It is 437 -- well, it's actually 436 through 441. And again, clarify the OPD is something that the seller has to fill out on their own. I can't help them with that. That's why

Page 77

**were those all completed satisfactorily, to your knowledge?**
A. Yes.
**Q. Do you remember the -- the date that the -- the work was finished? And to be clear, I mean the work to comply with the inspection notice.**
A. I have it someplace.
Well, I have -- I have one note on the timeline says Line 244, [As Read]: "Buyer reserves the right to visit the property during 'inspection notice'." Buyer visited 10/19 after it was done and an inspection notice deficiency would have had to have been in writing by 10/26/21.
**Q. After Gail hires these contractors and Cory does -- goes out and does the mold remediation, then Quinn goes back out and reinspects the property.**
A. Exactly.
**Q. And I'll refer you to binder No. 2, your -- I'm not sure which binder you're on. What -- This is page 716. Next binder. Sorry.**
A. Page what?
**Q. 716.**
**MR. CLARK:** There you go.
A. Okay. I'm there.

Page 78

**BY MR. SIMPSON:**
**Q. So Gail has the work completed by the contractor and, in particular, Cory at Advanced Restoration. Does she give you notice that the work's done or do you hear from the contractors that the work's done so that when --**
A. I hear from the work -- I -- I make sure that the work is done.
**Q. Okay.**
A. 'Cause I'm also representing Gail and she's not there, so I have to be able to say to Gail the work is done, I have to be able to say and Matt and Rachel the work is done.
**Q. Okay. So say the work's done, then what happens? What's the next step in this process?**
A. Really is no next step once the work is done.
**Q. Quinn goes back out -- After you learn the work's done, somebody notifies D. Quinn Construction to go back out and do a reinspection.**
A. Correct.
**Q. Was that you?**
A. That was me.
**Q. And that results in a building inspection analysis report dated 10/27/21. Is that right?**

Page 79

A. What page is that?
**Q. That was 716.**
A. Yes.
**Q. That -- And I'll refer you to page 760, which appears to be the email from Quinn sending you the reinspection for Glacier Bear dated October 27, 2021.**
A. Yes.
**Q. And so that goes both to yourself and to the Duseks. Is that right?**
A. Correct.
**Q. After you received the reinspection report, did you have any concerns that there was anything left hanging that Gail hadn't accomplished?**
A. No.
**Q. And I want to also refer you to Quinn had a separate report with respect to the mold.**
A. Correct.
**Q. All right. And take a look -- Sorry, we're jumping around here so much, Scott, but there -- there are multiple versions of this, but I know we can find one starting on page 8. 08.**
A. Which book?
**MR. CLARK:** That would be the first one.

Page 80

A. This one here?
**MR. CLARK:** No. Right here. Might be time to retire your binder once you're done with it.
**MR. SIMPSON:** Yeah.
**MR. CLARK:** Okay. There you go.
A. Okay. So hang on.
Okay.
**BY MR. SIMPSON:**
**Q. What is it we're looking at starting on page GSIR 008?**
A. This is Advanced Restoration. This is the reinspection report, I think, about the mold. Yes, mold, Glacier Bear.
**Q. Prepared by Quinn -- D. Quinn Construction.**
A. Correct.
**Q. So is this David Quinn that does this work?**
A. Yeah. It says [As Read]: "Prepared by David Quinn."
**Q. And what's the date of the limited microbial inspection?**
A. October 26, 2021.
**MR. COLEMAN:** I'm sorry. What page are

we on?

**MR. CLARK:** 8.

**MR. SIMPSON:** 8.

**BY MR. SIMPSON:**

**Q. Is that your handwriting in the middle of the upper third "ALL ok per Matt Rachel 10/28/21"?**

A. Correct.

**Q. What led to you making that notation on that report?**

A. A phone call.

**Q. Do you recall the phone call with them?**

A. I do. I don't recall every word that was said, but I recall that we had the conversation. I would have said, "Are you guys good with this?"

This was after Matt had talked to David Quinn, and -- and the substantive piece of that was that, you know, he -- it's complicated. We all acknowledge that, you have to be a scientist, you're not going to get it in a phone conversation and -- but that Quinn, I think, calmed him -- that there wasn't a significant issue, and he suggested just have it retested in six months.

**Q. And as we discussed earlier, if there was some finding, Cory would come back out.**



A. He would have to, yeah. Well, he -- in theory he would have to unless he went out of business or something like that.

**Q. You want to jump back in time a little bit to I believe it was October 19 when Mr. and Mrs. Dusek visited the property.**

A. Correct.

**Q. What do you recall about their visit?**

A. We had a beautiful day, which was nice. They spent time with me walking through everything. I showed them exactly where the mold issue was. We walked -- We walked around, looked at all the inspection items. Matt and I both commented on while they did fix the -- the drainage and the railing, maybe it could be better, and I think that -- what I don't remember is they -- I made them redo the railing once, and I don't remember whether -- when that was before the 19th or after the 19th. The next -- The fix on the railing was still not great, but functional from -- from -- for where it was.

**Q. Where was the railing located?**

A. It was in the guesthouse upstairs, and it sort of protected what was, like, a loft with a hot water heater that sat to the side.



**Q. When you say "the guesthouse," this is not the main house.**

A. This is not the main house.

**Q. How many structures are on the property?**

A. Two. Well, three with a garage.

**Q. Okay. How long are you on -- How long are the Duseks on the property during the inspection?**

A. So I spent, I don't know, an hour to two hours with them, and then I said, "Why don't you guys just -- we'll just leave it open. Why don't you guys just absorb, do whatever you want to do till you fly out later that afternoon," 'cause I found over the years that it's helpful to let couples have time alone in a house so they can talk openly and candidly amongst themselves and not feel like they have to remember to talk about something later. And so we just left them alone for the rest of their time that day, so I think they probably had a -- you know, they had at least several hours more after I left them.

**Q. Did you meet up with them later that day?**

A. No. Then they flew home and then we talked, and --

**Q. Was there anybody else besides Mr. and**



**Mrs. Dusek and you present during their visit to the property?**

A. I think Tracy was there, but I'm not positive. I wanted her to meet them, so my -- my gut is that Tracy was there.

**Q. Who locked up after they finished?**

A. I don't remember. One of -- One of -- I would have went back or their caretaker would have went back or --

**Q. Okay.**

A. -- I -- I don't remember.

**Q. Was there a follow-up call the next day or that night?**

A. Yes, there was a follow-up call because I can remember -- and there's a note in -- within here where Matt mentioned that he -- there was more noise on Camas Road than they expected; that the house was better than they expected; that the property wasn't as detailed out as they expected; but that they -- but that they were more excited than when -- about the purchase than when they came. I mean, they left more excited than when they came.

**Q. There weren't any spoilers.**

A. There weren't any spoilers, yeah.

Page 85

**Q. If you turn to page 432, Scott, and I -- it's the same binder you're already in.**
A. Got it.
**Q. What -- What is that page?**
A. This is my note to Gail about the trip. Just kind of letting her know how it went.
**Q. The -- The handwriting on here again, that's yours?**
A. Correct.
**Q. Item 2. says the railing infant --**
A. That means in front.
**Q. [As Read]: "In front of the water heater looks poorly." There's some following that, but then you've got a notation in handwriting that says "GAIL will fix."**
A. Correct.
**Q. All right.**
A. Yeah, 'cause I know the first time it wasn't good. I know it was fixed at least once.
**Q. Okay. And then there are a couple notes down on 7. and 8. You wrote "GAIL" next to those two numbers. What did that mean?**
A. That means it was up to Gail to see that that gets taken care of.
**Q. Do you know if she did?**

Page 86

A. Yes.
**Q. She -- She followed up on both --**
A. Mm-hmm.
**Q. -- those things?**
A. Yes. And -- And I did with Cory, and then I went back to make sure the mechanical room was cleaned up.
**Q. All right. And then what's the issue about the kayaks?**
A. Oh, Gail just wanted Duseks to know that the kayaks needed to get permit, she'd be happy to help with that, and that she texted Matt -- or I -- I -- I must have texted Matt the P.O. Box for, oh, WG, I don't know what -- maybe it's WC, watercraft, and that the bikes and the kayaks will -- would stay with the property.
**Q. All right. Did the Duseks indicate any intention to you during or immediately after their visit that they weren't planning to move forward with the purchase?**
A. At what point in time?
**Q. Well, let's say the 19th or the 20th of October.**
A. No.
**Q. Okay. As far as you knew, based on what they were telling you on the date of the visit, they were intending to move forward with the closing?**

Page 87

A. The date and the date after.
**Q. Okay.**
**MR. COLEMAN:** I'm sorry, what was that?
A. The date and the date after when we talked.
**BY MR. SIMPSON:**
**Q. I can refer you to the page, if you want, but at some point do you recall providing the title document to the Duseks?**
A. Mm-hmm, yes.
**Q. Do you know what they did? Did they tell you what they did after they received the preliminary commitment?**
A. Yes, I -- I went through it, but then I also called the manager of the title company that does the -- the reports, not the escrow stuff, and asked her to look at it 'cause she's very thorough, been at it for 25 years, probably, and she reviewed it, didn't see anything unusual. I let Matt know that. That's -- You'll see in the -- my notes KK, that's her initials.
**Q. Is that Karla?**

Page 88

A. Kemm.
**Q. Kemm.**
A. She's the one that signed the -- you would have saw in the title report. She signed that title report. Though one of her subordinates would have prepared it. Then --
**Q. If it's helpful to -- to reference it, Scott, I'll tell you the page number. It starts at 092.**
A. Same binder?
**Q. Same binder.**
A. Okay. I'm close.
Okay.
**Q. Does that look like it starting at 092?**
A. That is it.
**Q. Okay. Karla Kemm, K-e-m-m; is that right?**
A. Correct.
**Q. There were a couple -- I believe there were a couple mortgages listed on the exceptions. Was your understanding that those mortgages would be paid off at the closing?**
A. Yes.
**Q. Okay. Were there any concerns that you were aware of that the Duseks had with the stated**

**title as shown on the preliminary commitment?**
A. No. In -- In one of these documents, I asked Matt to have his attorney review. His attorney did review, and I made a note that -- that Karla Kemm was okay with it and Matt Dusek's attorney was okay with it.
**Q. Okay.**
A. "Title all good" or I said something like that. I can't remember.
**Q. All right. At some point during the course of the transaction, did you learn that Glacier Bear Retreat, LLC was the actual titled owner of the property?**
A. Yes.
**Q. Okay.**
A. I don't remember when.
**Q. Okay. And -- And are you -- Do you recall that Mr. and Mrs. Dusek also learned of that fact?**
A. Yes.
**Q. Did they voice any concern to you that it was Glacier Bear Retreat, LLC instead of Gail and Darryl?**
A. No. Matter of fact, Matt was trying to figure out whether he would want -- would want to



buy it and keep the LLC and was going to get advice on that. I don't remember all the details of that. That's -- I mean, when we do these closings, you know, sometimes the day before closing it goes into a trust, it goes into an LLC, it -- they buy it together. That's a moving target on most deals right up till the last week.
**Q. The fact that it was in an LLC instead of held by Gail and Darryl individually wasn't an issue.**
A. No, no. Not that I know of.
**Q. Okay. Nobody ever told you it was a problem.**
A. No. Yeah.
**Q. Okay.**
**MR. CLARK:** Can we go off the record for just a sec?
**MR. SIMPSON:** You bet.
(Recess taken from 12:13 p.m. to 12:14 p.m.)
BY MR. SIMPSON:
**Q. Back on the record here.**
**I think we've already covered the water rights in some detail, but I want to -- I want to just nail down what was in your file. If you look**



**at page 551 to 554?**
A. Which book?
**MR. CLARK:** That would be the first book.
**BY MR. SIMPSON:**
**Q. The first book.**
A. Is that what I'm looking at?
**MR. CLARK:** Yeah.
A. Got it.
**BY MR. SIMPSON:**
**Q. So what's shown at pages 551 and 552, Scott?**
A. The general abstract for the water rights.
**Q. What's your understanding as to the purpose of the general abstract?**
A. It just shows that you have a water right.
**Q. And this was --**
A. That's --
**Q. -- the water right for the -- the property.**
A. For the well, yeah.
**Q. Okay. And then what's on page 553 and 554?**
A. The well log, which is what Gail did not



have when we listed. She -- The well was already there. She just didn't -- The well driller did not record the log with DNRC.
**Q. And then if we turn to page 555.**
A. Okay.
**Q. What's that email chain documenting?**
A. That's me letting Matt know -- of course, he got copies of these previous pages -- that the water rights were now recorded and that I let the title company know, because the title company actually handles the transfer of water rights at closing. And then you can see right below my first email, Tracy Dugan is the manager of Fidelity National Title in Whitefish, and -- and I say "Please see recorded water rights, that will need transferred at closing."
**Q. Was there anything left to do other than Fidelity taking care of the transfer at closing with respect to the water rights --**
A. Not that I know of.
**Q. -- the -- The abstract, which was the first page we just looked at?**
A. Right.
**Q. A minute ago, page 551 and 552, it says near the top "PROVISIONAL PERMIT." In your**

Page 93

**experience, is it common for these abstracts to reflect a provisional permit?**
A. Matt, asked me about that at one point, and I just went back into some of our old files -- I'd never paid attention -- and they all said provisional permit.
**Q. So that to you was not a red flag.**
A. Yeah, and I conveyed that to Matt.
**Q. Okay.**
A. And he didn't convey that that was a problem --
**Q. Okay.**
A. -- to me.
**Q. Okay. At some point you learn that the -- the Duseks are having second thoughts about closing?**
A. Yes.
**Q. When, in this history we've been discussing, do you learn that?**
A. There's a page -- I don't have -- I can't go to the page, but --
**Q. I bet I can -- I bet I can direct you there.**
A. Why don't you direct me there 'cause I -- I remember it distinctly.

Page 94

**Q. Take a look at 427, please, as well as, you know, 427, 428, 429 and 430.**
A. Okay. These may be out of order. It may be -- 'cause I wouldn't have -- where -- on 427 it says "Going to proceed" with a red checkmark, that would have come after the conversation where he was -- they were having second -- not necessarily second thoughts, but the way Matt explained it was they were considering their -- in quotes I put "Weighing Their Options" was Matt's overriding theme in that conversation.
**Q. Did -- Do these pages, though, help refresh your memory as to when you learned that they were --**
A. Yeah, that's --
**Q. -- not considering that moving forward? That's what day?**
A. 10/26.
**Q. Okay. And you're referring right now to page 428; is that right?**
A. Correct.
**Q. So take a look -- I notice you've got, near the top, at the very top you've got date 10/26/21, but then the first substantive handwritten paragraph it says "M 10/25/21."**

Page 95

A. Oh, okay. Yeah, we would have -- that -- now that makes more sense 'cause we would have had the conversation, and then I would have memorialized it the next day after we kind of got through it because it -- because where I have on 10/26 on the yellow page that looks like legal pad --
**Q. Yes.**
A. -- "Going to proceed," that was the day after we had the conversation.
**Q. Okay. So would -- would you read to me item 1.?**
A. Mm-hmm. [As Read]: "Monday 10/25/21 Matt D called And Asked me to keep confidential what he was About to discuss with him. I said I would.
A) Not sure" -- This is Matt. "Not sure he was going to go forward with the deal BUT still might.
B) Considering the property not on the Lake and the Road Noise from Camas Road."
In other words, Matt's considering the fact that the property's not on the lake and that they did hear some road noise from Camas Road.
"Options considering Going forward to close (And keep" -- [As Read]: "Options

Page 96

considering: 1. Going forward to close (And keep looking for a place on the lake)."
In other words, they would close on this deal and then keep looking for a place on the lake.
**[As Read]:** "2. Terminating the contract And waiting for the Right/'perfect' property, but knew that that might take -- that might take a long time."
**[As Read]:** "D) Said he was getting Advice (would not say from whom - but from people at home and some in Montana) that he was paying too much."
Want me to keep going?
**Q. So that -- is that the -- note document the substance of your conversation with Matt Dusek on October 25th, 2021?**
A. There was actually, you know, another that I didn't write in here. Matt actually asked me if I would be comfortable representing them if -- at weighing other options, and how Gail -- I can't remember how he put it -- how Gail would feel about that, you know, if suddenly they didn't go forward, I'm now still representing them and looking at other options.
**Q. "Other options" meaning other properties?**

A. Other properties. And -- And I -- I can't remember. I -- I -- I think I just said I probably wouldn't be comfortable with that or I would have said "I need to think about that." I don't remember what I said.
**Q. Were you surprised when Matt -- well, first of all, did Matt call you or did you call Matt on the 25th?**
A. He called me.
**Q. Were you surprised when he told you these things during the call?**
A. Very.
**Q. Why was that?**
A. Well, because up till then, given everything that had taken place, them coming, leaving, seeing they were more excited when they left than when they got here, that it didn't feel -- another comment -- it's somewheres in these notes -- it didn't feel real to them until they were actually on property. So, yeah, when he called, I was surprised, and I was concerned because, you know, the contingencies were -- I thought he had a problem with seller's remedies.
**Q. You thought Gail and Darryl had done what they were supposed to do.**



A. Exactly.
**Q. And the deal was going to go forward.**
A. Exactly.
**Q. What -- Tell me, if you would, about the significance of the handwritten notes in the left-hand column.**
A. Okay.
**Q. And you can read those out, and then explain if that -- that might be the best way to handle that.**
A. Just start at the top --
**Q. Yeah.**
A. -- and read down?
"Gail's Airplane deal."
**[As Read]:** "Tell Matt to have a lawyer look at Inspection Contingency & Seller's Remedies in writing. I did verbally on 10/25 (twice). Tom Burk," our company president, said, "no, let his lawyer look at."
In other words, I shouldn't be telling him, have his lawyer look at it.
**Q. What -- What was -- What was Gail's airplane deal, first of all?**
A. So Gail had an airplane under contract, is my understanding. I didn't ask, I don't really



know. But there were contingencies in her deal, and her money went hard on a certain date, and she was anxious to be sure that this deal was going to cross the finish line before she went hard on the airplane deal.
Then I -- Again, I put then "Weighing" -- in quotes I put [As Read]: "'Weighing Their Options' was Matt's overriding theme on the day before in our conversation on 10/25."
**[As Read]:** "I told Matt in the morning conversation and Afternoon conversation to have his lawyers look at this was what our team interpreted the Inspection Notice meant."
And by that I was saying, "I think if you don't go forward, you have a problem with -- your contingencies are gone or seller's remedies."
I -- I -- I know I told him to have someone look at seller's remedies.
**Q. So there -- there are obviously two conversations on October 25th.**
A. Yes. Or, well, I don't know whether there were two on the 25th.
**Q. Well --**
A. I assume so.
**Q. -- morning conversation?**



A. Oh, yeah. Must have been, yeah.
**Q. Do you recall, did Matt initiate both of those calls, or do you remember?**
A. I don't remember.
**Q. Okay. What was -- What steps, if any, did you take after you have these -- well, the first conversation with Matt on the 25th where you gives you this indication that he's weighing his options?**
A. I would have talked to Tom Burk and maybe Angie.
**Q. Do you remember the substance of those conversations with Tom and maybe Angie?**
A. Only that we'd just have to wait and see, but by the next day -- let's see, I can't remember. Oh, yeah, by the next day he told me -- he called and told me he was going to go forward. I asked him if I could tell Gail that, that he was going to go forward. He said, "Yes." And so I did.
**Q. That's what you've just described occurred on the 26th of October.**
A. Right.
**Q. Okay. On the bottom of page 428, you've got point No. 2. First of all, would you tell me**

**when -- was this part of your conversation on the 25th?**
A. No, it was -- Yeah. Well, let me read it.
**Q. Would you read it out loud so we can get it on the record?**
A. Yes. "I listened then explained that if he terminated A) He was likely going to lose his earnest money. B) That Gail would sue for Specific Performance and he needed to look at Seller's Remedies. C) I told him I would do a check on my position and get back to him." I talked with Angie, she agreed with me. Jamie Bowditch -- Tom agreed with my conclusions of -- that they were -- you know, he would lose his earnest money. And Jamie Bowditch, who's our company counsel, also agreed with us.
**Q. So was that a notation of what you advised Matt during either the afternoon or morning call on the 25th of October?**
A. Yes. You know, I -- and that's when I said, you know, our team in this -- that lower right hand, I told Matt, blah-blah-blah, that our -- what -- how our team interpreted the seller's remedies. So everybody on our team that I could



go to for advice all agreed that he would at -- at best lose his earnest money.
**Q. If he backed out at this stage?**
A. If he backed -- If he backed out at this date.
**Q. Okay. Was it your conclusion that Gail and Darryl had complied with their obligations under the agreement, and the opportunity for the Duseks to back out had passed?**
A. Yes.
**MR. CLARK:** Hold on. Objection. Compound.
But you can answer, if you can.
**BY MR. SIMPSON:**
**Q. Well, I'll break that up. Was it your understanding as of the 25th of October that Gail and Darryl had complied with their obligations under the buy-sell and the inspection notice?**
A. Yes.
**Q. And was it your -- also your understanding that it was too late for the Duseks to back out of the buy-sell agreement?**
A. Yes.
**Q. Okay. And my understanding is that Angie, Tom, and Jamie Bowditch also agreed with**



**your interpretation.**
A. Yes.
**Q. Okay. What was Matt's response or reaction, if any, when you gave him that understanding?**
A. You know, I -- I honestly don't remember. Matt was always easy to talk to, a very measured guy, so he either would have said possibly, "Well, I'll have -- I'll get some -- I'll have somebody look at it." 'Cause I told him -- after talking to Tom, Tom said, "Tell him to have his lawyer look at it."
So I'm sure I did that, and I don't know that it was any more complicated than that.
**Q. Okay.**
A. It wasn't emotional or it wasn't -- it was just, you know, I was suddenly worried that I represent him, that he didn't understand that he was past his -- his contingencies. I'd never run into that in all my years of doing this.
**Q. If you turn to the following page, page 429, and it starts out with point 3., would you interpret and read this for us into the record?**
A. Mm-hmm. This is 10/26. [As Read]: "I



got back to him And talked with him and Rachel.
A) Told them our managing Broker Agreed with my interpretation As did our legal counsel.
B) They Thought They still had an out with legal or Accounting Advice."
This is Matt -- I'm referring to Matt and Rachel. Because on the inspection notice, results/remedies, there's this menu of options that one can do during that inspection notice time, and I always point out to my clients -- which most brokers don't -- is that you can get legal and accounting advice, and that's just like your inspection notice, but it happens during that window of time of results and remedies. And -- And so they -- they -- I -- I don't know why or how, but they thought somehow that wasn't included in that menu. But if you read through the contract, it's in that menu, in the language. If you read all the language to begin with and to end with, we all felt it was abundantly clear that those options were now off the table.
**Q. Did they say, "Well, we've gotten some particular legal or accounting advice that suggested we not go forward with this"?**
A. Not that I remember that they -- I just

A. Yes.
**Q. And was that -- was that -- what was the purpose of that? That notice of release of contingencies?**
A. That was -- Gail was asking for a notice of release of contingencies, so -- and I didn't want to do that until I was sure that I had gone -- one, that all were released; and two, that I had gone through the entire contract with Matt and Rachel. So there's another page in here where I went through the entire contract, and then I noted that I went through it line by line with Matt and Rachel before we sent them this notice of release and contingencies and said, you know, "Do you concur that this was done?" You know, "Are there any questions?"
And then at the end of that conversation, I said, "Can I send you a -- a note -- a draft, not a DocuSign, a draft for you to have someone review?"
Which she said, "I just have the person to review it," and that's in here.
**Q. And what -- do you know why Gail had inquired about having this sent to them?**
A. Because of -- the airplane purchase, and



she had money that was going to go hard, and she wanted to be sure that -- that what happened didn't happen, and then she would lose her earnest money.
**Q. And this was not necessary that the Duseks signed this. This didn't in any way modify the buy-sell agreement.**
A. It did not.
**Q. Okay. Was there also some discussion from the Duseks at one point about wanting to close early?**
A. You know, we -- it seems like we talked about that once. I wouldn't say I can remember or point to that. It seems like in reviewing the binder there might have been one conversation about that, but not substantial enough for me to think that that was going to happen or that was...
**Q. Did you ever tell the Duseks that unless they signed this they didn't have to proceed to closing? And when I say "this," the notice -- I mean the notice of release of contingencies.**
A. No.
**Q. Okay. This was solely to speed things up and allow Gail some more certainty that she could close on a different transaction.**



A. Exactly.
**Q. Okay. Did -- Did you ever hear anything else from Matt and/or Rachel after you forwarded this to them and Matt said, "I've got just the guy to look at this."**
A. No, that's when -- if you look at the text stream, that's when, for the first time -- you know, we talked, you know, every other day, probably, for the entire transaction or every three days, sometimes every day, and suddenly he -- he just went dark. And in -- in my texts you can see where I'm saying, "I don't understand why you're not responding. Is there something I'm missing?"
**Q. Did he respond to those texts?**
A. No.
**Q. Okay. So this is sent to -- this notice of release of contingencies is sent to them on the 28th. Right?**
A. Right.
**Q. And did you have a discussion with them on the 27th about sending this to them or was it the 28th?**
A. I don't remember, but it's in here.
**Q. Okay.**



A. It's in here somewheres.
**Q. Did -- Did you then have a discussion with Gail about -- on -- on the 29th about the deal going hard on -- on the 29th at 5:00 p.m.?**
A. I think she asked me in a text, which is in here, if, in my opinion, the deal was hard, and I think my answer was, correct. I think that's in these texts.
**Q. Do you recall being on the phone with Gail on the 29th at 5 p.m. Montana time, you and Tom Burk, Gail on the other end and you guys saying, "All right, it's 5 p.m. and we haven't heard anything from the Duseks, the deals gone hard."**
A. No.
**Q. You don't recall that?**
A. I don't recall that.
**Q. Okay. So did you hear anything from the Duseks on the 28th?**
A. I didn't hear anything from the Duseks until the -- the -- the -- the -- there was a text and said, "I'll call Scott. We're not going forward, I'll call Scott," and then we got the email with the attachment with the letter.
**Q. And that was on the 30th, correct?**

A. I believe so, yes.
**Q. Take a look at -- Well, let me -- Did -- Did you receive any communication from the Duseks on October 29th?**
A. Not that I remember, unless it's memorialized.
**Q. I haven't seen it in there.**
A. Okay.
**Q. I'm just wondering if you recall anything.**
A. I don't recall it.
**Q. Okay.**
A. I don't literally recall anything until Matt said they weren't going to go forward.
**Q. And that was on -- When Matt said, "We're not going forward," that was on October 30th, right?**
A. I believe so, and the text said "I'll call" -- or the email said "I'll call Scott."
**Q. Would you please turn to page -- this is in the last binder, the little --**
A. This one.
**Q. -- white three-ring binder? And it's near the very end of that. It's pages 1296, 1297, 1298.**



A. Okay.
**Q. Do you recognize those documents?**
A. I do.
**Q. So what's -- The first one is -- No. 1296, it's an October 30th, 2021 letter from Matt and Rachel to Gail. Did they send that to you to forward to Gail?**
A. I think it was -- I think they must have only, I'm not positive. I think it was part of that attachment.
**Q. Okay.**
A. Yeah. As a matter of fact, I'm sure it was in a text attachment that --
**Q. In an email attachment?**
A. Yeah, or an email attachment.
**Q. If you look at 1297 and 1298, what are those documents?**
A. It's the same document.
**Q. Those are letters to you from the Duseks?**
A. Yeah.
**Q. And were those the first written indication that you had from the Duseks that they were not going to close?**
A. It was.
**Q. Were you surprised?**



A. Well, because I hadn't heard from him for two days, I knew something was up, and I -- I was -- I was surprised that the water rights, the well-related permitting water rights, because that had never even been a conversation except the one time when he asked about the word "provisional," but he never -- that was not -- you know, usually that would be a bigger issue where he -- you know, "Let's look into this, let's hire a water rights lawyer," that sort of thing.
**Q. This was the first time you'd heard from this that it was a problem.**
A. Yes, that it's a problem.
**Q. And he -- did he explain to you what the nature of the problem was?**
A. No.
**Q. What about the visibility and noise of traffic on Camas Road? What was your understanding as to the deadline for him to raise that issue?**
A. During the inspection period, but -- or his personal visit.
**Q. Yeah.**
A. You know, and -- and after his personal visit, again, his comments were "There was more



noise from Camas Road than we expected"; "The property wasn't as detailed out as we thought it would be"; "The house is better than we thought it would be."
Those were the three takeaways.
**Q. "And were more excited than we were before."**
A. "And we were more excited than we were before."
**Q. Did you have any discussion with Matt and/or Rachel on the 30th of October?**
A. Hm-mmm.
**Q. No? You have to say yes or no.**
A. Oh, no. I'm sorry.
**MR. CLARK:** Answer verbally.
**BY MR. SIMPSON:**
**Q. Did you talk with him at any time after the 30th of October?**
A. No.
**Q. You haven't talked to them to this day?**
A. No.
**Q. Okay. Have you had any other written exchanges with them beyond these letters?**
A. Not -- Whatever is in the text --
**Q. Yeah.**

known to the dual agent, regardless of any confidentiality considerations;" and two, [As Read]: "may not disclose the following information without written consent of the person to whom the information is confidential;

(i) the fact that the buyer's willing to pay more than the offered purchase price;

(ii) the fact that the seller is willing to accept less than the purchase price that the seller is asking for the property;

(iii) factors motivating either party to buy or sell;"

And "(iv) any information that a party indicating in writing to a dual agent is to be kept confidential."

**Q. All right. Items 1 through 4 there from lines 60 through 66, is that consistent with your understanding of the rules or statutes that govern what constitutes confidential information in a dual agency relationship?**

A. It is. It's a bit more articulate than I was earlier, but...

**Q. All right. Okay. Let's -- Let's take a look at 428 and 430.**

A. Same book?



**Q. First book.**

A. Okay.

**Q. Just a sec. I thought I had -- had that page marked. All right. So I -- I won't have you recount your entire conversation -- the entirety of the conversations that you had on October 25 with the Duseks. In your conversation with them, when they told you that they were considering terminating the agreement, did they mention anything about mold being one of the reasons why?**

A. No.

**Q. Did they -- From the -- From the point in time when mold was identified on the property, did they, at any point, identify any concerns to you about allergies?**

A. You know, I think -- I'm pretty sure that Matt mentioned that either Rachel was allergic to mold or that just in general, you know, they would be concerned about guests and -- and company, sort of thing, as everybody is, and so it was a fair -- but it was never really brought up beyond that.

**Q. Did they ever tell you they were considering not purchasing the property because of concerns about mold or allergies?**

A. No.



**Q. We've had a lot of discussion today about -- about the various contingencies under the buy-sell agreement when those were released. You described earlier a -- you used the term "menu" of reasons why a person would terminate a buy-sell. Once a party has exercised those contingencies, their -- the -- the contingencies that they can use to terminate the buy-sell are limited to those that they've reserved. Is that -- Is that a fair assessment?**

A. Yes, unless there would be fraud or -- or something illegal.

**Q. Sure. Okay. After a party has -- Strike that.**

**After a buyer has exercised the inspection contingency and identified the items that need fixed, if a buyer simply decides that they are paying too much for the property and want to terminate it for that reason, is it your understanding that that would be a valid reason under the -- the inspection contingency?**

A. No.

**Q. All right. Those are the questions I've got.**

**MR. CLARK:** Fred, do you have any follow-up?



**EXAMINATION**

**BY MR. SIMPSON:**

**Q. Just a couple brief ones.**

**You were asked a number of questions by Mr. Coleman about the buy-sell agreement and whether you routinely use that agreement. Do you remember those questions?**

A. Yes.

**Q. And do you believe that that standard form buy-sell agreement is suitable for a broad range of buyers and sellers regardless of their level of real estate sophistication?**

A. Yes, because -- I -- I absolutely do. It's easy to read, it's in layman's language, and it's easy to explain.

**Q. Do you recall ever being asked any questions by the Duseks that led you to believe they were unable to understand or interpret the agreement?**

A. No.

**Q. Do you recall if during the time period that Mr. and Mrs. Dusek visited the property there was additional noise on, I believe, it's Camas Road because of road construction?**