Shane P. Coleman
BILLSTEIN, MONSON & SMALL PLLC
1555 Campus Drive, Suite 201
Billings, MT 59102
Telephone: 406.656.6551
shane@bmslawmt.com

ATTORNEYS FOR DEFENDANTS
MATT AND RACHEL DUSEK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,<br><br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>MATT DUSEK and RACHEL DUSEK,<br><br>Defendants/Counterclaimants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 9:22-cv-00019-DLC-KLD<br><br>**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 3

LEGAL STANDARD ..... 8

ARGUMENT ..... 10

I. The Dusek's October 30, 2021 notice timely terminated the BSA under three independent contingencies. ..... 10

A. The BSA includes conditions to closing. ..... 10

B. Duseks' termination notice was timely under the Property Condition Inspection Contingency release date of November 5, 2021. ..... 11

1. The parties extended the Property Condition Inspection Contingency release date to November 5, 2021, to allow Plaintiffs the opportunity to attempt to remediate the mold, moisture, and other problems that were identified in the First Inspection Report. ..... 11

2. David Quinn's Moisture and Mold Reinspection Report makes clear that Plaintiffs' efforts failed to remediate moisture and mold. ..... 12

a) David Quinn's narrow engagement was to analyze whether Plaintiffs had properly remediated the mold and moisture. ..... 12

b) David Quinn found elevated levels of moisture, post-remediation. ..... 13

c) David Quinn also found elevated levels of mold, post-remediation. ..... 14

d) Duseks terminated the BSA when Plaintiffs failed to remediate the mold and moisture. ..... 15

3. Kelly Quinn's General Reinspection Report is irrelevant to the issue of moisture and mold remediation. ..... 16

4. *Halcro v. Moon* is inapposite. ....................................................... 18

C. Duseks' termination notice was timely under the Well Permitting and Water Rights Contingency release date of November 3, 2021. .......... 19

1. The parties separately agreed to a release date of November 3, 2021 to satisfy Duseks' concerns regarding well permitting and water rights. ....................................................... 19

2. The Well Permitting and Water Rights Contingency is not part of the Property Condition Inspection Contingency. ....................................................... 20

3. Plaintiffs did not provide Duseks with "all well related permitting" or any "well log recording." ....................................................... 22

4. The limited information Plaintiffs did provide revealed significant water rights issues. ....................................................... 22

D. Duseks' termination notice was timely under the Personal Visitation Contingency, which had no release date. ....................................................... 24

II. Duseks are entitled to a return of their earnest money, because they timely notified Plaintiffs that the contingencies were not satisfied. .............. 28

CONCLUSION ....................................................... 29

## TABLE OF AUTHORITIES


<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........................................9, 10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).....................................................8, 9

*Estate of Lahren*, 268 Mont. 284, 886 P.2d 412, (Mont. 1994) ..............................21

*Halcro v. Moon*, 226 Mont. 121, 733 P.2d 1305 (1987) ........................................18

*Ideal Mut. Ins. Co. v. Patzer*, 624 F. Supp. 426 (D. Mont. 1985)...........................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................9

*Olsen v. Milner*, 2012 MT 88, 364 Mont. 523, 276 P.3d 934 (Mont. 2012)...........26

<u>Statutes</u>

Mont. Code Ann. §28-1-401 ..........................................................................10

Mont. Code Ann. §28-3-205 ........................................................... 21, 22, 27

<u>Rules</u>

Fed. R. Civ. P. 56 ............................................................................................8

# INTRODUCTION

The Buy-Sell Agreement ("BSA") terminated on its own terms when Duseks gave timely notice on October 30, 2021 that three separate contingencies were not met. Each contingency forms an independent basis for terminating the BSA; the failure of any one is fatal to Plaintiffs' claims.

The Property Condition Inspection Contingency release date was November 5, 2021. The Individual Plaintiffs agreed in the Inspection Notice to repair/remediate nine different property conditions. This contingency was not satisfied, because the undisputed facts show that elevated levels of mold and moisture remained in the Property after Plaintiffs' remediation efforts. Further, the Property failed to pass the required mold clearance test.

The separately-added Well Permitting and Water Rights Contingency had a release date of November 3, 2021. This contingency obligated Plaintiffs to ensure "[a]ll well-related permitting, well log recording, and any associated water rights … be in place prior to closing." Plaintiffs operated their well without permitted rights for 8 years. They sought a "Provisional Permit" only subsequent to listing the Property for sale. Plaintiffs never provided all the required information concerning the Provisional Permit, never secured the durable water rights, and never provided any well-log information, as required.

The Personal Visitation Contingency had no release date. The parties separately added this requirement to the standard form buy-sell agreement, because Duseks had not visited the Property. The lack of a release date was deliberate, due to the travel complications inherent to the Covid-19 pandemic. Scott Darkenwald, the real estate agent/broker for both buyers and sellers, knew it was critical that Duseks visit the Property in person and approve of it before committing to such a significant purchase. He assured Duseks that this contingency broadly allowed them to terminate the BSA if, for any reason, they did not like what they saw, including "if the wind blows wrong across the property." Without this contingency, Duseks would not have agreed to purchase the Property sight-unseen. Upon visiting the Property, Duseks concluded that it did not meet their expectations.

For each of these independent items, Duseks declined to release the contingencies when Darkenwald asked them to do so, and their termination notice was timely served. Plaintiffs are not entitled to summary judgment. Duseks are entitled to a return of their earnest money.

## FACTUAL BACKGROUND

The parties assert breach-of-contract claims against each other, concerning the BSA for residential property located in Glacier Park (the "Property").[1] Plaintiffs (sellers) seek to specifically enforce the BSA, by requiring Duseks (buyers) to purchase the Property.

The parties signed the BSA on October 5, 2021. SDF[2] ¶4. The BSA included contingencies, including those three mentioned above. SDF ¶33. These contingencies are analyzed separately herein.

After signing the BSA, Duseks hired D. Quinn Construction, Inc. to inspect the home. SDF ¶¶42-44. Kelly Quinn prepared a report dated October 13, 2021 (the "First Inspection Report"). *Id.* It noted various problems concerning the Property, including "Evidence of moisture" and "Mold build-up." Regarding moisture infiltration, it alerted:

> Note evidence of moisture and water stains located main level closet under the stair area appears to have been caused by prior and/or ongoing leakage at the northeast siding flashing area.

*Id.* Regarding mold buildup, the report included a photo of the visible black mold, and it recommended remediation along with more thorough mold testing.

---

[1] Defendants also assert Counterclaim Count 2 for breach of the implied covenant of good faith and fair dealing, but this Motion may be resolved without reaching that issue.

[2] Defendants' Statement of Disputed Facts filed herewith.

> Note water stains and possible surface fungal growth was found at main level closet under the stairs, possibly caused by inadequate siding flashing although unable to confirm without further testing. This surface fungal growth (black) could produce fruiting bodies and, when mature, produce millions of tiny spores (seeds) which are present in the air. For a more detailed fungal growth inspection, suggest consulting a licensed Certified (AmIAQ) Mold Inspector (D. Quinn Const., Inc.). Also note this visual inspection does not include surface fungal growth, which are not visible at time of inspection. Recommend contacting a qualified mold remediation contractor at this time for further evaluation.

*Id.* For both mold and moisture, it alerted, "Item condition requires immediate attention." *Id.*

Neither Plaintiffs nor Darkenwald previously disclosed the mold or moisture infiltration. SDF ¶51. Only after the First Inspection Report was prepared did Plaintiffs provide their "Owners Property Disclosure," which disclosed nothing other than referencing the First Inspection Report, which Duseks already had. SDF ¶52. When they did complete that form, Plaintiffs ignored the only question about mold, notwithstanding the First Inspection Report. *Id.* Goodwin prepared Darkenwald's Agent's Property Disclosure for him, which likewise disclosed nothing other than what was identified in the First Inspection Report. *Id.*

After receiving the First Inspection Report, Duseks signed an "Inspection Notice" on October 15, 2021, itemizing nine separate property condition issues to be resolved for the proposed transaction to proceed, including resolution of the mold and moisture problems. SDF ¶¶45-50. On October 17, the Individual

Plaintiffs accepted these conditions, including the condition that "All mold to be remediated and pass a clearance test," as discussed further herein with respect to the Property Condition Inspection Contingency. *Id.*

On October 19, Duseks personally visited the Property for the first time, pursuant to the Personal Visitation Contingency, discussed further herein. SDF ¶¶57-64. When Duseks visited the Property, the three contingencies at issue were each still in effect. *Id.* As much as Duseks enjoyed Glacier Park, they found the Property lacking. *Id.* Particularly, the road noise levels and traffic visibility at the Property were significantly more invasive than they expected, given the location, purchase price, and prior assurances from Darkenwald. *Id.*

Following their visit, Duseks had various conversations with Darkenwald regarding their concerns. SDF ¶16, 25, 60. During their visit, Darkenwald specifically asked whether Duseks were willing to release their contingencies, and they declined. SDF ¶¶16, 64. In follow-up conversations, Duseks stated that they understood that their contingencies remained in effect and that they were moving forward on that basis; they expressly declined to release those contingencies early. *Id.* Duseks continued to consider their options while they awaited the resolution of other contingencies, including the items to be remediated pursuant to the Inspection Notice under the Property Condition Inspection Contingency and their

consideration of the Well Permitting and Water Rights Contingency. SDF ¶¶16, 25.

On October 25, Darkenwald sent a text message to Matt Dusek stating that the re-inspections were taking place that day, and that they should have a report the following day. SDF ¶21. Darkenwald's text message acknowledged that the Property Condition Inspection Contingency remained in effect and its satisfaction would depend on the mold reinspection results:

> We should have the inspection results all done by tomorrow late afternoon. That would wrap up your contingencies if all is well.

*Id.*

After the mold and moisture remediation work was performed by Advanced Restoration, Kelly and David Quinn (both of D. Quinn Construction) separately reinspected the Property. SDF ¶65. Kelly considered general property issues and prepared a General Reinspection Report dated October 27, 2021, on which Plaintiffs' Brief relies. *Id.* David specifically measured the moisture and mold post-remediation, and he prepared a Moisture and Mold Reinspection Report dated October 26, 2021. *Id.* Plaintiffs' Brief ignores David's report. Duseks received copies of both reports on October 27, 2021, and Darkenwald informed them that Plaintiffs had concluded their efforts to satisfy the contingencies stipulated in the BSA. SDF ¶¶89, 115.

Duseks were concerned that the Moisture and Mold Reinspection Report indicated that the mold and moisture remained, after Cory Rensmon's efforts to remediate it. SDF ¶¶89-92. Even before receiving the report, Scott Darkenwald told Duseks that they should speak directly to David Quinn about his Moisture and Mold Reinspection Report, because these are highly technical issues. SDF ¶66-67. After speaking with David Quinn directly, Duseks concluded that the mold and moisture problems were not remediated and did not pass any clearance test. SDF ¶92.

Duseks expressly refused to release the outstanding contingencies. On October 28, 2021, Darkenwald's office sent Duseks a form "Notice of Release of Contingencies" document, which specifically asked Duseks to release all outstanding contingencies to the BSA, including the three contingencies at issue in this litigation. It stated:

> The following contingency(ies) is/are released, satisfied, or waived as of the date indicated below and are of no further force and effect.
>
> All contingencies in the buy-sell dated 10/4/2021 are released including inspection contingency & remedies, title contingency, insurance contingency, corner pins, personal visit and well & water rights contingencies have all been satisfied & released as of 10/28/2021.
>
> Earnest money is now non-refundable as long as seller performs per the buy-sell dated 10/4/2021.

SDF ¶116-117. Plaintiffs knew that Darkenwald would ask Duseks to release the outstanding contingencies in writing on October 28; the previous day (October 27), Goodwin texted Darkenwald:

> My goal for the day is to have a signed agreement with Matt removing all contingencies and if he chooses, moving the closing date sooner. Just thought I'd put that out there for you to weave your magic to make it happen. :)

SDF ¶118.

On October 30, Duseks told Darkenwald orally and in writing that they would not sign the Notice of Release of Contingencies. SDF ¶119. Darkenwald responded that it was too late. Notwithstanding his request two days earlier to sign a Notice of Release of Contingencies, Darkenwald now claimed that document was meaningless when he sent it. SDF ¶¶116-117. Notwithstanding his text five days earlier that the Property needed to pass a mold clearance test, Darkenwald now claimed the test results were irrelevant. SDF ¶¶21, 66. In fact, Darkenwald claimed that all of the contingencies lapsed before Duseks even visited the Property, notwithstanding the dates he wrote into the BSA. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those which may affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.*

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## ARGUMENT

### I. The Dusek's October 30, 2021 notice timely terminated the BSA under three independent contingencies.

#### A. The BSA includes conditions to closing.

"An obligation is conditional when the rights or duties of any party thereto depend upon the occurrence of an uncertain event." Mont. Code Ann. §28-1-401. Duseks' obligation to close on the Property purchase was expressly conditioned upon certain contingencies in the BSA. The BSA includes a general "Contingencies" clause that governs the specific contingencies that follow. Individual contingencies expire at 5:00 p.m. on the dates, if any, specified for each contingency.

> **CONTINGENCIES**: The contingencies set forth in this Agreement or on attached addenda shall be deemed to have been released, waived, or satisfied, and the Agreement shall continue to closing, unless, by 5:00 p.m. (Mountain Time) on the date specified for each contingency, the party requesting that contingency has notified the other party or the other party's Broker/Salesperson in writing that the contingency is not released, waived, or satisfied. If a party has notified the other party on or before the release date that a contingency is not released, waived, or satisfied, this Agreement is terminated, and the earnest money will be returned to the Buyer, unless the parties negotiate other terms or provisions.

SDF ¶¶34-36. Three separate contingencies apply to this dispute: (1) the general Property Condition Inspection Contingency; (2) the Personal Visitation Contingency, which the parties separately added to the form BSA; and (3) the Well Permitting and Water Rights Contingency, which the parties also separately added. SDF ¶37-41, 57, 95.

**B. Duseks' termination notice was timely under the Property Condition Inspection Contingency release date of November 5, 2021.**

**1. The parties extended the Property Condition Inspection Contingency release date to November 5, 2021, to allow Plaintiffs the opportunity to attempt to remediate the mold, moisture, and other problems that were identified in the First Inspection Report.**

The Property Condition Inspection Contingency is a stock part of the realtors' buy-sell agreement form.

> INSPECTION CONTINGENCY:
>
> This Agreement is contingent upon Buyer's acceptance of any Property conditions that Buyer deems appropriate, including but not limited to any inspections or advice listed below. ….

SDF ¶¶38-39. The clause then provides a non-exhaustive list of the types of property conditions for which prospective home buyers often hire a home inspector to review. *Id.* The BSA stated a deadline of October 26, 2021 for Duseks to object to a property condition. SDF ¶41.

Duseks timely provided "written notice(s) of [their] disapproval of the Property conditions" by the original October 26, 2021 deadline when they signed the Inspection Notice, requesting remediation of nine property condition issues that

were identified in the First Inspection Report. SDF ¶¶45-53. They delivered the signed "Inspection Notice" to Darkenwald on October 15. *Id.* On October 17, Plaintiffs agreed to the terms of the Inspection Notice. *Id.*

Thereafter, Plaintiffs hired contractors to attempt to remediate the Property defects. SDF ¶¶54-56. Plaintiffs hired Advanced Restoration to remediate the moisture and mold problems. *Id.* Following the remediation efforts, Duseks hired D. Quinn Construction for reinspection. SDF ¶65. Both Kelly Quinn and his father, David, inspected the Property post-remediation, for different issues, and each prepared the reinspection reports noted *supra*. *Id.*

2. **David Quinn's Moisture and Mold Reinspection Report makes clear that Plaintiffs' efforts failed to remediate moisture and mold.**

    a) **David Quinn's narrow engagement was to analyze whether Plaintiffs had properly remediated the mold and moisture.**

The post-remediation analysis by David Quinn, a Certified Residential Mold Inspector, was the "clearance test" that the parties agreed to in the Inspection Notice. SDF ¶¶49, 73, 90. David Quinn's Moisture and Mold Reinspection Report was performed specifically "to confirm remediation" of the mold and moisture problems, which Kelly Quinn's General Reinspection Report expressly excluded. SDF ¶73. David Quinn performed a visual inspection of the remediation, took moisture measurements, and performed air sampling. SDF ¶¶73-88. David Quinn's

report concluded that mold spores and the moisture causing the mold spores remained present at the Property despite remediation efforts. *Id.*

**b) David Quinn found elevated levels of moisture, post-remediation.**

David Quinn visually observed that the moisture problems were not remediated. He noted that the closet and storage areas still retained moisture.

> **Upon entering the closet/storage no noticeable odor was observed. A closer inspection of this area did not reveal any visual evidence of microbial growth although wet/damp conditions existed of the OSB (Oriented Strand Board) siding and/or by prior remediation, delamination of the OSB (Oriented Strand Board) siding and/or no metal z-bar channel flashing installed at upper and lower horizontal wood trim, caulking only.**

SDF ¶78 (emphasis original). He also noted that the stairwell drywall continued to retain moisture.

> **Also, note based on the visible observations and moisture readings it appears that the upper stairwell interior drywall is still retaining excess absorbed moisture from a past on-going water intrusion which could also contain microbial growth.**

SDF ¶79 (emphasis original).

Quantitative measurements reinforced these visual observations, showing elevated moisture content in 8 of the 12 areas tested. SDF ¶¶79-80.

> … However, six locations in the OSB (Oriented Strand Board) siding/shear wall paneling had readings ranging from **41% to 92%** indicating substantially wet. Also, note two locations at upper stairwell interior drywall had readings ranging from **20% to 22%** indicating damp moisture levels and appear to be still retaining excess absorbed moisture from a past on-going water intrusion.

SDF ¶82 (emphasis original). From these measurements, David Quinn concluded that moisture remained in the areas where mold was present.

> Based on the visible observations and moisture readings it appears that the closet/storage OSB (Oriented Strand Board) siding/shear wall paneling under stairs and upper stairwell interior drywall system are either still retaining excess absorbed moisture from a past ongoing water intrusion, or they still experiencing another form of moisture possibly from recent remediation work in the attic space.

SDF ¶81. Beyond any doubt, the moisture problems identified in the First Inspection Report were not remediated by the extended deadline of November 5, 2021.

**c) David Quinn also found elevated levels of mold, post-remediation.**

> Mold is a significant issue that cannot be addressed superficially.
>
> The Purpose of Remediation
>
> • "The purpose of mold remediation is to remove the mold to prevent human exposure and damage to building materials and furnishings. It is necessary to clean up mold contamination, not just to kill the mold. Dead mold is still allergenic, and some dead molds are potentially toxic. The use of biocide, such as chlorine bleach, is not recommended as a routine practice during mold remediation, although there may be instances where professional judgment may indicate its use."
>
> – EPA Mold Remediation in Schools and Commercial Buildings

SDF ¶74 (emphasis added by David Quinn). To determine if Plaintiffs' mold remediation efforts were successful, David Quinn performed mold spore tests for both air and surface fungus. SDF ¶84. He tested both air and surfaces of two indoor areas and took an outdoor air measurement for comparison. *Id.* He sent those

samples to an independent laboratory for analysis. SDF ¶85. The laboratory's report cautioned that "active fungal growth in indoor environments is inappropriate and may lead to exposure and adverse health effects." SDF ¶¶85-86, 91. The laboratory's analysis revealed elevated levels of certain types of mold spores for both airborne tests. *Id.*

David Quinn's Moisture and Mold Reinspection Report noted these results, namely that both indoor air samples continued to show elevated levels of certain types of mold spores. *Id.* Particularly, both indoor air tests revealed the continued presence of the toxic Stachybotrys and Penicillium/Apsergillus spores. SDF ¶87. Neither of these types of mold spores were detected in the outdoor "control" sample of the air, meaning they originate inside the home. *Id.*

Beyond any doubt, the mold problems identified in the Inspection Report were not remediated by the extended deadline of November 5, 2021. If anything, David Quinn's Moisture and Mold Reinspection Report understates the mold problem, because he considered only a small portion of the Property. SDF ¶80.

**d) Duseks terminated the BSA when Plaintiffs failed to remediate the mold and moisture.**

On October 27, 2021, David Quinn sent a copy of his Moisture and Mold Reinspection Report to Matt Dusek. SDF ¶68. Even before it was issued, Darkenwald recommended that Duseks contact David Quinn directly to discuss the

report, because mold and moisture infiltration are highly technical and serious matters, beyond Darkenwald's expertise. SDF ¶67.

Upon receiving the Moisture and Mold Reinspection Report on October 27, Duseks spoke with David Quinn concerning his findings. SDF ¶89. From the conversation with David Quinn and from the report, itself, Duseks concluded that both moisture and mold remained in the living area of the Property, despite the remediation efforts. *Id.* David Quinn also suggested that the Property might pass a mold clearance test if it were retested for mold and moisture six months later – i.e., long past the contingency deadline and closing. *Id.*

Following the conversation with David Quinn, Duseks had a follow-up conversation with Darkenwald. SDF ¶90. They specifically discussed the Property's potential health risks, particularly for those with allergies. SDF ¶89. They also discussed David Quinn's recommendation to re-test for mold and moisture six months later. SDF ¶89.

Duseks were not interested in buying a home with such problems and did not want to gamble on the possibility that the mold might simply go away on its own, with time. Based on their concerns, Duseks decided to terminate the BSA.

**3. Kelly Quinn's General Reinspection Report is irrelevant to the issue of moisture and mold remediation.**

Plaintiffs' reliance on Kelly Quinn's General Reinspection Report is misplaced because Kelly expressly did not consider mold and moisture issues. SDF

¶¶69-72. The reinspection to test for moisture and mold was David Quinn's engagement. SDF ¶¶70-87. Kelly's General Reinspection Report covers only "a **visual** evaluation of reasonably accessible areas of the structure." *Id.*

Kelly's General Reinspection Report expressly does not cover anything related to mold, beyond what is open and obvious to the naked eye.

> Also note this visual inspection does not include surface mold, which is not visible at the time of inspection. These surface molds require a special type of equipment to detect. Note surface molds produce fruiting bodies and, when mature, produce millions of tiny spores (seeds) that are present in the air.

*Id.*

> **Scope of work shall not extend to or include or be applicable to:**
>
> … 2. Defects in areas inaccessible to inspectors view.
>
> … 14. Mold/fungi which is not plainly visible.

*Id.*

Beyond any doubt, Kelly Quinn did not test the Property for mold or moisture post-remediation; his father, David, did that work. Kelly Quinn's opinions regarding mold and moisture, for which he did not test, are irrelevant. The only post-remediation mold and moisture testing was performed by David Quinn, a Certified Residential Mold Inspector. David Quinn's Moisture and Mold Reinspection Report unequivocally states that the Property continued to have elevated levels of mold and moisture, even after the attempted remediation.

**4. *Halcro v. Moon* is inapposite.**

Plaintiffs' reliance on *Halcro v. Moon*, 226 Mont. 121, 733 P.2d 1305 (1987) is misplaced because it involved a different contract and different facts. First, unlike the BSA, the *Halcro* contract did not have a Property Condition Inspection Contingency. The "only condition precedent contained in the agreement was that Moon sell his home in Colorado." *Id.* Because the buyer had no such contingency, the issue in *Halcro* was not whether a contingency was met by its release date, but rather whether the buyer could "rescind the contract" notwithstanding the lack of a contingency "upon grounds of mistake of fact and failure of consideration" or "upon the grounds of" the sellers' breach. *Id.*, 226 Mont. at 123. Unlike a contract such as the BSA terminating under its own contract term for failure of a condition, rescission requires proof of a material breach. *Id.*

Second, the facts of *Halcro* showed nothing more than small amounts of water in the home and crawl space, which did not amount to a material breach. Even if Duseks had to prove a material breach (and they need not), the Property's moisture and mold are material. The parties specifically contracted to resolve these issues and "pass a clearance test" before November 5, 2021. That undeniably did not happen. These Property Condition Inspection Continency conditions were not remedied before the extended deadline of November 5, 2021. Duseks properly terminated the BSA for Plaintiffs' failure to cure the mold and moisture problems.

### C. Duseks' termination notice was timely under the Well Permitting and Water Rights Contingency release date of November 3, 2021.

#### 1. The parties separately agreed to a release date of November 3, 2021 to satisfy Duseks' concerns regarding well permitting and water rights.

The parties acknowledged the importance of proper water rights ownership and well permitting. The BSA noted that the failure to properly obtain and transfer water rights "could result in a penalty against the transferee and rejection of the deed for recording." SDF ¶93. The parties also expressly recognized the "general policy of the State of Montana" "to prohibit unauthorized projects related" to "natural water bodies and the lands immediately adjacent thereto." SDF ¶96.

For these, and other reasons, including concerns expressed by Duseks, Scott Darkenwald added the Well Permitting and Water Rights Contingency as a separate contingency. SDF ¶112.

> So in the buy-sell where it talks about water rights? Where's that? On lines -- this is 399 and then lines 237 through 238, essentially, that's my language, and that's to protect Duseks, because at that point -- at that -- it was critical that that well log be recorded.

*Id.* This contingency is distinct from the Property Conditions Inspection Contingency discussed above. SDF ¶95. It is not a part of the form buy-sell agreement. *Id.* The separately-added contingency language proposed by Darkenwald and agreed to by the parties provides:

> This Agreement is contingent upon:
>
> All well related permitting, well log recording, and any associated water rights to be in place prior to closing. Reasonable extension for contingency and closing to be granted upon written request.
>
> Release Date: 11/03/2021 at 5:00 p.m. (Mountain Time)

*Id.*

**2. The Well Permitting and Water Rights Contingency is not part of the Property Condition Inspection Contingency.**

The form buy-sell agreement plainly contemplates that parties might select common, stock contingencies, or that they might draft their own contingencies. The stock contingencies are listed with optional "check boxes," each indented directly below the general "Contingencies" section at lines 132-137. SDF ¶¶34-36. The Property Condition Inspection Contingency is one of these stock paragraphs available for selection. SDF ¶38. Directly below the stock contingencies, the form buy-sell agreement provides space for parties to add their own contingencies. *Id.* That is exactly what the parties did in this case when they separately added Darkenwald's suggested Well Permitting and Water Rights Contingency and assigned it its own separate release date. SDF ¶¶95-96. The general "Contingencies" clause also contemplates that different contingencies will have different release dates and clarifies that each separate contingency "shall be deemed to have been released … unless, by 5:00 p.m. (Mountain Time) **on the date specified for each contingency**" written notice is provided to the contrary.

SDF ¶34 (emphasis added). Here, the parties selected November 3, 2021 as the release date for the Well Permitting and Water Rights Contingency, and they noted that in its own separate section, manually added to their BSA. SDF ¶94. The separate November 3, release date is entirely consistent with the general "Contingencies" clause of the BSA.

Moreover, Montana law is clear that the parties' specific addition of the Well Permitting and Water Rights Contingency with its separately assigned release date would govern, if the two clauses conflicted.

> **28-3-205. Written or original terms to control printed terms.** Where a contract is partly written and partly printed or where part of it is written or printed under the special directions of the parties and with a special view to their intention and the remainder is copied from a form originally prepared without special reference to the particular parties and the particular contract in question, the written parts control the printed parts and the parts which are purely original control those which are copied from a form and, if the two are absolutely repugnant, the latter must be so far disregarded.

Mont. Code Ann. §28-3-205. *See also Estate of Lahren*, 268 Mont. 284, 288, 886 P.2d 412, (Mont. 1994) (handwritten "P.O.D." (pay-on-death) notation overrules pre-printed joint tenancy clause on deposit account); *Ideal Mut. Ins. Co. v. Patzer*, 624 F. Supp. 426 (D. Mont. 1985) ("Where there is a conflict between the printed and typewritten portions of [an insurance] policy the latter prevail.") (citing Mont. Code Ann. §28-3-205). Here, the parties separately added the Well Permitting and Water Rights Contingency in the space provided at lines 236-240 to the form

realtor buy-sell agreement, which already included the preprinted Property Conditions Inspection Contingency at lines 139-184. SDF ¶38. To the extent that they might conflict, "the latter must be so far disregarded." Mont. Code Ann. §28-3-205.

### 3. Plaintiffs did not provide Duseks with "all well related permitting" or any "well log recording."

The only well information Plaintiffs provided was a 2-page "General Abstract" relating to Provisional Permit that was first sought and obtained after the Property was listed for sale. Plaintiffs did not provide Duseks with any well-log data. SDF ¶113. Plaintiffs' only well log was produced by Scott Darkenwald in discovery and shows a date stamp of November 1, 2021 – i.e., after Duseks terminated the BSA. *Id.* Plaintiffs did not provide Duseks with a copy of the provisional "Permit to Appropriate Water" or its cover letter, which explains the provisional nature of the water rights and the requirements to apply for permanent water rights. SDF ¶¶97-105.

### 4. The limited information Plaintiffs did provide revealed significant water rights issues.

The 2-page General Abstract for Provisional Rights revealed that these rights were not permanent, and they issued to Gail Goodwin, individually – not the owner of the Property, Glacier Bear Retreat LLC. SDF ¶¶102-103. Plaintiffs knew that Duseks were concerned about the provisional nature of the water rights. SDF

¶107. Goodwin, herself, admitted that she did not understand the difference between a provisional permit and permanent water rights, but believed there was nothing more she could have done to obtain permanent rights, because her delay in filing put her "at the mercy of DNRC." SUF ¶108.

The provisional rights cannot become permanent water rights, absent further action by the landowner. SDF ¶¶102-106. That requires approval from the DNRC, which was something that could not have been obtained before the November 3, 2021 contingency release date. *Id.* Further, as documents first produced in discovery show, the failure of a buyer of the Property, such as Duseks, to pursue these rights through DNRC "will result in the termination of [the buyer's] provisional permit." SDF ¶104.

Further, Plaintiffs' eight-year delay in pursuing water rights subordinated any permanent water rights that might issue from this Provisional Permit. SDF ¶¶109-110, 114. The Provisional Permit emphasizes that it is inferior to any rights obtained prior to September 3, 2021, and that the owner of the Property "MAY BE SUBJECT TO A CALL BY SENIOR WATER RIGHT HOLDERS, IN WHICH CASE YOU MAY BE REQUIRED TO DISCONTINUE YOUR USE OF WATER FOR THE PERIOD OF THE CALL." *Id.* (capitalization original). Also, any potential water rights are disputed by tribal governments and may be subject to

reserved water rights of the Confederated Salish and Kootenai Tribes, possibly resulting in complete defeasance. SDF ¶111.

On balance, Duseks concluded that the potential water rights problems and the lack of well log information simply raised too many issues. On October 28, 2021, Darkenwald sent Duseks a Notice of Release of Contingencies, which listed the "well & water rights contingency" as one of the outstanding contingencies, which Duseks had not yet released. SDF ¶116-117. On October 30, Duseks informed Darkenwald that they would not release the contingencies, including the Well Permitting and Water Rights Contingency. SDF ¶119. Duseks' written notice of their refusal to release the Water Rights Contingency was timely because it was made in writing before the November 3, 2021 deadline. SDF ¶131.

### D. Duseks' termination notice was timely under the Personal Visitation Contingency, which had no release date.

The parties also added a Personal Visitation Contingency separately to the standard form realtor buy-sell agreement. It provides: "Buyer reserves the right to visit the property during the inspection period." SDF ¶57. Darkenwald explained to them that this contingency allowed them to terminate the BSA for virtually any reason, if they did not like the Property when they visited it, including, in Scott's words, "if the wind blows wrong across the property." SDF ¶61. Duseks insisted that this contingency be included in the BSA, because they had not visited the

Subject Property when the BSA was signed. SDF ¶58. No date is specified for the release of the Personal Visitation Contingency. SDF ¶59.

In fact, Duseks were underwhelmed by their visit to the Property; it was not as represented to them in several critical ways. Duseks personally visited the Subject Property on October 19, 2021. SDF ¶63. During their visit, they observed that there was excessive road noise and traffic visibility on the Property and generally found it to be less desirable than they had previously believed. *Id.* Upon returning from their personal visit to the Property, Duseks informed Scott Darkenwald repeatedly of their misgivings about the transaction. SDF ¶64.

Plaintiffs' suggestion that Duseks enjoyed their visit to the Property is inaccurate and irrelevant. First, Duseks did not state that they intended to waive any contingencies, much less the Personal Visitation Contingency, as suggested by the narrow deposition excerpts that Plaintiffs rely upon. SDF ¶¶16, 64. The complete context of Matt Dusek's deposition testimony demonstrates that, at the time of one particular conversation with Scott Darkenwald long before the contingency-release date, Duseks did not then intend to terminate the agreement, nor did they intend to waive their contingencies. *Id.* Second, Duseks said exactly the opposite: during their visit, Darkenwald asked whether they were ready to release the remaining contingencies, and they declined. *Id.* Third, such comments are insufficient to create an oral waiver of Duseks' contingencies stated in the

BSA, as a matter of law. *See*, *e.g.*, *Olsen v. Milner*, 2012 MT 88, 364 Mont. 523, 276 P.3d 934 (Mont. 2012) ("To establish a knowing waiver, the party asserting waiver must demonstrate the other party's knowledge of the existing right, acts inconsistent with that right, and resulting prejudice to the party asserting waiver.") <u>Fourth</u>, when Darkenwald presented to Duseks a "Notice of Release of Contingencies" document, which would have expressly released "[a]ll contingencies … including … personal visit," Duseks declined to sign it. SDF ¶¶116-117.

The parties and their dual agent understood that the BSA was subject to the Dusek's personal visit to the Property and their satisfaction with the Property during that visit. SDF ¶¶60-62. Goodwin acknowledged "of course" Duseks had the right to visit the Property and to terminate the BSA "[i]f they didn't like what they saw;" she merely disagrees with the release date. *Id.* Darkenwald expressly added the Personal Visitation Contingency as one of the contingencies that he asked Duseks to release in the Notice of Release of Contingencies. SDF ¶117.

Plaintiffs' suggestion that the Personal Visitation Contingency somehow merged into the Property Condition Inspection Contingency and lapsed when it was not listed on the Inspection Notice is contrary to Montana law and common sense. The general Contingency language makes clear that individual contingencies have different release dates, as stated by the parties in the BSA.

SUF ¶¶9, 34. Here, the parties deliberately added the Personal Visitation Contingency to the standard form BSA, and they deliberately did not add a release date for it, unlike their separately added Well Permitting and Water Rights Contingency. Plaintiffs' argument completely reads out that added language. As with the Well Permitting and Water Rights Contingency, the Personal Visitation Contingency is entirely separate from the Property Condition Inspection Contingency. It supersedes the Property Condition Inspection Contingency, to the extent of any conflict. *See* Mont. Code Ann. §28-3-205.

Further, Plaintiffs' argument makes no logical sense from a timing perspective. Duseks addressed the Property Condition Inspection Contingency issues on October 15, 2021, when they completed the Inspection Notice based on the First Inspection Report. The Individual Plaintiffs signed the Inspection Notice on October 17, 2021. Duseks did not visit the Property until October 19 – i.e., two days after the Inspection Notice was countersigned. Under Plaintiffs' theory, the whole point of Duseks' visit to the Property would be meaningless, because the time to object would have already passed before they saw the Property.

However, it's not meaningless, and was in fact a crucial part of the transaction activities, without which there would have been no contract. The Personal Visitation Contingency stands on its own, unwedded to any of the other contingencies or their release dates. The Personal Visitation Contingency has no

specified release date, so it persists until closing. Duseks' termination notice is timely.

## II. Duseks are entitled to a return of their earnest money, because they timely notified Plaintiffs that the contingencies were not satisfied.

The general Contingencies makes clear that the potential purchaser's earnest money must be returned if any of the specified contingencies are not met.

> …If a party has notified the other party on or before the release date that a contingency is not released, waived, or satisfied, this Agreement is terminated, and the earnest money will be returned to the Buyer, unless the parties negotiate other terms or provisions.

SDF ¶34. Here, three separate contingencies remained in effect when Duseks gave written notice on October 30, 2021.

- The parties extended the release date for the Property Condition Inspection Contingency to November 5, 2021. That continency was not satisfied because the Property still had elevated moisture and failed to pass a mold clearance test.
- The parties separately assigned November 3, 2021 as the release date for the Well Permitting and Water Rights Contingency. That contingency was not satisfied because Plaintiffs did not obtain permanent water rights and did not ever provide copies of the well log data or the Provisional Permit.

- The parties separately added the Personal Visitation Contingency, but did not add any deadline for its release. Duseks had until closing to raise objections based on their personal visitation.

For each of these independent reasons, Duseks provided timely written notice that they would not waive their contingencies. Moreover, Plaintiffs and Scott Darkenwald knew that these contingencies remained in effect; that's why they specifically presented the Notice of Release of Contingencies to Duseks on October 28, 2021. Because Duseks' notice was timely, the BSA unequivocally requires the return of their earnest money.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment must be denied. Duseks are entitled to the return of their earnest money.

Dated this 18th day of August, 2022.

By: *<u>/s/ Shane P. Coleman</u>*
Shane P. Coleman
BILLSTEIN, MONSON & SMALL, PLLC

ATTORNEYS FOR DEFENDANTS MATT DUSEK AND RACHEL DUSEK

## CERTIFICATE OF COMPLIANCE

The undersigned, Shane P. Coleman, certifies that this Brief complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman font typeface consisting of 14 characters per inch. The total word count is 6,427, excluding caption and certificates of service and compliance, table of contents and authorities, and exhibit index. The undersigned relies on the word count of the word processing system used to prepare this document.

By:*/s/ Shane P. Coleman*
Shane P. Coleman
BILLSTEIN, MONSON & SMALL, PLLC

ATTORNEYS FOR DEFENDANTS MATT DUSEK AND RACHEL DUSEK