Shane P. Coleman
BILLSTEIN, MONSON & SMALL PLLC
1555 Campus Drive, Suite 201
Billings, MT 59102
Telephone: 406.656.6551
shane@bmslawmt.com

ATTORNEYS FOR DEFENDANTS
MATT AND RACHEL DUSEK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,<br><br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>MATT DUSEK and RACHEL DUSEK,<br><br>Defendants/Counterclaimants. | ) | Case No. 9:22-cv-00019-DLC-KLD<br><br>**DEFENDANTS' STATEMENT OF DISPUTED FACTS (L.R. 56.1)** |

Matt Dusek and Rachel Dusek ("Duseks") hereby submit the following Statement of Disputed Facts ("SDF") in opposition to Plaintiffs' Motion for Summary Judgment (doc. 25).

**Verbatim Response to Plaintiffs' Statement of Undisputed Facts:**

1. At all times relevant to this case, GBR was the owner of real property commonly known as 348 Grist Road, West Glacier, MT 59936 and legally described as follows (the "Property"):

> Tract 1 of COS #19007 (situated, lying and being in Gov. Lot 2 of Section 14, Township 32N, Range 19W, P.M.M.) according to the map, plat or survey thereof on file and of record in the office of the Clerk and Recorder of Flathead County, Montana.

Declaration of Gail Goodwin, ¶ 3 (July 27, 2022) (attached as **Exhibit A**).

*Undisputed.*

2. At all times relevant to this case, Ms. Goodwin and Mr. Slattengren, wife and husband, were the sole members of GBR. Decl. G. Goodwin, ¶¶ 2, 5; Declaration of Darryl Slattengren, ¶ 2 (July 26, 2022) (attached as **Exhibit B**).

*Undisputed.*

3. Ms. Goodwin and Mr. Slattengren listed the Property for sale with real estate broker Scott Darkenwald ("Mr. Darkenwald") of Glacier Sotheby's International Realty on or about September 1, 2021. Decl. G. Goodwin, ¶ 6. GBR was the record owner of the Property, but due to confusion arising from Flathead County not having the property owner tax information up to date, the Property was listed with Ms. Goodwin and Mr. Slattengren as the owners of the Property, rather than GBR. *Id*.

*Undisputed, except that Plaintiffs' subjective reasons for listing the Property for sale in their own names rather than in name of its owner, Glacier Bear Retreat, LLC, is immaterial to summary judgment.*

4. On or about October 5, 2021, Ms. Goodwin and Mr. Slattengren, as Sellers, entered a Buy-Sell Agreement (the "BSA" or "Agreement") with Duseks, as Buyers, for the sale and purchase of the Property. SSF, ¶ 6; Decl. G. Goodwin, ¶ 7; Deposition of Matthew Dusek, 35:1-6 (July 5, 2022) (relevant portions of Mr. Dusek's deposition are attached as **Exhibit C**). A true and correct copy of the BSA, with the price terms redacted to preserve the confidentiality of that information, is attached hereto as **Exhibit D**. (The identical copy is Exhibit A to Statement of Stipulated Facts ("SSF"), ¶ 6 (Doc. 15).

*Undisputed.*

5. Duseks deposited a portion of the purchase price into escrow, and the balance was due in cash at the closing. Depo. M. Dusek, 40:12-22. The BSA provided for a closing on or before November 9, 2021. Exhibit D, BSA, at 1, ll. 28-44.

*Undisputed.*

6. Duseks were notified by Mr. Darkenwald after they signed the BSA that the Property was owned by GBR, and this was confirmed by the preliminary title commitment. Depo. M. Dusek, 62:11-63:4. This was not an issue that caused

Duseks to terminate the BSA. *Id*. Ms. Goodwin and Mr. Slattengren notified Duseks of their intention to close on the BSA on behalf of GBR. Decl. of G. Goodwin, ¶ 12.

*Disputed. The Duseks never had any communications with the Plaintiffs before this litigation, much less concerning their intentions concerning GBR. Matt Dusek first raised the issue of ownership with Scott Darkenwald, after receiving an email from Scott suggesting that Gail Goodwin and Darryl Slattengren (the "Individual Plaintiffs") who are the signatories to the BSA might not be the actual owners of the Property. Ex. A, M. Dusek Decl., ¶4; R. Dusek Decl., ¶4.*

7. Early on in the process, Mr. Darkenwald notified Duseks that there was an outstanding issue with water rights for the Property. Depo. M. Dusek, 24:2-14; Deposition of Scott Darkenwald, 44:9-22 (May 26, 2022) (relevant portions of Mr. Darkenwald's deposition are attached as **Exhibit E**). The BSA provided for additional time for Glacier Bear to formalize the water rights attendant the Property. Ex. D, BSA at 5, ll. 236-239, Depo. S. Darkenwald Depo., 44:23-45:3.

*Disputed. GBR was not a party to BSA, and Plaintiffs have defined "Glacier Bear" to include GBR. BSA[1], ll.496-543, SSF, doc. 15, p. 3, doc. 15-1. Further, the*

[1] The Statement of Stipulated Facts, doc. 15 is referred to herein as "SSF" to be consistent with Plaintiffs' terminology. The signed Buy-Sell Agreement is filed in the Court Docket as an attachment to the parties' Statement of Stipulated Facts, doc. 15-1. It is referred to herein by the notation "BSA." It includes line numbers

*provisional water permit that issued on October 12, 2021, was never issued in the name of the Property owner, GBR; it issued in the name of Gail Goodwin, individually. Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16. Plaintiffs' statement also omits critical facts relevant to the water rights and the Well Permitting and Water Rights Contingency, which are a part of the BSA and discussed herein, in the Duseks' Additional Facts. BSA, ll.236-240, SSF, doc. 15, p. 3, doc. 15-1.*

8. Despite Mr. Darkenwald's concern that resolving this issue might delay the closing, it was resolved by issuance of a water rights permit by the Montana Department of Natural Resources and Conservation ("DNRC"). Mr. Darkenwald notified Duseks of this development on October 12, 2021, and on that date, provided them with the water rights abstract issued by DNRC. Depo. S. Darkenwald Depo., 45:4-46:23; 90:23-93:13; Depo. M. Dusek, 66:19-67:16; 68:12-15. The water rights abstract and well log were produced by Glacier Sotheby's International Realty in response to a Subpoena Duces Tecum as GSIR SDT 551-554, which was included as Exhibit 1 at Mr. Darkenwald's deposition. Relevant portions of the Glacier Sotheby's file are (including the water rights abstract and well log) are attached as Exhibit 1 to the Declaration of Fred Simpson, which is attached as **Exhibit F**. The only person with whom Duseks communicated

1-543 that run continuously along the left margins of the 10-page document, and line citations refer to those numbers.

to investigate water rights attendant the Property was Mr. Darkenwald. Depo. M. Dusek, 68:5-10; Duseks' Answer to Interrogatory No. 5 (the relevant portions of Duseks' discovery responses are attached as **Exhibit G**).

*Disputed. This specific contingency (the "Well Permitting and Water Rights Contingency") reads:*

> *This Agreement is contingent upon:*
>
> *All well related permitting, well log recording, and any associated water rights to be in place prior to closing. Reasonable extension for contingency and closing to be granted upon written request.*
>
> *Release Date: 11/03/2021 at 5:00 p.m. (Mountain Time)*

*BSA, ll.236-240, SSF, doc. 15, p. 3, doc. 15-1.*

*The Well Permitting and Water Rights Contingency was never satisfied. Plaintiffs constructed the residence in 2013 and immediately built and used an unpermitted well on the Property. Ex. D, Goodwin Dep. 8:7-20. Plaintiffs did not provide the Duseks with any well log information, much less "all well related permitting" or "well log recording." Ex. C, M. Dusek Dep. 68:12-24. The Duseks received a copy of the "General Abstract" of the provisional permit for water rights but did not ever receive a copy of the actual provisional "Permit to Appropriate Water" with the cover letter from the Montana Department of Natural Resources and Conservation ("DNRC"), which explained the further steps that would be required for the DNRC to issue permanent rights. Ex. C, M. Dusek Dep. 68:12-24. Nor did Scott Darkenwald provide the Duseks with any well data from*

*Plaintiffs, much less the required well log. Ex. C, M. Dusek Dep. 68:12-24. Documents produced in discovery show that the only Well Log Plaintiffs ever obtained was date and time-stamped November 1, 2021 at 4:43 p.m. – i.e., after the Duseks terminated the BSA on October 30, 2021 – demonstrating unequivocally that it was not provided to the Duseks before termination. Ex. A, M. Dusek Decl., ¶18, Ex. 38.*

*Further, the water rights were not "in place prior to closing." Since constructing the residence, the Plaintiffs built and operated their unpermitted well, without any water rights from the State of Montana. Ex. D, Goodwin Dep. 8:7-20, Ex. E, Darkenwald Dep. 91:23-92:3. After listing the Property for sale, Plaintiffs filed and obtained "provisional rights," which required further approvals by the DNRC to complete, were junior to intervening registrants, and were disputed as to validity by the Confederated Salish and Kootenai Tribes, as discussed further in the Additional Facts herein. Ex. D, Goodwin Dep. 74:25-75:14, Ex. 15. To date, Plaintiffs still have not secured permanent water rights for the Property. Ex. D, Goodwin Dep. 67:3-22.*

9. The BSA provided a number of contingencies to closing:

> **CONTINGENCIES:** The contingencies set forth in this Agreement or on attached addenda shall be deemed to have been released, waived, or satisfied, and the Agreement shall continue to closing, unless, by 5:00 p.m. (Mountain Time) on the date specified for each contingency, the party requesting that contingency has notified the other party or the other party's Broker/Salesperson in writing that the

> contingency is not released, waived, or satisfied. If a party has notified the other party on or before the release date that a contingency is not released, waived, or satisfied, this Agreement is terminated, and the earnest money will be returned to the Buyer, unless the parties negotiate other terms or provisions.
>
> **INSPECTION CONTINGENCY:**
> **[x]** This Agreement is contingent upon Buyer's acceptance of any Property conditions that Buyer deems appropriate, including but not limited to any inspections or advice listed below. Buyer agrees to acquire, at Buyer's own expense, independent inspections or advice from qualified inspectors or advisors of Buyer's choice . . .

Ex. D, BSA at 3, ll. 132-149.

*Undisputed, but the Property Conditions Inspection Contingency (found at lines 139-184 of the BSA and broken out from the general Contingencies provision found at lines 132 – 137 of the BSA and indented thereunder) is just one of three distinct and separate contingencies at issue, which are stated in the BSA and discussed further herein, in the Duseks' Additional Facts. BSA, ll.236-240, 244-245, SSF, doc. 15, p. 3, doc. 15-1.*

10. Immediately following this paragraph was a list of property conditions for which Duseks had the right to perform inspections and seek advice, including, (as relevant to this case):

Home/Property Inspection

Mold

Water Rights

*Id*. at 3-4, ll. 151-169. Under the BSA, Duseks also "reserve[d] the right to visit property in person during the inspection period." *Id*. at 5, ll. 244.

The BSA then provided:

> Unless Buyer delivers written notice(s) of Buyer's disapproval of the Property conditions on or before (Notice Date) 10/26/2021 at 5:00 p.m. (Mountain Time), this inspection contingency shall be of no further force or effect. **If Buyer disapproves** of the Property condition, Buyer shall deliver written notice to the Seller or the Seller's Broker/Salesperson on or before the date specified above, together with a copy of ONLY that portion of the inspection or report upon which the disapproval is based. Buyer shall also state whether Buyer elects to immediately terminate the Agreement or negotiate a resolution of the conditions noted. **If Buyer elects to negotiate** a resolution of the conditions noted, the notice must contain all of Buyer's objections and requested remedies.
>
> If the parties enter into a written agreement in satisfaction of the conditions noted, this contingency shall be of no further force or effect. If the parties cannot come to written agreement in satisfaction of the conditions noted or if the Buyer does not withdraw, in writing, his/her disapproval of the condition noted, on or before (Resolution Date) 10/29/2021 at 5:00 p.m. (Mountain Time), the earnest money shall be returned to the Buyer, and the Agreement then terminated.

*Id*. at 4, ll. 171-184 (emphasis in original). The BSA also provided that "This Agreement is contingent upon All well related permitting, well log recording, and any associated water rights to be in place prior to closing. Reasonable extension for contingency and closing to be granted upon reasonable written request." A "release date" of November 3, 2021 at 5:00 p.m. (Mountain Time) was provided for the water rights to be in place. *Id*. at 5, ll. 236-240.

*Disputed. Plaintiffs' paragraphs 9 and 10 conflate the three separate contingencies that are at issue in this litigation – i.e., the Property Conditions Inspection Contingency (BSA lines 139 – 184), the Personal Visitation Contingency (BSA line 244-245), and the Well Permitting and Water Rights Contingency (BSA lines 236 – 240). Only the Property Conditions Inspection Contingency is subject to the approval / disapproval language cited above at lines 171-184 of the BSA. BSA, ll.139-184, 236-240, 244-245, SSF, doc. 15, p. 3, doc. 15-1.*

*The general "Contingencies" paragraph (found at lines 132-137) applies to all three contingencies that are at issue. The general Contingencies clause provides that each separate contingency is released at "5:00 p.m. (Mountain Time) on the date specified for each contingency," absent written notice by the Duseks that they do not release the contingency. BSA, ll.132-137, SSF, doc. 15, p. 3, doc. 15-1.*

*The Property Conditions Inspection Contingency is one subset of the BSA contingencies. BSA, ll.139-184, SSF, doc. 15, p. 3, doc. 15-1. It encompasses a non-exclusive list of items that generally allows the Dusek's home inspector to inspect the Property, identify problems, and propose remediation measures, if the Duseks so desired. Id. The Duseks had until October 26, 2021 (5:00 p.m.) to*

*identify problems with the Property, which they might want remedied. BSA, l.172, SSF, doc. 15, p. 3, doc. 15-1.*

*The Well Permitting and Water Rights Contingency discussed above with respect to paragraphs 8 and 9 is wholly separate and apart from the Property Conditions Inspection Contingency. BSA, ll.236-240, SSF, doc. 15, p. 3, doc. 15-1. The parties separately added it to the standard form BSA at lines 236-240 with its own separate contingency release date of "11/03/2021." Id.*

*The Personal Visitation Contingency is wholly separate and apart from the Property Conditions Inspection Contingency. The parties separately added it to the standard form BSA at lines 244-245. BSA, ll. 244-245, SSF, doc. 15, p. 3, doc. 15-1. "Buyer reserves the right to visit the property in person during the inspection period." Id. The personal visitation contingency has no contingency release date. Id.*

11. After obtaining a property inspection from D. Quinn Construction, Inc., and already having the water rights abstract from DNRC in hand, Duseks, through Mr. Darkenwald, provided Glacier Bear with a document labeled "Inspection Notice (Results/Remedies)" (the "Inspection Notice") on or about October 16, 2021. Decl. G. Goodwin, ¶ 8; Depo. S. Darkenwald Depo., 45:4-46:23; 90:23-93:13; Depo. M. Dusek, 64:2-20, 66:19-67:16. The Inspection Notice provided two boxes from which Duseks could select one. One option allowed

Duseks to terminate the BSA immediately and receive a return of their earnest money. Alternatively, the other option provided, "Buyer elects to negotiate the items of disapproval described above and offers the following resolution: Seller, at seller's expense, to remedy the following [list of nine conditions]." The Inspection Notice is Exhibit B to the SSF, and attached hereto as **Exhibit H**. Instead of immediately terminating the BSA and receiving a return of their earnest money, Duseks selected this latter option. Ex. H, Inspection Notice at 2, ll. 54; Depo. M. Dusek, 81:9-82:4.

*Disputed. The Duseks signed and delivered the Inspection Notice on October 15, 2021. Inspection Notice, ll.1, 84, SSF, doc. 15, p. 3, doc. 15-2.*

*The Well Permitting and Water Rights Contingency was never a part of the Property Conditions Inspection Contingency; the parties added it to the standard form BSA and gave it its own, distinct expiration date of November 3, 2021. BSA, ll.236-240, SSF, doc. 15, p. 3, doc. 15-1. It was the sellers' responsibility to have in place "all well related permitting, well log recording, and any associated water rights" before the "Release Date" of November 3, 2021. BSA, ll.236-240, SSF, doc. 15, p. 3, doc. 15-1. Also, as noted above with respect to paragraphs 8 and 9, the rights identified by the General Abstract provided by Plaintiffs and issued by the Montana DNRC were provisional rights only. Ex. D, 74:25-75:14, Ex. 15. Further, the Duseks never received the actual provisional Permit to Appropriate*

*Water, nor did they receive the instructions from the DNRC explaining the process that would be required of the Duseks to try to perfect these rights post-closing. Ex. C, M. Dusek Dep. 68:12-24. Further, the Duseks did not receive any well log, as required by the Well Permitting and Water Rights Contingency. Ex. A, M. Dusek Decl., ¶18, Ex. 38. To date, Plaintiffs still have not secured permanent water rights for the property. Ex. D, Goodwin Dep. 67:3-22. The Inspection Notice document pertained only to the Property Conditions Inspection Contingency. BSA, ll. 139-184, SSF, doc. 15, p. 3, doc. 15-1.*

*Further, the Provisional Permit and cover letter – not provided to the Duseks until this litigation – explains the additional burden required of the provisional rightsholder to possibly obtain a permanent water right for the Property, including the filing of a Form 617. Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16. The consequence of the failure of the rightsholder to pursue these rights through DNRC "will result in the termination of [the buyer's] provisional permit." Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16.*

*Also, the Property Conditions Inspection Contingency was just one of three separate contingencies that are at issue here, each of which if not satisfied or withdrawn required the return of the Duseks' earnest money and the BSA terminates. BSA, ll.132-184, 236-240, 244-245, SSF, doc. 15, p. 3, doc. 15-1. The Inspection Notice and the election to negotiate the items disapproved related only*

*to the Property Conditions Inspection Contingency. BSA, ll.139-184, SSF, doc. 15, p. 3, doc. 15-1.*

12. The Inspection Notice enumerated the nine different conditions of the Property that Duseks requested Glacier Bear to repair or remedy which were drawn directly from Quinn's report. Depo. M. Dusek, 79:21-80:15. Those conditions included: drainage, siding condition, flashing, evidence of moisture, mold build-up, stairs (railing in guest house), valley flashing, insulation, and evidence of leakage. Ex. H, Inspection Notice at 2, ll. 56-75. However, nowhere in the Inspection Notice did Duseks raise any concern or objection to the water rights appurtenant to the Property, even though "Water Rights" was a condition listed in the "Inspection Contingency" paragraph. Ex. H, Inspection Notice at 1-2; Ex. D, BSA at 4, ll. 166. The Inspection Notice also provided, "If Seller and Buyer agree to the remedies specified above, this document shall constitute an amendment to the Buy-Sell Agreement referred to above and shall be an integral part of this transaction. Seller shall complete all agreed upon resolution(s) to the condition(s) and problem(s) identified above by 5:00 p.m. (Mountain Time) on 11/05/2021." Ex. H, Inspection Notice at 2, ll. 79-82; Depo. M. Dusek, 81:16-82:4.

*Disputed. The Inspection Notice was provided to Scott Darkenwald by the Duseks on October 15, 2021. Inspection Notice, ll.1, 84, SSF, doc. 15, p. 3, doc. 15-2. The Inspection Notice did not mention water rights, because the Inspection*

*Notice resolution process and its associated contingency release dates apply only to the Property Conditions Inspection Contingency. BSA, ll.236-240, SSF, doc. 15, p. 3, doc. 15-1. The Well Permitting and Water Rights Contingency is distinct from the Property Conditions Inspection Contingency. BSA, ll.236-240, SSF, doc. 15, p. 3, doc. 15-1. The parties separately added it to the form BSA document and gave it its own distinct contingency release date of November 3, 2021. BSA, ll.236-240, SSF, doc. 15, p. 3, doc. 15-1. Also, as noted above with respect to paragraphs 8 and 9, the Provisional Permit and cover letter – not provided to the Duseks until this litigation – explains the additional burden required of the provisional rightsholder to possibly obtain a permanent water right for the Property, including the filing of a Form 617. Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16. The consequence of the failure of the rightsholder to pursue these rights through DNRC "will result in the termination of [the buyer's] provisional permit." Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16.*

*The separate release date of November 3, 2021 applied to the Well Permitting and Water Rights Contingency because the parties added this contingency separately and provided its own distinct release date. BSA, ll.132-137, 236-240, SSF, doc. 15, p. 3, doc. 15-1.*

13. Duseks signed and dated the Inspection Notice on October 15, 2021. Depo. M. Dusek, 80:1-9; SSF, ¶ 7.

*Undisputed, except that the Inspection Notice procedures apply only to those matters identified under the Property Condition Inspection Contingency and not to all other contingencies. BSA, ll.132-184, 236-240, SSF, doc. 15, p. 3, doc. 15-1.*

14. Mr. Darkenwald discussed what was required under the Inspection Notice with Ms. Goodwin. Ms. Goodwin's response was, "fix whatever needs to be fixed, or we'll – we will fix whatever needs to be fixed." Depo. S. Darkenwald 64:16-24. There was no reservation on her part about moving forward to complete the repairs. *Id*., 64:25-65:2; Decl. of G. Goodwin, ¶¶ 9-10; Decl. of D. Slattengren, ¶ 6.

*Undisputed.*

15. Ms. Goodwin and Mr. Slattengren signed and dated the Inspection Notice on October 17, 2021, and returned it to Duseks through Mr. Darkenwald that same day. Decl. G. Goodwin, ¶ 9; Decl. D. Slattengren, ¶ 5; Depo. S. Darkenwald, 65:3-14. Mr. Darkenwald forwarded the fully executed Inspection Notice to Duseks the following day. Depo. S. Darkenwald, 65:11-17. Duseks received the fully executed Inspection Notice on October 18, 2021. Depo. M. Dusek, 82:5-83:2.

*Undisputed.*

16. Duseks sole personal inspection of the Property occurred on October 19, 2021. Depo. S. Darkenwald, 82:4-7; Depo. M. Dusek, 114:12-22. They told

Mr. Darkenwald that they more excited about the purchase than before they had arrived. Depo. S. Darkenwald, 84:12-23.

*Disputed. Duseks personally visited the Property on October 19, 2021, but they did not tell Scott Darkenwald that they were more excited about the purchase than before they arrived. Ex. A, M. Dusek Decl., ¶6; Ex. B, R. Dusek Decl. ¶6. The Duseks were not more excited about the potential purchase, but instead were troubled by the road noise and other issues that they observed during their personal visit. Ex. A, M. Dusek Decl., ¶6; Ex. B, R. Dusek Decl. ¶6. Matt Dusek testified as follows:*

> Q Do you recall Scott's testimony that after you visited the property, you were more excited about the transaction than you were before you visited the property?
>
> A I remember that testimony.
>
> Q Do you agree or disagree with that testimony?
>
> A I disagree with that testimony.
>
> Q Tell me why.
>
> A We discussed with Scott that there were certain matters that were, you know, sort of better than we expected them to be and certain matters that were worse than we expected them to be; matters related to the house notwithstanding the mold, but just that -- he had sort of -- Scott would often refer to the Iron Horse properties, and some of this was in relation to just how do we think about pricing and whatnot. So he had sort of maybe made it seem like the house was -- like don't focus on the house.
>
> We thought the house was, you know, a nice -- you know, like especially if it was being used as a family retreat, vacation rental; it

was a nice house. The property was worse insofar as what we were looking for, you know, again, the road noise and so forth. I think Scott might have been confused by the excitement that I especially have -- I set foot in Montana; I set foot in Glacier National Park; I become ecstatic.

Q Did you ask Scott if he had any explanation for why there was more road noise than you anticipated when you visited?

A I said, We talked about this.

And he said, I never noticed it before. Now that you say it, yeah, but maybe because it's fall and there aren't leaves on the trees, and maybe it will be better during the summer.

I was like, What? When the 3 million visitors hit?

Q At any time did anyone make you aware that there was road construction going on on Camas Road when you were visiting?

A Not to my recollection. And to be clear, the noise that we noticed when -- we had walked around the property with Scott and Tracy. Eventually Scott and Tracy left, and Scott suggested we remain on the property and walk around and just take it all in.

We were standing on the front porch and heard the first vehicle drive by -- first that we were paying attention to -- and we saw it drive by. You could see it sort of blinking through the trees. We were like, Oh, no. How did we not notice that? Now that we're standing there looking at it, it's obvious.

And, you know, subsequent vehicles -- this wasn't jackhammers and forklifts and, you know, whatever, front loaders. This was just regular vehicle traffic.

*Ex. C, M. Dusek Dep. 115:18-117:19. Near the conclusion of the Duseks' visit with Scott Darkenwald, Scott suggested that they take some time to walk around the house and the property alone. Before the Duseks did that, he asked whether they were satisfied and prepared to release their contingencies early, before the*

*contingency release dates. The Duseks told Scott that they were not prepared to release any contingencies at that time. After Scott's departure, during their private walk around the property, the Duseks were underwhelmed. The traffic noise and visibility were much more invasive than they had been led to believe. Matt Dusek mentioned this to Scott Darkenwald during their phone call the following day. Ex. A, M. Dusek Decl., ¶6; Ex. B, R. Dusek Decl. ¶6.*

17. Ms. Goodwin took immediate steps to perform the work required by the Inspection Notice by hiring the necessary contractors. Decl. G. Goodwin, ¶ 10. As required by the Inspection Notice, she hired Cory Rensmon at Advanced Restoration to repair the siding condition, flashing, evidence of moisture and mold build-up as those items were identified in the Inspection Notice. *Id*. The work was completed on or about October 26, 2021. *Id*. GBR spent a total of $30,319.75 on the repairs, including $25,244 on mold and moisture remediation performed by Mr. Rensmon at Advanced Restoration. *Id*. Mr. Darkenwald notified Mr. Dusek, by email of October 14, 2021, that Mr. Rensmon "guarantees his work[.]" Depo. M. Dusek, 130:14-22. Mr. Darkenwald's email to Mr. Dusek of October 14, 2021, which was marked as Exhibit 10 at Mr. Dusek's deposition, is attached as Exhibit 2 to the Declaration of Fred Simpson.

*Disputed. Cory Rensmon performed work on the Property pursuant to an agreement with Plaintiffs, but the work was far from complete and far from*

*satisfying the Property Conditions Inspection Contingency regarding moisture and mold remediation. Ex. A, M. Dusek Decl., ¶13, Ex. 34. Duseks never had any contract or even any communications with Cory Rensmon. Ex. A, M. Dusek Decl., ¶8; Ex. B, R. Dusek Decl. ¶8. A guarantee of Rensmon's work was never provided to Duseks by Advanced Restoration. Ex. A, M. Dusek Decl., ¶8; Ex. B, R. Dusek Decl. ¶8.*

18. D. Quinn Construction then returned to the Property to perform a re-inspection. It issued a report of its re-inspection dated October 27, 2021. D. Quinn's Re-inspection Report was produced by Glacier Sotheby's International Realty in response to a Subpoena Duces Tecum, and marked as Exhibit 1 at the Deposition of Scott Darkenwald. The Re-Inspection Report (Bates numbered GSIR SDT 709-759[2]) is attached as Exhibit 3 to the Declaration of Fred Simpson. That report confirmed that the repairs to each of the nine items listed in the Inspection Notice had been completed satisfactorily. Exhibit 3, GSIR SDT 712 (Drainage/gutter extension); GSIR SDT 709 (Siding Condition); GSIR SDT 709 (Flashing); GSIR SDT 731 (Evidence of moisture); GSIR SDT 710 (Mold build-up); GSIR SDT 711 (Stairs- railing in guest house); GSIR SDT 712 (Valley Flashing); GSIR SDT 713 (Insulation); and GSIR SDT 714 (Evidence of Leakage).

---

[2] Due to an apparent copying error, some of the pages in the report appear out of sequence in the GSIR production.

Mr. Dusek confirmed his agreement that all such items had been satisfactorily repaired, with the exception of "evidence of moisture" and "mold build-up." Depo. M. Dusek, 107:2-21; 108:11-109:5.

*Disputed. Two separate reinspection reports were performed by D. Quinn Construction, Inc. after the remediation by Cory Rensmon at Advanced Restoration. Ex. A, M. Dusek Decl., ¶¶9-14, Ex. 34, 35. Plaintiffs' statement ignores the one that specifically applies to mold and moisture, entitled, "Limited Microbial Investigation Report" (the "<u>Moisture and Mold Reinspection Report</u>") issued by David Quinn, a Certified Residential Mold Inspector and father of Kelly Quinn. Ex. A, M. Dusek Decl., ¶11, Ex. 34.*

***<u>Kelly Quinn's General Reinspection Report (10/27/2021)</u>***

*Kelly Quinn provided the report referenced in Plaintiff's paragraph 18 (the "<u>General Reinspection Report</u>"). Ex. A, M. Dusek Decl., ¶14, Ex. 35. Kelly Quinn's General Reinspection Report expressly covers only general construction matters that were open and visible to the naked eye. Ex. A, M. Dusek Decl., ¶14, Ex. 35. It disclaims, "This is a* ***<u>visual</u>*** *evaluation of reasonably accessible areas of the structure." Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 10 (emphasis original). Kelly Quinn's General Reinspection Report expressly does not analyze the mold remediation, except to the extent that mold might remain visibly present. It makes clear:*

> *Also note this visual inspection does not include surface mold, which is not visible at the time of inspection. These surface molds require a special type of equipment to detect. Note surface molds produce fruiting bodies and, when mature, produce millions of tiny spores (seeds) that are present in the air.*

*Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 10. The list of "Exclusions" to Kelly Quinn's General Reinspection Report expressly limits its scope of work as follows:*

> ***Scope of work shall not extend to or include or be applicable to:***
>
> *… 2. Defects in areas inaccessible to inspectors view.*
>
> *… 14. Mold/fungi which is not plainly visible.*

*Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 9 (emphasis original). It further includes "General Exclusions" that provides:*

> ***The Inspector is not required to report on:***
>
> *… 21. Any component or system which, was not observed.*
>
> *… 24. Determine the presence of any suspected hazardous substance including but not limited to: toxins, contaminants in soil, carcinogens, water, air, and noise.*

*Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 9.*

***<u>David Quinn's Moisture and Mold Reinspection Report (10/26/2021)</u>***

*Kelly Quinn's father, David Quinn, performed a separate moisture and mold reinspection and detailed his findings in a report entitled "Limited Microbial Investigation" dated October 26, 2021 (the "Moisture and Mold Reinspection Report"). Ex. A, M. Dusek Decl., ¶13, Ex. 34. The Moisture and Mold Reinspection Report was to serve as the "clearance test" referenced in the*

*Inspection Notice. Ex. D, Goodwin Dep. 158:23-25 ("Q The clearance testing was the test performed by D. Quinn and the lab that he hired? A That is correct."); Ex. A, M. Dusek Decl., ¶11, Ex. 38. David Quinn is a Certified Residential Mold Inspector who sampled the home for moisture and performed surface and air tests for mold spores. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 1. David Quinn sent his samples to a third-party laboratory in Arizona for analysis. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 10-22. The laboratory results are included in David Quinn's report and reveal that mold and moisture remained at elevated levels even after the remediation work performed by Cory Rensmon. Ex. A, M. Dusek Decl., ¶13, Ex. 34; see also Defendants' Additional Facts herein.*

19. Concerning the "evidence of moisture," D. Quinn's Re-Inspection Report provides, "Satisfactory" and "Note evidence of moisture and water stains located main level closet under the stair area during the original inspection as (*sic*) been corrected and was dry at time of inspection with the flashing and siding issue having been corrected." Ex. 3 to Declaration of F. Simpson, GSIR SDT 731; Depo. M. Dusek, 120:4-20.

*Disputed. Two separate reinspection reports were performed by D. Quinn Construction, Inc. after the remediation by Cory Rensmon at Advanced Restoration. Ex. A, M. Dusek Decl., ¶¶9-14, Ex. 34, 35. Plaintiffs' statement ignores the one that specifically applies to mold and moisture, entitled, "Limited*

*Microbial Investigation Report" (the "Moisture and Mold Reinspection Report") issued by David Quinn, a Certified Residential Mold Inspector and father of Kelly Quinn. Ex. A, M. Dusek Decl., ¶11, Ex. 34.*

***Kelly Quinn's General Reinspection Report (10/27/2021)***

*Kelly Quinn provided the report referenced in Plaintiff's paragraph 18 (the "General Reinspection Report"). Ex. A, M. Dusek Decl., ¶14, Ex. 35. Kelly Quinn's General Reinspection Report expressly covers only general construction matters that were open and visible to the naked eye. Ex. A, M. Dusek Decl., ¶14, Ex. 35. It disclaims, "This is a* ***visual*** *evaluation of reasonably accessible areas of the structure." Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 10 (emphasis original). Kelly Quinn's General Reinspection Report expressly does not analyze the mold remediation, except to the extent that mold might remain visibly present. It makes clear:*

> *Also note this visual inspection does not include surface mold, which is not visible at the time of inspection. These surface molds require a special type of equipment to detect. Note surface molds produce fruiting bodies and, when mature, produce millions of tiny spores (seeds) that are present in the air.*

*Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 10. The list of "Exclusions" to Kelly Quinn's General Reinspection Report expressly limits its scope of work as follows:*

> ***Scope of work shall not extend to or include or be applicable to:***
>
> *… 2. Defects in areas inaccessible to inspectors view.*
>
> *… 14. Mold/fungi which is not plainly visible.*

*Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 9 (emphasis original). It further includes "General Exclusions" that provides:*

> ***The Inspector is not required to report on:***
>
> *… 21. Any component or system which, was not observed.*
>
> *… 24. Determine the presence of any suspected hazardous substance including but not limited to: toxins, contaminants in soil, carcinogens, water, air, and noise.*

*Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 9.*

***<u>David Quinn's Moisture and Mold Reinspection Report (10/26/2021)</u>***

*Kelly Quinn's father, David Quinn, performed a separate moisture and mold reinspection and detailed his findings in a report entitled "Limited Microbial Investigation" dated October 26, 2021 (the "Moisture and Mold Reinspection Report"). Ex. A, M. Dusek Decl., ¶13, Ex. 34. The Moisture and Mold Reinspection Report was to serve as the "clearance test" referenced in the Inspection Notice. Ex. D, Goodwin Dep. 158:23-25 ("Q The clearance testing was the test performed by D. Quinn and the lab that he hired? A That is correct."); Ex. A, M. Dusek Decl., ¶11, Ex. 38. David Quinn is a Certified Residential Mold Inspector who sampled the home for moisture and performed surface and air tests for mold spores. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 1. David Quinn sent his samples to a third-party laboratory in Arizona for analysis. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 10-22. The laboratory results are included in David Quinn's report and reveal that mold and moisture remained at elevated levels even after the*

*remediation work performed by Cory Rensmon. Ex. A, M. Dusek Decl., ¶13, Ex. 34; see also Defendants' Additional Facts herein.*

20. Concerning the "mold build-up," D. Quinn's Re-Inspection Report provides that it was, "Satisfactory" and "Note the water stains and possible surface fungal growth that was found at main level closet under the stairs during the original inspection does appear to have been properly treated and remediated. The insulation and vapor barrier was yet to be installed to allow for visual inspection[n] and was scheduled to be done." Ex. 3 to Declaration of F. Simpson, GSIR SDT 710.

*Disputed. Two separate reinspection reports were performed by D. Quinn Construction, Inc. after the remediation by Cory Rensmon at Advanced Restoration. Ex. A, M. Dusek Decl., ¶¶9-14, Ex. 34, 35. Plaintiffs' statement ignores the one that specifically applies to mold and moisture, entitled, "Limited Microbial Investigation Report" (the "<u>Moisture and Mold Reinspection Report</u>") issued by David Quinn, a Certified Residential Mold Inspector and father of Kelly Quinn. Ex. A, M. Dusek Decl., ¶11, Ex. 34.*

***<u>Kelly Quinn's General Reinspection Report (10/27/2021)</u>***

*Kelly Quinn provided the report referenced in Plaintiff's paragraph 18 (the "<u>General Reinspection Report</u>"). Ex. A, M. Dusek Decl., ¶14, Ex. 35. Kelly Quinn's General Reinspection Report expressly covers only general construction*

*matters that were open and visible to the naked eye. Ex. A, M. Dusek Decl., ¶14, Ex. 35. It disclaims, "This is a **visual** evaluation of reasonably accessible areas of the structure." Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 10 (emphasis original). Kelly Quinn's General Reinspection Report expressly does not analyze the mold remediation, except to the extent that mold might remain visibly present. It makes clear:*

> *Also note this visual inspection does not include surface mold, which is not visible at the time of inspection. These surface molds require a special type of equipment to detect. Note surface molds produce fruiting bodies and, when mature, produce millions of tiny spores (seeds) that are present in the air.*

*Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 10. The list of "Exclusions" to Kelly Quinn's General Reinspection Report expressly limits its scope of work as follows:*

> ***Scope of work shall not extend to or include or be applicable to:***
>
> *… 2. Defects in areas inaccessible to inspectors view.*
>
> *… 14. Mold/fungi which is not plainly visible.*

*Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 9 (emphasis original). It further includes "General Exclusions" that provides:*

> ***The Inspector is not required to report on:***
>
> *… 21. Any component or system which, was not observed.*
>
> *… 24. Determine the presence of any suspected hazardous substance including but not limited to: toxins, contaminants in soil, carcinogens, water, air, and noise.*

*Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 9.*

***David Quinn's Moisture and Mold Reinspection Report (10/26/2021)***

*Kelly Quinn's father, David Quinn, performed a separate moisture and mold reinspection and detailed his findings in a report entitled "Limited Microbial Investigation" dated October 26, 2021 (the "Moisture and Mold Reinspection Report"). Ex. A, M. Dusek Decl., ¶13, Ex. 34. The Moisture and Mold Reinspection Report was to serve as the "clearance test" referenced in the Inspection Notice. Ex. D, Goodwin Dep. 158:23-25 ("Q The clearance testing was the test performed by D. Quinn and the lab that he hired? A That is correct."); Ex. A, M. Dusek Decl., ¶11, Ex. 38. David Quinn is a Certified Residential Mold Inspector who sampled the home for moisture and performed surface and air tests for mold spores. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 1. David Quinn sent his samples to a third-party laboratory in Arizona for analysis. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 10-22. The laboratory results are included in David Quinn's report and reveal that mold and moisture remained at elevated levels even after the remediation work performed by Cory Rensmon. Ex. A, M. Dusek Decl., ¶13, Ex. 34; see also Defendants' Additional Facts herein.*

21. On October 25, 2021, Mr. Darkenwald had a conversation with Duseks during which they told him where "Rachel and I stood with regard to purchasing the transaction and some concerns we had and that we were contemplating terminating the transaction and wanted to review with him, as our

agent." Depo. M. Dusek, 42:12-17. Ms. Goodwin and Mr. Slattengren were not made aware of this conversation until after the current lawsuit was filed. Decl. G. Goodwin, ¶ 12. Mr. Darkenwald told Mr. Dusek of his opinion that Duseks would have a problem with "seller's remedies" as he believed that Ms. Goodwin and Mr. Slattengren had complied with the Inspection Notice. Depo. S. Darkenwald, 97:6-99:18. He advised Duseks twice on October 25th, that their "contingencies are gone" and to have their attorney "look at Inspection contingency & Seller's Remedies in writing." *Id*., 98:12-99:18. Mr. Darkenwald then confirmed that Tom Burk, the president of his company, Glacier Sotheby's International Realty, and Jaymie Bowditch, Glacier Sotheby's counsel, agreed with his assessment. *Id*., 100:5-102:2. It was Mr. Darkenwald's opinion that as of October 25, 2021, Ms. Goodwin and Mr. Slattengren had complied with their obligations under the Inspection Notice and BSA, that it was too late for Duseks to back out of the Agreement, and at best they would lose their earnest money. *Id*., 101:18-103:2.

*Disputed. Rachel Dusek was not a party to the conversations with Scott Darkenwald on October 25, 2021. Ex. A, M. Dusek Decl., ¶10. Ex. B, R. Dusek Decl., ¶6. Also, Matt Dusek denies that Scott Darkenwald said then that the sellers had complied with their obligations under the Inspection Notice. By text message on October 25, 2021, Scott Darkenwald acknowledged that the Property Condition*

*Inspection Contingency remained in effect and would be released only if the moisture and mold were remediated and passed the "clearance test."*

> *Hi. We should have the inspection results all done by tomorrow late afternoon.*
> *That would wrap up your contingencies if all is well.*
> *Where are you on the LLC business ?*
> *Once that is decided we could close early if you like.*
> *Scott*

*Ex. A, M. Dusek Decl., ¶10, Ex. 36; Ex. B, R. Dusek Decl., ¶7., Ex. 36. Later, Scott Darkenwald changed his opinion and said that the Duseks had forfeited their contingencies when they signed the Inspection Notice, which was the very document that required remediation of the moisture and mold and required that the Property pass a mold "clearance test." The Duseks signed the Inspection Notice on October 15, 2021 – i.e., even before the Duseks had visited the Property. Ex. A, M. Dusek Decl. ¶9, Ex. 36. Further, Plaintiffs' assertion defies logic because the remediation work and reinspection reports had not yet even been completed by October 25, 2021, so it would have been impossible to know whether Plaintiffs' remediation efforts resolved the mold and moisture issues. Ex. A, M. Dusek Decl. ¶9, Ex. 36. Also, Matt Duseks denies that Scott Darkenwald discussed anything regarding the sellers' remedies during the October 25, 2021 conversations. Ex. A, M. Dusek Decl. ¶10. The Duseks did not ever discuss the issue of specific performance with Scott Darkenwald; on or about October 30, 2021, Scott Darkenwald discussed with Matt Dusek his claim that the Duseks'*

*earnest money was at risk of loss or litigation. Ex. A, M. Dusek Decl. ¶10. Further, any interpretation of the BSA is a legal matter for the Court to resolve; the opinions of Scott Darkenwald or his employer as to the meaning of the BSA are not relevant.*

22. On October 26, 2021, Mr. Dusek "called and told [Mr. Darkenwald] he was going to go forward" and that Mr. Darkenwald could so inform Ms. Goodwin." Depo. S. Darkenwald, 100:12-20. Mr. Dusek concurs that during his discussion with Mr. Darkenwald on October 26, 2021, he told Mr. Darkenwald, "We were going to proceed toward closing, which is to say we were going to continue forward – we still – you know, pending all the work that was ongoing." Depo. M. Dusek, 48:13-20.

*Disputed. The statement from Matt Dusek's deposition is incomplete and taken out of context. On October 26, 2021, Matt Dusek told Scott Darkenwald that they were continuing to proceed toward closing, but that they still needed to review the results of moisture and mold testing and that they were not then willing to release any of their contingencies. Matt's complete testimony on this point was:*

> ***Q Before we go back into your discussion with Scott about the contingencies and your understanding of those when the contract was signed, was there a discussion with Scott on the 26th where you told him you were going to proceed to closing?***
>
> *A We were going to proceed toward closing, which is to say we were going to continue forward -- we still -- you know, pending all the work that was ongoing. We needed to review the mold report. We*

*needed to see everything was finished up. We needed to do a final review.*

*I think this was one of the things, you know, again, like with repeatedly discussing with us moving up the closing, you know. The language says "on or before the closing date." Yes, we agreed, on or before -- we'll do it before, if we close and if we're able to.*

*I think in the same way that there seemed to be a -- particularly in retrospect -- there seemed to be a lot of confusion with Scott between saying, "We're going to continue on course" with, "Okay, we're all done then."*

***Q We're gonna close?***

*A Right. Which was not what we were signaling. If that were the case, we should all sign release of contingencies that day, right there on the moment. That was not what we conveyed to him.*

*Ex. C, M. Dusek Dep. 48:13-49:12.*

Q In this he notes, No. 1, "Going to proceed." I take it from our *earlier discussion this morning, you did not tell him -- according to your testimony, you did not tell him that you were going to proceed?*

*A Proceed towards closing as opposed to terminating immediately. We're going to continue the process; we're not going to end the process, at that particular point in time. We weren't relinquishing any opportunity or any rights under the contract to continue to evaluate, and his behavior evidenced an understanding of that. He continued to bring us information about how we were doing and how the whole transaction – contemplated transaction was doing as concerns the satisfaction of issues raised.*

*Ex. C, M. Dusek Dep. 124:6-19. Further, the Duseks did not ever tell Scott Darkenwald that they could inform the Plaintiffs that the Duseks intended to proceed to closing.*

*Q Did he inquire of you whether you could -- I'm sorry.*

*Did Scott inquire of you whether he could tell Gail that you intended to close?*

*A He did not. He said that he did. He did not, because there was not any -- you know, this is what I was referring to -- telling Gail that we were going forward in spite of our concerns makes no sense, because Gail didn't know about our concerns.*

*A confidential discussion is a confidential discussion. It would serve no purpose -- like from our point of view, going -- you know, proceeding -- all it could do is cause the sellers unnecessary concern at a point in time when it was unknown.*

*It looked like on the 30th, Scott tried to move back and cover his tracks.*

*Ex. C, M. Dusek Dep. 49:13-50:3.*

23. On October 30, 2021, Mr. Dusek emailed two letters dated October 30, 2021, to Mr. Darkenwald purporting to terminate the BSA and demanding a return of Duseks' earnest money. Depo., M. Dusek, 87:8-88:2; Depo. S. Darkenwald 117:20-118:24. Those letters, which were also produced by Glacier Sotheby's International Realty in response to a Subpoena Duces Tecum as GSIR 1297-1298, and were included as Exhibit 1 at Mr. Darkenwald's deposition. They are attached hereto as Exhibit 4 to the Declaration of Fred Simpson. These letters were the first notice from Duseks to Glacier Bear that they intended not to close on the transaction. Depo. S. Darkenwald, 118:16-24; Depo. M. Dusek, 123:7-12.

*Undisputed.*

24. Duseks explained their reasons for backing out of the BSA as follows:

> As we are unable to come to written agreement in satisfaction of the conditions noted, and as we did not withdraw, in writing, our disapproval of the conditions noted on or before the stipulated Resolution Date (10/29/2021 at 5:00 PM MT), we expect that the earnest money shall be returned to us and the Agreement then terminated.

Ex. 4, GSIR SDT 1298. The second letter provided additional grounds:

> [W]e hereby serve notice of our disapproval of the Property conditions and do not wish to proceed with the purchase – we elect to immediately terminate the Agreement.
>
> In this decision, we are specifically relying on our reserved rights under the agreement to contingencies based on:
>
> **Well Related Permitting/Water Rights** (line 273)
> We don't find the water rights of the property to our satisfaction.
>
> **Additional Provisions – Personal Inspection/Property Visitation** (line 245)
> We don't find the visibility and noise of traffic on Camas Rd. adjacent to the Property to our satisfaction.

Ex. 4, GSIR 1297.

*Undisputed.*

25. These letters of October 30, 2021 were the first notice to Mr. Darkenwald or GBR that Duseks had any objection to the water rights, as well as visibility and noise of traffic on Camas Road. Depo. S. Darkenwald, 119:1-120:5; Depo. M. Dusek, 122:20-123:12. Duseks' notice was untimely; at the latest, they had until 5:00 p.m., Mountain Time, on October 26, 2021, to terminate the BSA, or

even under their interpretation of the Agreement, until 5:00 p.m., Mountain Time, on October 29, 2021. Ex., D, BSA at 4, ll. 171-184.

*Disputed. Even prior to their personal visitation, the Duseks repeatedly discussed with Scott Darkenwald their concerns about road noise at the Property, their concerns about the well permitting and water rights, and their concerns about mold and moisture in the Property. Ex. C, M. Dusek Dep. 115:18-117:19, 127:23-129:7; Ex. E, Darkenwald Dep. 44:9-45:3, 84:12-23, 118:21-120:4, 276:22-277:6. Scott Darkenwald's handwritten notes from October 5, 2021 specifically mention one of the Duseks concerns as "5. Road noise on Camas in peak season." Ex. F, Excerpts of Darkenwald's file (GSIR 462).*

*Also, Duseks' notice was timely under the amended BSA. As to the Property Conditions Inspection Contingency under the terms of the Inspection Notice, the parties agreed that Plaintiffs had until November 5, 2021 to cure the defects; the Plaintiffs failed to remediate the mold and moisture. As to the Well Permitting and Water Rights Contingency, the release date was November 3, 2021. As to the Personal Visitation contingency, the BSA provides no release date. Duseks' October 30, 2021 termination letters were timely under each of these three contingencies. BSA, ll.132-184, 236-240, 244-245, SSF, doc. 15, p. 3, doc. 15-1.*

*Finally, the October 29, 2021 date in the BSA has nothing to do with any deadline for terminating the BSA. BSA, ll.180-184, SSF, doc. 15, p. 3, doc. 15-1.*

26. Duseks have the financial resources to close on the purchase of the Property if so ordered by the Court. Depo. M. Dusek, 29:14-17.

*Undisputed.*

27. The BSA contains a section titled "Seller's Remedies." It provides:

> **SELLER'S REMEDIES:**
>
> If the Seller accepts the offer contained in this Agreement and Buyer refuses or neglects to consummate the transaction anticipated by this Agreement within the time period provided in this Agreement, the Seller may:
>
> > (1) Declare the earnest money paid by Buyer to be forfeited whereupon the rights and duties of the Buyer and Seller under this Agreement shall be terminated; **OR**
> >
> > (2) Demand that Buyer specifically perform Buyer's duties and obligations under this Agreement; **OR**
> >
> > (3) Demand that Buyer pay monetary damages for Buyer's failure to perform the terms of this Agreement.

Ex. D, BSA at 7, ll. 386-392.

*Undisputed.*

28. The Buy-Sell Agreement provides:

> **ATTORNEY FEE:** In any action brought by the Buyer or Seller to enforce any of the terms of this Agreement, the prevailing party in such action shall be entitled to such reasonable attorney fees as the court or arbitrator shall determine just.

Ex. D, BSA at 8, ll. 427-429.

*Undisputed.*

**DEFENDANTS' ADDITIONAL FACTS IN OPPOSITION TO PLAINTIFFS' MOTION:**

29. Glacier Sotheby's, Scott Darkenwald, and Traci Rossi acted as dual agents in connection with the BSA, representing both the sellers and the buyers. BSA, ll.460-489, SSF, doc. 15, p. 3; doc. 15-1.

30. When the BSA was executed, the Duseks had not yet personally visited the Subject Property. Ex. A, M. Dusek Decl. ¶¶5-6.

31. When the Inspection Notice was executed, the Duseks had not yet personally visited the Subject Property. Ex. A, M. Dusek Decl., ¶¶5-6.

32. The BSA had a closing date of November 9, 2021. BSA, l.44, SSF, doc. 15, p.3; doc. 15-1.

33. The BSA includes certain contingencies to closing the contemplated transaction. BSA, ll.132-184, 237-240, 244-245, SSF, doc. 15, p. 3; doc. 15-1.

34. Contingencies are covered generally at page 3, lines 132-37 of the BSA, which provides:

> **CONTINGENCIES**: The contingencies set forth in this Agreement or on attached addenda shall be deemed to have been released, waived, or satisfied, and the Agreement shall continue to closing, unless, by 5:00 p.m. (Mountain Time) on the date specified for each contingency, the party requesting that contingency has notified the other party or the other party's Broker/Salesperson in writing that the contingency is not released, waived, or satisfied. If a party has notified the other party on or before the release date that a contingency is not released, waived, or satisfied, this Agreement is terminated, and the

> earnest money will be returned to the Buyer, unless the parties negotiate other terms or provisions.

BSA, ll.132-137, SSF, doc. 15, p. 3; doc. 15-1.

35. In addition to the general contingency language, the BSA also includes certain specific contingencies, whose deadlines may be the general deadline set forth above or may be separately set forth. BSA, ll.132-184, 237-240, 244-245, SSF, doc. 15, p. 3; doc. 15-1.

36. For a contingency to apply, either the box to a particular contingency needed to be checked or the contingency needed to be separately identified in the BSA. *E.g.*, BSA, ll.140, 237-240, 244-245, SSF, doc. 15, p. 3; doc. 15-1.

37. Three separate contingencies are at issue in this litigation – (1) the general "Property Condition Inspection Contingency," (2) the "Personal Visitation Contingency," and (3) the "Well Permitting and Water Rights Contingency." The latter two contingencies were specifically and separately identified and added to the standard form BSA. BSA, ll.132-184, 237-240, 244-245, SSF, doc. 15, p. 3; doc. 15-1.

38. The first of the specifically selected contingencies is the Property Condition Inspection Contingency, found at pages 3-4, lines 139-84 of the BSA, which reads:

**INSPECTION CONTINGENCY**:

This Agreement is contingent upon Buyer's acceptance of any Property conditions that Buyer deems appropriate, including but not limited to any inspections or advice listed below. Buyer agrees to acquire, at Buyer's own expense, independent inspections or advice from qualified inspectors or advisors of the Buyer's choice. Buyer agrees that any investigations or inspections undertaken by Buyer or on his/her behalf shall not damage or destroy the Property, without the prior written consent of Seller. Seller agrees to provide Buyer and Buyer's agents, inspectors and advisors reasonable access to the Property to conduct any inspections desired by Buyer. Buyer agrees to indemnify, defend and hold harmless Seller from any and all claims or damage, including attorney's fees, caused by or incurred during any inspections of the Property by or on behalf of the Buyer and that arise out of or are related to (i) any loss or damage to the Property or the contents of the Property caused by any inspection or (ii) any injury to Buyer or Buyer's inspectors or advisors.

BSA, ll. 139-184, SSF, doc. 15, p. 3; doc. 15-1.

39. The Property Condition Inspection Contingency identifies a non-exhaustive ("including but not limited to") list of example items for inspection and approval by Duseks, including:

| | |
|---|---|
| Home/Property Inspection | Review and Approval of Protective Covenants |
| Owner's Property Disclosure Statement | Easements |
| Roof Inspection | Flood Plain Determination |
| Structural/Foundation Inspection | Water Sample Test |
| Electrical Inspection | Septic or Cesspool Inspection |
| Plumbing Inspection | Mineral Rights Search |
| Heating, ventilation, cooling system - Inspection | Radon |
| Stove/Fireplace Inspection | Asbestos |
| Pest/Rodent Inspection | Wild Fire Risk |

| | |
|---|---|
| Well Inspection for Condition of Well and Quantity of Water | Legal Advice |
| Accounting Advice | Toxic Waste/Hazardous Material |
| Survey or Corner Pins located | Underground Storage Tanks |
| Access to Property | Sanitary Approval/Septic permit |
| Verification of # of code compliant bedrooms | Mold |
| Verification of square footage of improvements | Verification of lot size |
| Water Rights | Airport Affected Area |
| Zoning Determination | Road Maintenance |
| Post-Closing Rental Obligations | Internet Availability/Speed |
| Inspection/Testing for Methamphetamine | |

BSA, ll.139-169; SSF, doc. 15, p.3; doc. 15-1.

40. The Property Condition Inspection Contingency applies a specific deadline for release and a specific procedure for attempts to satisfy the contingency. BSA, ll.171-184; SSF, doc. 15, p.3; doc. 15-1.

41. Under the Property Condition Inspection Contingency, Duseks had until October 26, 2021 to give written notice of their objection to the Subject Property's condition regarding any of the above-referenced items. The BSA provides:

> Unless Buyer delivers written notice(s) of Buyer's disapproval of the Property conditions on or before (Notice Date) 10/26/2021 at 5:00 p.m. (Mountain Time), this inspection contingency shall be of no further force or effect. **If Buyer disapproves** of the Property condition, Buyer shall deliver written notice to the Seller or the Seller's Broker/Salesperson on or before the date specified above, together with a copy of ONLY that portion of the inspection or report

> upon which the disapproval is based. Buyer shall also state whether Buyer elects to immediately terminate the Agreement or negotiate a resolution of the conditions noted. **If Buyer elects to negotiate** a resolution of the conditions noted, the notice must contain all of Buyer's objections and requested remedies.

BSA, ll.171-178; SSF, doc. 15, p.3; doc. 15-1.

42. D. Quinn Construction, Inc. of Kalispell, Montana was retained by the Duseks to perform a property condition inspection, along with testing for radon and of drinking water quality. Ex. A, M. Dusek Dec., ¶7.

43. On October 13, 2021, D. Quinn Construction, Inc. provided a report prepared for execution by Kelly Quinn, identifying certain property condition problems with the Subject Property (the "<u>First Inspection Report</u>"). Ex. A, M. Dusek Dec., ¶7, Ex. 33.

44. The First Inspection Report noted various problems concerning the Property, including "Evidence of moisture" and "Mold build-up." Regarding moisture infiltration, the First Inspection Report cautioned:

> Note evidence of moisture and water stains located main level closet under the stair area appears to have been caused by prior and/or ongoing leakage at the northeast siding flashing area. Consulting a qualified trade's contractor is advised at this time for further evaluation and repairs if needed.

Ex. A, M. Dusek Dec., ¶7, Ex. 33 at 12. Regarding mold buildup, the report included a photo of the visible mold, and it recommended remediation along with a more thorough mold testing to detect mold that might not be open and obvious

> Note water stains and possible surface fungal growth was found at main level closet under the stairs, possibly caused by inadequate siding flashing although unable to confirm without further testing. This surface fungal growth (black) could produce fruiting bodies and, when mature, produce millions of tiny spores (seeds) which are present in the air. For a more detailed fungal growth inspection, suggest consulting a licensed Certified (AmIAQ) Mold Inspector (D. Quinn Const., Inc.). Also note this visual inspection does not include surface fungal growth, which are not visible at time of inspection. Recommend contacting a qualified mold remediation contractor at this time for further evaluation.

Ex. A, M. Dusek Dec., ¶7, Ex. 33 at 13. Both of these items included the notation, "Attention," meaning that the "Item condition requires immediate attention. See 'Comments' for further explanation." Ex. A, M. Dusek Dec., ¶7, Ex. 33 at 12, 13, 49.

45. On October 15, 2021, Duseks gave Plaintiffs written notice of their disapproval of the property condition and of their intent to negotiate these terms in a document entitled "Inspection Notice." Inspection Notice, SSF, doc. 15, p. 3, doc. 15-2.

46. Specifically, in the Inspection Notice, the Duseks objected to drainage, siding condition, flashing, evidence of moisture, mold build-up, stairs, valley flashing, insulation, and evidence of a leaking waste pipe. Inspection Notice, ll.9-24, SSF, doc. 15, p. 3, doc. 15-2.

47. The Duseks' objections to the property conditions were timely made in the Inspection Notice before the Property Condition Inspections Contingency deadline of October 26, 2021. BSA, l.172, SSF, doc. 15, p. 3, doc. 15-1.

48. Specifically regarding the moisture retention, the Duseks requested in the Inspection Notice: "Evidence of moisture – remedy to suggestion in inspection report, Cory Rensmon at Advanced Restoration to complete work." Inspection Notice, ll.63-64, SSF, doc. 15, p. 3, doc. 15-2.

49. Specifically regarding the mold, the Duseks requested in the Inspection Notice: "Mold Build-up – All mold to be remediated and pass a clearance test. Cory Rensmon at Advanced Restoration to complete work." Inspection Notice, ll.66-67, SSF, doc. 15, p. 3, doc. 15-2.

50. On October 17, 2021, Plaintiffs accepted Duseks' proposed remedies of the property conditions and agreed to complete all work no later than November 5, 2021. Inspection Notice, l.82, SSF, doc. 15, p. 3, doc. 15-2.

51. The mold and moisture problems were never disclosed by either Plaintiffs or Scott Darkenwald prior to the Duseks receiving the First Inspection Report. Ex. D, Goodwin Dep. 184:23-188:13; 192:1-194:17; Ex. 30.

52. On October 17, 2021, the Plaintiffs provided an "Owners Property Disclosure" form only after the First Inspection Report was issued. Ex. D, Goodwin Dep. 184:23-188:13; 192:1-194:17; Ex. 30. On that form, the Plaintiffs

simply reference the First Inspection Report and did not respond to the question of whether there was mold. *Id.*

> Q You believe your statement on Page 1 covers the mold issue?
>
> A It specifically said except for the things that are disclosed on the notice. And the notice, the first thing is mold.
>
> Q So why didn't you check the box that said it has been tested for mold, and there's mold there?
>
> A I can’t answer that. I don't know. I just knew that it had already been covered.

Ex. D, Goodwin Dep. 188:5-13. Plaintiff Gail Goodwin prepared Scott Darkenwald’s Agent’s Property Disclosure for him, which likewise disclosed nothing other than what was already reported in D. Quinn Construction’s First Inspection Report. Ex. D, Goodwin Dep. 184:23-188:13; 192:1-194:17; Ex. 30.

> Q There's a line for "Seller Agent Signature" and Scott Darkenwald's name is typed there. Do you see that?
>
> A I do.
>
> Q Do you know why Scott didn't sign this document?
>
> A You would have to ask him. And he might have. I just don't -- I don't have a copy where he did.
>
> Q Do you know why you would complete in your handwriting a document for Scott's signature?
>
> A He told me that it had to be filled out in the seller's handwriting. That's why it couldn't be done on DocuSign.
>
> Q Even the page that was to bear his signature, 316?
>
> A Again, this all came together as one document. I did not differentiate. I didn't even notice that portion. I just looked, Okay, this

> is him; this is us back here. So I don't know why. You'd have to ask him.

Ex. D, Goodwin Dep. 194:1-17.

53. Upon acceptance of the Inspection Notice, the Inspection Contingency deadline was amended to November 5, 2021. The Inspection Notice provides:

> If Seller and Buyer agree to the remedies specified above, this document shall constitute an amendment to the Buy-Sell Agreement referred to above and shall be an integral part of this transaction. Seller shall complete all agreed resolution(s) to the condition(s), and problem(s) identified above by 5:00 p.m. (Mountain Time) on 11/05/2021 (date).

BSA, ll.79-82, Statement of Stipulated Facts, doc. 15, p. 3, doc. 15-1.

54. After October 17, 2021, Plaintiffs hired contractors to attempt to address the deficiencies identified in the Inspection Notice. SDF, ¶17, *supra*.

55. Plaintiffs hired contractors to perform simple construction remedies that are not at issue here, such as installation of the handrailing, extensions of the gutters, electrical wiring problems, etc. Ex. D, Goodwin Dep. 181:10-182:8.

56. Pursuant to the Inspection Notice, Plaintiffs hired Cory Rensmon of Advanced Restoration to address the mold and moisture problems, as well as to address problems related to the siding and flashing that were thought to cause the moisture infiltration. Ex. D, Goodwin Dep. 86:14-21, 180:11-14.

57. The Buy/Sell Agreement also includes a Personal Visitation Contingency. It provides: "Buyer reserves the right to visit the property during the inspection period." BSA, ll.244-245 SSF, doc. 15, p. 3, doc. 15-1.

58. This contingency was necessary because Duseks had not visited the Subject Property before signing the BSA. Ex. A, M. Dusek Decl. ¶¶5-6; Ex. B, R. Dusek Decl. ¶¶5-6.

59. The BSA does not specify a date for the release of the Personal Visitation Contingency. BSA, ll.244-245 SSF, doc. 15, p. 3, doc. 15-1.

60. Scott Darkenwald explained that the Personal Visitation Contingency broadly allowed the Duseks to terminate the BSA if they did not like anything about the Property when they visited.

> Q … What's the purpose of their visit to the property?
>
> A. To just see what they were spending $[**redacted**] on.
>
> Q. At the time they visited the property on 10/19, could they have backed out of the deal?
>
> A. Yes.
>
> Q. Under what clause, to your understanding?
>
> A. It was -- There was a contingency, I believe, in the buy-sell. Somebody's got to find that buy-sell.

Ex. E, Darkenwald Dep. 219:8-18

> Q. Okay. So I'm clear in my head, on 10/19 when my clients visited the property, at that point they could have backed out of this deal --
>
> A. Yes.
>
> Q. -- as far as you're concerned?
>
> A. Yeah.

Q. For any reason at all.

A. Yes.

Ex. E, Darkenwald Dep. 221:23-222:5.

61. When the Personal Visitation Contingency was added to the standard form realtor buy-sell agreement without any release date, Scott Darkenwald explained to the Duseks that it broadly allowed them to terminate the BSA for any reason at all, if they disliked the Property. In Scott's words, "If the wind blows wrong across the property, you're out." Ex. B, R. Dusek Decl., ¶5; Ex. C, M. Dusek Dep. 47:22-48:12.

62. The Plaintiffs understood that the Personal Visitation allowed the Duseks to terminate the transaction if they did not like the Property when they visited it.

> Q Okay. Any other contingencies that you think applied to this transaction?
>
> A Other than the buyer visiting the property.

Ex. D, Goodwin Dep. 117:14-16

> Q (BY MR. COLEMAN) Do you have an understanding in your own mind of when the visitation contingency expired?
>
> A At the very latest the 26th, because that's what the contract states, that all contingencies expired on the 26th.

Ex. D, Goodwin Dep. 118:12-17.

> Q How, if at all, do you believe Exhibit 21 [the Inspection Notice] affects the so-called visitation contingency, the right of my clients to visit the property? Or does it?

A Your clients visiting the property was not an inspection; however, they came to inspect the property. Again, these -- it's asking me -- you're asking me for a legal conclusion that I cannot give you.

But my understanding is if they come to the property and say, We hate this; we're out of here, that's one thing. But they came and said, We love it; we're leaving even more excited than when we got here. And I'm told by the broker that Rachel had tears, and it was an amazingly, emotional experience; so that's great.

So we had no reason to believe, nor did we get anything in writing saying, Being there we have objections, and here's what they are; prior to the 26th, we didn't get anything. So how would I have known that they were not happy? I had no way of knowing that. The only thing I can go by is the contract, which states that they have to let me know in writing by a certain date, and they didn't.

Q And that certain date, if they were unhappy with what they saw when they looked at the property, you think they had an obligation to tell you in writing what that was by a certain date?

A As per Exhibit 20 --

MR. SIMPSON: Objection. Calls for a legal conclusion. Document speaks for itself.

Go ahead.

A As per Exhibit 20, Line 171, "Buyer has to deliver written notice of buyer's disapproval of the property conditions on or before 10-26 at 5:00 p.m."

That's not my opinion; that's what we agreed to.

Q (BY MR. COLEMAN) I guess that goes back to my previous question, is it your understanding that my client's right to visit the property is somehow a part of the inspection contingency?

A I never thought about that. What I can tell you is that regardless if it is or isn't, "Buyer delivers written notification of buyer's disapproval of the property conditions on or before the 26th." That didn't happen.

Q So to try to summarize, you understand my clients were entitled to come visit the property before it closed, right?

A Of course.

Q And did you understand --

A They did.

Q And they did that, right?

A Yeah, they did.

Q If they didn't like what they saw, did you understand that they had the right to not close the transaction?

A If they didn't like what they saw, I was under the impression that the drop-dead date for any disapproval or for walking away was prior to the 26th.

Q And so to the extent they didn't like what they saw during their personal visitation, they needed to tell you in writing, is your position, by 10-26-21?

A Yes. But I don't think it's my position. It's Line 171 in the contract of Exhibit 20.

Ex. D, Goodwin Dep. 119:24-122:9.

63. The Duseks personally visited the Property on October 19, 2021. During their visit, they observed that there was excessive road noise/traffic visibility on the Property and generally found it to be less desirable than they had been led to believe. Ex. A, M. Dusek Decl. ¶6; Ex. B, R. Dusek Decl., ¶6; Ex. C, M. Dusek Dep. at 115:18-117:19.

64. When the Duseks visited the Property, the Property Condition Inspection Contingency, the Well Permitting and Water Rights Contingency, and

the Personal Visitation Contingency were still in effect. BSA, ll.172, 240, 244-245, SSF, doc. 15, p. 3, doc. 15-1; Inspection Notice, ll.82, SSF, doc. 15, p. 3, doc. 15-2. Near the conclusion of the Duseks' visit with Scott Darkenwald, Scott suggested that they take some time to walk around the house and the property alone. Before the Duseks did that, he asked whether they were satisfied and prepared to release their contingencies early, before the contingency release dates. The Duseks told Scott that they were not prepared to release any contingencies at that time. After Scott's departure, during their private walk around the property, the Duseks were underwhelmed. The traffic noise and visibility were much more invasive than they had been led to believe. Matt Dusek mentioned this to Scott Darkenwald during their phone call the following day. Ex. A, M. Dusek Decl., ¶6. In follow-up conversations, Duseks stated that they understood that their contingencies remained in effect and that they were moving forward on that basis; they expressly declined to release those contingencies early. Ex. A, M. Dusek Decl., ¶6; Ex. B, R. Dusek Decl., ¶6.

65. Following the work by Advanced Restoration, D. Quinn Construction performed two separate re-inspections and prepared two separate reports. One report was prepared by David Quinn and is dated October 26, 2021 and entitled "Limited Microbial Investigation" (the "Moisture and Mold Reinspection Report"). Ex. A, M. Dusek Decl. ¶13, Ex. 34. The other report was prepared by David's son,

Kelly Quinn, and is dated October 27, 2021 and entitled "Building Inspection Analysis Report (the "General Reinspection Report"). Ex. A, M. Dusek Decl. ¶14, Ex. 35.

66. On October 25, 2021, Scott Darkenwald sent the Duseks a text message indicating that David Quinn was performing testing for residual mold and moisture and that a report would be forthcoming. Scott's text message acknowledged that the Property Condition Inspection Contingency remained unsatisfied. Ex. A, M. Dusek Decl., ¶11, Ex. 38.

67. On October 26, 2021, Scott Darkenwald contacted Matt Dusek to let him know that the Moisture and Mold Reinspection Report would be forthcoming the following morning, and that Matt should speak with David Quinn directly because mold is a highly technical and serious matter in which Scott had no expertise. Ex. A, M. Dusek Decl., ¶11. Scott Darkenwald told Gail Goodwin that the Moisture and Mold Reinspection Report was just "a lot of technical, scientific mumbo-jumbo" to him. Ex. D, Goodwin Dep. 86:22-87:12.

68. On October 27, 2021, David Quinn sent a copy of his Moisture and Mold Reinspection Report to Matt Dusek and Scott Darkenwald, among others. Ex. A, M. Dusek Decl., ¶13, Ex. 34. Also on October 27, 2021, the Duseks received a copy of Kelly Quinn's General Reinspection Report. Ex. A, M. Dusek Decl., ¶14, Ex. 35.

69. Kelly Quinn's General Reinspection Report expressly covers only those matters that were open and visible to the naked eye. It disclaims, "This is a **visual** evaluation of reasonably accessible areas of the structure." Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 10 (emphasis original).

70. Kelly Quinn's General Reinspection Report expressly does not analyze the mold remediation, except to the extent that mold might remain visibly present. It makes clear:

> Also note this visual inspection does not include surface mold, which is not visible at the time of inspection. These surface molds require a special type of equipment to detect. Note surface molds produce fruiting bodies and, when mature, produce millions of tiny spores (seeds) that are present in the air.

Ex. A, M. Dusek Decl., ¶15, Ex. 35, p. 10.

71. The list of "Exclusions" to Kelly Quinn's General Reinspection Report expressly limits its scope of work as follows:

> **Scope of work shall not extend to or include or be applicable to:**
>
> … 2. Defects in areas inaccessible to inspectors view.
>
> … 14. Mold/fungi which is not plainly visible.

Ex. A, M. Dusek Decl., ¶15, Ex. 35, p. 8 (emphasis original).

72. Kelly Quinn's General Reinspection Report further includes a "General Exclusions" section that provides:

> … 21. Any component or system which, was not observed. …

> … 24. Determine the presence of any suspected hazardous substance including but not limited to: toxins, contaminants in soil, carcinogens, water, air and noise."

Ex. A, M. Dusek Decl., ¶15, Ex. 35, p. 9. At the end of these exclusions, Kelly Quinn's General Reinspection Report reiterates:

> Note: Inspections done in accordance with the above standards are visual only.

Ex. A, M. Dusek Decl., ¶15, Ex. 35, p. 9.

73. David Quinn's Moisture and Mold Reinspection Report was performed specifically "to confirm remediation" of the mold and moisture problems, which the Kelly Quinn General Reinspection Report expressly did not cover. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 1. David Quinn's Moisture and Mold Reinspection Report served as the "clearance test" referred to in the Inspection Notice. *Ex. D, Goodwin Dep. 158:23-25 ("Q The clearance testing was the test performed by D. Quinn and the lab that he hired? A That is correct.")* David Quinn is a Certified Residential Mold Inspector. Ex. A, M. Dusek Decl., ¶13, Ex. 34, p. 10.

74. Quoting the EPA, The David Quinn Moisture and Mold Reinspection Report describes the purpose of mold remediation as follows:

> <u>The Purpose of Remediation</u>
>
> - "The purpose of mold remediation is to remove the mold to prevent human exposure and damage to building materials and furnishings. It is necessary to clean up mold contamination, not

> just to kill the mold. Dead mold is still allergenic, and some dead molds are potentially toxic. The use of biocide, such as chlorine bleach, is not recommended as a routine practice during mold remediation, although there may be instances where professional judgment may indicate its use."
>
> – EPA Mold Remediation in Schools and Commercial Buildings (emphasis added by Quinn)

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 1.

75. David Quinn performed a visual inspection of the remediation, took moisture measurements, and performed air sampling. Ex. A, M. Dusek Decl., ¶13, Ex. 34.

76. The air samples taken by David Quinn were analyzed on October 26, 2021 by Eurofins EMLab P&K, a third-party laboratory that reported its results back to David Quinn. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 10-22.

77. David Quinn's report concluded that mold spores and the moisture causing the mold spores remained present at the Property even after Advanced Restoration had performed its remediation work. Ex. A, M. Dusek Decl., ¶13, Ex. 34.

78. David Quinn noted that the closet and storage areas still retained moisture.

> **Upon entering the closet/storage no noticeable odor was observed. A closer inspection of this area did not reveal any visual evidence of microbial growth although wet/damp conditions existed of the OSB (Oriented Strand Board) siding and/or by prior remediation, delamination of the OSB (Oriented Strand Board siding and/or no**

> **metal z-bar channel flashing installed at upper and lower horizontal wood trim, caulking only.**

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 3 (emphasis original).

79. David Quinn noted that the stairwell drywall continued to retain moisture.

> **Also, note based on the visible observations and moisture readings it appears that the upper stairwell interior drywall is still retaining excess absorbed moisture from a past on-going water intrusion which could also contain microbial growth.**

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 3 (emphasis original).

80. David Quinn further added the caveat that his Moisture and Mold Reinspection Report did not intend to identify every instance of possible mold growth.

> Note that this limited investigation is not intended to identify every area of microbial growth in the residence, but to provide a general overview of its condition related to prior fungal growth found in closet/storage under stairs. Since it was not possible for our company to investigate the losses at the time of occurrence, it was necessary to rely on visual determinations, supplied information from the current home owners and laboratory analysis.

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 3.

81. David Quinn's moisture measurements showed elevated moisture content in 8 of the 12 areas tested. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 5.

82. David Quinn used a Surveymaster Moisture Protimeter to determine whether the closet/storage area continued to retain excessive absorbed moisture, where water staining was present before Advanced Restoration performed its work.

> Twelve individual locations were measured during this inspection. The moisture meter uses an analog scale with relative readings from 0% to 99". On these scales, readings from 0% to 16% are considered normal, 17% to 22% are considered damp, and 23% to 99% are considered substantially wet. Note four locations tested had readings in the 6% to 14% range indicating normal levels. However, six locations in the OSB (Oriented Strand Board) siding/shear wall paneling had readings ranging from **41% to 92%** indicating substantially wet. Also, note two locations at upper stairwell interior drywall had readings ranging from **20% to 22%** indicating damp moisture levels and appear to be still retaining excess absorbed moisture from a past on-going water intrusion.

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 5 (emphasis original).

83. From these measurements, David Quinn concluded that moisture remained in the areas where mold was present.

> Based on the visible observations and moisture readings it appears that the closet/storage OSB (Oriented Strand Board) siding/shear wall paneling under stairs and upper stairwell interior drywall system are either still retaining excess absorbed moisture from a past ongoing water intrusion, or they [sic] still experiencing another form of moisture possibly from recent remediation work in the attic space.

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 5.

84. David Quinn also performed mold spore tests of both air and surface fungus. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 6. Two indoor areas were tested for both air and surface, plus an outdoor air measurement. *Id.*

85. Eurofin's analysis cautioned that "active fungal growth in indoor environments is inappropriate and may lead to exposure and adverse health effects." Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 14.

86. Eurofin's analysis revealed elevated levels of certain types of mold spores for both airborne tests. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 10-22. Eurofin's analysis further explained that in the MoldSCORE Spore Trap analysis report found "Final MoldScores" in the amount of 167 and 189 from two separate indoor tests collected; with the explanation the ratings between 150 and 250 indicate a moderate likelihood of indoor fungal growth. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 19-20.

87. Particularly, both indoor air tests revealed the continued presence of the toxic Stachybotrys and Penicillium/Apsergillus spores, which the report explains are both potential water intrusion indicators and molds capable of mycotoxin production. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 14, 19-20. Neither of these types of mold spores were detected in the outdoor "control" sample of the air, meaning they originate inside the home. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 19-20.

88. David Quinn's Moisture and Mold Reinspection Report noted these results in his report, namely that both indoor air samples continued to show elevated levels of certain types of mold spores. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 7.

89. Upon receiving David Quinn's Moisture and Mold Reinspection Report on October 27, 2021, the Duseks spoke with David Quinn, as suggested by

Scott Darkenwald. Ex. A, M. Dusek Decl., ¶15. David Quinn confirmed and explained the statements in his Moisture and Mold Reinspection Report. *Id.* David Quinn suggested that they might want to again re-test the property in six months, to see if it was able to pass a clearance test. *Id.* Based on that conversation and on the Moisture and Mold Reinspection Report, itself, the Duseks concluded that both moisture and mold remained in the living area of the Subject Property, despite the efforts by Advanced Restoration to remediate the problems. *Id.*

90. Following the conversation with David Quinn, the Duseks had a follow-up conversation with Scott Darkenwald concerning David Quinn's Moisture and Mold Reinspection Report. Ex. A, M. Dusek Decl., ¶16. They specifically discussed the potential health risks for people who might use the Property, including themselves, their relatives, friends, potential renters, and others. *Id.* They particularly discussed the potential for health risks to those with allergies, such as Matt himself, some family members, and some friends. *Id.* They also discussed David Quinn's statement that the Property would need to be again re-tested for moisture and mold in six months. *Id.*

> Q. What did Matt tell you about his discussion with David Quinn?
>
> A. That he understood more than he did when he started. That it was complicated, you know, 'cause it's very scientific, and -- but that he was comfortable. There was no sense that he wasn't comfortable with what he heard from David Quinn in terms of not wanting to go forward. And again, the only -- the -- the takeaway I got was that Quinn recommended that he might want to retest in six months.

Q. Okay. Did you ever speak with David Quinn about the mold?

A. No.

Ex. E, Darkenwald Dep. 173:11-24.

> Q. What was your understanding needed to be done in six months? I think I heard you say that a minute ago.
>
> A. Just to retest and a clearance test.
>
> Q. Why would there be need to be more work in six months?

Ex. E, Darkenwald Dep. 176:1-4.

> Q. What was -- What was your understanding of what needed to be done in six months after -- say after the date of this report?
>
> A. Just another clearance test taken.

Ex. E, Darkenwald Dep. 177:2-5.

91. Based on David Quinn's Moisture and Mold Reinspection Report, the moisture was not remediated as required by the Inspection Notice. Ex. A, M. Dusek Decl., ¶13, Ex. 34.

92. Based on David Quinn's Moisture and Mold Reinspection Report, the mold was not remediated and did not pass a clearance test, as required by the Inspection Notice. Ex. A, M. Dusek Decl., ¶13, Ex. 34.

93. In the BSA, the parties agreed to the importance of proper water rights ownership.

> WATER RIGHT OWNERSHIP UPDATE DISCLOSURE: By Montana law, failure of the parties at closing or transfer of real property to pay the required fee to the Montana Department of Natural Resources and Conservation for updating water right ownership may

> result in the transferee of the property being subject to a penalty. Additionally, in the case of water rights being exempted, severed, or divided, the failure of the parties to comply with section 85-2-424, MCA, could result in a penalty against the transferee and rejection of the deed for recording.

BSA, ll.278-82, Statement of Stipulated Facts, doc. 15, p. 3; doc. 15-1.

94. Due to the existence of a stream on the Property, the parties also took note of the following disclosure, contained in the Buy Sell Agreement:

> NATURAL WATER BODIES AND LAND PRESERVATION DISCLOSURE: Buyers of property in the State of Montana should be aware that some properties contain or are adjacent to streams, rivers. wetlands, floodplains and other water bodies. It is the general policy of the State of Montana that natural water bodies and the lands immediately adjacent to them are to be protected and preserved to be available in their natural or existing state, and to prohibit unauthorized projects related thereto. Property owners should consult their local soil conservation board, a land use professional, or other qualified advisor, regarding any applicable local, state or federal regulations, including permitting or other approvals, before working in or around any streams, rivers, wetlands, floodplains or other water bodies, including vegetation removal.

BSA, ll.284-290, SSF, doc. 15, p. 3; doc. 15-1.

95. The BSA also included a Well Permitting and Water Rights Contingency, which the parties separately added to the standard realtor form buy-sell agreement, along with a separate release date for this contingency. It provides:

> This Agreement is contingent upon:
>
> All well related permitting, well log recording, and any associated water rights to be in place prior to closing. Reasonable extension for contingency and closing to be granted upon written request.
>
> Release Date: 11/03/2021 at 5:00 p.m. (Mountain Time)

BSA, ll.237-39, SSF, doc. 15, p. 3; doc. 15-1.

96. The release date for the Well Permitting and Water Rights Contingency was 5:00 p.m. November 3, 2021. BSA, l.240, SSF, doc. 15, p. 3; doc. 15-1.

97. On October 12, 2021, a General Abstract "Provisional Permit, Version 1 Original Right" was issued by the State of Montana Department of Natural Resources and Conservation to Gail Goodwin indicating an enforceable Priority Date of September 3, 2021. Ex. D, Goodwin Dep. 74:25-75:14, Ex. 15.

98. Exhibit 37 is a true, correct, and complete copy of the "General Abstract for the Provisional Permit. Ex. A, M. Dusek Decl., ¶18, Ex. 38. The Duseks received Exhibit 37 on October 12, 2021. This is the only document relating to the well permitting or water rights that was provided to the Duseks.

99. Water rights on the Subject Property were first sought by the Plaintiffs when the Property was listed for sale, because the well was never previously permitted by the State of Montana, despite its operation for years. Ex. D, Goodwin Dep. 8:5-20.

100. The Provisional Permit sets forth limitations on the water rights for the Subject Property. Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16.

101. Plaintiffs did not ever provide the Duseks with the Provisional Permit or its explanatory cover letter from the DNRC. Ex. A, M. Dusek Decl., ¶¶17-18.

102. The General Abstract names Gail Goodwin as the owner of the Provisional Permit, rather than naming the Property owner, Glacier Bear Retreat, LLC. Ex. A, M. Dusek Decl., ¶18, Ex. 38.

103. The General Abstract explains that the provisional rights cannot become permanent water rights without further action by the landowner. Here, that requires certain regulatory approvals by the Montana Department of Natural Resources ("DNRC"). Ex. A, M. Dusek Decl., ¶18, Ex. 38.

104. The Provisional Permit and cover letter – not provided to the Duseks until this litigation – explains the additional burden required of the provisional rightsholder to possibly obtain a permanent water right for the Property, including the filing of a Form 617. Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16. The consequence of the failure of the rightsholder to pursue these rights through DNRC "will result in the termination of [the buyer's] provisional permit." Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16.

105. The Provisional Permit to Appropriate Water issued on October 12, 2021 in the name of Gail Goodwin contains the following notice

> **COMPLETION DEADLINE**
>
> THE DEADLINE TO COMPLETE THIS PERMIT AND FILE A PROJECT COMPLETION NOTICE (FORM 617) IS **DECEMBER 31, 2022**. IF YOU CANNOT MEET THE DEADLINE, FILE A FORM 607, APPLICATION FOR EXTENSION OF TIME BY **DECEMBER 31, 2022**. OTHERWISE, THE PERMIT IS VOID.

Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16 (capitalization, underscoring, emphasis original).

106. The compiling of a Form 617 is a significant undertaking in that the Instructions for Project Completion Notice for Permitted Water Development (Form No. 617) states:

> This form must be completed by a person experienced in the design, construction, or operation of the appropriation works. This may include, but is not limited to, hydrologists, water resource consultants, irrigation specialists, engineers, or the permittee if experienced in water measurement and legal land descriptions. If the form is not completed properly of corrected within the time allowed by the Department, the permit may be subject to revocation pursuant to Section 85-2-314, MCA.

Ex. D, Goodwin Dep. 67:3-22, Ex. 12 at 5. Under PART A GENERAL INFORMATION paragraph 2 carries the additional name change requirement due to the fact that the Provisional Permit was issued in Gail Goodwin's name individually:

> 2. Name the current owner of the permit (permittee), mailing address and daytime phone number. If the current owner is different that the owner listed on the permit or in the DNRC records, a Water Right Ownership Update Form No. 608 must be filed to update the DNRC ownership records

Ex. D, Goodwin Dep. 67:3-22, Ex. 12 at 5.

107. Plaintiffs understood that the Duseks were concerned about the provisional nature of the water permit, but believed that their concern went away after October 12, 2021, notwithstanding the fact that the Duseks did not receive a copy of the Provisional Permit and cover letter or the well log.

> Q Did Scott Darkenwald ever share with you the fact that my clients were concerned about the water rights and the provisional nature of them?
>
> A Prior to October 12, yes, but not after October 12, no.

Ex. D, Goodwin Dep. 76:18-22.

108. Goodwin, herself, admitted that she did not understand the difference between a Provisional Permit and permanent water rights, but believed there was nothing more she could have done to obtain permanent rights, because the delay in filing put her "at the mercy of DNRC."

> Q As you sit here today, can you tell me what the difference is between provisional water rights and permanent water rights?
>
> A I cannot, and I'm not sure anyone at DNRC can either, other than to say we did everything we could possibly have done and have to this day as well, and we're at the mercy of DNRC.

Ex. D, Goodwin Dep. 123:10-19.

109. Due to Plaintiffs' delay in seeking water rights, approval of permanent water rights could not have been obtained by the November 3, 2021 deadline. Ex. D, Goodwin Dep. 123:10-19. Plaintiffs did not obtain permanent water rights

by November 3, 2021. To date, Plaintiffs still have not obtained permanent water rights.

Q Is there a permanent water right in the property right now?

A I can't answer that.

Ex. D, Goodwin Dep. 7:10-12.

110. The General Abstract notes that the provisional water permit is subordinate to any rights obtained prior to September 3, 2021, and that the owner of the Property may be subject to a call by senior water users. Ex. A, M. Dusek Decl., ¶18, Ex. 38. It states:

> **CLARK FORK RIVER BASIN LAW**
>
> THIS PROVISIONAL WATER USE PERMIT HAS A PRIORITY DATE THAT IS JUNIOR TO THE RIGHTS OF SENIOR WATER RIGHT HOLDERS IN THE CLARK FORK RIVER BASIN. IN ACCORDANCE WITH MONTANA LAW, YOU MAY BE SUBJECT TO A CALL BY SENIOR WATER RIGHT HOLDERS, IN WHICH CASE YOU MAY BE REQUIRED TO DISCONTINUE YOUR USE OF WATER FOR THE PERIOD OF THE CALL.

*Id.* (capitalization original).

111. The General Abstract and Provisional Permit indicate that the water rights are subject to prior senior rights claimed by tribal governments and may be subject to exercise, possibly resulting in complete defeasance.

> **CONFEDERATED SALISH AND KOOTENAI TRIBES - RESERVED WATER RIGHTS**
>
> THIS RIGHT IS SUBJECT TO ALL PRIOR INDIAN RESERVED WATER RIGHTS OF THE CONFEDERATED SALISH

> AND KOOTENAI TRIBES IN THE SOURCE OF SUPPLY. IT IS THE TRIBE'S POSITION THAT THE EXERCISE OF JUNIOR WATER RIGHTS EITHER WITHIN OR OUTSIDE OF THE EXTERIOR BOUNDARIES OF THE FLATHEAD INDIAN RESERVATION MAY AFFECT THE RESERVED WATER RIGHTS OF THE TRIBE WITHIN THE EXTERIOR BOUNDARIES OF THE RESERVATION. IT IS THE TRIBE'S POSITION THAT ECONOMIC INVESTMENTS MADE IN RELIANCE UPON THIS RIGHT DO NOT CREATE IN THE APPROPRIATOR ANY EQUITY OR VESTED RIGHT AGAINST THE TRIBES. THE APPROPRIATOR IS HEREBY NOTIFIED THAT ANY FINANCIAL OUTLAY OR WORK INVESTED IN A PROJECT PURSUANT TO THIS RIGHT IS AT APPROPRIATOR'S RISK. THE ISSUANCE OF THIS RIGHT DOES NOT REDUCE THE APPROPRIATOR'S LIABILITY FOR DAMAGE CAUSED BY THE EXERCISE OF THE RIGHT. IT DOES NOT MAKE THE DEPARTMENT LIABLE FOR DAMAGE CAUSED BY THE EXERCISE OF THE RIGHT. NOR IS THE DEPARTMENT LIABLE FOR ANY LOSS TO THE APPROPRIATOR CAUSED BY THE EXERCISE OF SENIOR RESERVED WATER RIGHTS.

Ex. A, M. Dusek Decl., ¶18, Ex. 38 (capitalization original).

112. Scott Darkenwald informed the Plaintiffs that it was “critical” that the well log be recorded and disclosed to the Duseks, and “that’s to protect the Duseks.”

> Q. Do you recall having any conversation with either Matt or Rachel before they signed the buy-sell that there was some question about -- or some issue with water rights that needed to be addressed on the property?
>
> A. Yes.
>
> Q. Tell me about that discussion.
>
> A. Well, Gail told me right after we had agreed to take the listing, she said -- she called me and said -- I don't -- she may have texted me,

> I don't remember -- and said when the well was drilled, the well log was not recorded. And so I said to her we will have to disclose that right away to whomever looks at the property.
>
> So in the buy-sell where it talks about water rights? Where's that? On lines -- this is 399 and then lines 237 through 238, essentially, that's my language, and that's to protect the Duseks, because at that point -- at that -- it was critical that that well log be recorded.

Ex. E, Darkenwald Dep. 44:9-45:3.

113. The Duseks did not receive any well log before they terminated the transaction. Ex. A, M. Dusek Decl., ¶17, Ex. 37. Exhibit 37 is a true, correct, and complete copy of the well log for the Subject Property, which is date-stamped November 1, 2021. *Id.* The Duseks did not receive a copy of this well log until discovery in this litigation. *Id.*

114. The Provisional Permit has a priority date that is junior to all other rights issued prior to its September 3, 2021 issuance date, and could result in discontinuance in favor of senior users. Ex. A, M. Dusek Decl., ¶18, Ex. 38. It provides that, "in accordance with Montana Law, you may be subject to a call by senior water right holders, in which case you may be required to discontinue your use of water for the period of the call." *Id.*

115. On October 28, 2021, Scott Darkenwald told the Duseks that Plaintiffs had concluded their efforts to satisfy the contingencies and were asked to review the efforts and decide whether or not to proceed to closing. Ex. C, M. Dusek Dep. 103:2-104:1.

116. On October 28, 2021, Tracy Rossi sent the Duseks a form "Notice of Release of Contingencies" document, with the email notation, "Hi Matt, Here is a draft for your review of the Notice of Release of Contingencies. Thanks! Tracy." Ex. A, M. Dusek Decl. ¶18, Ex. 38; Ex. E, Darkenwald Dep. 112:2-10.

117. The Notice of Release of Contingencies specifically asked Duseks to release all outstanding contingencies to the BSA, including the three contingencies at issue in this litigation. It stated:

> The following contingency(ies) is/are released, satisfied, or waived as of the date indicated below and are of no further force and effect.
>
> All contingencies in the buy-sell dated 10/4/2021 are released including inspection contingency, & remedies, title contingency, insurance contingency, corner pins, personal visit and well & water rights contingencies have all been satisfied & released as of 10/28/2021.
>
> Earnest money is now non-refundable as long as seller performs per the buy-sell dated 10/4/2021.

Ex. A, M. Dusek Decl. ¶19, Ex. 39.

118. Plaintiffs knew that Scott would be requesting the Duseks to sign a written release of contingencies, because she requested it. The previous day, Gail Goodwin texted Scott Darkenwald to explain that "My goal for the day is to have a signed agreement with Matt removing all contingencies and if he chooses, moving the closing date sooner. Just thought I'd put that out there for you to weave your magic to make it happen. :)" Ex. D, Goodwin Dep. 165:23-166:24, Ex. 2 at Glacier Bear 0192. Scott Darkenwald explained:

> Q. And was that -- was that -- what was the purpose of that? That notice of release of contingencies?
>
> A. That was -- Gail was asking for a notice of release of contingencies, so -- and I didn't want to do that until I was sure that I had gone -- one, that all were released; and two, that I had gone through the entire contract with Matt and Rachel. So there's another page in here where I went through the entire contract, and then I noted that I went through it line by line with Matt and Rachel before we sent them this notice of release and contingencies and said, you know, "Do you concur that this was done?" You know, "Are there any questions?"

Ex. E, Darkenwald Dep. 113:2-16; *see also* Ex. E, Darkenwald Dep. 124:14-20; 207:16-211:23.

119. On October 30, 2021, the Duseks informed Scott Darkenwald orally and in writing that they would not release the contingencies and would not close the transaction. Specifically, they cited their disapproval of the Property Conditions; Well Related Permitting/Water Rights and Personal Inspection/Property Visitation contingencies. SDF, ¶23, *supra*.

120. The Duseks' written notice of their refusal to release the Property Condition Inspection Contingency was timely because it was made before the extended deadline of November 5, 2021. BSA, ll.132-184, SSF, doc. 15, p. 3, doc. 15-1; Inspection Notice, SSF, doc. 15, p. 3, doc. 15-2.

121. The Duseks' written notice of their refusal to release the Well Permitting and Water Rights Contingency was timely because it was made in

writing before the November 3, 2021 deadline. BSA, ll.132-137, 236-240, SSF, doc. 15, p. 3, doc. 15-1.

122. The Duseks written notice of their refusal to release the Personal Visitation Contingency was timely because it had no release date in advance of closing. BSA, ll.132-7, 244-245, SSF, doc. 15, p. 3, doc. 15-1.

Dated this 18th day of August, 2022.

By: */s/ Shane P. Coleman*

Shane P. Coleman
BILLSTEIN, MONSON & SMALL PLLC

ATTORNEYS FOR DEFENDANTS MATT DUSEK AND RACHEL DUSEK