# M. Dusek Deposition Excerpts

# Exhibit C

**In The Matter Of:**

*GLACIER BEAR RETREAT, LLC, ET AL. v.*
*MATT DUSEK and RACHEL DUSEK*

---

*DEPOSITION OF MATTHEW DUSEK*
*July 5, 2022*

---

*Hazlett Reporting & Legal Video Services*
*140 Second Avenue West, Suite B*
*Kalispell, Montana 59901*
*Phone (406) 752-4645*
*deposheri@gmail.com ~ kalispellcourtreporter.com*

Original File 070522md.txt
Min-U-Script® with Word Index

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

Cause No. CV 22-19-M-KLD

---

GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,

Plaintiffs/Counterclaim Defendants,

vs.

MATT DUSEK AND RACHEL DUSEK,

Defendants/Counterclaimants.

---

DEPOSITION OF MATTHEW DUSEK
July 5, 2022

Pursuant to Notice and the Federal Rules of Civil Procedure, this deposition was taken by at Plaintiffs and Counterclaim Defendants at 530 West 19th Street, Whitefish, Montana, at 9:07 a.m., before Sheri J. Hazlett, Registered Professional Reporter and Notary Public of the State of Montana.

A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFFS AND COUNTERCLAIM DEFENDANTS:

FRED SIMPSON, ESQ.
Jenks & Simpson, P.C.
1821 South Avenue West
Suite 204
Missoula, Montana 59801
fsimpson@jenkssimpson.legal

APPEARING ON BEHALF OF THE DEFENDANTS/COUNTERCLAIMANTS:

SHANE P. COLEMAN, ESQ.
Billstein, Monson & Small, PLLC
1555 Campus Way
Suite 201
Billings, Montana 59102
shane@bmslawmt.com

MARK V. ANDERSON, ESQ. (VIA VIDEOCONFERENCE)
Handler Thayer, LLP
191 North Upper Wacker Drive
Suite 2300
Chicago, Illinois 60606
manderson@handlerthayer.com

ALSO PRESENT:

RACHEL DUSEK
GAIL GOODWIN
DARRYL SLATTENGREN

# I N D E X


| EXAMINATION | | PAGE |
|---|---|---|
| BY MR. SIMPSON | | 4 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 3 | Defendants' Responses to Plaintiffs' First Combined Set of Discovery Requests, 4-14-22 | 10 |
| 4 | Email, Matt Dusek to Ruccolo, 10-29-21; Email, Ruccolo to Matt Dusek, 10-29-21, Bates Nos. Dusek000391 and Dusek000392 | 15 |
| 5 | Letter, Haines to Darkenwald, 10-6-21, Bates No. Dusek000087 | 27 |
| 6 | Email, Matt Dusek to Palleschi, 10-5-21, Bates No. Dusek000086 | 28 |
| 7 | String of emails, 10-12-21, Bates No. Dusek000117 | 66 |
| 8 | String of emails, 10-12-21, Bates Nos. Dusek000120 and Dusek000121 | 66 |
| 9 | String of emails, October 2021, Bates Nos. Dusek000243 and Dusek000244 | 72 |
| 10 | String of emails, 10-14-21, Bates Nos. Dusek000243 and Dusek000244 | 129 |

MATTHEW DUSEK,

being first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. SIMPSON:

Q    Good morning.  Would you please state your full name and address.

A    Sure.  Matt Dusek -- Matthew Dusek.  And my address is 1816 Oak Knoll Drive, Belmont, California.

Q    How would you like me to address you today?

A    Matt.

Q    We met briefly before your deposition started. I'm sure you've had a chance to discuss with your attorney the process and what the ground rules are, but I'd like to just go over some basics so that you and I are operating on the same page.

As you can see, we have a court reporter.  She is taking down everything that's said during your deposition verbatim.  She'll be preparing a transcript afterwards for you to review and sign.  It's important that you and I not speak over each other so that she can do her job and wind up with a clean transcript.  So if you can wait until I'm done asking the questions before you answer, that will make her job easier.

A    Okay.

try to accelerate closing, and we'd sort of gently rebuff and say, We're not opposed to closing early, A, if we proceed to closing, and, B, if everything is in place on our end, that we need to make sure that any entities are in place to take ownership, that we've settled on how to do that and so forth. He knew that. I think he had referenced that on the morning of the 25th, from memory.

Q And then during the conversation or conversations -- to bring us back up to later in that day -- you told Scott you were considering terminating the agreement, and --

A Yes.

Q -- I believe you testified earlier that you didn't feel like you had a good opportunity to tell him the reasons why.

A Because he moved into more what -- you know, what I took to be a defensive posture, suggesting this was something that was counter to what he wanted.

Q Did he tell you he believed that the contingencies had expired at that point?

A He did.

Q And what was your response to that?

A I said, "No, Scott. If the wind blows wrong across the property, we have an out," remember? Because we had spoken at length -- I said we would no doubt return

to the contingencies. We had spoken at length about the contingencies we wanted to have in place in this agreement. And his words to us were -- you know, after we had put this all together, and in particular with the personal-visitation contingency -- his exact words were, "If the wind blows wrong across the property, you're out."

And so it had not even entered our minds on the 25th that there would not be contingencies available to us, and we did not believe that it was the case, that there were not contingencies available to us. The word he used was that the contingencies had been "forfeited" in serving the Inspection Notice.

Q Before we go back into your discussion with Scott about the contingencies and your understanding of those when the contract was signed, was there a discussion with Scott on the 26th where you told him you were going to proceed to closing?

A We were going to proceed toward closing, which is to say we were going to continue forward -- we still -- you know, pending all the work that was ongoing. We needed to review the mold report. We needed to see everything was finished up. We needed to do a final review.

I think this was one of the things, you know, again, like with repeatedly discussing with us moving up

the closing, you know. The language says "on or before the closing date." Yes, we agreed, on or before -- we'll do it before, if we close and if we're able to.

I think in the same way that there seemed to be a -- particularly in retrospect -- there seemed to be a lot of confusion with Scott between saying, "We're going to continue on course" with, "Okay, we're all done then."

Q We're gonna close?

A Right. Which was not what we were signaling. If that were the case, we should all sign release of contingencies that day, right there on the moment. That was not what we conveyed to him.

Q Did he inquire of you whether you could -- I'm sorry.

Did Scott inquire of you whether he could tell Gail that you intended to close?

A He did not. He said that he did. He did not, because there was not any -- you know, this is what I was referring to -- telling Gail that we were going forward in spite of our concerns makes no sense, because Gail didn't know about our concerns.

A confidential discussion is a confidential discussion. It would serve no purpose -- like from our point of view, going -- you know, proceeding -- all it could do is cause the sellers unnecessary concern at a

point in time when it was unknown.

It looked like on the 30th, Scott tried to move back and cover his tracks.

Q Did you see anything either by text, email, or in any written form where Scott informed Gail and/or Darryl that -- about your confidential discussion on the 25th where you said, We're considering terminating?

A I have a recollection that he said something on the order of, Yeah, we gained peace of mind, or something like that. And that raised a red flag like, What's he doing talking about -- like, it suggested -- and I don't -- I certainly don't remember the verbatim text -- but the impression I came away with was he had conveyed doubts, hesitation, whatever, contemplation of termination, but that we had turned it around. And it seemed to serve no purpose in representing us as buyers.

Q Let's go back and talk about the discussion you had with Scott concerning the contingencies.

A Sure.

Q First of all, would that have been when you wrote up the initial offer of [redacted], or was it in regard to the [redacted] offer contained in the fully signed agreement?

A My recollection -- and from reviewing the two versions -- I believe it's the case that all of the

Exhibit 1, for the record.

A Okay.

Q (BY MR. SIMPSON) Do you recognize that document? Does it have handwriting on the first page?

A It does. I recognize it, minus the handwriting, from my records. My records don't have the handwriting. And I do recognize the handwriting from the Glacier Sotheby's production.

Q Do you understand that to be Scott Darkenwald's handwriting?

A I understand it to be.

Q Did you receive the general abstract, which is GSIR 551 and 552, from Scott on October 2012 -- I'm sorry, October 12, 2021?

A Yes. I received the general abstract. I did not receive any further documentation. I didn't receive the well-log report.

Q For the record, the well-log report is GSIR 553, 554; is that right?

A That's right.

Q Did you receive any other water-rights documentation from Scott, other than the general abstract, at any time?

A No, not to my knowledge.

Q As I understand it, this general abstract was

A I could only guess.
Q What do you recall telling Scott during your conversation with him about the mold report?
A The things that I relayed to you -- related to you. He mentioned the same in his deposition, the six-month retesting, the allergy issues.
Hazarding a guess, I think this is another case where, on the 28th, we were going through the checklist of all of the things and where everything stood. And Scott had asked us for final review, because on the 28th specifically -- 27th, I think everything was wrapping up. We had the mold report. We had the reinpspection. Scott said, All the work is complete, right. The remedies, according to Scott, all the progress timelines were done, and it was time to do a final review and make decisions.
And so we went through them together, and -- you know, Scott said I went through with my red marker and highlighter and walked through all the points. We did indeed do that together.
He said, Get together with your -- he said advisor, but I think he meant Scott Robinson or something -- do a final review and make sure there are no objections.
And we said, Okay. Yeah. We understand everything that's in here. We're going to go look at it

and think it over and make a decision.

Q Was the mold report the straw that broke the camel's back, if you will?

A Well, it was all of the items we mentioned together. I think that any one of them, you know, was sufficient to terminate, but all of them together, we sort of looked at it that -- and maybe by way of context, I led off with conversations with Scott saying, I love Glacier National Park. It would be nice to be the person who doesn't care the most in this, but, you know, I'm -- I like the idea a lot, and so I need to -- we need to put in place contingencies to make sure I protect myself from myself.

And in the final review, we just looked at the issues we had raised along the line. We had raised the issue of the road noise. That was one of the first conversations I had with Scott, was trying to understand the property itself. And, you know, what we were after sort of in the grand scheme of things -- you know, just put together your perfect list -- we'd find a place on the lake looking out at the mountains inside Glacier National Park. If it's not that, well, it should be tranquil; it should be serene; it should be forested, and so forth. And I asked about the road noise, and he said there wasn't any. In the final moment, there's road noise.

Q -- and Darryl signed this?

A And I'm saying on the 17th. We were talking about in terms of the 15th, our delivery of the inspection report. But, yes, I think technically it would have been, you know, according to his position, when Gail signed it and Darryl signed it.

And Scott became flustered, because he said, No, no. You served your Inspection Notice after you visited the property.

And we said, No. Look at the dates. It was before we visited the property. Wouldn't you -- you know, as our agent, as the buyers' agent, wouldn't you discuss with us, Scott, the very important matter of forfeiting all contingencies if that were true? It's just simply not true. But if you thought it were, you should talk with us about it.

And he had no conversation.

Q Do you recall Scott's testimony that after you visited the property, you were more excited about the transaction than you were before you visited the property?

A I remember that testimony.

Q Do you agree or disagree with that testimony?

A I disagree with that testimony.

Q Tell me why.

A We discussed with Scott that there were certain

matters that were, you know, sort of better than we expected them to be and certain matters that were worse than we expected them to be; matters related to the house notwithstanding the mold, but just that -- he had sort of -- Scott would often refer to the Iron Horse properties, and some of this was in relation to just how do we think about pricing and whatnot. So he had sort of maybe made it seem like the house was -- like don't focus on the house.

We thought the house was, you know, a nice -- you know, like especially if it was being used as a family retreat, vacation rental; it was a nice house. The property was worse insofar as what we were looking for, you know, again, the road noise and so forth. I think Scott might have been confused by the excitement that I especially have -- I set foot in Montana; I set foot in Glacier National Park; I become ecstatic.

Q Did you ask Scott if he had any explanation for why there was more road noise than you anticipated when you visited?

A I said, We talked about this.

And he said, I never noticed it before. Now that you say it, yeah, but maybe because it's fall and there aren't leaves on the trees, and maybe it will be better during the summer.

I was like, What? When the 3 million visitors hit?

Q At any time did anyone make you aware that there was road construction going on on Camas Road when you were visiting?

A Not to my recollection. And to be clear, the noise that we noticed when -- we had walked around the property with Scott and Tracy. Eventually Scott and Tracy left, and Scott suggested we remain on the property and walk around and just take it all in.

We were standing on the front porch and heard the first vehicle drive by -- first that we were paying attention to -- and we saw it drive by. You could see it sort of blinking through the trees. We were like, Oh, no. How did we not notice that? Now that we're standing there looking at it, it's obvious.

And, you know, subsequent vehicles -- this wasn't jackhammers and forklifts and, you know, whatever, front loaders. This was just regular vehicle traffic.

Q I think one of the things you mentioned at some point -- maybe it was in a letter or earlier in your testimony -- was that it wasn't on the lake. You were aware that it wasn't on the lake --

A I was completely aware it was not on the lake. None of this was conditioned on it being on the lake.

deposition. And it's Pages 4 -- it starts on GSIR 427 in the binder.
A 427, you said?
Q Yes.
A I'm on it.
Q In this he notes, No. 1, "Going to proceed." I take it from our earlier discussion this morning, you did not tell him -- according to your testimony, you did not tell him that you were going to proceed?
A Proceed towards closing as opposed to terminating immediately. We're going to continue the process; we're not going to end the process, at that particular point in time. We weren't relinquishing any opportunity or any rights under the contract to continue to evaluate, and his behavior evidenced an understanding of that. He continued to bring us information about how we were doing and how the whole transaction -- contemplated transaction was doing as concerns the satisfaction of issues raised.
Q Item No. 2 on his list says, "Flip the coin and watch the/our reaction."
A Right.
Q And I remember pretty distinctly his discussion of that point. But I guess I want to hear from you if you have an understanding of what he meant when he wrote that.

were saying, All right, heads we close, tails we walk away from this?

A As a hypothetical exercise. As a hypothetical exercise to know what it tells you about your own mind or your own heart on it. Not as a literal -- again, if there were a decision made in that moment, then in that moment Scott should send us the Notice of Release of Contingencies that he sent us later, and we can sign it all. That's just not where we were. We didn't do that.

We said -- you know, he continued to get the reports, go over the reports with us, do the full review. You know, prior to sending the letters, he was still talking -- you know, as I said, he was still sending us the information on the water rights. It was not a closed book. It was not a done deal.

Q To be clear about the water rights, though, you received that back on October 12, right?

A He sent something about it on the 28th again, if I'm remembering the date correctly. He had done some further -- sort of reaching out of, Here's some information on insurance, and here's some information on water rights; are you concerned about these? Et cetera.

Q My recollection and -- strike that.

The information that I understood that he provided, after the initial information on October 12 with

the appropriation document that you saw, was that he had checked his files and that all of them said "provisional permit."

A And just to be clear, I think the appropriation, if I've got the language right, that was the document that we didn't see. We only ever saw the abstract.

We raised questions -- I raised questions about the provisional permit, and the provisional nature of it specifically. Critically, Hey, I know what provisional means. I watch Formula 1. Nobody wants to be a provisional winner or a provisional pole-sitter. They want to know that they've got it.

And we discussed that as a potential complication on the transaction; this can't be something afterwards, after the ink is dry and the money has changed hands, that those rights expires. It can't go away; it has to be completed.

And the information he related to us was, I looked at other properties; they also have it. That doesn't answer the question. We needed to make a decision based on the information that was relayed to us, and we made -- you know, we made a decision that in totality with everything else and knowing that there was a contingency that protected us, it was too big a gamble to make; it was too big a roll of the dice.

And there was on -- you know, two different counts -- on the mold/moisture retention and on the water rights; they were two big throws of the dice -- on top of the fact that we know from seeing it firsthand that there's traffic visibility and the noise; it's also at odds with something we had described as our interests. In totality we just can't go forward with that.

Q Jumping back a little bit in the process here from the end, my understanding was that you were originally going to inspect the property on October 12; is that correct?

A That's correct. Well, I mean, it was a date under discussion. We had hoped to be able to line that up, and we were not able to line that up. We were not able to get an air itinerary for then.

MR. SIMPSON: Let's take a short break. I think I'm almost done.

(Recess taken 2:45 p.m. to 3:08 p.m.)

Q (BY MR. SIMPSON) Matt, back on the record here. I'm handing you what I've labeled as Exhibit 10.

(Exhibit 10 marked.)

Q (BY MR. SIMPSON) Barring some unforeseen development, this should be the last exhibit I'll be showing you today. Do you recognize the email exchange in this document?

REPORTER'S CERTIFICATE

I, SHERI J. HAZLETT, Registered Professional Reporter and Notary Public, do hereby certify:

THAT I did report the foregoing transcript after having first duly sworn the witness to testify to the truth; and

THAT said transcript was taken at the time and place stated on the caption hereto; and

THAT the testimony of the witness was taken in shorthand by me and subsequently reduced to writing under my direction; and

THAT the foregoing is a true and correct transcription of all the testimony of said witness to the best of my ability.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal of office this 18th day of July, 2022.

SHERI J. HAZLETT, RPR and Notary Public
for the State of Montana
Residing in Flathead County
My Commission Expires 3/2/2025