Goodwin Deposition Excerpts
& Selected Exhibits

# Exhibit D

**In The Matter Of:**

*GLACIER BEAR RETREAT, LLC, ET AL. v.*

*MATT DUSEK and RACHEL DUSEK*

---

*DEPOSITION OF GAIL GOODWIN*

*Vol. I*

*July 5, 2022*

---

*Hazlett Reporting & Legal Video Services*

*140 Second Avenue West, Suite B*

*Kalispell, Montana 59901*

*Phone (406) 752-4645*

*deposheri@gmail.com ~ kalispellcourtreporter.com*

Original File 070522gg.txt

**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

Cause No. CV 22-19-M-KLD

---

GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,

Plaintiffs/Counterclaim Defendants,

vs.

MATT DUSEK AND RACHEL DUSEK,

Defendants/Counterclaimants.

---

DEPOSITION OF GAIL GOODWIN
VOLUME I
July 5, 2022

Pursuant to Notice and the Federal Rules of Civil Procedure, this deposition was taken by Defendants/Counterclaimants at 530 West 19th Street, Whitefish, Montana, at 3:37 p.m., before Sheri J. Hazlett, Registered Professional Reporter and Notary Public of the State of Montana.

# A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFFS/COUNTERCLAIM DEFENDANTS:

FRED SIMPSON, ESQ.
Jenks & Simpson, P.C.
1821 South Avenue West
Suite 204
Missoula, Montana 59801
fsimpson@jenkssimpson.legal

APPEARING ON BEHALF OF THE DEFENDANTS/COUNTERCLAIMANTS:

SHANE P. COLEMAN, ESQ.
Billstein, Monson & Small, PLLC
1555 Campus Way
Suite 201
Billings, Montana 59102
shane@bmslawmt.com

MARK V. ANDERSON, ESQ. (VIA VIDEOCONFERENCE)
Handler Thayer, LLP
191 North Upper Wacker Drive
Suite 2300
Chicago, Illinois 60606
manderson@handlerthayer.com

ALSO PRESENT:

RACHEL DUSEK
MATT DUSEK
DARRYL SLATTENGREN

I N D E X


| EXAMINATION | PAGE |
|---|---|
| BY MR. COLEMAN | 4 |

GAIL GOODWIN,
being first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. COLEMAN:
Q Please state your name and address for the record.
A Gail Goodwin. Address is 14305 214th Way, Woodinville, Washington 98077. Can you tell we moved there just a few weeks ago?
Q That was gonna be my next question, actually.
A Exactly.
Q Have you ever had your deposition taken before?
A No.
Q But you have had the opportunity to watch the last two depositions, as well as Mr. Darkenwald's?
A I have.
Q So you've seen the general rules. I'll reiterate a couple of things. If I ask a question that you don't understand -- and I likely will; if we have an hour or so, it's bound to happen -- let me know, and I'll try to rephrase it. Fair enough?
A Fair.
Q And otherwise, we'll cover the other rules that might get broken by you or me as we go through if it

A Yes.

Q And since we're talking about the water rights, what is your understanding of provisional water rights?

A At the time that I went in and met with DNRC and got the water rights, they told me that they are always provisional to start, and they gave me a specific outline of things that had to be done to make them -- I don't even recall what the term was, but better than provisional. And those things have all been done.

Q Is there a permanent water right in the property right now?

A I can't answer that. And the reason I can't answer that is though DNRC tells me yes, that a provisional water right is a permanent water right; however, they require that you come back six months after you file a provisional, fill out additional paperwork -- which I've done -- and now they hold all that paperwork that comes in from all of 2022 to the first week of January of 2023, and that's when they approve them all. They said they don't have staff to do it any other way.

And so we are waiting until January of 2023 for them to put the stamp on it and send it back to me. But we've done everything we can do and have given them all the paperwork that they need, and they have told me that this is the way it's done in Montana and that this is

permanent water rights.
Q Is that the term -- that was just a term I made up, "permanent," but is there some other --
A I don't know what the term is. I don't know.
Q What was the problem with the water rights on the property?
A When I built this property in 2013, I had a contractor that worked for us at that time, and he hired the well contractor, who said they filed everything they needed to file. And it wasn't until I listed it with Scott that Scott said, Do you have the water rights on this?
I said, I mean, I have a copy of the well log, and they told me they filed everything.
So I went down to DNRC, and they hadn't filed anything. That's what happened. So I immediately filed it.
Q And more specifically, how did you first find out that there was no water rights there?
A In conversations with Scott.
Q Did Scott investigate it and tell you that?
A I am not sure exactly. I don't remember how it came up, but it was in our conversation that he asked me for something about water rights because of where the property was located. And I said, Let me check; we'll

REPORTER'S CERTIFICATE

I, SHERI J. HAZLETT, Registered Professional Reporter and Notary Public, do hereby certify:

THAT I did report the foregoing transcript after having first duly sworn the witness to testify to the truth; and

THAT said transcript was taken at the time and place stated on the caption hereto; and

THAT the testimony of the witness was taken in shorthand by me and subsequently reduced to writing under my direction; and

THAT the foregoing is a true and correct transcription of all the testimony of said witness to the best of my ability.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal of office this 19th day of July, 2022.

SHERI J. HAZLETT, RPR and Notary Public
for the State of Montana
Residing in Flathead County
My Commission Expires 3/2/2025

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

Cause No. CV 22-19-M-KLD

---

GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,

Plaintiffs/Counterclaim Defendants,

vs.

MATT DUSEK AND RACHEL DUSEK,

Defendants/Counterclaimants.

---

DEPOSITION OF GAIL GOODWIN
VOLUME II
July 6, 2022

Pursuant to Notice and the Federal Rules of Civil Procedure, this deposition was taken by Defendants/Counterclaimants at 530 West 19th Street, Whitefish, Montana, at 8:51 a.m., before Sheri J. Hazlett, Registered Professional Reporter and Notary Public of the State of Montana.

A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFFS/COUNTERCLAIM DEFENDANTS:

FRED SIMPSON, ESQ.
Jenks & Simpson, P.C.
1821 South Avenue West
Suite 204
Missoula, Montana 59801
fsimpson@jenkssimpson.legal

APPEARING ON BEHALF OF THE DEFENDANTS/COUNTERCLAIMANTS:

SHANE P. COLEMAN, ESQ.
Billstein, Monson & Small, PLLC
1555 Campus Way
Suite 201
Billings, Montana 59102
shane@bmslawmt.com

MARK V. ANDERSON, ESQ. (VIA VIDEOCONFERENCE)
Handler Thayer, LLP
191 North Upper Wacker Drive
Suite 2300
Chicago, Illinois 60606
manderson@handlerthayer.com

ALSO PRESENT:

MATT DUSEK
RACHEL DUSEK (VIA VIDEOCONFERENCE)
DARRYL SLATTENGREN

# I N D E X


| EXAMINATION | PAGE |
|---|---|
| BY MR. COLEMAN | 63 |
| BY MR. SIMPSON | 198 |

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Email, Simpson to Kracker, 7-5-22; Email Wilson to Gail Goodwin, 6-23-22 | 67 |
| 12 | State of Montana, Department of Natural Resources and Conservation, Project Completion Notice form | 67 |
| 13 | Water Conversion Table | 67 |
| 14 | Completed State of Montana, Department of Natural Resources and Conservation, Project Completion Notice form, 6-27-22 | 67 |
| 15 | State of Montana, Department of Natural Resources and Conservation General Abstract document, Bates Nos. Glacier Bear 0430 and 0431 | 74 |
| 16 | Letter, Seback to Gail Goodwin with attached Permit to Appropriate Water, 10-12-21, Bates Nos. Glacier Bear 0432 through 0434 | 74 |
| 17 | D. Quinn Construction, Inc., Limited Microbial Investigation, 10-26-21, Bates Nos. Glacier Bear 007 through 0028 | 85 |
| 18 | Advanced Restoration & Maintenance, Certificate of Completion and Satisfaction, 11-4-21, Bates Nos. Glacier Bear 0029 and 0030 | 94 |

I N D E X (Continued):


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 19 | D. Quinn Construction, Inc., Limited Microbial Investigation with handwritten notes, 10-26-21, Bates Nos. Glacier Bear 0360 through 0383 | 100 |
| 20 | Buy-Sell Agreement, 10-4-21, Bates Nos. Glacier Bear 0032 through 0041 | 104 |
| 21 | Inspection Notice, 10-15-21, Bates Nos. Glacier Bear 0346 and 0347 | 105 |
| 22 | Letter, Matt Dusek and Rachel Dusek to Darkenwald, 11-3-21, Bates No. Glacier Bear 0042 | 124 |
| 23 | Letter, Matt Dusek and Rachel Dusek to Darkenwald, 10-30-21, Bates No. Glacier Bear 0031 | 124 |
| 24 | Copies of text messages, Bates Nos. Glacier Bear 0060 through 0088 | 124 |
| 25 | Listing Agreement - Residential, Exclusive Right to Sell, 9-1-21, Bates Nos. Glacier Bear 0354 through 0359 | 139 |
| 26 | Copy of text messages between Gail Goodwin and Teryn Teets, Bates Nos. Glacier Bear 0244 through 0261 | 179 |
| 27 | Copy of text messages between Gail Goodwin and Les Aasheim, Bates Nos. Glacier Bear 0262 through 0268 | 179 |
| 28 | Building Inspection Analysis Report by D. Quinn Construction, 10-13-21, Bates Nos. GSIR SDT 763 through 802 | 186 |
| 29 | Building Inspection Analysis Report by D. Quinn Construction, 10-27-21, GSIR SDT 716 through 762 | 187 |

I N D E X (Continued):


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 30 | String of emails with attached Montana Association of Realtors Property Disclosure Statement, 10-17-21, Bates Nos. Glacier Bear 0312 through 0324 | 187 |
| 31 | Listing Agreement - Residential, Exclusive Right to Sell, 4-8-22, Bates Nos. Glacier Bear 0348 through 0353 | 192 |
| 32 | Addendum to Listing Agreement for Additional Provisions, 4-26-22, Bates Nos. Glacier Bear 0292 through 0294 | 192 |

GAIL GOODWIN,

having been previously duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. COLEMAN:

Q Gail, do you understand that you're still under oath, and we're picking up where we left off yesterday?

A Yes.

Q Before the deposition started, you mentioned to me you had a matter that you wanted to correct for the record.

A Yes. You asked me a question yesterday of have I ever -- I'm gonna paraphrase -- owned, looked at, bought, sold houses with mold, and I told you yes and told you the ones that I could think of. Last night at dinner we thought of two more. I wanted to let you know I'm not trying to hide them; I just didn't think of them.

Q Sure. What's the nature of those properties?

A One was a property in the Swan valley on Cougar Lane that we looked at to purchase and ended up not purchasing that did have a mold issue. But we didn't walk away from that purchase -- the mold had nothing to do with it; we would have bought it and mitigated it. There were other reasons that we didn't buy it.

through 14.

(Exhibits 11 through 14 marked.)

Q (BY MR. COLEMAN) Gail, I've handed you what's been marked as Deposition Exhibits 11 through 14. I'd like you to -- and these are documents produced by your counsel at the conclusion of our day of work yesterday. I'd like you to go through these, tell me what they are, and start with Exhibit 11, please.

A 11 is an email from Travis Wilson to me saying, Hey, Gail, here's the link with all the scanned documents pertinent to your water-rights permit.

Q Okay.

A 12 is the actual Project Completion Notice that has to be filled out and returned to them.

13 is a Water Conversion Table that gives me the formula of how to determine the numbers that go on Exhibit 12.

And 13 is the completed -- I'm sorry -- 14 is the actual completed version of Exhibit 12 that Travis was kind enough to sit down and walk through with me and help me fill out properly, so that when this is in the hands of the person in January, it will be approved.

Q Turning back to Exhibit 11 in front of you, this is an email dated June 23 of 2022 -- I'm looking at the bottom of the first page -- do you see that?

differently. Have you seen an earlier version of any document seeking permanent or non-provisional water rights for the property?

A Not that I recall.

Q Before 2021 when you sought provisional water rights for the property, are you aware of any documents before that date that sought provisional water rights?

A Not that I recall. If I filed one, I have no recollection. I don't remember it.

(Exhibits 15 and 16 marked.)

Q (BY MR. COLEMAN) I'm handing you what's been marked as Deposition Exhibits 15 and 16. Do you recognize those documents?

A Yes, I do.

Q And we went over these documents yesterday, I think, during my client's deposition, but I just want to make sure I understand what your understanding is of these. Those are both documents that were part of your files that you produced in this case; is that right?

A Correct.

Q We can tell that by the "Glacier Bear" number at the bottom in red?

A I didn't know what that meant, but if you say so.

Q What is Exhibit 15?

A Exhibit 15 is the General Abstract from the State of Montana, Department of Natural Resources and Conservation, and it is showing the information on the water at the property.

Q What is Exhibit 16?

A Exhibit 16 is a letter to me from Austin Seback, the hydrologist, at the Kalispell Regional Water Resources Office for DNRC, dated October 12, enclosing the provisional permit that had been issued for the right to appropriate water.

Q Did you receive both of these documents directly from the State of Montana?

A 15, I received in an email from Kathy Olsen, and 16, I must have, but I'm not certain.

Q Did you provide either of these documents to Scott Darkenwald?

A I did.

Q Do you know when, approximately, you provided them to him?

A Upon receipt.

Q Do you know whether Mr. Darkenwald provided these to my client?

A He certainly told me that he did, but I have no proof that he did.

Q Specifically with respect to Exhibit 16, did

Mr. Darkenwald tell you that he forwarded this document to the Duseks?

A I do not recall, specifically this one as opposed to this one (indicating).

Q What do you recall Mr. Darkenwald telling you with respect to whether he transmitted these water rights documents to my clients?

A I have either a text or an email -- and I honestly don't remember which -- that I recall Scott telling me that he sent the water information to Matt, and Matt's comment was something like, Great.

Q Would it help to look at that text or email to refresh your recollection?

A No, because it would take me a while to find it.

Q Do you remember anything beyond that general discussion you just mentioned?

A No. Just that -- no.

Q Did Scott Darkenwald ever share with you the fact that my clients were concerned about the water rights and the provisional nature of them?

A Prior to October 12, yes, but not after October 12, no.

Q Was it your understanding that after October 12, my clients' concerns about the water rights were alleviated?

Q (BY MR. COLEMAN) Is this the mold report that we've been talking about?

MR. SIMPSON: I'm gonna lodge an objection on the grounds of foundation.

Go ahead.

A Yes, it appears to be.

Q (BY MR. COLEMAN) Let me ask it again to address your counsel's objection. We've been talking about a mold report that I understood you did not have until this litigation was filed. When we talked about that mold report, is this the mold report, Exhibit 17, that you were referring to?

A Again, without going back and looking, I'm assuming this is the mold report that was in the information that was provided by Scott Darkenwald.

Q When?

A After the commencement of the litigation.

Q Do you know when Scott -- do you think this came from Scott's file as a result of the subpoena?

A I would assume so. Again, I'm not certain, but I would assume that's where it came from.

Q But this litigation, then, was the first time that you actually read Exhibit 17?

A I still haven't read the entire thing of Exhibit 17.

later than the 26th of October?
A As per the contract, correct.
Q All right. We've talked about the inspection contingencies. What other contingencies did you understand applied to this transaction?
A Title, and title we -- I gave -- well, Tracy Dugan gave to Scott and to me -- Tracy Dugan with Fidelity Title did the preliminary title report, and I can't give you a date, but it was sometime before the 20th of October that Tracy sent it to Scott, Scott copied me, also sent it to the Duseks. And I got a note back from Scott saying something to the effect of, The Duseks' attorneys said the title looked great. So that was not an issue.
Q Okay. Any other contingencies that you think applied to this transaction?
A Other than the buyer visiting the property.
Q What's your understanding of the buyers' right to visit the property?
A The buyers were -- I was told when we signed this the buyers were coming on the 12th of October. And then as I understand it, the private jet that they wanted to fly in on wasn't available that day, and so they had to delay an entire week. I was there the 12th. I was looking forward to walking through and meeting them, but I was out of the country on the 19th when they eventually

did come in. So I knew that they were coming to see it, and was thrilled when I was told that they left even more excited than when they came.

Q Okay. Tell me how you believe that contingency applied to this contract and on what date that contingency was waived.

MR. SIMPSON: Objection; document speaks for itself.

Go ahead.

A I'd say the same thing. I can't even answer. It's in the document.

Q (BY MR. COLEMAN) Do you have an understanding in your own mind of when the visitation contingency expired?

A At the very latest the 26th, because that's what the contract states, that all contingencies expired on the 26th.

Q And so we're clear, you're referring to Line 122 of Exhibit 20?

A No. Line 172.

Q Sorry. What did I say?

A 122. It's 172.

Q Yes. Okay. In that same paragraph -- no, I apologize -- in the following paragraph, the second sentence --

A Can you give me a line number?

Q I will. I'm looking at 181 and 182. We talked about "If the parties cannot come to a written agreement in satisfaction of the conditions noted," I think. I want to refer to the second clause after the "or" -- disjunctive "or." If the buyer does not withdraw in writing his or her disapproval of the condition noted or -- on or before -- I'm paraphrasing -- 10-29-2021 -- I apologize. Poor question.

My question is what's the significance of the 10-29 date in your mind?

A My understanding for the 10-29 was as it states, that, "If the parties cannot come to a written agreement"; however, read the first sentence first, "If the parties enter into a written agreement in satisfaction of." At the time that this contract was signed, Exhibit 21 had not been given to us or executed by us and returned back. So by executing Exhibit 21, Line 180 supersedes the rest of that paragraph. I think the rest of that paragraph was there in the event this -- "this" being Exhibit 21 -- did not get signed in a timely manner, that the 29th was the absolute drop-dead, If we don't hear by the 29th, it's a done deal.

Q How, if at all, do you believe Exhibit 21 affects the so-called visitation contingency, the right of

my clients to visit the property? Or does it?

A Your clients visiting the property was not an inspection; however, they came to inspect the property. Again, these -- it's asking me -- you're asking me for a legal conclusion that I cannot give you.

But my understanding is if they come to the property and say, We hate this; we're out of here, that's one thing. But they came and said, We love it; we're leaving even more excited than when we got here. And I'm told by the broker that Rachel had tears, and it was an amazingly, emotional experience; so that's great.

So we had no reason to believe, nor did we get anything in writing saying, Being there we have objections, and here's what they are; prior to the 26th, we didn't get anything. So how would I have known that they were not happy? I had no way of knowing that. The only thing I can go by is the contract, which states that they have to let me know in writing by a certain date, and they didn't.

Q And that certain date, if they were unhappy with what they saw when they looked at the property, you think they had an obligation to tell you in writing what that was by a certain date?

A As per Exhibit 20 --

MR. SIMPSON: Objection. Calls for a legal

transaction?

A If they didn't like what they saw, I was under the impression that the drop-dead date for any disapproval or for walking away was prior to the 26th.

Q And so to the extent they didn't like what they saw during their personal visitation, they needed to tell you in writing, is your position, by 10-26-21?

A Yes. But I don't think it's my position. It's Line 171 in the contract of Exhibit 20.

Q Are there any other contingencies that applied to this transaction, to your mind?

A Not that I'm aware of.

Q I'm gonna turn your attention to Exhibit 20 beginning at Line 236. Tell me when you got that there, please.

A Okay. Oh, yeah. I'm sorry. I thought you meant in addition to what was -- your prior question, yes, we had to get the well recorded.

Q And you also had to provide "All well-related permitting, well-log recording, and any associated water rights to be in place prior to closing"?

A Correct.

Q "Reasonable extension for contingency and closing to be granted upon written request," right?

A Yes.

Q Did you ever request the Duseks extend that contingency?
A There was no need to.
Q Do you believe you provided them with any associated water rights that were in place prior to closing?
A Absolutely. We moved mountains to get that recorded on the 12th of October, which was well in advance of the closing.
Q As you sit here today, can you tell me what the difference is between provisional water rights and permanent water rights?
A I cannot, and I'm not sure anyone at DNRC can either, other than to say we did everything we could possibly have done and have to this day as well, and we're at the mercy of DNRC.
Q To your mind, what was the deadline for releasing that contingency relative to water rights?
A No later than the 26th.
Q What's the significance of the 11-3-2021 line -- or reference at Line 240 of Exhibit 20?
A A random date that Scott put in. I don't know.
Q Is that meaningless to you?
A It is. It's a contingency, and it specifically says contingencies are tied to everything has to be done

asked, "Did you get my text exchange with Cory?"

A That is probably what is above. You could have made it easier for us and started with that.

Q I only realized for a few months now that you can forward texts. That's news to me.

A You forward the information of "I'm forwarding this first," though.

Q The next page, though, 185 at the very top, can you read to me your response to -- your very first blue bubble on the upper right there -- your response to Scott about the mold remediation work?

A "If we give the buyers our guarantee that the mold will be mitigated" -- wait a minute -- "that the mold will be mitigated, we still need their release of contingencies by the 25th, as per the contract."

Q What do you mean by that?

A Let me read a little before and after; I can perhaps answer that better. I was questioning with Scott when the mold mitigation contingency would be released, and he answers it in the next one saying, "They wouldn't have to release the contingencies on the mold until it passes the clearance testing," which is the 26th.

Q The clearance testing was the test performed by D. Quinn and the lab that he hired?

A That is correct.

A From reading the text, I would assume after.
Q Do you remember what time it was after?
A No idea.
Q His next message, without a separate time stamp reads, "Will have clearance testing late today/early evening. Sometimes they don't get next day until 6:00 p.m." Do you see that?
A Yes.
Q Does that refresh your recollection at all about when you spoke with Mr. Darkenwald on October 26?
A It does not.
Q Let's go forward to the next couple of pages here, spilling into Page 192, if you will. Please take a moment to review those pages. 191, 192.
A Okay.
Q Does any of that discussion about Scott attending a funeral on the 26th refresh your recollection of what time you might have talked with him that afternoon or evening?
A I'm not certain it was that afternoon or evening, and I have no recollection of what time it would have been.
Q The very bottom of Page 192, you've written a text to Mr. Darkenwald telling him your "goal for the day is to have a signed agreement with Matt removing all

contingencies, and if he chooses, moving the closing date sooner." Do you see that?

A Yes.

Q What contingencies were you hoping that Matt would sign off in writing on that day?

A Scott had told me that, as per the contract, all final contingencies had to be removed by the 29th, and that was drop-dead, when everything went hard; all deposits became nonrefundable, and we both had agreed, as per the contract, to move forward.

And because of the plane deal and because Scott had told me that Matt wanted to close earlier, I asked him, Great, can we move the deadline of the 29th to the 28th? And that way I don't have to revamp the plane contract, because I had to let them know, and I was running out of time on that. And that's what that was in reference to.

And when I asked Scott, The inspection contingencies have already been taken care of; what else is there?

He said, Well, title, and I don't know, but I'm a stickler about the details, and I want to go over this with Matt and make sure that every "I" is dotted and every "T" is crossed, and that's what I'm doing.

Q Did you agree with Scott that it would be good

was Teryn Teets; Les Aasheim, which is Exhibit 27; Ben Rogers, which is a carpenter. I'm trying to think who else was there. That week they were the only three that were there. Oh, and Teryn's husband, Aaron, A-a-r-o-n.

Q What role, if any, did Teryn play in remediating the mold at the Glacier Bear property?

A Teryn is my on-site Montana property manager; so when I'm not here, if a worker needs to be let into the building, she'll make sure he has the key and access and answer any questions to make his job as easy as possible to expedite the work.

Q Do you know whether Teryn had any direct interactions with my clients?

A Not to my knowledge.

Q Was Teryn in the Virgin Islands when my clients visited?

A Yes. She was intending to meet them the week before when they couldn't make it.

Q Did you ever have a discussion with Teryn about the noise at the property?

A Only after the deal fell through.

Q What was the nature of that discussion?

A She asked me why the deal fell through, and I gave her the three reasons.

Q The three reasons my client articulated?

A Yes.
Q Is that the water rights, the mold --
A And the noise.
Q Okay. Did you ever discuss that with Teryn -- the noise, that is -- by telephone?
A I don't recall.
Q Was there construction going on nearby when the Duseks visited the property?
A Most definitely, yes.
Q What was the nature of that construction?
A It was major construction on the Camas Road.
Q Meaning what? They resurfaced it or --
A I'm not exactly sure what they did, but it was something along the lines of resurfacing. They were doing major work there for about a month, and it was the noisiest we've ever heard. In the eight years we've owned Glacier Bear, we've -- I can count on one hand the amount of times that I've heard a car and even noticed that it was there.
Q Did you ever talk with Scott Darkenwald about noise at the property?
A Only when this surfaced -- I didn't even know it was an issue until I knew it was an issue, and then I explained to him, Are you aware that there was construction at the property?

And in the defense of Glacier Bear, I'll also say that the only time that we hear noises are end of August and September, because otherwise that stream -- the two streams that surround the property at the back gush the rest of the year and make such a lovely noise. We always sleep with our windows open because the noise is so lovely. And we never hear cars; we hear the stream.

Q Did you ever have a discussion with Scott about the time of year and whether the trees would absorb the noise or not?

A Only after I knew it was an issue, and at that time, yes.

Q What was the nature of that discussion?

A As I just explained to you, it was the same thing I just said. It's -- my word -- I think it's -- they don't know because they haven't been here, and if you hear one truck during construction, I get that you'd think it's an issue, but we've lived here for eight years; it has never been an issue. We spent so much time in the art studio, so much time on that back deck; it's just never been an issue. If we hear anything, it's the stream. It's one of the reasons we go to Glacier. And he just said, I'll relay this to the Duseks.

Q Did he say whether the noise was general road noise or specific to construction work?

and Les Aasheim, A-a-s-h-e-i-m.
Q What's the first number on that?
A 262.
Q Again, do you know whether Les has ever met my clients personally?
A To my knowledge, he has not. Again, he was scheduled to be there on the 19th to answer any questions that they might have, but was in the Caribbean -- I'm sorry -- was scheduled to be there on the 12th and was in the Caribbean on the 19th when they came.
Q What, if any, work did he perform as a part of the remediation?
A Of mold remediation, none, that I'm aware of. That was all done by Cory at Advanced Restoration.
Q Did he do any of the other work?
A Yes. Les is my general handyman that did things like the flex hose on the downspout. Just anything that -- if you look at the very first text in here, I'm asking him to replace the light bulb in the Thermador oven. Anything that needs to be done to maintain Glacier Bear to the standard we have it, Les is the guy who does it.
Q Farther into this exhibit, there's a few photographs of someone working on the property. Do you see those? Maybe just on one page, 266.

A I do see that.
Q Is that Les?
A I don't know. It's funny. The first thing I did, Shane, is I wanted to go like this (indicating).
Q I understand exactly.
A Because it looks like -- if I'm not mistaken, it looks like that person has gray hair. I don't think it's the hood. And Les has bright blond hair; so I do not think that's Les.
Q I'm sure I asked yesterday, and I apologize, but who's Bear Barinowski?
A He was one of the project managers with Malmquist Construction.
Q What kind of work did he do on the property?
A When I got the inspection report, I had mentioned earlier that I am a Type-A personality and wanted to get it done immediately, and I moved mountains to meet these deadlines.
I called Bear over at Malmquist Construction and said, Here's the list of things that needs to be done; I need a plumber to help fix whatever -- I don't recall what the issue was, but there was a small plumbing thing that needed to be fixed. The downspout was one of them. Electrical was one of them.
So we had a couple little things on that

inspection report, and I called Bear and said, Which ones can you tackle and how quickly? Specifically I asked him, I want that railing done in the guesthouse; who can we get that I could pull strings now, pull favors now and get it done immediately? Because, as you know, getting on a subcontractor's list is not an easy thing to get done. And Bear called in some favors, and we had people there the next day.

(Exhibit 28 marked.)

Q (BY MR. COLEMAN) I'm handing you what's been marked as Deposition Exhibit 28. Is that a building-inspection report that was done by Mr. Quinn on or about the 13th of October, 2021?

A It appears to be.

Q When was the first time you saw that report?

A In its entirety, the first time I saw this report was when it was produced by Scott Darkenwald in his documents.

Q In response to the subpoena that was issued in this case?

A Yes.

Q Is that what we've been referring to today or what you and I have -- what you have understood being the first inspection report?

A Yes.

(Exhibit 29 marked.)

Q (BY MR. COLEMAN) I'm handing you what's been marked as Deposition Exhibit 29. When was the first time you saw that document in its entirety?

A What's the difference between 28 and 29?

Q I would suggest the date at the top is different on the upper left, unless I gave you the wrong one.

A One is the 13th, and one is 27th. Oh, this is the reinspection; is that correct? This is the reinspection?

Q It is.

A It was done afterwards. Okay.

Q My first question is, when have you seen what you believe to be the reinspection report in its entirety?

A Again, as part of the discovery from Scott Darkenwald.

Q Did you receive any portions of it from Scott Darkenwald before --

A Not that I recall.

Q And, again, is it your understanding that this is the document that today and yesterday you and I have referred to as the "second inspection report"?

A For the reinspection, yes.

Q Reinspection report, okay.

(Exhibit 30 marked.)

Q (BY MR. COLEMAN) I'm handing you what's been marked as Deposition Exhibit 30. Do you recognize that document?

A Well, it's quite a few pages. So on the front it appears to be the Glacier Bear inspection report, OPD, dated October 18.

Q What's the Bates number of that document?

A 312.

Q That's an email from Scott to my client and Tracy Rossi at the very top, does it appear?

A Yes.

Q And if you go farther down below -- well, step back.

And the very top email is dated October 18, 2021; is that right?

A Yes.

Q Farther down it references an email from you to Tracy and Scott dated October 17, 2021?

A Yes.

Q Are you forwarding the Owner's Property Disclosure on that date?

A I am forwarding -- yes, it appears that I am.

Q And so we have a clean record, what's the final page of that Exhibit 30?

A 320.

the boxes checked affirmatively or negatively as the property having or not having mold?

A That is correct, as it was already covered on Page 1.

Q You believe your statement on Page 1 covers the mold issue?

A It specifically said except for the things that are disclosed on the notice. And the notice, the first thing is mold.

Q So why didn't you check the box that said it has been tested for mold, and there's mold there?

A I can't answer that. I don't know. I just knew that it had already been covered.

(Exhibit 31 marked.)

Q (BY MR. COLEMAN) I've handed you what's been marked as Deposition Exhibit 31. Do you recognize that document?

A Yes, I do.

Q What is that?

A The Listing Agreement, Exclusive Right to Sell for the relisting of the property for Glacier Bear with Scott Strellnauer at PureWest Real Estate.

Q For the record, is this Document No. 348 to 353?

A Yes, it is.

(Exhibit 32 marked.)

Q (BY MR. COLEMAN) I'm handing you what's been marked as Deposition Exhibit 32. Do you recognize that document?
A Yes, I do.
Q What is it?
A This is an addendum to the Listing Agreement between Glacier Bear Retreat, LLC, and PureWest Real Estate.
Q What's the purpose of this addendum?
A To clarify language, and it's an additional provision in reference to this pending litigation.
Q And together are Exhibits 31 and 32 the complete agreement for relisting the Glacier Bear property that are currently in effect?
A Yes, they are. And if you want, it's Page No. 292, and it's out of order.
Q I'm sorry.
A That's okay. Just so you know, it goes 353 and then goes to 292, just so the record reflects that.
Q Okay. Let's make sure I understand. When I say the "complete" -- well, we talked about Exhibit 31 already. What are the numbers of Exhibit 32?
A 31 goes 348 to 353, and then the following, Exhibit 32, is Page 292.
Q Through?

A It's 292. It's one page.
Q I'm sorry. Can you substitute this guy in? Three-page document.
Well, let me ask the question first off, what are the second two pages of the document I just handed you? Maybe we don't need them.
A I'll let you know in a moment. It looks like a copy of this one (indicating). There's more to this one, too. Page 292, Exhibit 32, and what you just handed me, the first page is the same -- this is only one page (indicating); this is three pages. You can just staple this to the front of this and we're good. The first two pages are identical. So this page and this page are the same.
Q Can you give me 32 back? I'll give you -- is what I've handed you now and marked as Exhibit 32 the complete addendum to the current Listing Agreement?
A Yes.
Q And together with Exhibit 31, is that the complete agreement for relisting the Glacier Bear property?
A Yes.
Q You don't hold a real estate license, do you?
A No.
Q Not anywhere in the country?

REPORTER'S CERTIFICATE

I, SHERI J. HAZLETT, Registered Professional Reporter and Notary Public, do hereby certify:

THAT I did report the foregoing transcript after having first duly sworn the witness to testify to the truth; and

THAT said transcript was taken at the time and place stated on the caption hereto; and

THAT the testimony of the witness was taken in shorthand by me and subsequently reduced to writing under my direction; and

THAT the foregoing is a true and correct transcription of all the testimony of said witness to the best of my ability.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal of office this 19th day of July, 2022.

_______________________________________
SHERI J. HAZLETT, RPR and Notary Public
for the State of Montana
Residing in Flathead County
My Commission Expires 3/2/2025

# Depo. Ex. 2

**(excerpts)**

To: Scott Darkenwald



Thank you Scott, I will let you know. Just out of curiosity, we are on 348 Crist Rd. It is a 3500 square-foot main house with four bedrooms 3 1/2 baths and a guest house of 500 with two bedrooms and one bath, on a privately deeded on .8 acre lot inside glacier national Park. Fish creek and Apgar creek run through the back of the property. You can see photos at GlacierBearRetreat.com. It rents for over 15,000 per week and is rented about 20 weeks out of the year. This is true definition of your replaceable trophy property. What kind of a value would you list this one at?

Ok. This I will need to process ... fun !!!

Thu, Jul 29, 7:49 PM

Scott, do you think there's a chance you would sell unit seven? I'm questioning whether we list it now or list it later because I don't want to confuse people that might be looking at Ponderosa four or five. Love to talk to you about your thoughts on this.

I will sleep on. We can talk tomorrow or this weekend

Thank you

Fri, Jul 30, 5:44 PM

Wow. Spent considerable time on Glacier Bear this afternoon ... so much to think about !!!
I will trail run the next 2 mornings and I know what I will be thinking about. The perfect office setting (mountain trails) to process what you have ... haha :)

EXHIBIT 2
Scott Darkenwald
Thu, May 26, 2022
Reported by:
Mary Sullivan, RMR, CRR

To: Scott Darkenwald

GLACIER BEAR 0192

Tue, Oct 26, 5:18 PM

Will call after we get the clearance test results. Bill Hileman died and will drop by the reception at 4:30.

I don't know who Bill was but I'm sorry for your loss.

He was a long time lawyer and in his retirement the city judge. He and his wife sold their home on the lake last year and were building at iron horse. She too was a lawyer.

Thank you Scott, now I know exactly who you mean. I'm so sorry to hear of his early passing.

So sad. His wife was the first person I met here in 1990 when I was buying a building.

I've had so many friends that retired only to die within a very short period of time there after. That's why I want to run away to the islands sooner rather than later. Thank you for helping to make that dream come true.

Wed, Oct 27, 8:27 AM

Good morning Scott. Just thought I'd let you know... My goal for the day is to have a signed agreement with Matt removing all contingencies and if he chooses, moving the closing date sooner. Just thought I'd put that out there for you to weave your magic to make it happen. :) Thank you! I am off to kayak and snorkel for the day and will be available in a few hours should you need me. Thanks!

**Depo. Ex. 12**

Form No. 617 U03/19

Dept. Reviewer ____________
NOC RCD Coded ____________

STATE OF MONTANA
DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION

# PROJECT COMPLETION NOTICE

FOR PERMITTED WATER DEVELOPMENT
Field Report

**INSTRUCTIONS:** Use this form to report the completion of a Permit to Appropriate Water. This form must be filed on or before the deadline date on the permit or authorized extension of time. If the project is not completed, file an Application for Extension of Time (Form No. 607) by the permit deadline date; otherwise the permit is void. For complete instructions, read "Instructions for Project Completion Notice for Permitted Water Development."

## A. GENERAL INFORMATION

1. **PERMIT NO.** ____________

2. Permit Owner ____________
   Mailing Address ____________ Telephone No. ____________
   City ____________ State ____________ Zip ______

3. Field Examiner ____________ Profession ____________
   Mailing Address ____________ Telephone No. ____________
   City ____________ State ____________ Zip ______

4. Field Investigation Date: ____________

## B. OVERLAPPING WATER RIGHTS

1. Other water rights with same place of use: Water Right Number ____________

____________

2. Other water rights with same point of diversion: Water Right Number ____________

____________

## C. SOURCE OF WATER

- ☐ Well (Attach a copy of the Well Log Report)
- ☐ Developed Spring (Describe development) ____________
- ☐ Lake/Reservoir Name ____________ Tributary to ____________
- ☐ Stream Name ____________ Tributary to ____________
- ☐ Unnamed Source - Tributary to ____________
- ☐ Closed Basin (A closed basin results when water drains into a depression, lake, etc., from which water escapes only by evaporation.)

## D. SYSTEM DESCRIPTION

1. Means of Diversion: ☐ Pump ☐ Headgate/Ditch or pipeline ☐ Dike ☐ Dam ☐ Pit ☐ Other (Describe) ____________

2. Pump: ☐ Centrifugal ☐ Turbine ☐ Submersible

   Brand name ____________ GPM Capacity ____________
   Model # ____________ Discharge pressure ____________
   Impeller diameter ____________ No. of Stages / Bowls ____________
   ____________ Lift (in feet) ____________

   Motor:
   Brand Name ____________ HP Rating ____________
   No. of Phases ____________ RPM ____________
   Voltage ____________ Service factor (SF) ____________
   Amperage ____________

   Engine:
   Fuel Type ____________ Displacement ____________
   Brand name ____________ RPM ____________
   HP rating ____________

EXHIBIT 12
tabbies
7.6.22

3. Reservoir: Attach an engineering survey, an "NRCS As Built" survey, or complete the formula below with current measurements of the reservoir or pit as it was built.

Dam: Surface Area __________ X Maximum Depth __________ X 0.4 = __________ AC-FT
Pit: Surface Area __________ X Maximum Depth __________ X 0.5 = __________ AC-FT

Release Other Than Spillway ☐ No ☐ Yes, (Describe type and size of any release or drainage device)

______________________________________________________________________

4. Conveyance Facilities: ☐ Centrifugal ☐ Turbine ☐ Submersible
Describe (pipe material, size, length, top width, bottom width, depth, etc.) __________________________

______________________________________________________________________

______________________________________________________________________

5. Irrigation System:
Flood: ☐ Contour Ditch ☐ Border Dike ☐ Spreader Dike

Sprinkler: ☐ Handline # of Heads __________________
☐ Wheel Line PSI __________________
☐ Big Gun Nozzle size __________________
Nozzle type __________________
☐ Center Pivot (attach a copy of sprinkler chart)
☐ Other (Describe) __________________________
______________________________________________
Type of Crop: ☐ Alfalfa ☐ Pasture ☐ Small grains ☐ Other __________

E. **PERIOD OF APPROPRIATION**
The time during the year that water is diverted, impounded, or withdrawn from the source.
__________________ to __________________
month/day month/day

F. **POINT OF DIVERSION**

| IDENT NO | LOT | BLK | GOV'T LOT | 1/4 | 1/4 | 1/4 | SEC | TWP N/S | RGE E/W | CNTY |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |

Subdivision Name ______________________________________________

G. **PLACE OF USE**
For Irrigation:

| ACRES | LOT | BLK | 1/4 | 1/4 | 1/4 | SEC | TWP N/S | RGE E/W | CNTY | (N)New/ (S)Supp. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

_______ TOTAL ACRES Subdivision Name ______________________________

For Non-Irrigation:
If the place of use is the same as the point of diversion, check. ☐

| PURPOSE | GOV'T LOT | LOT | BLK | 1/4 | 1/4 | 1/4 | SEC | TWP N/S | RGE E/W | CNTY |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |

Subdivision Name ____________________________________________

H. **FLOW MEASUREMENTS**

1. Method of measurement: ☐ Meter ☐ Weir ☐ Flume ☐ Float and Stopwatch ☐ Other ______________________________

2. Water Measurement Equipment Statistics:

| Equipment | Type | Make | Model No. | Size |
|---|---|---|---|---|
| | | | | |
| | | | | |

3. Measurement readings: or ☐ See Field Notes Attached.

____________________________________________
____________________________________________
____________________________________________
____________________________________________

I. **VOLUME CALCULATIONS**

1. Calculations for Irrigation

Crop Requirement: (Complete A <u>and</u> B, C, or D)

A. $V_{IR}$ = __________ (acres) X __________ (irrigation requirement) = __________ acre-feet/yr

Actual Amount Used: (Complete B, C, or D)

B. $V_{DR}$ = __________ (GPM) X 60 X __________ (hours/day) X __________ (days irrigated) ÷ 325,851 = __________ acre-feet/yr

C. $V_{IN}$ = __________ (inches/irrigation) X __________ (no. of irrigations) X __________ (acres) ÷ 12 = __________ acre-feet/yr

D. $V_{MT}$ = __________ (metered volume) acre-feet/yr

Comparison: If the volume of water indicated in (A) above is less than or greater than the amount calculated in (B), (C), or (D), identify any facts that would explain why. ______________________________
____________________________________________
____________________________________________
____________________________________________

2. ☐ Calculations for Other Uses (Water Conversion Table, Form No. 615, is available at the Regional Office)

J. **BENEFICIAL USE AND PERIOD OF USE**

☐ Domestic: Number of households ________________

from _________ to _________ rate _________ ☐ GPM ☐ CFS volume _________ acre-feet

☐ Lawn & garden: Number of acres ______________

from _________ to _________ rate _________ ☐ GPM ☐ CFS volume _________ acre-feet

☐ Stock: Number and type ________________________________________________________

from _________ to _________ rate _________ ☐ GPM ☐ CFS volume _________ acre-feet

☐ Irrigation: Number of acres ______________

from _________ to _________ rate _________ ☐ GPM ☐ CFS volume _________ acre-feet

☐ Other Uses: _________________________________________________________________

from _________ to _________ rate _________ ☐ GPM ☐ CFS volume _________ acre-feet

K. **PERMIT CONDITIONS OR LIMITATIONS**

Explain how each of the conditions of the permit have or have not been met.

_______________________________________________________________________________

_______________________________________________________________________________

_______________________________________________________________________________

_______________________________________________________________________________

_______________________________________________________________________________

L. **MAP AND PHOTOGRAPHS**

☐ Attach a copy of aerial photo or USGS Quadrangle showing the following:

- Section Corners and Numbers
- Location of Ditch, Pipeline, etc.
- Township and Range Numbers
- Place of Use (stock tanks, acres irrigated)
- Point of Diversion
- Reservoir Location

☐ Photographs of your diversion and the place of use will help document the completion and operation of your project. If photos are submitted, label them with the following information:

- Permit Number
- Name of photographer
- Date photo taken
- Subject of photo (point of diversion, etc.)

M. **CERTIFICATION**

The above information is a true statement of the extent the project was developed.

I declare under penalty of perjury and under the laws of the state of Montana that the foregoing is true and correct.

Field Examiner Printed Name: ________________________________________

Field Examiner Signature: ________________________________________ Date: ______________

N. **PERMIT OWNER** (sign only if the person signing the certification is not the permittee)

I have reviewed these findings and submit this Notice of Completion to the Department.

I declare under penalty of perjury and under the laws of the state of Montana that the foregoing is true and correct.

Permit Owner Printed Name: ________________________________________

Permit Owner Signature: ________________________________________ Date: ______________

**SUBMIT THE COMPLETED FORM TO YOUR WATER RESOURCES REGIONAL OFFICE LISTED IN THE INSTRUCTIONS.**

# INSTRUCTIONS
for
# PROJECT COMPLETION NOTICE
FOR PERMITTED WATER DEVELOPMENT
(Form No. 617 U01/13)

**Important:** Montana water law requires the holder of a "Permit to Appropriate Water" to file a certified statement with the Department (DNRC) notifying it how the project was completed. Form No. 617, Project Completion Notice for Permitted Water Development, must be completed and submitted to the Department on or before the completion deadline date indicated on the permit. If the project cannot be completed or the water cannot be put to beneficial use before the deadline, an Application for Extension of Time (Form No. 607) must be filed prior to the deadline date; otherwise the permit is void.

This form must be completed by a person experienced in the design, construction, or operation of the appropriation works. This may include, but is not limited to, hydrologists, water resource consultants, irrigation specialists, engineers, or the permittee if experienced in water measurement and legal land descriptions. If the form is not completed properly or corrected within the time allowed by the Department, the permit may be subject to revocation pursuant to Section 85-2-314, MCA.

*Form No. 617 is to be completed with information showing how the project was developed and used. Show all measurements or calculations on Form 617 or attach field notes. For standard water conversions, obtain Form No. 615, Water Conversion Table, from your local Regional Office. When completing Form No. 617, follow the line-by-line instructions below. If you have any questions, contact your local Water Resources Regional Office listed on the back page. Regional office employees cannot, however, complete the form for you.*

## PART A GENERAL INFORMATION

1. List the permit number. The permit number has two parts: a water basin number and a numeric part. (Example: 43QJ-24450). This number can be found on the permit or in DNRC's records.
2. Name the current owner of the permit (permittee), mailing address and daytime phone number. If the current owner is different than the owner listed on the permit or in the DNRC records, a Water Right Ownership Update Form No. 608 must be filed to update the DNRC ownership records.
3. If the field examiner (the person completing this form) is someone other than the Permittee, indicate that person's full name, professional title, mailing address, and daytime phone number. If the field examiner is the Permittee, write, "same."
4. Indicate the date on which the project was examined.

## PART B OVERLAPPING WATER RIGHTS

1. List the water right numbers of any other water rights that are used on the same place of use as the permit. Contact your local Regional Office, if needed, to identify the proper water right numbers.
2. List the water right numbers of any other water rights that are diverted from the same point of diversion as the permit. Contact the local Regional Office, if needed, to identify the proper water right numbers.

## PART C SOURCE OF WATER

1. Check the block for the source of water.
   - **For wells:** Attach a copy of the driller's Well Log Report, Form No. 603.
   - **For developed springs:** Describe in detail how the spring was developed.
   - **For lakes or reservoirs:** List its name and the outflowing stream of which it is tributary.
   - **For streams:** List its name and the source or stream of which it is a tributary
   - **For unnamed streams:** List the name of the source or stream of which it is tributary.
   - **For closed basins:** Check the block. A closed basin results when water drains into a depression, lake, etc., from which water escapes only by evaporation.

## PART D SYSTEM DESCRIPTION

1. Indicate how the water is diverted from the source. Check the appropriate box or describe the diversion.
2. For pump diversions, complete all of the pertinent information.
3. For reservoirs, give the capacity in acre-feet. Attach an engineering survey or an "NRCS As Built" survey. If a survey was not made, attach the field examiner's measurements and complete the appropriate formula. Indicate whether there is a release in the dam other than the spillway. If so, describe in detail the type and size of the release or drainage device.
4. Describe the conveyance facilities: how the water is conveyed from the source to the place of use. Describe the type, length, and inside diameter of any pipeline, or length, top and bottom width, and depth of any ditch or natural carrier or other means of conveyance.
5. For irrigation, describe the kind of system installed. For sprinkler systems include the number of heads, the PSI (pounds per square inch), the type and size of nozzles, or attach a sprinkler chart. Indicate the type of crop irrigated.

## PART E PERIOD OF APPROPRIATION

The period of appropriation is the time during the year that water is diverted, impounded, or withdrawn from the source. Indicate the first month and day and the last month and day of the year that water is removed from the source.

## PART F POINT OF DIVERSION

Assign each point of diversion listed an identification number (Ident. No.) that corresponds to that particular diversion on the map required in Part L. List all of the points of diversion for the permit. This is the location where the water is diverted from the source. Describe the point of diversion to the nearest 10- acre description, the 1/4 1/4 1/4 section, Section, Township, Range and County. If the diversion is in a subdivision, give the location by lot and block numbers, subdivision name, and the legal description including 1/4 section, Section, Township, Range and County. If the diversion lies in a government lot (Gov't. Lot), give the lot number and the 1/4 section, Section, Township, Range and County.

## PART G PLACE OF USE

For irrigation, list the legal description for each parcel of irrigation and the number of acres in each parcel. Describe the parcel to the nearest 1/4 section or 1/4 1/4 section, and the Section, Township, Range, and County. If the parcel is located in a subdivision, also list the lot and block numbers and the subdivision name, or, if a government lot indicate the lot number. Indicate if the acres are new (N) irrigation. If there are other water rights used on the same ground, the permit is considered supplemental to the other water rights. Indicate these acres as supplemental (S).

For non-irrigation purposes, indicate the purpose and the place of use. If it is the same location as the point of diversion, check the block.

## PART H FLOW MEASUREMENTS

The rate at which the water is diverted from the source must be identified. The method of measurement, type of equipment used, and the measurement readings must be indicated. Attach copies of any field notes taken of the measurements.

1. Check the appropriate block and, if checking "other", describe how the flow rate was measured.
2. Give the particular details requested for the equipment used to take the flow rate measurement.
3. List the measurement readings or attach a copy of the field notes.

## PART I VOLUME CALCULATIONS

1. The volume (acre-feet) of water used for each purpose must be determined. For irrigation, identify the crop requirement according to the NRCS Irrigation Guide of Montana to complete Item A. The Irrigation Guide is available at your local NRCS office or Water Resources Regional Office. To reasonably determine the amount of water actually used, also complete one of Items B, C, OR D. If Item A is greater or lesser than the actual amount of water used as indicated in Items B, C, or D, identify any facts that would explain why.
2. For other uses, show the calculations used to determine the volume of water used on an annual basis. Water conversion standards can be found on Form No. 615, Water Conversion Table, available at your local Regional Office.

## PART J BENEFICIAL USE AND PERIOD OF USE

Check the purpose for which the permit is used. Complete the requested information for each purpose. Identify the period of use, the time during the year water is used for the particular purpose. Indicate the first month and day that water is used during the year and the last month and day. If there is more than one purpose and only one point of diversion, the flow rate for each purpose should read the same. For example, a ditch diverting water from a stream carries water to the property. From the ditch, a pump is used to fill a stock tank and to water the lawn and garden. The rate at which water is diverted from the stream by the ditch is the same for both stock and irrigation purposes.

## PART K PERMIT CONDITIONS OR LIMITATIONS

All water use permits, by law, are issued subject to prior existing water rights and the final determination of those water rights. Some permits include other conditions to protect prior water rights or to ensure that the permit criteria are met. For example, the installation of a measuring device may be required so that the flow rate can be monitored and records can be kept on the amount of water diverted during the year. Review the permit and any final order to identify any conditions placed on the permit other than the prior rights and final determination conditions. Describe how each of these conditions have been met, or it they have not been, explain why.

## PART L MAP AND PHOTOGRAPHS

A map of the project must accompany Form No. 617. Use a copy of an aerial photograph or a USGS quadrangle. The scale must be 2 inches to the mile or greater. The map must contain section corners, section numbers, township and range numbers, the means of conveyance, and the point of diversion. Label the point of diversion with the identification number as noted under Part F of Form No. 617.

Photographs may be used as additional documentation to show that the permit was developed and that the water was put to beneficial use. Photos may be submitted along with Form No. 617 to be placed in the permit file. Photos must include the following information: permit number, date photo was taken, photographer's name, and the subject of the picture (point of diversion, etc.).

## PART M CERTIFICATION

The person completing Form No. 617 must sign the certification. If the permittee signs the certification, he/she does not need to sign Part N.

## PART N PERMIT OWNER

If the permit owner completes Form No. 617, he/she does not need to sign Part N.

**Submit the completed Form No. 617 to your local Regional Office.**

# WATER RESOURCES REGIONAL OFFICES

**BILLINGS:** AIRPORT INDUSTRIAL PARK, 1371 RIMTOP DRIVE, BILLINGS MT 59105-1978
PHONE: 406-247-4415 FAX: 406-247-4416
SERVING: Big Horn, Carbon, Carter, Custer, Fallon, Powder River, Prairie, Rosebud, Stillwater, Sweet Grass, Treasure, and Yellowstone Counties

**BOZEMAN:** 2273 BOOT HILL COURT, SUITE 110, BOZEMAN MT 59715
PHONE: 406-586-3136 FAX: 406-587-9726
SERVING: Gallatin, Madison, and Park Counties

**GLASGOW:** 222 6TH STREET SOUTH, PO BOX 1269, GLASGOW MT 59230-1269
PHONE: 406-228-2561 FAX: 406-228-8706
SERVING: Daniels, Dawson, Garfield, McCone, Phillips, Richland, Roosevelt, Sheridan, Valley, and Wibaux Counties

**HAVRE:** 210 6TH AVENUE, PO BOX 1828, HAVRE MT 59501-1828
PHONE: 406-265-5516 FAX: 406-265-2225
SERVING: Blaine, Chouteau, Glacier, Hill, Liberty, Pondera, Teton, and Toole Counties

**HELENA:** 1424 9TH AVENUE, PO BOX 201601, HELENA MT 59620-1601
PHONE: 406-444-6999 FAX: 406-444-9317
SERVING: Beaverhead, Broadwater, Deer Lodge, Jefferson, Lewis and Clark, Powell, and Silver Bow Counties

**KALISPELL:** 655 TIMBERWOLF PARKWAY, SUITE 4, KALISPELL MT 59901-1215
PHONE: 406-752-2288 FAX: 406-752-2843
SERVING: Flathead, Lake, Lincoln, and Sanders Counties

**LEWISTOWN:** 613 NORTHEAST MAIN STREET, SUITE E, LEWISTOWN MT 59457-2020
PHONE: 406-538-7459 FAX: 406-538-7089
SERVING: Cascade, Fergus, Golden Valley, Judith Basin, Meagher, Musselshell, Petroleum, and Wheatland Counties

**MISSOULA:** 2705 SPURGIN ROAD, BLDG C, PO BOX 5004, MISSOULA MT 59806-5004
PHONE: 406-721-4284 FAX: 406-542-5899
SERVING: Granite, Mineral, Missoula, and Ravalli Counties

---

***MONTANA DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION***
***Water Resources Division - Water Rights Bureau***
***WEBSITE:*** **http://dnrc.mt.gov/wrd/**

---



**Depo. Ex. 15**

**STATE OF MONTANA**

**DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION**

1424 9TH AVENUE P.O. BOX 201601 HELENA, MONTANA 59620-1601

# GENERAL ABSTRACT

**Water Right Number:** 76I 30153319 PROVISIONAL PERMIT

**Version:** 1 -- ORIGINAL RIGHT

**Version Status:** ACTIVE

**Owners:** GAIL GOODWIN
3868 GELANDE ST APT 7
WHITEFISH, MT 59937-9002

**Priority Date:** SEPTEMBER 3, 2021 at 12:39 P.M.

**Enforceable Priority Date:** SEPTEMBER 3, 2021 at 12:39 P.M.

**Purpose (Use):** DOMESTIC
OTHER PURPOSE

**Maximum Flow Rate:** 4.00 GPM

**Maximum Volume:** 1.15 AC-FT

**Source Name:** GROUNDWATER

**Source Type:** GROUNDWATER

**Point of Diversion and Means of Diversion:**

| ID | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|---|---|---|---|---|---|---|
| 1 | 2 | SWSWSW | 14 | 32N | 19W | FLATHEAD |

**Period of Diversion:** JANUARY 1 TO DECEMBER 31

**Diversion Means:** WELL

**Well Depth:** 58.00 FEET

**Flowing:** YES

THE POINT OF DIVERSION IS LOCATED IN CERTIFICATE OF SURVEY NO. 19007 TRACT 1.

**Purpose (Use):** DOMESTIC

**Households:** 1

**Volume:** 1.00 AC-FT

**Period of Use:** JANUARY 1 to DECEMBER 31

**Place of Use:**

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|---|---|---|---|---|---|---|---|
| 1 | | 2 | SWSWSW | 14 | 32N | 19W | FLATHEAD |

**Purpose (Use):** OTHER PURPOSE **Purpose Clarification:** GUEST HOUSE

**Volume:** 0.15 AC-FT

**Period of Use:** MAY 15 to SEPTEMBER 15

**Place of Use:**

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|---|---|---|---|---|---|---|---|
| 1 | | 2 | SWSWSW | 14 | 32N | 19W | FLATHEAD |

PENGAD 800-631-6989 EXHIBIT 15 7.6.22 Goodwin

THE PLACE OF USE IS LOCATED IN CERTIFICATE OF SURVEY NO. 19007 TRACT 1.

**Geocodes/Valid:** 07-4406-14-3-02-10-0000 - Y

---

**Remarks:**

**CLARK FORK RIVER BASIN LAW**

THIS PROVISIONAL WATER USE PERMIT HAS A PRIORITY DATE THAT IS JUNIOR TO THE RIGHTS OF SENIOR WATER RIGHT HOLDERS IN THE CLARK FORK RIVER BASIN. IN ACCORDANCE WITH MONTANA LAW, YOU MAY BE SUBJECT TO A CALL BY SENIOR WATER RIGHT HOLDERS, IN WHICH CASE YOU MAY BE REQUIRED TO DISCONTINUE YOUR USE OF WATER FOR THE PERIOD OF THE CALL.

**CONFEDERATED SALISH AND KOOTENAI TRIBES - RESERVED WATER RIGHTS**

THIS RIGHT IS SUBJECT TO ALL PRIOR INDIAN RESERVED WATER RIGHTS OF THE CONFEDERATED SALISH AND KOOTENAI TRIBES IN THE SOURCE OF SUPPLY. IT IS THE TRIBE'S POSITION THAT THE EXERCISE OF JUNIOR WATER RIGHTS EITHER WITHIN OR OUTSIDE OF THE EXTERIOR BOUNDARIES OF THE FLATHEAD INDIAN RESERVATION MAY AFFECT THE RESERVED WATER RIGHTS OF THE TRIBE WITHIN THE EXTERIOR BOUNDARIES OF THE RESERVATION. IT IS THE TRIBE'S POSITION THAT ECONOMIC INVESTMENTS MADE IN RELIANCE UPON THIS RIGHT DO NOT CREATE IN THE APPROPRIATOR ANY EQUITY OR VESTED RIGHT AGAINST THE TRIBES. THE APPROPRIATOR IS HEREBY NOTIFIED THAT ANY FINANCIAL OUTLAY OR WORK INVESTED IN A PROJECT PURSUANT TO THIS RIGHT IS AT APPROPRIATOR'S RISK. THE ISSUANCE OF THIS RIGHT DOES NOT REDUCE THE APPROPRIATOR'S LIABILITY FOR DAMAGE CAUSED BY THE EXERCISE OF THE RIGHT. IT DOES NOT MAKE THE DEPARTMENT LIABLE FOR DAMAGE CAUSED BY THE EXERCISE OF THE RIGHT. NOR IS THE DEPARTMENT LIABLE FOR ANY LOSS TO THE APPROPRIATOR CAUSED BY THE EXERCISE OF SENIOR RESERVED WATER RIGHTS.

**U.S. NATIONAL PARK SERVICE - FUTURE CONSUMPTIVE LIMIT**

THIS PERMIT WAS NOT COUNTED AS PART OF THE FUTURE SURFACE SOURCE CONSUMPTIVE USE LIMITS DETAILED IN THE U.S. NATIONAL PARK SERVICE-MONTANA COMPACT.

**U.S. NATIONAL PARK SERVICE - MONTANA COMPACT (GLACIER PARK)**

THIS RIGHT IS ISSUED IN ACCORDANCE WITH THE GLACIER NATIONAL PARK PROVISIONS OF THE JANUARY 31, 1994, U.S. NATIONAL PARK SERVICE-MONTANA COMPACT.

Depo. Ex. 16

# DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION

Water Resources Division • Kalispell Regional Office
655 Timberwolf Pkwy, Suite 4, Kalispell, MT 59901 Phone: (406) 752-2288 Fax: (406) 752-2843

GREG GIANFORTE, GOVERNOR | 1539 ELEVENTH AVENUE

STATE OF MONTANA

DIRECTOR'S OFFICE: (406) 444-2074
FAX: (406) 444-2684

PO BOX 201601
HELENA, MONTANA 59620-1601


October 12, 2021

Gail Goodwin
3868 Gelande St, #7
Whitefish, MT 59937

Dear Applicant,

Your provisional permit has been issued in accordance with section 85-20-401 of Montana Code Annotated. Your provisional permit has been assigned the water right number **76LJ 30153319** and the extent of your water right is outlined in the enclosed permit document.

The Department has designated a notice of completion of permitted water development (form 617) due date of **December 31, 2022**. This date is important for you to remember because failure to file a notice of completion (form 617) or application for extension of time (form 607) on or before this date will result in the termination of your provisional permit.

If you have any questions regarding your enclosed provisional permit, please contact me at (406) 752-2702 or Austin.Seback@mt.gov.

Sincerely,

Austin Seback
Hydrologist / Water Resource Specialist
Kalispell Regional Water Resources Office

EXHIBIT 16 Goodwin 7.6.23
PENGAD 800-631-6989

STATE OF MONTANA
DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION
1424 9TH AVENUE P.O.BOX 201601 HELENA, MONTANA 59620-1601

# PERMIT TO APPROPRIATE WATER

UPON FINDING THE REQUIREMENTS OF SECTION 85-20-401, MCA, HAVE BEEN MET, THIS PROVISIONAL PERMIT IS GRANTED.

**Water Right Number:** 76I 30153319 PROVISIONAL PERMIT

**Version:** 1 -- ORIGINAL RIGHT

**Version Status:** ACTIVE

**Owners:** GAIL GOODWIN
3868 GELANDE ST APT 7
WHITEFISH, MT 59937 9002

**Priority Date:** SEPTEMBER 3, 2021 at 12:39 P.M.

**Enforceable Priority Date:** SEPTEMBER 3, 2021 at 12:39 P.M.

**Purpose (Use):** DOMESTIC
OTHER PURPOSE

**Maximum Flow Rate:** 4.00 GPM

**Maximum Volume:** 1.15 AC-FT

**Source Name:** GROUNDWATER

**Source Type:** GROUNDWATER

**Point of Diversion and Means of Diversion:**

| ID | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|---|---|---|---|---|---|---|
| 1 | 2 | SWSWSW | 14 | 32N | 19W | FLATHEAD |

**Period of Diversion:** JANUARY 1 TO DECEMBER 31

**Diversion Means:** WELL

**Well Depth:** 58.00 FEET

**Flowing:** YES

THE POINT OF DIVERSION IS LOCATED IN CERTIFICATE OF SURVEY NO. 19007 TRACT 1.

**Purpose (Use):** DOMESTIC

**Households:** 1

**Volume:** 1.00 AC-FT

**Period of Use:** JANUARY 1 to DECEMBER 31

**Place of Use:**

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|---|---|---|---|---|---|---|---|
| 1 | | 2 | SWSWSW | 14 | 32N | 19W | FLATHEAD |

**Purpose (Use):** OTHER PURPOSE **Purpose Clarification:** GUEST HOUSE

**Volume:** 0.15 AC-FT

**Period of Use:** MAY 15 to SEPTEMBER 15

**Place of Use:**

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|---|---|---|---|---|---|---|---|
| 1 | | 2 | SWSWSW | 14 | 32N | 19W | FLATHEAD |

THE PLACE OF USE IS LOCATED IN CERTIFICATE OF SURVEY NO. 19007 TRACT 1.

## COMPLETION DEADLINE

THE DEADLINE TO COMPLETE THIS PERMIT AND FILE A PROJECT COMPLETION NOTICE (FORM 617) IS **DECEMBER 31, 2022**. IF YOU CANNOT MEET THE DEADLINE, FILE A FORM 607, APPLICATION FOR EXTENSION OF TIME, BY **DECEMBER 31, 2022**. OTHERWISE, THE PERMIT IS VOID.

## CLARK FORK RIVER BASIN LAW

THIS PROVISIONAL WATER USE PERMIT HAS A PRIORITY DATE THAT IS JUNIOR TO THE RIGHTS OF SENIOR WATER RIGHT HOLDERS IN THE CLARK FORK RIVER BASIN. IN ACCORDANCE WITH MONTANA LAW, YOU MAY BE SUBJECT TO A CALL BY SENIOR WATER RIGHT HOLDERS, IN WHICH CASE YOU MAY BE REQUIRED TO DISCONTINUE YOUR USE OF WATER FOR THE PERIOD OF THE CALL.

## CONFEDERATED SALISH AND KOOTENAI TRIBES - RESERVED WATER RIGHTS

GLACIER BEAR 0433

THIS RIGHT IS SUBJECT TO ALL PRIOR INDIAN RESERVED WATER RIGHTS OF THE CONFEDERATED SALISH AND KOOTENAI TRIBES IN THE SOURCE OF SUPPLY. IT IS THE TRIBE'S POSITION THAT THE EXERCISE OF

JUNIOR WATER RIGHTS EITHER WITHIN OR OUTSIDE OF THE EXTERIOR BOUNDARIES OF THE FLATHEAD INDIAN RESERVATION MAY AFFECT THE RESERVED WATER RIGHTS OF THE TRIBE WITHIN THE EXTERIOR BOUNDARIES OF THE RESERVATION. IT IS THE TRIBE'S POSITION THAT ECONOMIC INVESTMENTS MADE IN RELIANCE UPON THIS RIGHT DO NOT CREATE IN THE APPROPRIATOR ANY EQUITY OR VESTED RIGHT AGAINST THE TRIBES. THE APPROPRIATOR IS HEREBY NOTIFIED THAT ANY FINANCIAL OUTLAY OR WORK INVESTED IN A PROJECT PURSUANT TO THIS RIGHT IS AT APPROPRIATOR'S RISK. THE ISSUANCE OF THIS RIGHT DOES NOT REDUCE THE APPROPRIATOR'S LIABILITY FOR DAMAGE CAUSED BY THE EXERCISE OF THE RIGHT. IT DOES NOT MAKE THE DEPARTMENT LIABLE FOR DAMAGE CAUSED BY THE EXERCISE OF THE RIGHT. NOR IS THE DEPARTMENT LIABLE FOR ANY LOSS TO THE APPROPRIATOR CAUSED BY THE EXERCISE OF SENIOR RESERVED WATER RIGHTS.

**U.S. NATIONAL PARK SERVICE - FUTURE CONSUMPTIVE LIMIT**

THIS PERMIT WAS NOT COUNTED AS PART OF THE FUTURE SURFACE SOURCE CONSUMPTIVE USE LIMITS DETAILED IN THE U.S. NATIONAL PARK SERVICE-MONTANA COMPACT.

**U.S. NATIONAL PARK SERVICE - MONTANA COMPACT (GLACIER PARK)**

THIS RIGHT IS ISSUED IN ACCORDANCE WITH THE GLACIER NATIONAL PARK PROVISIONS OF THE JANUARY 31, 1994, U.S. NATIONAL PARK SERVICE-MONTANA COMPACT.

**BACKFLOW PREVENTOR**

PURSUANT TO SECTION 85-2-505, MCA, TO PREVENT GROUND WATER CONTAMINATION, AN OPERATIONAL BACKFLOW PREVENTOR MUST BE INSTALLED AND MAINTAINED BY THE APPROPRIATOR IF A CHEMICAL OR FERTILIZER DISTRIBUTION SYSTEM IS CONNECTED TO THE WELL.

---

**THIS PROVISIONAL PERMIT IS SUBJECT TO ALL PRIOR EXISTING WATER RIGHTS IN THE SOURCE OF SUPPLY. FURTHER, THIS PERMIT IS SUBJECT TO ANY FINAL DETERMINATION OF EXISTING WATER RIGHTS, AS PROVIDED BY MONTANA LAW.**

**FAILURE TO COMPLY WITH ANY OF THESE TERMS AND CONDITIONS MAY RESULT IN THE LOSS OF THIS PROVISIONAL PERMIT.**

Witness Signature

Kathy Olsen
Water Resources Division

DATE ISSUED: OCTOBER 12, 2021

ORO Y PLATA

THE GREAT SEAL OF THE STATE OF MONTANA

GLACIER BEAR 0434

**Depo. Ex. 30**

Gmail

Tracy Rossi <tracyerossi@gmail.com>

# Fwd: Glacier Bear Inspection report - OPD

**Scott Darkenwald** <sdarkenwald@glaciersir.com> Mon, Oct 18, 2021 at 2:20 PM
To: Matt Dusek <matt.dusek@gmail.com>, Rachel Dusek <rldusek@gmail.com>
Cc: Tracy Rossi <trossi@glaciersir.com>

See below Owners Property Disclosure Statement in PDF from Gail … nothing new in here … she was holding off sending it until the water rights were resolved. So here you go !
scott

Begin forwarded message:

**From:** Gail Goodwin <gail@montanabearproperties.com>
**Subject: Fwd: Glacier Bear Inspection report**
**Date:** October 17, 2021 at 7:49:51 PM MDT
**To:** Tracy Rossi <trossi@glaciersir.com>, Scott Darkenwald <sdarkenwald@glaciersir.com>

Hi Tracy and Scott,

Here are the signed forms as per your request. Please let me know if you have any questions or need anything else. Thank you!

Hugs,
Gail

Gail Lynne Goodwin, CPM®
Montana Bear Properties
406-848-1771
*For one-of-a-kind uniquely located luxury vacation rentals, hibernate with us.*

Montana Bear
PROPERTIES

---------- Forwarded message ---------
From: **Gail Lynne Goodwin** <gaillynnegoodwin@gmail.com>
Date: Sun, Oct 17, 2021 at 9:48 PM
Subject: Fwd: Glacier Bear Inspection report
To: Gail Goodwin <Gail@montanabearproperties.com>

---------- Forwarded message ---------
From: **Gail Goodwin** <gailgoodwin@me.com>
Date: Sun, Oct 17, 2021 at 9:45 PM
Subject: Glacier Bear Inspection report
To: <gailgoodwin@gmail.com>

Created with SwiftScan
Download it for free and discover the world's leading scanner app.

PENGAD 800-631-6989 EXHIBIT 30 Goodwin 7.6.22

Sent from my iPhone

**IMPORTANT NOTICE: Never trust wiring instructions sent via email. Cyber criminals are hacking email accounts and sending emails with fake wiring instructions. These emails are convincing and sophisticated. Always independently confirm wiring instructions in person or via a telephone call to a trusted and verified phone number. Never wire money without double-checking that the wiring instructions are correct.**

---

**Glacier Bear Inspection report.pdf**
5774K

Gmail

Tracy Rossi <tracyerossi@gmail.com>

# Fwd: Glacier Bear Inspection report - OPD

**Matt Dusek** <matt.dusek@gmail.com> Mon, Oct 18, 2021 at 2:28 PM
To: Scott Darkenwald <sdarkenwald@glaciersir.com>
Cc: Rachel Dusek <rldusek@gmail.com>, Tracy Rossi <trossi@glaciersir.com>

Thanks, Scott!

On Mon, Oct 18, 2021 at 1:20 PM Scott Darkenwald <sdarkenwald@glaciersir.com> wrote:

See below Owners Property Disclosure Statement in PDF from Gail ... nothing new in here ... she was holding off sending it until the water rights were resolved. So here you go !
scott

Begin forwarded message:

**From:** Gail Goodwin <gail@montanabearproperties.com>
**Subject: Fwd: Glacier Bear Inspection report**
**Date:** October 17, 2021 at 7:49:51 PM MDT
**To:** Tracy Rossi <trossi@glaciersir.com>, Scott Darkenwald <sdarkenwald@glaciersir.com>

Hi Tracy and Scott,

Here are the signed forms as per your request. Please let me know if you have any questions or need anything else. Thank you!

Hugs,
Gail

Gail Lynne Goodwin, CPM®
Montana Bear Properties
406-848-1771
*For one-of-a-kind uniquely located luxury vacation rentals, hibernate with us.*

Montana Bear PROPERTIES

---------- Forwarded message ---------
From: **Gail Lynne Goodwin** <gaillynnegoodwin@gmail.com>
Date: Sun, Oct 17, 2021 at 9:48 PM
Subject: Fwd: Glacier Bear Inspection report
To: Gail Goodwin <Gail@montanabearproperties.com>

---------- Forwarded message ---------
From: **Gail Goodwin** <gailgoodwin@me.com>
Date: Sun, Oct 17, 2021 at 9:45 PM
Subject: Glacier Bear Inspection report
To: <gailgoodwin@gmail.com>

GLACIER BEAR 0314

Created with SwiftScan
Download it for free and discover the world's leading scanner app.

Sent from my iPhone

**IMPORTANT NOTICE: Never trust wiring instructions sent via email. Cyber criminals are hacking email accounts and sending emails with fake wiring instructions. These emails are convincing and sophisticated. Always independently confirm wiring instructions in person or via a telephone call to a trusted and verified phone number. Never wire money without double-checking that the wiring instructions are correct.**

# MONTANA ASSOCIATION OF REALTORS®
# PROPERTY DISCLOSURE STATEMENT

Date: 10/17/21

Property: 348 Grist Road West Glacier MT 59936
Seller(s): Gail Lynne Goodwin Darryl C Slattengren
Seller Agent: Scott Darkenwald

Concerning adverse material facts, Montana law provides that a seller agent is obligated to:

- disclose to a buyer or the buyer agent any adverse material facts that concern the property and that are known to the seller agent, except that the seller agent is not required to inspect the property or verify any statements made by the seller; and
- disclose to a buyer or the buyer agent when the seller agent has no personal knowledge of the veracity of information regarding adverse material facts that concern the property.

The Seller Agent identified above is providing the attached Owner's Property Disclosure Statement that has been completed and signed by the Seller(s), if one has been made available to the Seller Agent by the Seller(s). Regardless of whether Seller(s) has/have provided Seller Agent with an Owner's Property Disclosure Statement, **except as set forth below,** the Seller Agent has no personal knowledge:

(i) about adverse material facts that concern the Property or
(ii) regarding the veracity (accuracy) of any information regarding adverse material facts that concern the Property

Other than the items in the inspection report, Sellers Know of no other defects in the property

Information regarding adverse material facts that concern the Property and that are known to the Seller Agent, if any, is set forth above. However, the Seller Agent is not required to inspect the Property or verify any statements made by the Seller(s). Buyer(s) is/are therefore encouraged to obtain professional advice, inspections or both of the Property and to provide for appropriate provisions in a Buy-Sell Agreement between the Buyer(s) and Seller(s) with respect to any advice, inspections or defects.

Seller Agent Signature: ______________________
Scott Darkenwald

Dated: ______________________

Buyer and Buyer Agent acknowledge receipt of this Property Disclosure Statement.

Buyer Agent: ______________________

Buyer Agent Signature: ______________________

Dated: ______________________

Buyer Signature: ______________________

Dated: ______________________

© 2019 Montana Association of REALTORS®
Property Disclosure Statement, April 2019

DS MH



This form presented by Tracy Rossi | Glacier Sotheby's Int'l Realty | (406) 763-6808 | trossi@glaciersir.com

TRANSACTIONS

# OWNER'S PROPERTY DISCLOSURE STATEMENT
# MONTANA ASSOCIATION OF REALTORS® STANDARD FORM

The use of this form is for REALTOR® members only (members of the Montana Association of REALTORS®) and cannot be used by any other party for any purpose. Use of these forms by other parties may result in legal action by the Montana Association of REALTORS®.

Date: 10/17/21

The undersigned Owner is the owner of certain real property located at 348 Grist Road West Glacier MT 59936, in the City of West Glacier, County of Flathead, Montana, which real property is legally described as:
S14, T32 N, R19 W, COS 19007-1, TR 1W & TR 1X IN L 2, ASSR# 0000308750

(hereafter the "Property"). Owner executes this Disclosure Statement to disclose to prospective buyers all adverse material facts which concern the Property. Montana law defines an adverse material fact as a fact that should be recognized as being of enough significance as to affect a person's decision to enter into a contract to buy or sell real property and may be a fact that materially affects the value of the Property, that affects the structural integrity of the Property, or that presents a documented health risk to occupants of the Property.

## OWNER'S DISCLOSURE

☐ Owner has never occupied the Property. – guest occupied seasonally through
☐ Owner has not occupied the Property since ____________ (date). 10/2/21

The Owner declares that the Owner has prepared this Disclosure Statement and any attachments thereto based on any adverse material facts known to the Owner. Owner hereby authorizes providing a copy of this Statement to any person or entity in connection with any actual or anticipated sale of the Property. Owner further agrees to indemnify and hold any and all real estate agents involved, directly or indirectly, in the purchase and sale of the Property, harmless from all claims for damages based upon the disclosures made in this Disclosure Statement along with the failure of the Owner to disclose any adverse material facts known to the Owner.

This information is a disclosure by the Owner of known adverse material facts concerning the Property as of the above date. **It is not a warranty or representation of any kind by the Owner and it is not a contract between Owner and buyer. This disclosure statement is not a substitute for any inspections the buyer may wish to obtain.**

Please describe any adverse material facts concerning the items listed, or other components, fixtures or matters. If space is inadequate, please use the attached Addendum to Owner's Property Disclosure Statement.

1. APPLIANCES: (Refrigerators, Microwave, Range, Dishwasher, Garbage Disposal, Oven, Trash Compactor, Freezer, Washer, Dryer)
   none

2. COMPONENTS and BUILT-IN SYSTEMS: (Water Softener, Water Conditioners, Exhaust Fans, Central Vacuum System and components, Water Heater, Washer/Dryer Hookups, Ceiling Fan, Intercoms, Remote Controls, T.V. Antenna, Satellite Dish, Central sound systems, Wiring for phone, cable and internet, Security Alarms, Fire Alarms, Smoke Detectors, Garage Door Openers, and Security Gates)
   none

3. ELECTRICAL SYSTEM: (Wiring, Outlets, Switches, Services, Shorts, Alterations, and Overloads)

none

4. PLUMBING: (including Pipes, Drains, Faucets, Fixtures, Sump Pumps and Toilets)

a. Faucets, fixtures, etc.

none

b. Private Septic Systems (Adherence to Health Codes, Clogging, Backing Up, Drain Field, Septic Tanks, Holding Tanks, and Cesspools)

public sewer

c. Septic Systems permit in compliance with existing use of Property

public sewer

Date Septic System was last pumped?

n/a

d. Public Sewer Systems (Clogging and Backing Up)

n/a

5. HEATING, VENTILATION AND AIR-CONDITIONING SYSTEMS: (Central Heating including furnaces, Central Air Conditioning including compressors, Heat pumps, Electric heating systems, Solar systems, Gas Leaks, Thermostats, Wall/Window AC Evaporator Coolers, Humidifers, Propane tanks)

none

6. ADDITIONAL HEAT SOURCES: (Gas, Pellet, Wood Stoves or Fireplaces) (Compliance with Air Quality Laws, Chimney Cleanliness, Chimney Fires and Adherence to Codes in Installation)

none

7. INSULATION: (Walls, Ceiling, Utility Bills, Vapor Barrier and Formaldehyde or Asbestos Insulation)

none

8. OTHER BASIC COMPONENTS: (Interior Walls, Ceilings, Floors, Exterior Walls, Windows, Doors, Window Screens, Slabs, Driveways, Sidewalks, Fences)

none

9. BASEMENT: (Leakage, Flooding, Moisture or Evidence of Water, and Fuel Tanks)

none

10. FOUNDATION: (Depth, Footings, Reinforcement, and Cracking)

none

11. ROOF: (Rain Gutters, Leakage, Deterioration, Ice build ups and Structural Condition)

none

12. WATER: (Well Production, Water Quality and Quantity, Water Rights and Abandoned Wells)

none

a. Private well

none

b. Public or community water systems

none

13. POOLS, OUTDOOR LIVING, ANCILLARY BUILDINGS: (Window Screens, Pool, Spa, Pool/Spa Heater, Hot Tub, Sauna, Patio/Decking, Built-In Barbecue, Gazebo, Fountains, Water features, Underground Sprinklers systems and controls, Partially landscaped or un-landscaped yard, Garage, Shop, Barn, Carport)

none

14. Waste dump or disposal or landfill or gravel pit or commercial use in the vicinity of the Property, existing or proposed, which may cause smoke, smell, noise or other nuisance, annoyance or pollution:

none

15. ACCESS: (If the Property is not on a public street note any Driveway Agreements, Private Easements and Legal Disputes Concerning Access)

none

16. HAZARD INSURANCE/DAMAGES/CLAIMS (past and present):

none

17. METHAMPHETAMINE: If the Property is inhabitable real property, the Owner represents to the best of Owner's knowledge that the Property ☐ **has** ☒ **has not** been used as a clandestine Methamphetamine drug lab. If the Property has been used as a clandestine Methamphetamine drug lab Owner agrees to execute the Montana Association of REALTORS® "Methamphetamine Disclosure Notice" and provide any documents or other information that may be required under Montana law concerning the use of the Property as a clandestine Methamphetamine drug lab.

18. RADON: If the Property is inhabitable real property as defined in the Montana Radon Control Act, Owner represents that to the best of Owner's knowledge the Property ☐ **has** ☒ **has not** been tested for radon gas and/or radon progeny and the Property ☐ **has** ☒ **has not** received mitigation or treatment for the same. If the Property has been tested for radon gas and/or radon progeny, attached are any test results along with any evidence of mitigation or treatment.

19. LEAD-BASED PAINT: If a residential dwelling exists on the Property and was built before the year 1978, Owner ☐ **has** ☒ **has no** knowledge of lead-based paint and/or lead-based paint hazards on the Property. If Owner has knowledge of lead-based paint and/or lead-based paint hazards on the Property, attached are all pertinent reports and records concerning that knowledge.



This form presented by Tracy Rossi | Glacier Sotheby's Int'l Realty | (406) 763-6808 | trossi@glaciersir.com

20. MOLD: If the Property is inhabitable real property as defined in the Montana Mold Disclosure Act, the Owner represents to the best of Owner's knowledge that the Property ☐ **has** ☐ **has not** been tested for mold and that the Property ☐ **has** ☐ **has not** received mitigation or treatment for mold. If the Property has been tested for mold or has received mitigation or treatment for mold, attached are any documents or other information that may be required under Montana law concerning such testing, treatment or mitigation.

**If any of the following items or conditions exist relative to the Property, please check the box and provide details on the attached addendum.**

1. ☐ Asbestos.
2. ☐ Noxious weeds.
3. ☐ Pests, rodents.
4. ☐ Destructive insects such as termites, pine beetles or carpenter ants. (If the Property has been tested or treated, attach documentation.)
5. ☐ Common walls, fences and driveways that may have any effect on the Property.
6. ☐ Encroachments, easements, or similar matters that may affect your interest in the Property.
7. ☐ Room additions, structural modifications, or other alterations or repairs made without necessary permits or HOA and HOA architectural committee permission.
8. ☐ Room additions, structural modifications, or other alterations or repairs not in compliance with building codes.
9. ☐ Health department or other governmental licensing, compliance or issues.
10. ☐ Landfill (compacted or otherwise) on the Property or any portion thereof.
11. ☐ Location in the floodplain, shoreline master plan, wetland or other environmentally sensitive area.
12. ☐ Settling, slippage, sliding or other soil problems.
13. ☐ Flooding, draining, grading problems, or French drains.
14. ☐ Major damage to the Property or any of the structures from fire, earthquakes, floods, slides, etc.
15. ☐ Waste dump or disposal or landfill or commercial use in the vicinity of the Property which causes smoke, smell, noise or other pollution.
16. ☐ Hazardous or Environmental Waste: Underground storage tanks or sump pits.
17. ☐ Neighborhood noise problems or other nuisances.
18. ☐ Violations of deed restrictions, restrictive covenants or other such obligations.
19. ☐ Zoning or Historic District violations, non-conforming uses, violations of "setback" requirements, etc.
20. ☐ Zoning, Historic District or land use change planned or being considered by the city or county.
21. ☐ Street or utility improvement planned that may affect or be assessed against the Property.
22. ☐ Property Owner's association obligations (dues, lawsuits, etc.).
23. ☐ Proposed increase in the tax assessment value or homeowner's association dues for the Property.
24. ☐ "Common area" problems.
25. ☐ Tenant problems, defaults or other tenant issues.
26. ☐ Notices of abatement or citations against the Property.
27. ☐ Lawsuits or legal proceedings (including foreclosures and bankruptcies) affecting or threatening the Property.
28. ☐ Airport affected area.
29. ☐ Pet damage
30. ☐ Property leases including post-closing short-term rental obligations, crop share agreements, mineral leases or reservations.
31. ☐ Other matters as set forth in the attached addendum.

Owner certifies that the information herein is true, correct and complete to the best of the Owner's knowledge and belief as of the date signed by Owner.

Owner ______________________ Date 10/17/21
Gail Lynne Goodwin
Owner ______________________ Date 10/17/21
Darryl C Slattengreen



© 2019 Montana Association of REALTORS®


This form presented by Tracy Rossi | Glacier Sotheby's Int'l Realty | (406) 763-6808 | trossi@glaciersir.com

TRANSACTIONS

***Please note the following changes to the foregoing disclosure:*** ______

none

______ Owner's Signature ______ 10/17/21 Date

______ Owner's Signature ______ 10/17/21 Date

**BUYER'S ACKNOWLEDGEMENT**

Subject Property Address: 348 Grist Road
West Glacier MT 59936

Buyer(s) understand that the foregoing disclosure statement sets forth any adverse material facts concerning the Property that are known to the Owner. **The disclosure statement does not provide any representations or warranties concerning the Property, nor does the fact this disclosure statement fails to note an adverse material fact concerning a particular feature, fixture or element imply that the same is free of defects.**

Buyer(s) is/are encouraged to obtain professional advice, inspections or both of the Property and to provide for appropriate provisions in a contract between buyer(s) and owner(s) with respect to any advice, inspections or defects. **Buyer(s) are not relying upon this property disclosure statement for buyer(s)' determination of the overall condition of the Property in lieu of other inspections, reports or advice.**

I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS STATEMENT.

______ Buyer's/Lessee's Signature ______ Date

______ Buyer's/Lessee's Signature ______ Date

**NOTE:** Unless otherwise expressly stated the term "Days" means calendar days and not business days. Business days are defined as all days except Sundays and holidays. Any performance which is required to be completed on a Saturday, Sunday or holiday can be performed on the next business day.

© 2018 Montana Association of REALTORS®


This form presented by Tracy Rossi | Glacier Sotheby's Int'l Realty | (406) 763-6808 | trossi@glaciersir.com
TRANSACTIONS

Authentisign ID: D4DE9DA8-ED2D-EC11-981F-501AC544F02B

# INSPECTION NOTICE
## (Results/Remedies)

Date: 10/15/2021

IN REFERENCE TO THE BUY-SELL AGREEMENT DATED 10/05/2021,
between Goodwin & Slattengren (hereafter the "Seller")
and Matt Dusek And Rachel Dusek (hereafter the "Buyer")
for the real property commonly known as 348 Grist Road
West Glacier MT 59936.

BUYER HEREBY GIVES NOTICE TO SELLER OF DISAPPROVAL OF THE FOLLOWING ITEMS:
(Copy of the relevant portion of inspections or reports are attached.)

Page 12, Section 2, Item 13: Drainage

Page 13, Section 4, Item 2: Siding Condition

Page 14, Section 4, Item 4: Flashing

Page 16, Section 5, Item 19: Evidence of moisture

Page 17, Section 5, Item 20: Mold Build-up

Page 21, Section 7, Item 15: Stairs

Page 23, Section 8, Item 7: Valley flashing

Page 25, Section 9, Item 5: Insulation

Page 32, Section 14, Item 10: Evidence of leakage

MD / RD
Buyer's Initials

Seller's Initials

© 2018 Montana Association of REALTORS®


GLACIER BEAR 0322

This form presented by Tracy Rossi | Glacier Sotheby's Int'l Realty | (406) 763-6808 | trossi@glaciersir.com

Instanet FORMS

Buyer gives notice to the Seller as follows (Buyer should check only one box preceding the bolded Buyer language):

☒ **Buyer** elects to negotiate the items of disapproval described above and offers the following resolution:

**Seller, at seller's expense, to remedy to the following:**

**Page 12, Section 2, Item 13: Drainage - gutter to be extended to shed water away from foundation.**

**Page 13, Section 4, Item 2: Siding Condition - remedy to suggestions in inspection report, cosmetics to be in matching condition to rest of house. Cory Rensmon at Advanced Restoration to complete work.**

**Page 14, Section 4, Item 4: Flashing - remedy to suggestion in inspection report, cosmetics to be in matching condition to rest of house. Cory Rensmon at Advanced Restoration to complete work.**

**Page 16, Section 5, Item 19: Evidence of moisture - remedy to suggestion in inspection report, Cory Rensmon at Advanced Restoration to complete work.**

**Page 17, Section 5, Item 20: Mold Build-up - All mold to be remediated and pass a clearance test. Cory Rensmon at Advanced Restoration to complete work.**

**Page 21, Section 7, Item 15: Stairs - Railing in guest house to be installed with esthetically pleasing and up to code new railing.**

**Page 23, Section 8, Item 7: Valley flashing - Noted wiring to be installed in conduit and capped in specified areas by licensed electrician.**

**Page 25, Section 9, Item 5: Insulation - Appropriate insulation to be blown in by Cory Rensmon at Advanced Restoration to complete work.**

**Page 32, Section 14, Item 10: Evidence of leakage - noted leaking waste pipe to be remedied.**

If Seller and Buyer agree to the remedies specified above, this document shall constitute an amendment to the Buy-Sell Agreement referred to above and shall be an integral part of this transaction. Seller shall complete all agreed upon resolution(s) to the condition(s) and problem(s) identified above by 5:00 p.m. (Mountain Time) on 11/05/2021 (Date).

Matt Dusek / 10/15/21 | Rachel Dusek / 10/15/21

(Buyer's Signature) Date | (Buyer's Signature) Date

**Matt Dusek** | **Rachel Dusek**

Seller agrees to the terms and conditions as stated herein above.

_____ / 10/17/21 | _____ / 10/17/21

(Seller's Signature) Date | (Seller's Signature) Date

**Goodwin** | **Slattengren**

☐ Modified per Inspection Notice (Seller's Response) ____ / ____ / ____
Seller's Initials Date

☐ Rejected by Seller ____ / ____ / ____
Seller's Initials Date

☐ **Buyer** elects to terminate the Buy-Sell Agreement referred to above. All earnest money shall be returned to the Buyer and the Buy-Sell Agreement is terminated.

_____ / _____ | _____ / _____

(Buyer's Signature) Date | (Buyer's Signature) Date

**NOTE:** Unless otherwise expressly stated the term "Days" means calendar days and not business days. Business days are defined as all days as except Sundays and holidays. Any performance which is required to be completed on a Saturday, Sunday or holiday can be performed on the next business day.

# ADDENDUM TO OWNER'S PROPERTY DISCLOSURE STATEMENT

This Addendum is an attachment to the Owner's Property Disclosure Statement regarding certain real property located at 348 Grist Road 59936, in the City of West Glacier, County of Flathead, Montana, which real property is legally described as:
S14, T32 N, R19 W, COS 19007-1, TR 1W & TR 1X IN L 2, ASSR# 0000308750

The Owner hereby discloses the following information:

No additional items not already included in the inspector's report

Owner's Signature Date 10/17/21 Owner's Signature Date 10/17/21
Gail Lynne Goodwin Darryl C Slattengren

Buyer's/Lessee's Signature Date Buyer's/Lessee's Signature Date

© 2019 Montana Association of REALTORS®
Addendum to Owner's Property Disclosure Statement, April 2019
Addendum Page ____ of ____
GLACIER BEAR 0324