# Darkenwald Deposition Excerpts

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

GLACIER BEAR RETREAT, LLC,
GAIL L. GOODWIN and DARRYL C. SLATTENGREN,
Plaintiffs/Counterclaim Defendants,
vs.
MATT DUSEK AND RACHEL DUSEK,
Defendants/ Counterclaimants.

Cause No. CV 22-19-M-KLD

---

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION
OF
SCOTT DARKENWALD

---

BE IT REMEMBERED, that the videoconference deposition upon oral examination of Scott Darkenwald, appearing at the instance of the Plaintiffs and Counterclaim Defendants, was taken at 211 North Higgins Avenue, Suite 303, Missoula, Montana, on Thursday, May 26, 2022, beginning at the hour of 10:12 a.m., pursuant to the Federal

Rules of Civil Procedure, before Mary R. Sullivan, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public.

A P P E A R A N C E S

For the Plaintiffs/Counterclaim Defendants:

FRED SIMPSON, Esq.
Jenks & Simpson, P.C.
1821 South Avenue West, Suite 204
Missoula, Montana 59801
fsimpson@jenkssimpson.legal

For the Defendants/Counterclaimants:

SHANE P. COLEMAN, Esq.
Billstein, Monson & Small, PLLC
1555 Campus Way, Suite 201
Billings, Montana 59102
shane@bmslawmt.com

A P P E A R A N C E S

For the Deponent Scott Darkenwald:

BRETT P. CLARK, Esq.
Crowley Fleck, PLLP
900 North Last Chance Gulch, Suite 200
Helena, Montana 59601
bclark@crowleyfleck.com

ALSO PRESENT: Gail L. Goodwin, (Via Videoconference)
Matt Dusek, (Via Videoconference)
Rachel Dusek, (Via Videoconference)
Mark Anderson, (Via Videoconference)
Kelsey Sabol, (Via Videoconference)

I N D E X

DEPONENT: PAGE:

SCOTT DARKENWALD

Examination by Mr. Simpson.................. 7

Examination by Mr. Coleman.................. 125

Examination by Mr. Clark.................... 265

Examination by Mr. Simpson.................. 276

EXHIBITS:

Exhibit 1 File Glacier Sotheby's International produced in response to the plaintiffs' subpoena........ 17

Exhibit 2 Text messages..................... 237

S T I P U L A T I O N S

It was stipulated by and between counsel for the respective parties that the deposition be taken by Mary R. Sullivan, Freelance Court Reporter and Notary Public for the State of Montana, residing in Missoula, Montana.

It was further stipulated and agreed by and between counsel for the respective parties that the deposition be taken in accordance with the Federal Rules of Civil Procedure.

It was further stipulated and agreed by and between counsel for the respective parties and the deponent that the reading and signing of the deposition would be expressly reserved.

THURSDAY, MAY 26, 2022

Thereupon,

SCOTT DARKENWALD,

a witness of lawful age, having been sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

MR. SIMPSON: Would you please get a roll call of everybody that's here?

THE COURT REPORTER: If I could have everyone state who they are that's appearing remotely, please?

MS. GOODWIN: This is Gail Goodwin appearing remotely from St. John's. Thank you.

MR. ANDERSON: Mark Anderson appearing remotely from Chicago, Illinois.

MR. DUSEK: Matt Dusek appearing remotely from Belmont, California.

MS. DUSEK: Rachel Dusek --

MS. SABOL: Kelsey Sabol from Crowley Fleck appearing remotely from Helena, Montana.

MS. DUSEK: This is Rachel Dusek appearing remotely from Belmont, California.

EXAMINATION

BY MR. SIMPSON:

Q. Good morning. Would you please state

A. Not really. Matt's very thorough, as is Rachel, and, you know, we went through it. I'm sure there were questions because they're both very thorough and ask really good questions, so I don't remember -- you know, there was no -- there were no challenges in that conversation. I mean, intellectual challenges, but we certainly would have discussed it.

Q. Do you recall having any conversation with either Matt or Rachel before they signed the buy-sell that there was some question about -- or some issue with water rights that needed to be addressed on the property?

A. Yes.

Q. Tell me about that discussion.

A. Well, Gail told me right after we had agreed to take the listing, she said -- she called me and said -- I don't -- she may have texted me, I don't remember -- and said when the well was drilled, the well log was not recorded. And so I said to her we will have to disclose that right away to whomever looks at the property.

So in the buy-sell where it talks about water rights? Where's that? On lines -- this is 399 and then lines 237 through 238, essentially,

that's my language, and that's to protect the Duseks, because at that point -- at that -- it was critical that that well log be recorded.

Q. And I'm jumping ahead a little bit here, but were the -- were the water rights subsequently -- after this agreement was signed, were they documented correctly?

A. Yes.

Q. Okay.

A. By DNRC, supplied to everybody.

Q. Okay. And the well log -- the well log was provided as well.

A. Exactly.

Q. Okay. And -- And you -- Strike that.

You discussed the issue with the water rights with Mr. and Mrs. Dusek.

A. Correct.

Q. And what, to the best of your recollection, did you tell her?

A. I said I was surprised at how quickly I -- I thought potentially that the water rights could delay closing. Dealing with the state can sometimes not be the fastest thing in the world, and I was surprised that we got resolution as quickly as we did. At some point -- and I don't

Mrs. Dusek and you present during their visit to the property?

A. I think Tracy was there, but I'm not positive. I wanted her to meet them, so my -- my gut is that Tracy was there.

Q. Who locked up after they finished?

A. I don't remember. One of -- One of -- I would have went back or their caretaker would have went back or --

Q. Okay.

A. -- I -- I don't remember.

Q. Was there a follow-up call the next day or that night?

A. Yes, there was a follow-up call because I can remember -- and there's a note in -- within here where Matt mentioned that he -- there was more noise on Camas Road than they expected; that the house was better than they expected; that the property wasn't as detailed out as they expected; but that they -- but that they were more excited than when -- about the purchase than when they came. I mean, they left more excited than when they came.

Q. There weren't any spoilers.

A. There weren't any spoilers, yeah.

at page 551 to 554?

A. Which book?

MR. CLARK: That would be the first book.

BY MR. SIMPSON:

Q. The first book.

A. Is that what I'm looking at?

MR. CLARK: Yeah.

A. Got it.

BY MR. SIMPSON:

Q. So what's shown at pages 551 and 552, Scott?

A. The general abstract for the water rights.

Q. What's your understanding as to the purpose of the general abstract?

A. It just shows that you have a water right.

Q. And this was --

A. That's --

Q. -- the water right for the -- the property.

A. For the well, yeah.

Q. Okay. And then what's on page 553 and 554?

A. The well log, which is what Gail did not

have when we listed. She -- The well was already there. She just didn't -- The well driller did not record the log with DNRC.

Q. And then if we turn to page 555.

A. Okay.

Q. What's that email chain documenting?

A. That's me letting Matt know -- of course, he got copies of these previous pages -- that the water rights were now recorded and that I let the title company know, because the title company actually handles the transfer of water rights at closing. And then you can see right below my first email, Tracy Dugan is the manager of Fidelity National Title in Whitefish, and -- and I say "Please see recorded water rights, that will need transferred at closing."

Q. Was there anything left to do other than Fidelity taking care of the transfer at closing with respect to the water rights --

A. Not that I know of.

Q. -- the -- The abstract, which was the first page we just looked at?

A. Right.

Q. A minute ago, page 551 and 552, it says near the top "PROVISIONAL PERMIT." In your

the 25th.

Q. Okay. Would you please turn to page 125? Same binder you're in?

A. Okay.

Q. There's two pages here that are related. One is page 125, the other one's page 390, and I believe 390 was an attachment to 125.

A. Okay. Yeah, that's where [As Read]: "Hi Matt, here's a draft for your review of Notice of Release of Contingencies."

Q. And keep your finger on that page, if you could, and then turn to page 390. It's in that same binder.

A. Okay.

Q. What's that on page 390?

A. Let's see. Which page am I holding open? 125.

MR. CLARK: Yeah, so the other one.

BY MR. SIMPSON:

Q. Does 390, page 390, "NOTICE OF RELEASE OF CONTINGENCIES" go with page 125?

A. Yes.

Q. Okay. That was what was emailed to --

A. Yes.

Q. -- the Duseks on the 28th at 1:10 p.m.?

A. Yes.

Q. And was that -- was that -- what was the purpose of that? That notice of release of contingencies?

A. That was -- Gail was asking for a notice of release of contingencies, so -- and I didn't want to do that until I was sure that I had gone -- one, that all were released; and two, that I had gone through the entire contract with Matt and Rachel. So there's another page in here where I went through the entire contract, and then I noted that I went through it line by line with Matt and Rachel before we sent them this notice of release and contingencies and said, you know, "Do you concur that this was done?" You know, "Are there any questions?"

And then at the end of that conversation, I said, "Can I send you a -- a note -- a draft, not a DocuSign, a draft for you to have someone review?"

Which she said, "I just have the person to review it," and that's in here.

Q. And what -- do you know why Gail had inquired about having this sent to them?

A. Because of -- the airplane purchase, and

A. Okay.
Q. Do you recognize those documents?
A. I do.
Q. So what's -- The first one is -- No. 1296, it's an October 30th, 2021 letter from Matt and Rachel to Gail. Did they send that to you to forward to Gail?
A. I think it was -- I think they must have only, I'm not positive. I think it was part of that attachment.
Q. Okay.
A. Yeah. As a matter of fact, I'm sure it was in a text attachment that --
Q. In an email attachment?
A. Yeah, or an email attachment.
Q. If you look at 1297 and 1298, what are those documents?
A. It's the same document.
Q. Those are letters to you from the Duseks?
A. Yeah.
Q. And were those the first written indication that you had from the Duseks that they were not going to close?
A. It was.
Q. Were you surprised?

A. Well, because I hadn't heard from him for two days, I knew something was up, and I -- I was -- I was surprised that the water rights, the well-related permitting water rights, because that had never even been a conversation except the one time when he asked about the word "provisional," but he never -- that was not -- you know, usually that would be a bigger issue where he -- you know, "Let's look into this, let's hire a water rights lawyer," that sort of thing.

Q. This was the first time you'd heard from this that it was a problem.

A. Yes, that it's a problem.

Q. And he -- did he explain to you what the nature of the problem was?

A. No.

Q. What about the visibility and noise of traffic on Camas Road? What was your understanding as to the deadline for him to raise that issue?

A. During the inspection period, but -- or his personal visit.

Q. Yeah.

A. You know, and -- and after his personal visit, again, his comments were "There was more

noise from Camas Road than we expected"; "The property wasn't as detailed out as we thought it would be"; "The house is better than we thought it would be."

Those were the three takeaways.

Q. "And were more excited than we were before."

A. "And we were more excited than we were before."

Q. Did you have any discussion with Matt and/or Rachel on the 30th of October?

A. Hm-mmm.

Q. No? You have to say yes or no.

A. Oh, no. I'm sorry.

MR. CLARK: Answer verbally.

BY MR. SIMPSON:

Q. Did you talk with him at any time after the 30th of October?

A. No.

Q. You haven't talked to them to this day?

A. No.

Q. Okay. Have you had any other written exchanges with them beyond these letters?

A. Not -- Whatever is in the text --

Q. Yeah.

Q. And you're not here to take sides, I take it.
A. No.
Q. You're -- You're giving us your unbiased opinion as to how this transaction went down.
A. Yes.
MR. COLEMAN: Object to form.
BY MR. SIMPSON:
Q. Is that correct that you're giving us an unbiased opinion as a dual agent?
A. Correct.
MR. COLEMAN: Same objection.
BY MR. SIMPSON:
Q. Okay. Again, the -- I think we've established this, but I want to make sure that the draft notice of release of contingencies was not at all necessary for the Duseks to sign. The contingencies had already been released pursuant to the terms of the buy-sell.
A. I believe that.
Q. Okay.
MR. SIMPSON: Can we take a short break here?
MR. CLARK: Sure.
MR. SIMPSON: Be right back.

as you sit here today?

A. I do.

Q. Okay. How long did it last?

A. Less than ten minutes.

Q. Okay. I thought I heard you say a minute ago that -- that David Quinn said something in that conversation. Was he on the phone?

A. No. Matt talked to David Quinn.

Q. Okay. How do you know that?

A. 'Cause Matt told me.

Q. What did Matt tell you about his discussion with David Quinn?

A. That he understood more than he did when he started. That it was complicated, you know, 'cause it's very scientific, and -- but that he was comfortable. There was no sense that he wasn't comfortable with what he heard from David Quinn in terms of not wanting to go forward. And again, the only -- the -- the takeaway I got was that Quinn recommended that he might want to retest in six months.

Q. Okay. Did you ever speak with David Quinn about the mold?

A. No.

Q. Did you ever trade text messages or

Q. What was your understanding needed to be done in six months? I think I heard you say that a minute ago.

A. Just to retest and a clearance test.

Q. Why would there be need to be more work in six months?

A. I don't know.

MR. CLARK: Objection. Misstates his testimony.

BY MR. COLEMAN:

Q. Okay. Do you -- Was it your understanding there needed to be more work in six months?

A. No -- No. It was my understanding that there was -- that David Quinn suggested that they might want to retest in six months.

Q. What was your understanding of why David Quinn suggested they would want to retest in six months?

A. To cover his own -- because he -- to just make sure that he was giving Matt not -- that he wasn't saying to Matt, "You have no problem; you never have to worry about this ever again."

Q. I'm sorry, I didn't understand that. He -- He was --

A. Well, I --

Q. What was -- What was your understanding of what needed to be done in six months after -- say after the date of this report?

A. Just another clearance test taken.

Q. Okay. Is that because it didn't pass the moisture test at the time?

A. No, it did -- it -- my understanding is it passed the testing -- This is my understanding. I didn't -- I didn't get into it because I let Matt talk to David about it, and I was very clear that I didn't -- I didn't -- you know, he needed to talk to the horse's mouth so I didn't lose something in translation, and my understanding was that Matt was made comfortable with the mold situation and the remediation enough to -- well, he never said anything about not going forward because of mold ever, and so I don't have anything to add to that.

Q. Did you have any sort of understanding of what sort of issues the mold and moisture issues might present to someone with allergies?

A. Well, if there's existing mold, I -- I don't know this. I don't know the answer to that.

Q. Do you know whether Matt spoke with David

A. Oh, no.

BY MR. COLEMAN:

Q. Yeah. I would suggest it's probably not that --

A. Yeah --

Q. -- because they're --

A. -- it's not.

Q. -- all dated this.

A. Yeah, I don't know.

Q. Okay.

A. I think they're sequential. You know, the -- I think what you're looking at, I tried to go -- I -- you know, I started at the very beginning of the text messages, and then I went all the way through the whole list.

Q. Okay. There's a term -- Let's take a look, please, at document 420. In the blue bubble it references "releasing contingencies and em going hard."

What's -- What's that refer to?

A. "Em going hard."

MR. CLARK: "E-m going hard."

A. Earnest money.

BY MR. COLEMAN:

Q. Okay. What -- What's -- What's "going

hard" mean?
A. That means it is no longer refundable.
Q. Did you ever use that term with the Duseks?
A. "Going hard"?
Q. Yeah. Did you ever tell them at some point the money was going to go hard or the earnest money was going to go hard?
A. Well, we talked a lot about when -- when their contingencies were over, and -- and -- in very much in layman terms. They knew -- I mean, it -- I know that there -- clearly at the end they disagreed, but -- but I felt that I was very clear about when a contingency came off or was met.
Q. Did you ever use the phrase "going hard"?
A. I don't know.
Q. Is that a common term in your industry?
A. It is.
Q. Okay. What's it mean?
A. The -- The earnest money's nonrefundable, or the deal -- or, you know, one part of the deal has gone hard.
Q. The contingencies are no more?
A. Yes.
Q. Is that -- Is that a fair way to phrase

it?

A. Yes.

Q. Okay. And this was the same time you were sending the release of contingencies document to the Duseks?

A. Yeah, it must have been shortly thereafter 'cause we were talking with Rachel. In this I refer "Our meeting was moved to noon so Rachel could sit in."

I went through the entire buy-sell through them line by line already what has been executed.

Q. Okay. When -- We'll get to the document in a minute here, but -- but when you sent the release of contingencies to them, did you have a discussion with the Duseks before that?

A. Yes. We went through the entire buy-sell line by line so that I wanted to be sure they understood that when we send them a draft for release of contingencies, that -- that I was confident they understood that we had gone through the entire contract and talked about everything that needed to be talked about.

Q. And that's what's referenced in your text messages --

A. Yes.
Q. -- here?
A. Yeah.
Q. And by "here" I mean the next couple of pages?
A. I assume, yeah.
Q. When you sent them the release of contingencies document, did you tell them there's no real reason for you to sign it?
A. No.
Q. Why not?
A. I -- I don't know. I just -- It's not unusual -- It's not unusual in big deals for people -- for sellers to ask for a release of contingencies, and Gail wanted one because she wanted to not make this big purchase and then -- and then have them walk. And so -- But that's why I went through the buy-sell line item by line item so you wasn't asking them to sign anything that they didn't completely understand.
Q. When you say Gail had a big purchase, you're referring to the plane?
A. Yes.
Q. Okay. What's the status of the plane purchase?

A. They didn't do it.
Q. Okay. Because this deal fell through?
A. Yes.
Q. Is your understanding?
A. Well, that's my understanding. I don't know. She never told me, and I never asked.
Q. Aside from the plane deal, is there any reason, to your knowledge, why you think Gail wanted a release of contingencies in writing?
A. Not that I know of. That's all she ever referenced.
Q. Do you have a standard practice of sending clients a release of contingencies form when it's not really required?
A. Not unless the seller asks for one.
Q. Can you think of another instance in which you've sent out a release of contingencies request?
A. I can think of a few, but I -- I can't even think of what deals they were, 'cause I've done it before, but I -- it's not standard practice with me. They -- Usually the contingencies come and go and they just are gone.
Q. Again, I want to get an understanding of your practice. Let -- Let's say for purchases of

property. They visited 10/19 again, confirming that. And 10/26 is when Matt told me they were going to go forward with the purchase and I could tell the seller. Did I miss anything?

Q. Okay. And my questions a little bit different, but let me ask it a little differently this time.

What's the purpose of their visit to the property?

A. To just see what they were spending $[redacted] on.

Q. At the time they visited the property on 10/19, could they have backed out of the deal?

A. Yes.

Q. Under what clause, to your understanding?

A. It was -- There was a contingency, I believe, in the buy-sell. Somebody's got to find that buy-sell.

Q. I can --

MR. COLEMAN: Counsel can point you to --

MR. CLARK: Yeah. It's -- Gosh, I can't read the numbers here. I think it's 82.

BY MR. COLEMAN:

Q. I have one at 78. Only because the page before it's 77.

BY MR. COLEMAN:
Q. Okay. So the additional -- that's under "ADDITIONAL PROVISIONS" --
A. Yes.
Q. -- is that right?
A. Correct.
Q. "Buyer reserves the right to visit the property in person during the inspection period."
A. Yep.
Q. When is the inspection period?
A. Inspection period is 10/26, and resolution -- oh, wait a minute, I've got the wrong...
Q. I'll ask you where you're getting that number from.
A. Oh, okay. Line 172, the buyer has to deliver written notice by 10/26, and then they have three days to -- if there's negotiating on -- on seller's remedies if they're going to pay for it or not or not -- you know, "We'll do this but we won't that yet," you have to three days to work through that.
Q. Okay. So I'm clear in my head, on 10/19 when my clients visited the property, at that point they could have backed out of this deal --

A. Yes.
Q. -- as far as you're concerned?
A. Yeah.
Q. For any reason at all.
A. Yes.
Q. Okay.
A. Yeah. I can't -- Yes.
Q. Do you remember discussions with Matt or Rachel where they used the term optionality?
A. No. They talked about considering what their options were on the day that Matt called me and said he was considering other options, but I don't remember the term "optionality."
Q. Okay. Let's -- Let's talk about that. What -- What did he say about considering other options?
A. That's that one page that -- Let's -- I got to be able to find the pages. I can't remember. It was the one that I handwrit -- those three pages --
MR. CLARK: The notes?
A. -- the notes where --
BY MR. COLEMAN:
Q. 427. And look at the document, if you need to. My -- My question is what do you

follow-up?

EXAMINATION

BY MR. SIMPSON:

Q. Just a couple brief ones.

You were asked a number of questions by Mr. Coleman about the buy-sell agreement and whether you routinely use that agreement. Do you remember those questions?

A. Yes.

Q. And do you believe that that standard form buy-sell agreement is suitable for a broad range of buyers and sellers regardless of their level of real estate sophistication?

A. Yes, because -- I -- I absolutely do. It's easy to read, it's in layman's language, and it's easy to explain.

Q. Do you recall ever being asked any questions by the Duseks that led you to believe they were unable to understand or interpret the agreement?

A. No.

Q. Do you recall if during the time period that Mr. and Mrs. Dusek visited the property there was additional noise on, I believe, it's Camas Road because of road construction?

A. You know, I found out -- they mentioned that there -- you know, there was more noise on Camas Road than they expected. I found out, frankly, after the fact, that there was construction on Camas Road during that when they were there.

Q. And without that road construction, it may have been a considerably quieter setting?

A. Possibly, yes. You know, I don't know.

Q. Would you turn, please, in binder No. 1 to page 110?

A. Okay.

Q. And what is that document entitled?

A. "ADDENDUM TO OWNER'S PROPERTY DISCLOSURE STATEMENT."

Q. And I don't believe that this was necessarily included in the page range earlier for the owner's property disclosure, but is this page 110 part of the owner's property disclosure?

A. Yeah. It's actually -- You know, it -- it -- it's something that -- it's just basically an addendum to that, and so it can come virtually at any time.

Q. The -- The Duseks had already received Kelly Quinn's home inspection report by the time

DEPONENT'S CERTIFICATE

I, SCOTT DARKENWALD, the deponent in the foregoing deposition, DO HEREBY CERTIFY, that I have read the foregoing pages of typewritten material and that the same is, with any changes thereon made in ink on the corrections sheet, and signed by me, a full, true and correct transcript of my oral deposition given at the time and place hereinbefore mentioned.

SCOTT DARKENWALD, Deponent.

Subscribed and sworn to before me this day of , 2022.

PRINT NAME:
Notary Public, State of
Residing at:
My commission expires:

MRS - Glacier Bear Retreat v. Matt and Rachel Dusek

C E R T I F I C A T E

STATE OF MONTANA )
: ss
COUNTY OF MISSOULA )

I, Mary R. Sullivan, RMR, CRR, and Notary Public for the State of Montana, residing in Missoula, do hereby certify:

That I was duly authorized to and did swear in the witness and report the deposition of SCOTT DARKENWALD in the above-entitled cause; that the foregoing pages of this deposition constitute a true and accurate transcription of my stenotype notes of the testimony of said witness, all done to the best of my skill and ability; that the reading and signing of the deposition by the witness have been expressly reserved.

I further certify that I am not an attorney nor counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal on June 8, 2022.

