Shane P. Coleman
BILLSTEIN, MONSON & SMALL PLLC
1555 Campus Drive, Suite 201
Billings, MT 59102
Telephone: 406.656.6551
shane@bmslawmt.com

ATTORNEYS FOR DEFENDANTS
MATT AND RACHEL DUSEK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,<br><br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>MATT DUSEK and RACHEL DUSEK,<br><br>Defendants/Counterclaimants. | ) | Case No. 9:22-cv-00019-DLC-KLD<br><br>**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1

FACTUAL BACKGROUND ........................................................................ 3

LEGAL STANDARD .................................................................................. 9

ARGUMENT ............................................................................................ 10

I. The Dusek's October 30, 2021 notice timely terminated the BSA under three independent contingencies. ............................................................ 10

A. The BSA includes conditions to closing. ........................................... 10

B. Duseks' termination notice was timely under the Property Condition Inspection Contingency ................................................................... 11

1. The parties extended the Property Condition Inspection Contingency release date to November 5, 2021, to allow Plaintiffs the opportunity to attempt to remediate the mold, moisture, and other problems that were identified in the First Inspection Report. ....... 11

2. Undisputed evidence demonstrates that Plaintiffs' remediation efforts failed to remediate moisture and mold, and the Property did not pass a mold clearance test. ..................................................... 13

a) David Quinn's narrow engagement was to analyze whether Plaintiffs had properly remediated the mold and moisture. ............... 13

b) David Quinn found elevated levels of moisture, post-remediation. ........................................................................ 14

c) David Quinn also found elevated levels of mold, post-remediation. ........................................................................ 15

d) Duseks terminated the BSA when Plaintiffs failed to remediate the mold and moisture. ..................................................................... 16

C. Undisputed evidence demonstrates that Plaintiffs failed to satisfy the Well Permitting and Water Rights Contingency. ...................................... 19

1. The parties separately agreed to a release date of November 3, 2021 to satisfy Duseks' concerns regarding well permitting and water rights. ....19

2. The Well Permitting and Water Rights Contingency is an independent contingency, entirely separate and apart from the Property Condition Inspection Contingency. ....20

3. Plaintiffs did not ensure that "[a]ll well-related permitting, well log recording, and any associated water rights [were] in place prior to closing." ....22

4. The limited information Plaintiffs did provide revealed significant water rights issues. ....22

D. Duseks' termination notice was timely under the Personal Visitation Contingency, which had no release date. ....24

II. Duseks expressly declined to release the contingencies when Darkenwald asked them to do so. ....26

III. Duseks are entitled to a return of their earnest money, because they timely notified Plaintiffs that the contingencies were not released or satisfied. ....27

CONCLUSION ....29

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........ 9, 10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........ 9, 10

*Estate of Lahren*, 268 Mont. 284, 886 P.2d 412 (1994) ........ 21

*Ideal Mut. Ins. Co. v. Patzer*, 624 F. Supp. 426 (D. Mont. 1985) ........ 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........ 10

### Statutes

Mont. Code Ann. §28-1-401 ........ 10

Mont. Code Ann. §28-3-205 ........ 21

### Rules

Fed. R. Civ. P. 56(c) ........ 9

## INTRODUCTION

The Buy-Sell Agreement ("BSA") terminated on its own terms when Duseks gave timely notice on October 30, 2021 that three separate contingencies were not met. Each contingency forms an independent basis for terminating the BSA; the failure of any one is fatal to Plaintiffs' claims and entitles Duseks to summary judgment.

The Property Condition Inspection Contingency release date was November 5, 2021. The Individual Plaintiffs agreed in the Inspection Notice to repair/remediate nine different property conditions. This contingency was not satisfied, because the undisputed facts show that elevated levels of mold and moisture remained in the Property after Plaintiffs' remediation efforts. Further, the Property failed to pass the required mold clearance test.

The separately-added Well Permitting and Water Rights Contingency had a release date of November 3, 2021. This contingency obligated Plaintiffs to ensure "[a]ll well-related permitting, well log recording, and any associated water rights … be in place prior to closing." Plaintiffs operated their well without permitted rights for 8 years. They sought a "Provisional Permit" only after listing the Property for sale. Beyond any doubt, "[a]ll well-related permitting, well log recording, and any associated water rights" were not in place prior to closing.

Indeed, information concerning the Provisional Permit was incomplete, durable water rights were never secured, the Property owner was not named in the Provisional Permit, and no well-log information was provided.

The Personal Visitation Contingency had no release date prior to closing. The parties separately added this requirement to the standard form BSA, because Duseks had yet not visited the Property when they executed the BSA. The lack of a release date was deliberate, due to the travel complications inherent to the Covid-19 pandemic. Sellers and Scott Darkenwald, the real estate agent/broker for both buyers and sellers, knew it was critical that Duseks visit the Property in person and approve of it before committing to such a significant purchase. Darkenwald assured Duseks that this contingency broadly allowed them to terminate the BSA for any reason. Without this contingency, Duseks would not have entered into a contract to purchase the Property sight-unseen. This contingency was not satisfied because, upon visiting the Property, Duseks found that it did not meet their expectations. Crucial aspects were strikingly different than had been represented.

For each of these independent items, Duseks declined to release the contingencies when asked to do so, and their termination notice was timely served. As a matter of law, the BSA terminated on its own terms, and it entitles Duseks to the return of their earnest money.

## FACTUAL BACKGROUND

The parties assert breach-of-contract claims against each other, concerning the BSA for residential property located in Glacier Park (the "Property").[1] Plaintiffs (sellers) seek to specifically enforce the BSA, by requiring Duseks (buyers) to purchase the Property. Duseks seek the return of their earnest money due to timely termination of the BSA for Plaintiffs' failure to remedy or satisfy the agreed-upon contingencies to close the transaction. By this Motion, Duseks seek summary judgment on the respective contract claims.

The parties signed the BSA on October 5, 2021. SUF[2] ¶10. The BSA contained contingencies, including the three mentioned in the introduction. SUF ¶33. These contingencies are analyzed separately herein.

After signing the BSA, Duseks hired D. Quinn Construction, Inc. to inspect the home. SUF ¶¶42-44. Kelly Quinn prepared a report dated October 13, 2021 (the "First Inspection Report"). *Id.* It noted various problems concerning the Property, including "Evidence of moisture" and "Mold build-up." Regarding moisture infiltration, it alerted:

---

[1] Count 1 of Plaintiffs' Second Amended Complaint and Count 1 of Defendants' Counterclaim both allege breach of contract (the BSA). Defendants also assert Counterclaim Count 2 for breach of the implied covenant of good faith and fair dealing, but this Motion may be resolved without reaching that issue.

[2] Defendants' Statement of Undisputed Facts filed herewith at doc. 34.

> Note evidence of moisture and water stains located main level closet under the stair area appears to have been caused by prior and/or ongoing leakage at the northeast siding flashing area.

*Id.* Regarding mold buildup, the report included a photo of the visible black mold, and it recommended remediation along with more thorough mold testing.

> Note water stains and possible surface fungal growth was found at main level closet under the stairs, possibly caused by inadequate siding flashing although unable to confirm without further testing. This surface fungal growth (black) could produce fruiting bodies and, when mature, produce millions of tiny spores (seeds) which are present in the air. For a more detailed fungal growth inspection, suggest consulting a licensed Certified (AmIAQ) Mold Inspector (D. Quinn Const., Inc.). Also note this visual inspection does not include surface fungal growth, which are not visible at time of inspection. Recommend contacting a qualified mold remediation contractor at this time for further evaluation.

*Id.* For both mold and moisture, it alerted, "Item condition requires immediate attention." *Id.*

Neither Plaintiffs nor Darkenwald previously disclosed the mold or moisture infiltration prior to the issuance of the First Inspection Report, or after having received excerpts of this report from Duseks. SUF ¶51. It was only after the issuance of the First Inspection Report that Plaintiffs provided their "Owners Property Disclosure," which disclosed nothing other than referencing the First Inspection Report, which Plaintiffs admittedly had not even read. SUF ¶52. Even then, they failed to note "Mold" notwithstanding their receipt of the First Inspection Report. *Id.*

After receiving the First Inspection Report, Duseks signed an "Inspection Notice" on October 15, 2021. Through the Inspection Notice, Duseks gave notice to the Plaintiffs of their disapproval of nine separate property conditions and included remediation proposals required to be accomplished by November 5, 2021 for the proposed transaction to proceed to closing. Two of the nine proposed remedies included remedying moisture and "all mold to be remediated and pass a clearance test." SUF ¶¶45-50. On October 17, the Individual Plaintiffs accepted these remediation proposals, allowing the transaction to proceed toward closing. *Id.*

On October 19, Duseks personally visited the Property for the first time, pursuant to the Personal Visitation Contingency. SUF ¶¶57-64. When Duseks visited the Property, the three contingencies at issue were each still in effect. *Id.* As much as Duseks enjoyed Glacier Park, they found the Property lacking. *Id.* Particularly, the road noise levels and traffic visibility at the Property were significantly more invasive than they expected, given the marketing, the location, the sale price, and the prior assurances from Darkenwald. *Id.*

Following their visit, Duseks had various conversations with Darkenwald regarding their concerns. SUF ¶64. During their visit, Darkenwald specifically asked whether Duseks were willing to release their contingencies, and they declined. *Id.* In follow-up conversations, Duseks stated that they understood that

their contingencies remained in effect, that they were moving forward based on that understanding, and they expressly declined to release those contingencies early. *Id.* Duseks continued to consider their options while they awaited the resolution of other contingencies, including the items to be remediated pursuant to the Inspection Notice under the Property Condition Inspection Contingency and their consideration of the Well Permitting and Water Rights Contingency. *Id.*

On October 25, Darkenwald sent a text message to Matt Dusek indicating that the re-inspections were taking place that day, and that they should have a report the following day. SUF ¶¶66-67. Darkenwald's text message acknowledged that the Property Condition Inspection Contingency remained in effect and its satisfaction would depend on the mold reinspection results:

> We should have the inspection results all done by tomorrow late afternoon. That would wrap up your contingencies if all is well.

*Id.*

After the mold and moisture remediation work was performed by Advanced Restoration, Kelly and David Quinn (both of D. Quinn Construction) separately reinspected the Property. SUF ¶65. Kelly considered general property condition issues and prepared a General Reinspection Report dated October 27, 2021. *Id.* David, as a Certified Residential Mold Inspector, specifically measured the moisture and mold post-remediation, and he prepared a Moisture and Mold Reinspection Report dated October 26, 2021. *Id.* Duseks received copies of both

reports on October 27, 2021, and Darkenwald informed them that Plaintiffs had concluded their efforts to satisfy the contingencies stipulated in the BSA. SUF ¶¶68, 115.

Duseks were concerned that the Moisture and Mold Reinspection Report indicated that the mold and moisture remained, subsequent to Cory Rensmon's efforts to remediate it. SUF ¶¶89-92. Even before receiving the report, Scott Darkenwald told Duseks that they should speak directly to David Quinn about his Moisture and Mold Reinspection Report, because these are highly scientific issues. SUF ¶66-67. After speaking with David Quinn directly, Duseks concluded that the mold and moisture problems were not remediated and did not pass any clearance test. SUF ¶¶90-92. David Quinn recommended Duseks re-test the property in six months' time to determine if the mold issue had been resolved. *Id.* Darkenwald, as dual agent to both buyer and seller understood that further testing would be required, at a date significantly beyond the scheduled transaction closing date. *Id.*

Duseks expressly refused to release the outstanding contingencies. On October 28, 2021, Traci Rossi, business partner of Darkenwald's from Glacier Sotheby's International Realty's office, sent Duseks a form "Notice of Release of Contingencies" document, which specifically asked Duseks to release all outstanding contingencies to the BSA, including the three contingencies at issue in this litigation. It stated:

> The following contingency(ies) is/are released, satisfied, or waived as of the date indicated below and are of no further force and effect.
>
> All contingencies in the buy-sell dated 10/4/2021 are released including inspection contingency & remedies, title contingency, insurance contingency, corner pins, personal visit and well & water rights contingencies have all been satisfied & released as of 10/28/2021.
>
> Earnest money is now non-refundable as long as seller performs per the buy-sell dated 10/4/2021.

SUF ¶¶116-117. Plaintiffs were aware and supported Darkenwald's actions in pursuit of Duseks' release of the outstanding contingencies in writing on October 28. The previous day (October 27), Goodwin texted Darkenwald:

> My goal for the day is to have a signed agreement with Matt removing all contingencies and if he chooses, moving the closing date sooner. Just thought I'd put that out there for you to weave your magic to make it happen. :)

SUF ¶118.

On October 30, Duseks told Darkenwald orally and in writing that they would not sign the Notice of Release of Contingencies. SUF ¶119. Darkenwald responded that it was too late. Notwithstanding his request two days earlier (October 28) to sign a Notice of Release of Contingencies, Darkenwald now claimed that document was meaningless when he sent it. SUF ¶¶116-117. Notwithstanding his text five days earlier (October 25) that the Property needed to pass a mold clearance test, Darkenwald now claimed the test results were irrelevant. SUF ¶66. In fact, Darkenwald claimed that all of the contingencies had

lapsed before Duseks even visited the Property, notwithstanding the dates written into the BSA (by Darkenwald) and agreed to by the parties. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.*

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To

establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When making this determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See *Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## ARGUMENT

### I. The Dusek's October 30, 2021 notice timely terminated the BSA under three independent contingencies.

#### A. The BSA includes conditions to closing.

"An obligation is conditional when the rights or duties of any party thereto depend upon the occurrence of an uncertain event." Mont. Code Ann. §28-1-401. Duseks' obligation to close on the Property purchase was expressly conditioned upon certain contingencies in the BSA. The BSA includes a general "Contingencies" clause that governs the specific contingencies that follow. Individual contingencies "shall continue to closing" unless another date is specified.

> **CONTINGENCIES**: The contingencies set forth in this Agreement or on attached addenda shall be deemed to have been released, waived, or satisfied, and the Agreement shall continue to closing, unless, by 5:00 p.m. (Mountain Time) on the date specified for each contingency, the party requesting that contingency has notified the other party or the other party's Broker/Salesperson in writing that the contingency is not released, waived, or satisfied. If a party has notified the other party on or before the release date that a contingency is not released, waived, or satisfied, this Agreement is terminated, and the earnest money will be returned to the Buyer, unless the parties negotiate other terms or provisions.

SUF ¶¶34-36. Three separate contingencies apply to this dispute: (1) the general Property Condition Inspection Contingency; (2) the Personal Visitation Contingency, which the parties separately added to the form BSA; and (3) the Well Permitting and Water Rights Contingency, which the parties also separately added. SUF ¶¶37-41, 57, 95.

**B. Duseks' termination notice was timely under the Property Condition Inspection Contingency.**

**1. The parties extended the Property Condition Inspection Contingency release date to November 5, 2021, to allow Plaintiffs the opportunity to attempt to remediate the mold, moisture, and other problems that were identified in the First Inspection Report.**

The Property Condition Inspection Contingency is a standard part of the realtors' buy-sell agreement form.

> INSPECTION CONTINGENCY:
>
> This Agreement is contingent upon Buyer's acceptance of any Property conditions that Buyer deems appropriate, including but not limited to any inspections or advice listed below. ….

SUF ¶¶38-39. The clause then provides a non-exhaustive list of the types of property conditions which prospective home buyers engage home inspectors or advisors to review. *Id.* The BSA stated a deadline of October 26, 2021 for Duseks to object to a property condition. SUF ¶41.

Duseks timely provided "written notice(s) of [their] disapproval of the Property conditions" by the original October 26, 2021 deadline when they signed the Inspection Notice, requesting remediation of nine property condition issues that were identified in the First Inspection Report. SUF ¶¶45-53. They delivered the signed "Inspection Notice" to Darkenwald on October 15 (i.e., prior to personally visiting the Property). *Id.* At that point in time, Plaintiffs had the option of either accepting Dusek's requirements to remediate the nine property conditions listed on the Inspection Notice by November 5, 2021 or terminating the BSA. Plaintiffs chose the former. On October 17, Plaintiffs agreed to the terms of the Inspection Notice including the extension of time to November 5, 2021 for resolution of the Property Condition Inspection Contingency. *Id.* The Inspection Notice applied only to the property conditions identified pursuant to the Property Condition Inspection Contingency, but not to other, separate contingencies.

Thereafter, Plaintiffs hired contractors to attempt to remediate the Property defects. SUF ¶¶54-56. Plaintiffs hired Advanced Restoration to remediate the moisture and mold problems. *Id.* Following the remediation efforts, Duseks hired D. Quinn Construction for reinspection. SUF ¶65. Both Kelly Quinn and his father, David, inspected the Property post-remediation, for different issues, and each prepared the reinspection reports noted *supra*. *Id.*

**2. Undisputed evidence demonstrates that Plaintiffs' remediation efforts failed to remediate moisture and mold, and the Property did not pass a mold clearance test.**

**a) David Quinn's narrow engagement was to analyze whether Plaintiffs had properly remediated the mold and moisture.**

The post-remediation analysis by David Quinn, a Certified Residential Mold Inspector, was the "clearance test" that the parties agreed to in the Inspection Notice. SUF ¶¶49, 73. David Quinn's Moisture and Mold Reinspection Report was performed specifically "to confirm remediation" of the mold and moisture problems. SUF ¶73. David Quinn performed a visual inspection of the moisture and mold remediation, took moisture measurements, and performed air sampling. SUF ¶¶73-88. David Quinn's report concluded that mold spores and the moisture causing the mold spores remained present at the Property despite remediation efforts. *Id.*

**b) David Quinn found elevated levels of moisture, post-remediation.**

David Quinn visually observed that the moisture problems were not remediated. He noted that the closet and storage areas still retained moisture.

> **Upon entering the closet/storage no noticeable odor was observed. A closer inspection of this area did not reveal any visual evidence of microbial growth although wet/damp conditions existed of the OSB (Oriented Strand Board) siding and/or by prior remediation, delamination of the OSB (Oriented Strand Board) siding and/or no metal z-bar channel flashing installed at upper and lower horizontal wood trim, caulking only.**

SUF ¶78 (emphasis original). He also noted that the stairwell drywall continued to retain moisture.

> **Also, note based on the visible observations and moisture readings it appears that the upper stairwell interior drywall is still retaining excess absorbed moisture from a past on-going water intrusion which could also contain microbial growth.**

SUF ¶79 (emphasis original).

Quantitative measurements reinforced these visual observations, showing elevated moisture content in 8 of the 12 areas tested. SUF ¶¶79-80.

> … However, six locations in the OSB (Oriented Strand Board) siding/shear wall paneling had readings ranging from **41% to 92%** indicating substantially wet. Also, note two locations at upper stairwell interior drywall had readings ranging from **20% to 22%** indicating damp moisture levels and appear to be still retaining excess absorbed moisture from a past on-going water intrusion.

SUF ¶82 (emphasis original). From these measurements, David Quinn concluded that moisture remained in the areas where mold was present.

> Based on the visible observations and moisture readings it appears that the closet/storage OSB (Oriented Strand Board) siding/shear wall paneling under stairs and upper stairwell interior drywall system are either still retaining excess absorbed moisture from a past ongoing water intrusion, or they still experiencing another form of moisture possibly from recent remediation work in the attic space.

SUF ¶83. Beyond any doubt, the moisture problems identified in the First Inspection Report were not remediated by the extended deadline of November 5, 2021.

**c) David Quinn also found elevated levels of mold, post-remediation.**

Mold is a significant issue that cannot be addressed superficially. As David Quinn explained:

> The Purpose of Remediation
>
> • "The purpose of mold remediation is to <u>remove the mold</u> to prevent human exposure and damage to building materials and furnishings. It is necessary to clean up mold contamination, <u>not just to kill the mold</u>. Dead mold is still allergenic, and some dead molds are potentially toxic. The use of biocide, such as chlorine bleach, <u>is not recommended</u> as a routine practice during mold remediation, although there may be instances where professional judgment may indicate its use."
>
> – EPA Mold Remediation in Schools and Commercial Buildings

SUF ¶74 (emphasis added by David Quinn). To determine if Plaintiffs' mold remediation efforts were successful, David Quinn performed mold spore tests for both air and surface fungus. SUF ¶84. He tested both air and surfaces of two indoor areas and took an outdoor air measurement for comparison. *Id.* He sent those samples to an independent laboratory for analysis. SUF ¶85. The laboratory's

report cautioned that "active fungal growth in indoor environments is inappropriate and may lead to exposure and adverse health effects." SUF ¶¶85-86, 91. The laboratory's analysis revealed elevated levels of certain types of mold spores for both airborne tests. *Id.*

David Quinn's Moisture and Mold Reinspection Report noted these results, namely that both indoor air samples continued to show elevated levels of certain types of mold spores. *Id.* Particularly, both indoor air tests revealed the continued presence of the toxic Stachybotrys and Penicillium/Apsergillus spores. SUF ¶87. Neither of these types of mold spores were detected in the outdoor "control" sample of the air, meaning they originate inside the home. *Id.*

Beyond any doubt, the mold problems identified in the Inspection Notice were not remediated by the extended deadline of November 5, 2021. If anything, David Quinn's Moisture and Mold Reinspection Report understates the mold problem, because he considered only a small portion of the Property. SUF ¶80.

**d) Duseks terminated the BSA when Plaintiffs failed to remediate the mold and moisture.**

On October 27, 2021, David Quinn sent a copy of his Moisture and Mold Reinspection Report to Matt Dusek and Scott Darkenwald, among others. SUF ¶68. Even before it was issued, Darkenwald recommended that Duseks contact David Quinn directly to discuss the report, because mold and moisture

infiltration are highly scientific and serious matters, beyond Darkenwald's expertise. SUF ¶67.

Upon receiving the Moisture and Mold Reinspection Report on October 27, Duseks spoke with David Quinn concerning his findings. SUF ¶89. From the conversation with David Quinn and from the report, itself, Duseks concluded that both moisture and mold remained in the living area of the Property, despite the remediation efforts. *Id.* David Quinn also suggested that the Property might pass a mold clearance test if it were retested for mold and moisture six months later – i.e., long past the contingency deadline and closing date. *Id.*

Following the conversation with David Quinn, Duseks had a follow-up conversation with Darkenwald. SUF ¶90. They specifically discussed the Property's potential health risks, particularly for those with allergies. SUF ¶89. They also discussed David Quinn's recommendation to re-test for mold and moisture six months later. SUF ¶89. Darkenwald, as dual agent to both buyer and seller understood that further testing would be required, past the contingency deadline and long past the scheduled closing date.

> Q. What was -- What was your understanding of what needed to be done in six months after -- say after the date of this report?
>
> A. Just another clearance test taken.

SUF ¶90.

The undisputed facts demonstrate that the moisture and mold problems identified in the Inspection Report were not (and could not be) remediated by the extended property condition contingency deadline of November 5, 2021. The Property did not pass the required mold clearance test, and the mold inspector's only recommendation was that it be re-tested six months later – i.e., subsequent to the extended deadline and also subsequent to the scheduled transaction closing date.

Notwithstanding the continued mold and moisture problems and the need for re-testing in six months, Darkenwald asked Duseks to sign a written release of their objections to the property conditions noted in the Inspection Contingency. SUF ¶¶116-119. On October 28, 2021, he sent them the Notice of Release of Contingencies and specifically asked them to release all outstanding contingencies "… including inspection contingency, & remedies…." *Id.* Duseks were not interested in buying a home with such problems and did not want to gamble on the possibility that the mold might simply go away on its own, with time. Based on their concerns, Duseks declined to sign the written Release of Contingencies and decided to terminate the BSA. *Id.* At no point did Duseks agree that their objections to moisture and mold were "satisfied." *Id.* Nor did they "withdraw, in writing, [their] disapproval of the condition[s] noted" in the Inspection Notice, as required by the BSA. SUF ¶41. As a result, pursuant to the terms of the BSA, "the

earnest money shall be returned to the Buyer, and the Agreement then terminated." *Id.*

**C. Undisputed evidence demonstrates that Plaintiffs failed to satisfy the Well Permitting and Water Rights Contingency.**

**1. The parties separately agreed to a release date of November 3, 2021 to satisfy Duseks' concerns regarding well permitting and water rights.**

The parties acknowledged the importance of proper water rights ownership and well permitting. The BSA noted that the failure to properly obtain and transfer water rights "could result in a penalty against the transferee and rejection of the deed for recording." SUF ¶93. The parties also expressly recognized the "general policy of the State of Montana" "to prohibit unauthorized projects related" to "natural water bodies and the lands immediately adjacent thereto." SUF ¶94.

For these reasons, Darkenwald encouraged the parties to add the Well Permitting and Water Rights Contingency as a separate contingency.

> So in the buy-sell where it talks about water rights? Where's that? On lines -- this is 399 and then lines 237 through 238, essentially, that's my language, and that's to protect Duseks, because at that point -- at that -- it was critical that that well log be recorded.

SUF ¶112. This contingency is distinct from the Property Condition Inspection Contingency discussed above. SUF ¶95. It is not a part of the standard form buy-sell agreement. *Id.* The separately-added contingency language proposed for use in the BSA by Darkenwald and agreed to by the parties provides:

> This Agreement is contingent upon:
>
> All well related permitting, well log recording, and any associated water rights to be in place prior to closing. Reasonable extension for contingency and closing to be granted upon written request.
>
> Release Date: 11/03/2021 at 5:00 p.m. (Mountain Time)

*Id.*

**2. The Well Permitting and Water Rights Contingency is an independent contingency, entirely separate and apart from the Property Condition Inspection Contingency.**

The realtors' form buy-sell agreement plainly contemplates that parties might select from the common, standard-form optional contingencies, or that they might draft their own contingencies. The stock contingencies are listed with optional "check boxes," each indented directly below the general "Contingencies" section at lines 132-137. SUF ¶¶34-36. The Property Condition Inspection Contingency is one of these stock paragraphs available for selection. SUF ¶38. Directly below the standard form contingencies, the form buy-sell agreement provides space for parties to add their own contingencies independent of the standard form optional contingencies. *Id.* That is exactly what the parties did in this case when they separately added Darkenwald's suggested Well Permitting and Water Rights Contingency language and assigned it its own separate release date. SUF ¶¶95-96. The general "Contingencies" clause also contemplates that different contingencies might have different release dates (or no release dates at all) and clarifies that each separate contingency "shall be deemed to have been released …

unless, by 5:00 p.m. (Mountain Time) **<u>on the date specified for each contingency</u>**" written notice is provided to the contrary. SUF ¶34 (emphasis added). Here, the parties selected November 3, 2021 as the release date for the Well Permitting and Water Rights Contingency, and they noted that in its own separate section, manually added to their BSA. SUF ¶95. The separate November 3, release date is entirely consistent with the general "Contingencies" clause of the BSA.

Moreover, Montana law is clear that the parties' specific addition of the Well Permitting and Water Rights Contingency with its separately assigned release date would govern, in the event the two clauses conflicted. *See* Mont. Code Ann. §28-3-205; *see also Estate of Lahren*, 268 Mont. 284, 288, 886 P.2d 412, (1994) (handwritten "P.O.D." (pay-on-death) notation overrules pre-printed joint tenancy clause on deposit account); *Ideal Mut. Ins. Co. v. Patzer*, 624 F. Supp. 426 (D. Mont. 1985) ("Where there is a conflict between the printed and typewritten portions of [an insurance] policy the latter prevail.") (citing Mont. Code Ann. §28-3-205). Here, the parties separately added the Well Permitting and Water Rights Contingency in the space provided at lines 236-240 to the form realtor buy-sell agreement, which already included the preprinted Property Condition Inspection Contingency at lines 139-184. SUF ¶38. To the extent that they might conflict, "the latter must be so far disregarded." Mont. Code Ann. §28-3-205.

### 3. Plaintiffs did not ensure that "[a]ll well-related permitting, well log recording, and any associated water rights [were] in place prior to closing."

The only well information Plaintiffs provided was a 2-page "General Abstract" relating to Provisional Permit that was first sought and obtained after the Property was listed for sale. Plaintiffs did not provide Duseks with any well-log data. SUF ¶113. Plaintiffs' only well log was produced by Scott Darkenwald in discovery and shows a date stamp of November 1, 2021 – i.e., after Duseks terminated the BSA. *Id.* Plaintiffs did not provide Duseks with a copy of the provisional "Permit to Appropriate Water" or its cover letter, which explains the provisional nature of the water rights and the requirements to apply for permanent water rights. SUF ¶¶97-105.

### 4. The limited information Plaintiffs did provide revealed significant water rights issues.

The 2-page General Abstract for Provisional Rights revealed that these rights were not permanent, and also of critical importance, the provisional rights were issued to Gail Goodwin, individually – not to the owner of the Property, Glacier Bear Retreat LLC. SUF ¶¶102-103. The parties agreed that Plaintiffs would ensure that all water rights be in place prior to closing, and this outstanding ownership issue involved a rights-transfer process that Duseks were not prepared to undertake. Plaintiffs knew that Duseks were concerned about the provisional nature of the water rights. SUF ¶107. Goodwin, herself, admitted that she did not

understand the difference between a provisional permit a completed permit, but believed there was nothing more she could have done to obtain permanent rights, because her delay in filing put her "at the mercy of DNRC." SUF ¶108.

The provisional permit cannot become a completed permit, absent further action by the landowner. SUF ¶¶103-106. Obtaining permanent water rights requires approval from the DNRC, separate from the provisional rights, and which was something that could not have been obtained before the November 3, 2021 contingency release date. *Id.* Further, as documents first produced in discovery show, the failure of a buyer of the Property, such as Duseks, to pursue these rights through DNRC "will result in the termination of [the buyer's] provisional permit." SUF ¶104.

Additionally, Plaintiffs' eight-year delay in pursuing water rights subordinated any permanent water rights that might issue from this provisional permit. SUF ¶¶109-110, 114. The provisional permit emphasizes that it is inferior to any rights obtained prior to September 3, 2021, and that the owner of the Property "MAY BE SUBJECT TO A CALL BY SENIOR WATER RIGHT HOLDERS, IN WHICH CASE YOU MAY BE REQUIRED TO DISCONTINUE YOUR USE OF WATER FOR THE PERIOD OF THE CALL." *Id.* (capitalization original). Also, any potential water rights are disputed by tribal governments and

may be subject to reserved water rights of the Confederated Salish and Kootenai Tribes, possibly resulting in complete defeasance. SUF ¶111.

On balance, Duseks concluded that the incomplete well permitting and potential water rights problems, as well as the lack of well-log information simply raised too many issues and created a burden they were not interested in purchasing. The undisputed facts demonstrate that Plaintiffs did not and could not satisfy the Well Permitting and Water Rights Contingency by its release date. On October 28, 2021, Darkenwald sent Duseks a Notice of Release of Contingencies, which listed the "well & water rights contingency" as one of the outstanding contingencies, which Duseks had not yet released. SUF ¶116-117. On October 30, Duseks informed Darkenwald that they would not release the contingencies, including the Well Permitting and Water Rights Contingency. SUF ¶119. Duseks' written notice of their refusal to release the Water Rights Contingency was timely because it was made in writing before the November 3, 2021 deadline. SUF ¶121.

### D. Duseks' termination notice was timely under the Personal Visitation Contingency, which had no release date.

The parties also added a Personal Visitation Contingency separately to the standard form realtor buy-sell agreement. It provides: "Buyer reserves the right to visit the property during the inspection period." SUF ¶57. Darkenwald explained to Duseks that this contingency allowed them to terminate the BSA for virtually any reason, if they did not like the Property when they visited it. SUF ¶61. Duseks

insisted that this contingency be included in the BSA, because they had not visited the Subject Property when the BSA was signed. SUF ¶58.

No date is specified for the release of the Personal Visitation Contingency. SUF ¶59. This is not surprising, and the BSA expressly contemplates that contingencies might not have release dates prior to closing. Under the general "Contingencies" clause of the BSA, any contingency without a specified release date "shall continue to closing." SUF ¶34. In fact, the standard realtor form buy-sell agreement includes contingencies (not at issue here) that have no release dates prior to closing. For example, the Financing Contingency (BSA lines 186 – 189) contains the statement, "If financing cannot be obtained by the Closing Date this Agreement is terminated and the earnest money will be refunded to the Buyer." SUF ¶9. No further release date is provided in this case.

In fact, Duseks were underwhelmed with the Property when they visited; they determined that the Property was not as represented to them in several critical ways. Duseks personally visited the Subject Property on October 19, 2021. SUF ¶63. During their visit, they observed that there was excessive road noise and traffic visibility on the Property and generally found it to be less desirable than they had previously believed. *Id.* During their visit, Darkenwald asked whether they were ready to release the remaining contingencies, and they expressly declined. *Id.* Upon returning from their personal visit to the Property, Duseks

informed Scott Darkenwald repeatedly of their misgivings about the transaction. SUF ¶64.

All parties and their dual agent understood that the BSA was subject to the Dusek's personal visit to the Property and their satisfaction with the Property during that visit. SUF ¶¶60-62. Goodwin acknowledged "of course" Duseks had the right to visit the Property and terminate the BSA "[i]f they didn't like what they saw;" she merely disagrees with the release date. *Id.* She also agreed that the Personal Visitation Contingency was separate and apart from the Property Condition Inspection Contingency. "Your clients visiting the property was not an inspection; however, they came to inspect the property." SUF ¶62. Moreover, Darkenwald expressly included the Personal Visitation Contingency as one of the contingencies that he asked Duseks to release in the Notice of Release of Contingencies. SUF ¶117.

## II. Duseks expressly declined to release the contingencies when Darkenwald asked them to do so.

On October 28, 2021, Tracy Rossi, Darkenwald's business partner at Glacier Sotheby's, sent the Duseks a form "Notice of Release of Contingencies" document, with the email notation, "Hi Matt, Here is a draft for your review of the Notice of Release of Contingencies. Thanks! Tracy." SUF ¶116. The Notice of Release of Contingencies specifically asked Duseks to release all outstanding contingencies to the BSA, including the three contingencies at issue in this litigation. It stated:

> The following contingency(ies) is/are released, satisfied, or waived as of the date indicated below and are of no further force and effect.
>
> All contingencies in the buy-sell dated 10/4/2021 are released including inspection contingency, & remedies, title contingency, insurance contingency, corner pins, personal visit and well & water rights contingencies have all been satisfied & released as of 10/28/2021.
>
> Earnest money is now non-refundable as long as seller performs per the buy-sell dated 10/4/2021.

SUF ¶117. The unavoidable implication is that the contingencies were still in effect and the earnest money was refundable, when this Release was sent.

Plaintiffs knew that Darkenwald was requesting Duseks to sign a written release of contingencies, and specifically asked him to do so. The previous day, Gail Goodwin texted Scott Darkenwald to explain that "My goal for the day is to have a signed agreement with Matt removing all contingencies and if he chooses, moving the closing date sooner. Just thought I'd put that out there for you to weave your magic to make it happen. :)" SUF ¶118. All parties knew that these contingencies remained outstanding on October 28, 2021. Beyond any doubt, Duseks did not release those contingencies.

## III. Duseks are entitled to a return of their earnest money, because they timely notified Plaintiffs that the contingencies were not released or satisfied.

The general Contingencies makes clear that the potential purchaser's earnest money must be returned if any of the specified contingencies are not met.

> …If a party has notified the other party on or before the release date that a contingency is not released, waived, or satisfied, this Agreement is terminated, and the earnest money will be returned to the Buyer, unless the parties negotiate other terms or provisions.

SUF, ¶34. Here, three separate contingencies remained in effect when Duseks gave written notice on October 30, 2021 that the conditions subject to the contingencies were not released or satisfied.

- The parties extended the release date for the Property Condition Inspection Contingency to November 5, 2021. That continency was not and could not be satisfied by the extended contingency release deadline because the Property still had elevated moisture, showed evidence that all mold had not been remediated, failed to pass a mold clearance test, and would require further testing post-closing. Moreover, Duseks never signed a written release of their timely objections noted in the Inspection Notice.
- The parties separately assigned November 3, 2021 as the release date for the Well Permitting and Water Rights Contingency. That contingency was not satisfied because Plaintiffs did not complete the well permitting to obtain permanent water rights by the contingency release deadline.
- The parties separately added the Personal Visitation Contingency and did not add any deadline for its release. Duseks had until closing to raise objections based on their personal visitation. That contingency was not

satisfied because the Property presented unacceptable traffic visibility and road noise.

For each of these independent reasons, Duseks provided timely written notice that they would not release or waive their contingencies. Moreover, Plaintiffs and Scott Darkenwald knew that these contingencies remained in effect; that's why they specifically presented the Notice of Release of Contingencies to Duseks on October 28, 2021. Because Duseks' notice was timely, the BSA unequivocally requires the return of their earnest money.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment must be granted. Duseks are entitled to the return of their earnest money.

Dated this 2nd day of September, 2022.

By:*/s/ Shane P. Coleman*
Shane P. Coleman
BILLSTEIN, MONSON & SMALL, PLLC

ATTORNEYS FOR DEFENDANTS MATT DUSEK AND RACHEL DUSEK

## CERTIFICATE OF COMPLIANCE

The undersigned, Shane P. Coleman, certifies that this Brief complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman font typeface consisting of 14 characters per inch. The total word count is 6,467, excluding caption and certificates of service and compliance, table of contents and authorities, and exhibit index. The undersigned relies on the word count of the word processing system used to prepare this document.

By: */s/ Shane P. Coleman*

Shane P. Coleman
BILLSTEIN, MONSON & SMALL, PLLC

ATTORNEYS FOR DEFENDANTS
MATT DUSEK AND RACHEL DUSEK