Fred Simpson, Esq.
Hall & Evans, LLC
Millennium Building, Ste. 403
125 Bank Street
Missoula, MT 59801
Telephone: (406) 532-2635
Facsimile: (406) 519-2035
Email: simpsonf@hallevans.com

*Attorneys for Plaintiffs and Counterclaim Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,<br><br>Plaintiffs/Counterclaim Defendants,<br><br>vs.<br><br>MATT DUSEK AND RACHEL DUSEK,<br><br>Defendants/Counterclaimants. | Cause No. CV 22-19-M-KLD<br><br>**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ........................................................................................1

STATEMENT OF FACTS ...........................................................................1

A. Water Rights were Established. ..........................................................2

B. The Inspection, the Inspection Notice and the Property Visit. ............4

C. Glacier Bear's Compliance with the Inspection Notice.......................5

SUMMARY JUDGMENT STANDARD ...............................................................10

ARGUMENT...........................................................................................100

1. Dusek's Personal Property Visit was a Right not a Contingency. ......13

2. Even if the Personal Property Visit was a Contingency, it Expired upon Expiration of the Property Inspection Contingency Deadline of October 26, 2021, and Duseks' Objection of October 30, 2021 was Untimely. ..........................................................................14

4. Glacier Bear Successfully Remediated the Mold and Moisture. ........19

5. Glacier Bear Satisfied the Water Rights Condition to Closing..........21

6. The Notice of Release of Contingencies was not Required under the BSA. ....................................................................................25

CONCLUSION..........................................................................................26

CERTIFICATE OF COMPLIANCE...................................................................277

# TABLE OF AUTHORITIES

## Cases

*A.M. Welles, Inc. v. Mont. Materials, Inc.*,
2015 MT 38, 378 Mont. 173, 342 P.3d 987 .......................................... 13, 16

*Adams v. Chilcott*,
182 Mont. 511, 597 P.2d 1140 (1979)..........................................................25

*Confederated Salish & Kootenai Tribes v. Clinch*,
2007 MT 63, 336 Mont. 302, 158 P.3d 377 .................................................23

*Cortese v. Cortese*,
2008 MT, 341 Mont. 287, 176 P.3d 1064 ....................................................13

*Halcro v. Moon*,
226 Mont. 121, 733 P.2d 1305 (1987).................................................. 12, 19

*Payne v. Hall*,
2020 MT 46, 399 Mont. 91, 458 P.3d 1001 .................................................22

*Roland v. Davis*,
2013 MT 148, 370 Mont. 327, 302 P.3d 91 .................................................25

*Watters v. City of Billings*,
2017 MT 211, 388 Mont. 376, 404 P.3d 379 ...............................................24

*Wicklund v. Sundheim*,
2016 MT 62, 383 Mont. 1, 367 P.3d 403 .....................................................13

## Statutes

Fed. R. Civ. P. 56(a)...........................................................................................10

Mont. Code Ann. § 1-4-101 ...................................................................................13

Mont. Code Ann. § 28-2-904 .................................................................................16

Mont. Code Ann. § 28-10-604 ...............................................................................22

Mont. Code Ann. § 85-2-306(3)(a)(iii) .......... 23

Mont. Code Ann. § 85-2-313 .......... 23

Mont. Code Ann. § 85-20-401 .......... 23

**Other Authorities**

1997 Laws of Mont., ch. 497, 2790-91 .......... 23

## INTRODUCTION

Plaintiffs Gail L. Goodwin ("Ms. Goodwin"), Darryl C. Slattengren ("Mr. Slattengren") and Glacier Bear Retreat, LLC, ("GBR") (collectively, "Glacier Bear") file this Brief in Opposition to Defendants' Motion for Partial Summary Judgment. Defendants Matt Dusek ("Mr. Dusek") and Rachel Dusek ("Ms. Dusek") (collectively, "Duseks") have failed to establish the absence of genuine issues of material fact supporting their motion or that they are entitled to judgment as a matter of law. Rather, the undisputed facts of record demonstrate that Duseks breached the Buy-Sell Agreement ("BSA") when they gave untimely notice of their purported termination of the BSA after: Duseks exercised their right to visit the Property, Glacier Bear remediated the mold and moisture found in a closet underneath a staircase, and Glacier Bear provided Duseks documentation showing that water rights would transfer with the Property at the closing. Duseks' motion should be denied, and summary judgment entered for Glacier Bear.

## STATEMENT OF FACTS

As the Court is already familiar with the background of this case from earlier briefing, Glacier Bear will only address the pertinent points instead of regurgitating the details already familiar to the Court.

## A. Water Rights were Established.

The parties' dual agent, Scott Darkenwald, notified Duseks that there was an outstanding issue with water rights for the Property that need to be cleaned up – Glacier Bear lacked a permit to appropriate ground water – at the time the parties signed the BSA on October 5, 2021. Doc. 27, ¶ 7. Thus, the BSA provided for additional time for Glacier Bear to obtain those rights:

> This Agreement is contingent upon:
>
> All well related permitting, well log recording, and any associated water rights to be in place prior to closing. Reasonable extension for contingency and closing to be granted upon written request.
>
> Release Date: 11/03/2021 at 5:00 p.m. (Mountain Time)

*Id*.; Plaintiffs' Statement of Disputed Facts ("SDF"), ¶ 95.

Ms. Goodwin had been working diligently to document water rights for the Property since early September 2021. Her efforts came to fruition on October 12, 2021, when the Montana Department of Natural Resources and Conservation ("DNRC") issued a Provisional Permit (the "Permit") for water rights for the Property and a General Abstract documenting that right. SDF, ¶¶ 101, 102, 138. That same day, Mr. Darkenwald notified Duseks of issuance of the Permit and provided them with the water rights abstract issued by DNRC. Doc. 27, ¶ 8.

Duseks told Mr. Darkenwald they were satisfied with the water rights and never requested a single other document concerning the water rights before they attempted to terminate their duties under the BSA. They never asked for a copy of

the Permit, the well log or any other information, and apparently never bothered to look for the documents online, which are available on DNRC's website. SDF, ¶¶ 135, 136, Exhibit 1, Declaration of Gail Goodwin, ¶ 5 and Exhibit A thereto. Had they looked online at the DNRC website, or simply asked Mr. Darkenwald, Duseks would have been provided with the Permit, the well log, and other DNRC documentation confirming that water right number 76l 30153319 was issued for the Property. Exhibit 1 to SDF at Exhibit A.

The General Abstract Mr. Darkenwald gave to the Duseks contained important information: the priority date of September 3, 2021; a maximum flow rate of 4 gallons per minute; a "well" as the "diversion means;" and a period of use as January 1 through December 31. Doc. 27-6 at 5. Had they simply asked for the Permit, Duseks would have also learned that the Permit said, "UPON FINDNG THAT THE REQUIREMENTS OF 85-20-401, MCA, HAVE BEEN MET, THIS PROVISIONAL PERMIT IS GRANTED." Exhibit 1 to SDF at Exhibit A (caps in original).

Although the Permit had already been issued on October 12, 2021, Montana law required that an additional form, form 617, be completed and submitted to DNRC on or before December 31, 2022, for verification of completion of the well. Ms. Goodwin completed form 617 and submitted it to DNRC on or about June 30, 2022. SDF, ¶ 139.

Finally, while the water rights were in Ms. Goodwin's name, she intended to transfer those rights to Duseks upon closing of the BSA. SDF, ¶ 137. She remains ready, willing, and able to transfer those rights along with title to the Property if the Court orders Duseks to close on the BSA.

So much for background on the water rights.

**B. The Inspection, the Inspection Notice and the Property Visit.**

Duseks were originally scheduled to exercise their "right to visit property in person" on October 12, 2021. SDF, ¶ 134. Due to a snafu in chartering a private plane for the trip from their residence in California, Duseks chose to reschedule the visit to October 19, 2021. Doc. 27, ¶ 16; SDF ¶ 134.

On or about October 13, 2021, Duseks received an Inspection Report from Kelly Quinn of D. Quinn Construction, Inc. SDF, ¶ 43. In his report, Mr. Quinn identified some conditions on the Property that needed repair and remediation, including, as relevant here, mold and moisture in a closet under the staircase. SDF, ¶ 44. Based upon Mr. Quinn's report, and despite not having seen the Property in person, Duseks sent to Glacier Bear, through Mr. Darkenwald, the Inspection Notice which they signed on October 15, 2021, and in which they identified nine different conditions on the Property which they asked that Glacier Bear repair. Doc. 27, ¶¶ 11, 12. In the Inspection Notice, Duseks checked the box: "Buyer elects to negotiate the items of disapproval described above and offers the

following resolution: Seller, at seller's expense, to remedy the following [list of nine conditions]." Doc. 27, ¶ 11. On October 17, 2021, Ms. Goodwin and Mr. Slattengren signed the Inspection Notice on behalf of GBR, thereby committing GBR to repair those nine items to allow the transaction to proceed to closing. Doc. 27, ¶ 15.

Duseks eventually exercised their "right to visit property" on October 19, 2021. After their visit, Duseks told Mr. Darkenwald that they were more excited about the purchase than before they came to the Property. Doc. 27, ¶ 16; SDF, ¶ 63. Consistent with that discussion, on October 26, Mr. Dusek "called and told [Mr. Darkenwald] that he was going to go forward" and that Mr. Darkenwald could so inform Ms. Goodwin. Doc. 27, ¶ 22.

**C. Glacier Bear's Compliance with the Inspection Notice.**

Upon receipt of the Inspection Notice, Ms. Goodwin immediately hired contractors, including Cory Rensmon of Advanced Restoration and Maintenance ("ARM"), the contractor specified by Duseks in the Inspection Notice, to perform the work required by the Inspection Notice. Doc. 27, ¶ 17. GBR spent a total of $30,319.75 on the repairs, including $25,244 on mold/moisture remediation performed by ARM. *Id*. Mr. Darkenwald notified Mr. Dusek by email that Mr. Rensmon "guarantees his work." *Id*.

Mr. Rensmon, who holds a certification in microbial remediation, and his crew began work on the Property on October 19, 2021. Exhibit 2 to SDF, Decl. of Cory Rensmon, ¶ 4. Mr. Rensmon and his crew performed the mold and moisture remediation in accordance with ARM's customary business practices and industry standards. ARM took every step necessary in performing that work to make sure the mold was mitigated to the maximum degree possible. SDF, ¶ 127.

Per his usual business practice, Mr. Rensmon hired David Quinn of D. Quinn Construction to inspect the mold and moisture remediation that ARM had performed at the Glacier Bear property. SDF, ¶ 128. Mr. Quinn performed his inspection on October 25, 2021. After he performed the inspection, Mr. Quinn called Mr. Rensmon, either the evening of October 25 or morning of October 26, to report that there was still moisture in the main closet level in the Oriented Strand Board ("OSB"). Mr. Quinn later provided Mr. Rensmon with his report labeled "Limited Microbial Inspection" dated October 26, 2021. *Id*.

After being notified by Mr. Quinn that there was still moisture in the OSB, over the course of approximately 27 hours from the morning of October 26, 2021 to the morning of October 27, 2021, ARM located the source of the moisture – missing flashing on the roof wall joint. SDF, ¶ 129. ARM then installed the missing kick out flashing and sealed the area with water/ice moisture membrane and tore out the OSB in which Mr. Quinn had found moisture and replaced it with

new OSB and new studs. This work completely removed and replaced all of the wood material in which Mr. Quinn had found elevated moisture readings. *Id*.

Kelly Quinn (the same person who conducted the original inspection which found the mold and moisture) returned to reinspect the Property on October 27, 2021, after ARM had completed its work. SDF, ¶ 130. David Quinn did not return to the Property, and his report did not address the condition of the Property after ARM had completed its work. *Id*.

Mr. Rensmon has worked with D. Quinn Construction, Inc., hundreds of times. Based on this experience, Mr. Rensmon is familiar with how David Quinn authors his reports. Based upon his training and experience, including his experience with D. Quinn Construction, Inc., Mr. Rensmon is familiar with the terminology used in its reports with respect to mold remediation. According to Mr. Rensmon, David Quinn concluded in the Limited Microbial Investigation that the "surface remediation process was successful" in the closet/storage exterior wall system under the stairs, which means that the mold remediation conducted by ARM was successful. SDF, ¶ 131.

The mold and moisture remediation work performed by ARM was successfully completed in accordance with ARM's ordinary business practices. SDF, ¶ 133. Had there been any remaining mold or moisture to remediate, D. Quinn Construction, Inc., would have notified Mr. Rensmon. *Id*. D. Quinn

Construction, Inc.'s Building and Inspection Analysis Report dated October 27, 2021, confirms that ARM successfully performed the mold and moisture remediation work which it had contracted to perform. SDF, ¶ 133.

In addition to Mr. Rensmon's testimony, Kelly Quinn also testified that the mold and moisture had been successfully remediated. According to Mr. Quinn:

> [U]pon my reinspection I found that "evidence of moisture and water stains located main closet level under the stair area during the original inspection as (sic) been corrected and was dry at time of inspection with flashing and siding issue having been corrected." My observations in the report that the evidence of moisture and water stains had been corrected was true at the time I made those observations in my report of October 27, 2021, and I still believe them to be true. I also noted that this condition was "satisfactory." In the terminology of my report, "satisfactory" means that "item condition is good to adequate for the age of structure."
>
> [U]pon my reinspection I found that, "the water stains and possible surface fungal growth that was found at main level closet under the stairs during the original inspection does appear to have been properly treated and remediated. The insulation and vapor barrier was yet to be installed to allow for visual inspectio[n] and was scheduled to be done." My observations in the report that the water stains and possible surface fungal growth had been properly treated and remediated were true at the time I made those observations in my report of October 27, 2021, and I still believe them to be true. I also noted that this condition was "satisfactory."

Exhibit 5 to SDF, ¶¶ 6, 7.

Finally, David Quinn also confirmed that "the 'surface remediation process was successful' with respect to the closet/storage exterior wall system under the stairs," and that "[t]he low level of Penicillium/Aspergillus spores noted in the

[Limited Microbial Inspection] report were likely left-over dust and debris spores which are frequently present in high numbers after remediation." Exhibit 4 to SDF, ¶ 6.

On October 30, 2021, Mr. Dusek emailed two letters to Mr. Darkenwald purporting to terminate the BSA and demanding a return of Duseks' earnest money. Doc. 27, ¶ 23. This was the first notice to Glacier Bear, written or otherwise, from Duseks that they intended to terminate the transaction. Doc. 27, ¶ 23. Duseks explained their reasons for backing out of the BSA as follows:

> As we are unable to come to written agreement in satisfaction of the conditions noted, and as we did not withdraw, in writing, our disapproval of the conditions noted on or before the stipulated Resolution Date (10/29/2021 at 5:00 PM MT), we expect that the earnest money shall be returned to us and the Agreement then terminated.

Doc. 27, ¶ 24. The second letter provided additional grounds:

> [W]e hereby serve notice of our disapproval of the Property conditions and do not wish to proceed with the purchase – we elect to immediately terminate the Agreement.
>
> In this decision, we are specifically relying on our reserved rights under the agreement to contingencies based on:
>
> > **Well Related Permitting/Water Rights** (line 273)
> > We don't find the water rights of the property to our satisfaction.
> >
> > **Additional Provisions – Personal Inspection/Property Visitation** (line 245)
> > We don't find the visibility and noise of traffic on Camas Rd. adjacent to the Property to our satisfaction.

*Id*.

These letters of October 30, 2021, were the first and only notice to Mr. Darkenwald or GBR that Duseks had any objection to the water rights, as well as visibility and noise of traffic on Camas Road. Doc. 27, ¶ 25. Duseks' notice was untimely; at the latest, they had until 5:00 p.m., Mountain Time, on October 26, 2021, to terminate the BSA. *Id*.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that "a fact cannot be or is genuinely disputed" must support the assertion by (A) "citing to particular parts of materials in the record, including depositions, documents, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" or (B) "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

## **ARGUMENT**

Duseks raise the same three arguments in support of their motion that they raised in opposing Glacier Bear's motion. Accordingly, Glacier Bear incorporates by this reference the arguments set forth in its Brief in Support of Motion for

Partial Summary Judgment (Doc. 26) and Reply Brief in Support of Motion for Partial Summary Judgment (Doc. 31).

The Duseks are not entitled to summary judgment because:

> 1. The BSA contained no "Personal Visitation Contingency" and to the extent the BSA could be construed to create such a contingency, the deadline for Duseks to object to the Property based upon their site visit was October 26, 2021, yet they raised no such objection until October 30, 2021;
>
> 2. Duseks and Glacier Bear negotiated a resolution to Duseks' objections to various conditions on the Property when they executed the Inspection Notice, and Glacier Bear fully complied with its obligations under the Inspection Notice by remediating the mold and moisture as demonstrated by the testimony of Cory Rensmon, David Quinn and Kelly Quinn; and
>
> 3. Glacier Bear fulfilled its obligations with respect to establishing the water rights appurtenant to the Property by providing documentation to Duseks proving that there were water rights that would transfer with the Property, and Duseks' notice of objection to the water rights on October 30, 2021 was untimely.

The clear and unambiguous terms of the BSA, as amended by the Inspection Notice, warrant denial of Duseks' motion.

First, there was no "Personal Visitation Contingency" in the BSA. Under the BSA, the Duseks "reserved the right" to visit the Property, and undisputedly exercised that right without any interference by Glacier Bear. However, that right to visit did not grant them additional rights to withhold approval from closing, unless it was done in conjunction with the Inspection Contingencies deadline of October 26, 2021. At the latest, Duseks had until 5:00 p.m., on October 26, 2021,

to withdraw from the BSA based upon any objections they had upon their visit to the Property. Doc. 27 at ¶ 10. Because Duseks did not serve any objection based upon their property visit until October 30, 2021, their attempted termination based upon their visit to the property was untimely. Doc. 27 at ¶ 23.

With regard to the mold and moisture, the inspection "contingencies" were resolved upon execution of the Inspection Notice. Doc. 27 at ¶¶ 10-11. Under the plain language of the BSA, there were no further "contingencies" upon which Duseks could rely to avoid closing once Glacier Bear agreed to remediate the mold and moisture. Further, Glacier Bear successfully remediated the mold and moisture as shown by the testimony of the contractor, Cory Rensmon of ARM, the Duseks' building inspector, Kelly Quinn, and the mold inspector, David Quinn. To the extent Duseks believed that the mold and moisture had not been satisfactorily remediated, their remedy was to seek damages, not to avoid their obligations under the BSA. *Halcro v. Moon*, 226 Mont. 121, 733 P.2d 1305 (1987).

Finally, Glacier Bear fully complied with its obligations under the BSA with respect to water rights to be conveyed to Duseks. Under the BSA, the only water rights that Glacier Bear contracted to convey were "any associated" with the property. Doc. 27, ¶ 10. The water rights "associated" with the property were "in place" prior to closing as documented by the Permit, and the General Abstract

provided to Duseks on October 12, 2021, and GBR stood ready, willing and able to transfer them to Duseks at closing. Doc. 27, ¶¶ 6, 8; Doc. 27-1, ¶ 13; SDF, ¶ 137. Because the water rights were "in place" and would have transferred at closing, Duseks cannot avoid their obligation to close on the BSA.

**1. Dusek's Personal Property Visit was a Right not a Contingency.**

"Construction and interpretation of a contract present questions of law for the court to decide." *Wicklund v. Sundheim*, 2016 MT 62, ¶ 16, 383 Mont. 1, 367 P.3d 403 (citation omitted). When interpreting a contract, the Court's role "is to ascertain and effectuate the parties' mutual intentions…. The clear and explicit language of the contract reflects the parties' intentions and controls a court's interpretation." *A.M. Welles, Inc. v. Mont. Materials, Inc.*, 2015 MT 38, ¶ 8, 378 Mont. 173, 342 P.3d 987 (citations omitted). Further, "[t]he role of a judge in construing a contract is 'simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.'" *A.M. Welles, Inc.*, 2015 MT at ¶ 13 (*citing* Mont. Code Ann. § 1-4-101; *Cortese v. Cortese*, 2008 MT, ¶ 10, 341 Mont. 287, 176 P.3d 1064).

By referring to their "right to visit the property" as a "Personal Visitation Contingency," Duseks ask the Court to ignore these fundamental rules of contract interpretation by inserting terms into the BSA that do not exist. Nowhere in the BSA is any "contingency" associated with their "right to visit" the Property. It is

merely a "right to visit," not a "contingency."

While Duseks undisputedly had "the right to visit property during the inspection period," that right to visit does not amount to the right to withdraw approval based upon that visit, especially when their objection based upon that visit was lodged after the Inspection Contingency deadline of October 26, 2021, had expired.

**2. Even if the Personal Property Visit was a Contingency, it Expired upon Expiration of the Property Inspection Contingency Deadline of October 26, 2021, and Duseks' Objection of October 30, 2021 was Untimely.**

Even if the BSA could be construed to grant Duseks a right to lodge objections based upon their visit, such a right was "to visit (sic) property in person <u>during the inspection period.</u>" The Property Inspection Contingency specifically included a "Home/Property Inspection" among its list of "items for inspection and approval by Duseks." SDF, ¶ 39. The inspection period ended at 5:00 p.m. on October 26, 2021, by which point Duseks were obligated to notify Glacier Bear of any objections they had to the Property, including those based upon their "Home/Property Inspection. Doc. 27 at ¶ 10; SDF, ¶ 39.

Duseks' argument that this was a contingency without any deadline flies in the face of the plain language of the agreement and defies common sense. If the right to visit is read as a contingency, then it also follows that any right to object must also occur within "the inspection period" ending on October 26, 2021, at 5:00

p.m., Mountain Time.  Any other interpretation would lead to an absurd construction of the BSA.

Duseks do not dispute that they visited within the inspection period and that they did not raise any objection based upon their visit until October 30, 2021, which was four days after their last opportunity to do so.  Doc. 27, ¶¶ 23-25.

The timing of Duseks' visit to the property was entirely up to them, as was the timing of the Inspection Notice they delivered to Glacier Bear on October 16th. Duseks were originally scheduled to visit the Property on October 12th but chose to reschedule when the private jet they intended to charter to Montana was unavailable.  SDF, ¶ 134.  Any perceived problem in regard to their visit vis-à-vis the Inspection Notice was one entirely of Duseks' own making.  Duseks were, of course, free to postpone delivery of the Inspection Notice until after they had visited the property since they had until October 26, 2021, to deliver their Inspection Notice, and October 29, 2021, to withdraw from the BSA if they could not come to an agreement with Glacier Bear to resolve their objections.  Doc. 27, ¶ 10.  The decision to serve the Inspection Notice prior to their visit was Duseks' sole decision; they cannot rely on their own miscalculation to deprive Glacier Bear of the benefit of its bargain.

Further, Mr. Darknewald's alleged statements to Duseks about their right to withdraw from the BSA "if the wind blew wrong against the property" are hearsay,

and even if considered, cannot modify the terms of the parties' written agreement. "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." Mont. Code Ann. § 28-2-904. The BSA did not grant Duseks the right to withdraw from the BSA based upon their visit, unless it was done in conjunction with the Inspection Contingency. As their right to exercise the option to withdraw under the Inspection Contingency expired at 5:00 p.m., on October 26, 2021, their purported termination of the BSA on October 30, 2021, was untimely and ineffective to terminate the BSA.

**3. The Property Contingency Deadline was not Extended by Execution of the Inspection Notice.**

Like their other arguments, Duseks would have this Court insert terms into the BSA that do not exist contrary to Montana rules of contract interpretation. *A.M. Welles, Inc.*, 2015 MT at ¶ 13. According to Duseks, the BSA provided two sets of contingency deadlines with respect to the inspection contingencies, the first being "[t]he BSA stated a deadline of October 26, 2021 for Duseks to object to a property condition" (Doc. 28 at 11) and a "Property Condition Inspection Contingency release date [of] November 5, 2021" (Doc. 28 at 1), although the BSA contains no such mention of a "Property Condition Inspection Contingency."

The BSA provides for a single inspection contingency deadline:

> Unless Buyer delivers written notice(s) of Buyer's disapproval of the Property conditions on or before (Notice Date) 10/26/2021 at 5:00 p.m. (Mountain Time), this inspection contingency shall be of no further force or effect. **If Buyer disapproves** of the Property condition, Buyer shall deliver written notice to the Seller or the Seller's Broker/Salesperson on or before the date specified above, together with a copy of ONLY that portion of the inspection or report upon which the disapproval is based. Buyer shall also state whether Buyer elects to immediately terminate the Agreement or negotiate a resolution of the conditions noted. **If Buyer elects to negotiate** a resolution of the conditions noted, the notice must contain all of Buyer's objections and requested remedies.
>
> If the parties enter into a written agreement in satisfaction of the conditions noted, this contingency shall be of no further force or effect. If the parties cannot come to written agreement in satisfaction of the conditions noted or if the Buyer does not withdraw, in writing, his/her disapproval of the condition noted, on or before (Resolution Date) 10/29/2021 at 5:00 p.m. (Mountain Time), the earnest money shall be returned to the Buyer, and the Agreement then terminated.

Doc. 27 at ¶ 10.

Pursuant to the foregoing paragraph, Duseks sent Glacier Bear an Inspection Notice signed by Duseks on October 16, 2021. Doc. 27, ¶ 11. That Inspection Notice specifically provided that Duseks "elect[] to negotiate the items of disapproval described above and offer[] the following resolution: Seller, at seller's expense, to remedy the following [list of nine conditions]." Doc. 27 at ¶ 11. Ms. Goodwin and Mr. Slattengren signed and returned the Inspection Notice on October 17, 2021. Doc. 27, ¶ 15. At this point, upon signing the Inspection Notice, in the language of the BSA, the parties had "enter[ed] into a written

agreement in satisfaction of the conditions noted" such that "this [inspection] contingency shall be of no further force or effect." Since the inspection contingency was of "no further force or effect" no extended "inspection deadline" could exist. That this was the "written agreement in satisfaction of the conditions noted" is confirmed by the Inspection Notice which provides, "If Seller and Buyer agree to the remedies specified above, this document shall constitute an amendment to the Buy-Sell Agreement referred to above and shall be an integral part of this transaction. Seller shall complete all agreed upon resolution(s) to the condition(s) and problem(s) identified above by 5:00 p.m. (Mountain Time) on 11/05/2021." Nothing in the Inspection Notice provides for any further conditions or contingencies.

Duseks offer no reasonable alternative interpretation of the Inspection Notice. Instead, they claim (without reference to any provision of the BSA) that execution of the Inspection Notice simply started another set of contingency deadlines running for them to terminate the agreement. But no provision in the BSA or the Inspection Notice specifically grants them that right. While Glacier Bear agreed under the Inspection Notice to complete the repairs by 5:00 p.m. on November 5th, Duseks did not have the right to terminate the BSA simply because they deemed the quality of the repairs unsatisfactory.

The repairs listed in the Inspection Notice weren't contingencies or conditions to closing, and no language in the BSA or the Inspection Notice supports Duseks' argument. Instead, the Inspection Notice placed contractual duties on Glacier Bear, and Glacier Bear performed. Even assuming *arguendo* that the repairs weren't entirely successful, which Glacier Bear denies, as explained in Glacier Bear's Brief in Support of Motion for Partial Summary Judgment, Duseks' remedy for any alleged breach of those duties was a claim for damages, not the right to withdraw from the BSA. Doc. 26 at 24-26, *citing Halcro v. Moon*, 226 Mont. 121, 733 P.2d 1305, 1307 (1987).

**4. Glacier Bear Successfully Remediated the Mold and Moisture.**

Duseks have failed to demonstrate the absence of a genuine issue of material fact to support their contention that Glacier Bear failed to remediate the mold and moisture in the closet under the staircase. The testimony of the certified mold contractor who completed the work, Cory Rensmon, and the building inspector hired by Duseks, Kelly Quinn, proves just the opposite – that the mold and moisture were successfully remediated.

ARM performed the mold mitigation and water damage repairs in accordance with its customary business practices and industry standards. SDF, ¶ 127. ARM took every step necessary in performing that work to make sure the mold was mitigated to the maximum degree possible. *Id*.

Mr. Rensmon (not the Duseks) hired David Quinn of D. Quinn Construction to inspect the mold mitigation and moisture repair work. SDF, ¶ 128. Mr. Quinn performed his inspection on October 25, 2021. After he performed the inspection, Mr. Quinn called Mr. Rensmon to report that there was still moisture in the main closet level in the Oriented Strand Board ("OSB"). *Id*.

After being notified by Mr. Quinn that there was moisture in the OSB, ARM worked continuously from October 26 to the morning of October 27, 2021. ARM located the source of the moisture, fixed the problem, tore out the OSB in which Mr. Quinn had found moisture and replaced it with new OSB and new studs. This work completely removed and replaced all of the wood material in which Mr. Quinn had found elevated moisture readings. SDF, ¶ 129. David Quinn did not return to the Property, and thus, his report did not address the condition of the Property after ARM's work was completed. SDF, ¶ 130.

Duseks' home inspector who originally discovered the mold and moisture, Kelly Quinn, did return on October 27, 2021. Mr. Quinn found that both the moisture and mold had been successfully remediated. Exhibit 5 to SDF, ¶¶ 6, 7. Ironically, even though Mr. Quinn had been hired by Duseks to inspect the Property and conduct the re-inspection, they never contacted him with any questions about his findings upon his re-inspection, likely because those findings were unfavorable to their position. Exhibit 5 to SDF, ¶ 8.

These facts of record nullify any contention by Duseks that the mold and moisture were not satisfactorily remediated.

**5. Glacier Bear Satisfied the Water Rights Condition to Closing.**

Like their other arguments, Duseks' contentions concerning the water rights appurtenant to the Property are premised upon terms that do not exist in the BSA, including that the water rights be "permanent," rather than provisional, and that they were to be "provided" with the well-log and other water rights information, *even though they never requested it and it was readily available through Mr. Darkenwald and online*. SDF, ¶¶ 135, 136, 140. The BSA is clear and explicit as Glacier Bear's obligations and Duseks' rights in this regard:

> This Agreement is contingent upon All (sic) well related permitting, well log recording, and any associated water rights to be in place prior to closing. Reasonable extension for contingency and closing to be granted upon reasonable written request.

Doc. 27 at ¶ 10.

Duseks never requested any additional water rights information prior to sending their termination letters on October 30, 2021. SDF, ¶ 136. Moreover, they were provided with a water rights abstract by Mr. Darkenwald, on October 12, 2021. Doc. 27 at ¶ 8; Doc. 29 at ¶¶ 97-98; SDF, ¶ 164. As will be seen by a comparison between the two documents, the information provided in the General Abstract is substantially the same as that contained in the Permit. Further, the well-log was also "in place," and a copy of that document was in Mr.

Darkenwald's file and publicly available on DNRC's website. See Doc. 27 at ¶ 8; Doc. 29 at ¶ 104; SDF, ¶ 140. As Duseks' agent, Mr. Darkenwald's knowledge of the well log was imputed to them, even if Mr. Darkenwald had not communicated that information to Duseks (he testified that he did). *Payne v. Hall*, 2020 MT 46, ¶ 15, 399 Mont. 91, 458 P.3d 1001 (citing Mont. Code Ann. § 28-10-604).

Further, the BSA provided that a "[r]easonable extension for contingency and closing to be granted upon reasonable written request" to Glacier Bear to provide the necessary water rights information. Doc. 27, ¶ 10. Of course, Glacier Bear had no reason to seek an extension for this contingency because Duseks never notified Glacier Bear of their purported concerns about the water rights. SDF, ¶ 136. Instead of notifying Glacier Bear that they believed they did not have all the necessary information and giving Glacier Bear the "reasonable extension" called for in the BSA, Duseks simply terminated the agreement, and by doing so, breached the BSA.

Duseks complain that the water rights Glacier Bear intended to transfer to them were, at the time, provisional, rather than "permanent." However, the BSA did not require Glacier Bear to transfer "permanent water rights"[1] to Duseks; it only required "*any* associated water rights to be in place prior to closing." Doc. 27

[1] Duseks' reference to "permanent water rights" appears to be a novel concept in Montana law as they cite no authority for the term in their brief.

at ¶ 10 (emphasis added). Webster's defines "any" as "one, some or all indiscriminately of whatever quantity[.]" Webster's Collegiate Dictionary, Tenth Ed. Thus, "any associated water rights" includes within its scope "provisional," rights, as long as they were in place prior to closing.

The "provisional" nature of those rights is explained, in part, by the fact that properties within Glacier National Park, including the Property, are within the scope of the water compact between Montana and the United States National Park Service (Mont. Code Ann. § 85-20-401), and so are not otherwise exempt from permitting requirements pursuant to Mont. Code Ann. § 85-2-306(3)(a)(iii) which generally exempts water appropriations of less than 35 gallons per minute. (The Permit grants the Property an appropriation of 4 gallons per minute. *See* the Permit, which is included in Exhibit A to Exhibit 1 to the SDF). Further, "To allow for orderly permitting in the absence of a complete adjudication in the source of supply, permits issued under this chapter [Chapter 2 of Title 85, Part 3 – Appropriations, Permits and Certificates of Water Rights] are provisional." *Confederated Salish & Kootenai Tribes v. Clinch*, 2007 MT 63, ¶ 34, 336 Mont. 302, 158 P.3d 377 (*quoting* 1997 Laws of Mont., ch. 497, 2790-91). As there has been no complete adjudication in the affected basin where the Property is located, all permits issued in this area are, by definition, "provisional." Mont. Code Ann. § 85-2-313. Thus, no greater level of water rights could have been

transferred to Duseks.

Duseks have not met their burden of demonstrating that the water rights and well log for the Property were not "in place" prior to closing. Indeed, the Abstract and the Permit issued on October 12, 2021, demonstrate just the opposite – that they were "in place" more than 20 days prior to the closing scheduled for no later than November 9, 2021.

Duseks' complaints about the "unpermitted well" are likewise unavailing. They have cited no provision in Montana law requiring that a water well be permitted, and Glacier Bear is unaware of any such requirement. Further, the Permit and General Abstract describe the "Diversion Means" as "WELL." *See* the Permit, attached as part of Exhibit A to Exhibit 1 to SDF; General Abstract, Doc. 27-6 at 5. With that knowledge, DNRC issued the Permit authorizing Glacier Bear and subsequent owners of the Property to appropriate water at a rate of 4 gallons per minute for use on the Property.

Where the language of a contract is clear and unambiguous, "the court must apply the language as written." *Watters v. City of Billings*, 2017 MT 211, ¶ 16, 388 Mont. 376, 404 P.3d 379 (citations omitted). Here, the clear and unambiguous terms of the BSA did not grant Duseks a right to a "permanent" water right as a condition to closing. Further, "water rights accompany the land 'if the property is transferred without an express reservation of the appurtenant water rights.'"

*Roland v. Davis*, 2013 MT 148, ¶ 23, 370 Mont. 327, 302 P.3d 91 (*citing Adams v. Chilcott*, 182 Mont. 511, 518, 597 P.2d 1140, 1145 (1979). There was no "express reservation of appurtenant water rights" in the BSA, and Glacier Bear, through Ms. Goodwin, stood ready, willing and able to transfer those rights at closing. SDF, ¶ 137. Thus, those water rights would have transferred to Duseks along with title to the Property at closing. Because it is undisputed that the water rights were in place before closing and thereafter would have been conveyed to Duseks along with title to the Property, Duseks have failed to meet their burden and their motion on this issue must be denied.

**6. The Notice of Release of Contingencies was not Required under the BSA.**

Duseks' decision not to sign the notice of release of contingencies is irrelevant. Nowhere in the BSA is such a signed waiver required, and Duseks have not pointed the Court to any provision supporting their argument. Moreover, Glacier Bear understood that the release was irrelevant as the BSA governed the parties' rights and duties with respect to the waiver of contingencies. SDF, ¶ 122; Exhibit 1 to SDF, Decl. G. Goodwin, ¶ 9.

The BSA controls resolution of this issue. The burden was on Duseks as the party relying on the contingencies to put their objections to any contingencies in writing before the applicable time period expired:

> **CONTINGENCIES:** The contingencies set forth in this Agreement or on attached addenda shall be deemed to have been released, waived, or satisfied, and the Agreement shall continue to closing, unless, by 5:00 p.m. (Mountain Time) on the date specified for each contingency, the party requesting that contingency has notified the other party or the other party's Broker/Salesperson in writing that the contingency is not released, waived, or satisfied. If a party has notified the other party on or before the release date that a contingency is not released, waived, or satisfied, this Agreement is terminated, and the earnest money will be returned to the Buyer, unless the parties negotiate other terms or provisions.

Doc. 27, ¶ 9. Duseks' contention that they had to sign a waiver is, therefore, contrary to the plain language the BSA.

Duseks have failed to demonstrate the absence of a genuine issue of material fact or their entitlement to judgment as a matter of law on this issue, and their motion should be denied.

## CONCLUSION

Based upon the factual record, and the arguments set forth in their briefing, Plaintiffs respectfully request this Court to deny Defendants Matt and Rachel Duseks' Motion for Summary Judgment.

Dated this 23rd day of September, 2022

Hall & Evans, LLC

By /s/Fred Simpson
Fred Simpson

## CERTIFICATE OF COMPLIANCE

I hereby certify that Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment is in compliance with Local Rule 7.1(d)(2). The text is proportionately spaced Times New Roman text typeface of 14 points; is double-spaced; and word count calculated by Word 365 is 6,424 words, excluding the caption, Table of Contents, Table of Authorities, and Certificate of Compliance.

DATED this 23rd day of September, 2022.

Hall & Evans, LLC

By ___/s/Fred Simpson________
Fred Simpson