Fred Simpson, Esq.
Hall & Evans, LLC
Millennium Building, Ste. 403
125 Bank St.
Missoula, MT 59802
Telephone: (406) 532-2635
Facsimile: (406) 519-2035
Email: simpsonf@hallevans.com

*Attorneys for Plaintiffs and Counterclaim Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,<br><br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>MATT DUSEK and RACHEL DUSEK,<br><br>Defendants/Counterclaimants. | ) | Case No. CV 22-19-M-KLD<br><br>**PLAINTIFFS' STATEMENT OF DISPUTED FACTS (L.R. 56.1)** |

Plaintiffs Gail L. Goodwin ("Ms. Goodwin"), Darryl C. Slattengren ("Mr. Slattengren") and Glacier Bear Retreat, LLC, ("GBR") (collectively, Ms. Goodwin, Mr. Slattengren and GBR will be referred to as "Glacier Bear") file this Statement of Disputed Facts ("SUF") pursuant to L.R. 56.1(b) in opposition to

Defendants Matt Dusek's and Rachel Dusek's ("Dusesks") Motion for Summary Judgment (Doc. 33).

1. Plaintiff Glacier Bear Retreat, LLC ("GBR") is a limited liability company organized and existing under Montana law, and has its principal place of business in Flathead County, Montana. GBR is therefore deemed a citizen of the state of Montana. Statement of Stipulated Facts ("SSF"), doc. 15, p. 2.

*Undisputed*.

2. Plaintiffs Gail L. Goodwin and Darryl C. Slattengren (the "Individual Plaintiffs") are citizens of the U.S. Virgin Islands. SSF, doc. 15, p. 2.

*Undisputed*.

3. The Individual Plaintiffs are the sole members of GBR. Plaintiff's Statement of Undisputed Facts, doc. 27, ¶2.

*Undisputed*.

4. GBR owns real property located in Flathead County, Montana, within the exterior boundaries of Glacier National Park (the "Subject Property"). Plaintiff's Statement of Undisputed Facts, doc. 27, ¶1.

*Undisputed*.

5. On September 1, 2021, the Individual Plaintiffs listed the Subject Property for sale by signing a listing agreement with Glacier Sotheby's

International Realty Company. Plaintiff's Statement of Undisputed Facts, doc. 27, ¶3.

*Undisputed, although as explained in Planitiffs' Statement of Undisputed Facts, ¶ 3, GBR was the record owner of the property, and due to confusion arising from Flathead County's records, the Property was listed with Ms. Goodwin and Mr. Slattengren as the owners, rather than GBR.*

6. Scott Darkenwald and Traci Rossi are real estate brokers employed by Glacier Sotheby's. Buy-Sell Agreement ("BSA"), SSF, Ex. A, doc. 15-1, ll. 460-489; Plaintiff's Statement of Undisputed Facts, doc. 27, ¶3.

*Undisputed*.

7. The listing agreement is signed by the Individual Plaintiffs as sellers of the Subject Property and by Scott Darkenwald and Traci Rossi as the listing salespersons. Plaintiff's Statement of Undisputed Facts, doc. 27, ¶3.

*Undisputed*.

8. Defendants Matt Dusek and Rachel Dusek are married citizens of the state of California. Statement of Stipulated Facts, doc. 15, p. 2.

*Undisputed*.

9. On October 5, 2021, the Individual Plaintiffs and the Duseks signed a real estate purchase agreement for the Subject Property (the "BSA"). SSF, doc. 15, p. 3; doc. 15-1.

*Undisputed*.

10. GBR is not a party to the BSA. Statement of Stipulated Facts, doc. 15, p. 3; doc. 15-1.

*Undisputed, although Ms. Goodwin and Mr. Slattengren, as the sole members of GBR had the authority to bind GBR to the BSA, and intended to close the BSA on behalf of GBR. Plaintiffs' SUF (Doc. 27) at ¶ 6.*

11. Duseks deposited a portion of the purchase price into escrow, and the balance was due in cash at the closing. Plaintiffs' Statement of Undisputed Facts, doc. 27, ¶ 5.

*Undisputed*.

***12. Paragraph nos. 12-28 are intentionally left blank. The parties filed cross-motions for summary judgment. In an effort to keep the numbering simple, the following paragraphs 29-122 correspond substantively with the "Additional Facts" in paragraphs 29-122 of Defendants' Statement of Disputed Facts, doc. 29, respectively.***

29. Glacier Sotheby's, Scott Darkenwald, and Traci Rossi acted as dual agents in connection with the BSA, representing both the sellers and the buyers. BSA, ll.460-489, SSF, doc. 15, p. 3; doc. 15-1.

*Undisputed*.

30. When the BSA was executed, the Duseks had not yet personally visited the Subject Property. Ex. A, M. Dusek Decl. ¶¶5-6.

*Undisputed*.

31. When the Inspection Notice was executed, the Duseks had not yet personally visited the Subject Property. Ex. A, M. Dusek Decl., ¶¶5-6.

*Undisputed*.

32. The BSA had a closing date of November 9, 2021. BSA, l.44, SSF, doc. 15, p.3; doc. 15-1.

*Disputed. The BSA provides, in relevant part, "**CLOSING DATE:** The date of closing shall be (date) on or before 11/09/2021 (the "Closing Date"). The parties may, by mutual agreement, close the transaction anticipated by this agreement at any time prior to the date specified." Doc. 15-1 at ll. 44-46*.

33. The BSA includes certain contingencies to closing the contemplated transaction. BSA, ll.132-184, 237-240, 244-245, SSF, doc. 15, p. 3; doc. 15-1.

*Undisputed*.

34. Contingencies are covered generally at page 3, lines 132-37 of the BSA, which provides:

> **CONTINGENCIES**: The contingencies set forth in this Agreement or on attached addenda shall be deemed to have been released, waived, or satisfied, and the Agreement shall continue to closing, unless, by 5:00 p.m. (Mountain Time) on the date specified for each contingency, the party requesting that contingency has notified the

> other party or the other party's Broker/Salesperson in writing that the contingency is not released, waived, or satisfied. If a party has notified the other party on or before the release date that a contingency is not released, waived, or satisfied, this Agreement is terminated, and the earnest money will be returned to the Buyer, unless the parties negotiate other terms or provisions.

BSA, ll.132-137, SSF, doc. 15, p. 3; doc. 15-1.

*Undisputed, although the BSA contains a number of other contingencies. See, Doc. 15-1, at 3-5.*

35. In addition to the general contingency language, the BSA also includes certain specific contingencies, whose deadlines may be the general deadline set forth above or may be separately set forth. BSA, ll.132-184, 237-240, 244-245, SSF, doc. 15, p. 3; doc. 15-1.

*Undisputed*.

36. For a contingency to apply, either the box to a particular contingency needed to be checked or the contingency needed to be separately identified in the BSA. *E.g.*, BSA, ll.140, 237-240, 244-245, SSF, doc. 15, p. 3; doc. 15-1.

*Disputed to the extent that Duseks claim that "Buyer reserves the right to visit property in person during the inspection period" at ll. 244-245 of the BSA is a "contingency" as such language only created a right, not a contingency. Otherwise, undisputed*.

37. Three separate contingencies are at issue in this litigation – (1) the general "Property Condition Inspection Contingency," (2) the "Personal Visitation Contingency," and (3) the "Well Permitting and Water Rights Contingency." The latter two contingencies were specifically and separately identified and added to the standard form BSA. BSA, ll.132-184, 237-240, 244-245, SSF, doc. 15, p. 3; doc. 15-1.

*Disputed to the extent that Duseks claim that "Buyer reserves the right to visit property in person during the inspection period" at ll. 244-245 of the BSA is a "contingency" as such language only created a right, not a contingency.*

38. The first of the specifically selected contingencies is the Property Condition Inspection Contingency, found at pages 3-4, lines 139-84 of the BSA, which reads:

**INSPECTION CONTINGENCY**:

> This Agreement is contingent upon Buyer's acceptance of any Property conditions that Buyer deems appropriate, including but not limited to any inspections or advice listed below. Buyer agrees to acquire, at Buyer's own expense, independent inspections or advice from qualified inspectors or advisors of the Buyer's choice. Buyer agrees that any investigations or inspections undertaken by Buyer or on his/her behalf shall not damage or destroy the Property, without the prior written consent of Seller. Seller agrees to provide Buyer and Buyer's agents, inspectors and advisors reasonable access to the Property to conduct any inspections desired by Buyer. Buyer agrees to indemnify, defend and hold harmless Seller from any and all claims or damage, including attorney's fees, caused by or incurred during any inspections of the Property by or on behalf of the Buyer and that arise out of or are related to (i) any loss or damage to the Property or the contents of the Property caused by any inspection or (ii) any injury to Buyer or Buyer's inspectors or advisors.

BSA, ll. 139-184, SSF, doc. 15, p. 3; doc. 15-1.

*Undisputed*.

39. The Property Condition Inspection Contingency identifies a non-exhaustive ("including but not limited to") list of example items for inspection and approval by Duseks, including:

| | |
|---|---|
| Home/Property Inspection | Review and Approval of Protective Covenants |
| Owner's Property Disclosure Statement | Easements |
| Roof Inspection | Flood Plain Determination |
| Structural/Foundation Inspection | Water Sample Test |
| Electrical Inspection | Septic or Cesspool Inspection |
| Plumbing Inspection | Mineral Rights Search |
| Heating, ventilation, cooling system - Inspection | Radon |

| | |
|---|---|
| Stove/Fireplace Inspection | Asbestos |
| Pest/Rodent Inspection | Wild Fire Risk |
| Well Inspection for Condition of Well and Quantity of Water | Legal Advice |
| Accounting Advice | Toxic Waste/Hazardous Material |
| Survey or Corner Pins located | Underground Storage Tanks |
| Access to Property | Sanitary Approval/Septic permit |
| Verification of # of code compliant bedrooms | Mold |
| Verification of square footage of improvements | Verification of lot size |
| Water Rights | Airport Affected Area |
| Zoning Determination | Road Maintenance |
| Post-Closing Rental Obligations | Internet Availability/Speed |
| Inspection/Testing for Methamphetamine | |

BSA, ll.139-169; SSF, doc. 15, p.3; doc. 15-1.

*Undisputed*.

40. The Property Condition Inspection Contingency applies a specific deadline for release and a specific procedure for attempts to satisfy the contingency. BSA, ll.171-184; SSF, doc. 15, p.3; doc. 15-1.

*Disputed as to Duseks' contention that the Property Condition Inspection Contingency "applies a . . . specific procedure for attempts to satisfy the contingency." The Property Condition Inspection Contingency provides a procedure by which Duseks could either revoke their obligations to proceed under the BSA by serving written notice on or before October 26, 2021 to any*

*objectionable property conditions, or they could agree with Glacier Bear, as they did, that they would waive their objections to any property conditions by coming to "a written agreement in satisfaction of the conditions noted" such that "this contingency shall be of no further force or effect."  Doc. 15-1 at 5, ll. 171-181.*

41. Under the Property Condition Inspection Contingency, Duseks had until October 26, 2021 to give written notice of their objection to the Subject Property's condition regarding any of the above-referenced items. The BSA provides:

> Unless Buyer delivers written notice(s) of Buyer's disapproval of the Property conditions on or before (Notice Date) 10/26/2021 at 5:00 p.m. (Mountain Time), this inspection contingency shall be of no further force or effect. **If Buyer disapproves** of the Property condition, Buyer shall deliver written notice to the Seller or the Seller's Broker/Salesperson on or before the date specified above, together with a copy of ONLY that portion of the inspection or report upon which the disapproval is based. Buyer shall also state whether Buyer elects to immediately terminate the Agreement or negotiate a resolution of the conditions noted. **If Buyer elects to negotiate** a resolution of the conditions noted, the notice must contain all of Buyer's objections and requested remedies.

BSA, ll.171-178; SSF, doc. 15, p.3; doc. 15-1. It further provides that the BSA terminates automatically if either the parties do not come to a written agreement in satisfaction of the objectionable conditions or the buyers do not withdraw their objections to the property conditions.

> If the parties enter into a written agreement in satisfaction of the conditions noted, this contingency shall be of no further force or

> effect. If the parties cannot come to written agreement in satisfaction of the conditions noted or if the Buyer does not withdraw, in writing, his/her disapproval of the condition noted, on or before (Resolution Date) 10/29/2021 at 5:00 p.m. (Mountain Time), the earnest money shall be returned to the Buyer, and the Agreement then terminated.

*Undisputed as to the language of the BSA quoted above*.

42. D. Quinn Construction, Inc. of Kalispell, Montana was retained by the Duseks to perform a property condition inspection, along with testing for radon and of drinking water quality. Ex. A, M. Dusek Dec., ¶7.

*Undisputed*.

43. On October 13, 2021, D. Quinn Construction, Inc. provided a report prepared for execution by Kelly Quinn, identifying certain property condition problems with the Subject Property (the "First Inspection Report"). Ex. A, M. Dusek Dec., ¶7, Ex. 33.

*Undisputed*.

44. The First Inspection Report noted various problems concerning the Property, including "Evidence of moisture" and "Mold build-up." Regarding moisture infiltration, the First Inspection Report cautioned:

> Note evidence of moisture and water stains located main level closet under the stair area appears to have been caused by prior and/or ongoing leakage at the northeast siding flashing area. Consulting a qualified trade's contractor is advised at this time for further evaluation and repairs if needed.

Ex. A, M. Dusek Dec., ¶7, Ex. 33 at 12. Regarding mold buildup, the report included a photo of the visible mold, and it recommended remediation along with a more thorough mold testing to detect mold that might not be open and obvious

> Note water stains and possible surface fungal growth was found at main level closet under the stairs, possibly caused by inadequate siding flashing although unable to confirm without further testing. This surface fungal growth (black) could produce fruiting bodies and, when mature, produce millions of tiny spores (seeds) which are present in the air. For a more detailed fungal growth inspection, suggest consulting a licensed Certified (AmIAQ) Mold Inspector (D. Quinn Const., Inc.). Also note this visual inspection does not include surface fungal growth, which are not visible at time of inspection. Recommend contacting a qualified mold remediation contractor at this time for further evaluation.

Ex. A, M. Dusek Dec., ¶7, Ex. 33 at 13. Both of these items included the notation, "Attention," meaning that the "Item condition requires immediate attention. See 'Comments' for further explanation." Ex. A, M. Dusek Dec., ¶7, Ex. 33 at 12, 13.

*Undisputed that the First Inspection Report contains the quoted language, but disputed that the language occurs on pages 12-13 of that Report. The quoted portions appear at pages 17, 18 and 49 of said Report. Doc. 34-1 at 17, 18 and 49.*

45. On October 15, 2021, Duseks gave Plaintiffs written notice of their disapproval of the property condition and of their intent to negotiate these terms in a document entitled "Inspection Notice." Inspection Notice, SSF, doc. 15, p. 3, doc. 15-2.

*Undisputed*.

46. Specifically, in the Inspection Notice, the Duseks objected to drainage, siding condition, flashing, evidence of moisture, mold build-up, stairs, valley flashing, insulation, and evidence of a leaking waste pipe. Inspection Notice, ll.9-24, SSF, doc. 15, p. 3, doc. 15-2.

*Undisputed*.

47. The Duseks' objections to the property conditions were timely made in the Inspection Notice before the Property Condition Inspections Contingency deadline of October 26, 2021. BSA, l.172, SSF, doc. 15, p. 3, doc. 15-1.

*Undisputed*.

48. Specifically regarding the moisture retention, the Duseks requested in the Inspection Notice: "Evidence of moisture – remedy to suggestion in inspection report, Cory Rensmon at Advanced Restoration to complete work." Inspection Notice, ll.63-64, SSF, doc. 15, p. 3, doc. 15-2.

*Undisputed*.

49. Specifically regarding the mold, the Duseks requested in the Inspection Notice: "Mold Build-up – All mold to be remediated and pass a clearance test. Cory Rensmon at Advanced Restoration to complete work." Inspection Notice, ll.66-67, SSF, doc. 15, p. 3, doc. 15-2.

*Undisputed*.

50. On October 17, 2021, Plaintiffs accepted Duseks' proposed remedies of the property conditions and agreed to remediate the property conditions by the extended contingency release date of November 5, 2021. Inspection Notice, l.82, SSF, doc. 15, p. 3, doc. 15-2.

*Disputed to the extent Defendants claim the BSA included an "extended contingency release date of November 5, 2021." The BSA provided, in relevant part, "If Seller and Buyer agree to the remedies specified above, this document shall constitute an amendment to the Buy-Sell Agreement referred to above and shall be an integral part of this transaction. Seller shall complete all agreed upon resolution(s) to the condition(s) and problem(s) identified above by 5:00 p.m. (Mountain Time) on 11/05/2021 (Date)." Doc. 15-2 at ll. 79-82. Undisputed as the balance of this paragraph*.

51. The mold and moisture problems were never disclosed by either Plaintiffs or Scott Darkenwald prior to the Duseks receiving the First Inspection Report. Ex. D, Goodwin Dep. 184:23-188:13; 192:1-194:17; Ex. 30.

*Undisputed, although Plaintiffs were unaware of the mold and moisture prior to receipt of the Inspection Notice*. *Exhibit 1, Declaration of Gail Goodwin,* ¶ *8.*

52. On October 17, 2021, the Plaintiffs provided an "Owners Property Disclosure" form only after the First Inspection Report was issued. Ex. D,

Goodwin Dep. 184:23-188:13; 192:1-194:17; Ex. 30. On that form, the Plaintiffs simply reference the First Inspection Report and did not respond to the question of whether there was mold. *Id.*

> Q You believe your statement on Page 1 covers the mold issue?
>
> A It specifically said except for the things that are disclosed on the notice. And the notice, the first thing is mold.
>
> Q So why didn't you check the box that said it has been tested for mold, and there's mold there?
>
> A I can’t answer that. I don't know. I just knew that it had already been covered.

Ex. D, Goodwin Dep. 188:5-13. Plaintiff Gail Goodwin prepared Scott Darkenwald’s Agent’s Property Disclosure for him, which likewise disclosed nothing other than what was already reported in D. Quinn Construction’s First Inspection Report. Ex. D, Goodwin Dep. 184:23-188:13; 192:1-194:17; Ex. 30.

> Q There's a line for "Seller Agent Signature" and Scott Darkenwald's name is typed there. Do you see that?
>
> A I do.
>
> Q Do you know why Scott didn't sign this document?
>
> A You would have to ask him. And he might have. I just don't -- I don't have a copy where he did.
>
> Q Do you know why you would complete in your handwriting a document for Scott's signature?
>
> A He told me that it had to be filled out in the seller's handwriting. That's why it couldn't be done on DocuSign.

> Q Even the page that was to bear his signature, 316?
>
> A Again, this all came together as one document. I did not differentiate. I didn't even notice that portion. I just looked, Okay, this is him; this is us back here. So I don't know why. You'd have to ask him.

Ex. D, Goodwin Dep. 194:1-17. In fact, Goodwin had not even read the complete First Inspection Report when she referenced it in her Owner's Property Disclosure. ("… When this lawsuit was filed, I had none of them in my possession. Scott explained to me that the inspection report was the property of the buyer and, therefore, not mine. He sent me only screenshots of snippets that applied to the work that I had to do. And that's the only thing that I saw.") Goodwin Dep. 82:11-23.)

*Undisputed, although as Ms. Goodwin's testimony shows, Mr. Darkenwald sent her a packet of forms for the Property Disclosure, and she understood that she was supposed to complete all the forms, and she did not realize that she was completing forms that Mr. Darkenwald was supposed to complete.*

53. Upon acceptance of the Inspection Notice, the Property Condition Inspection Contingency deadline was amended to November 5, 2021. The Inspection Notice provides:

> If Seller and Buyer agree to the remedies specified above, this document shall constitute an amendment to the Buy-Sell Agreement referred to above and shall be an integral part of this transaction. Seller shall complete all agreed resolution(s) to the condition(s), and

> problem(s) identified above by 5:00 p.m. (Mountain Time) on 11/05/2021 (date).

BSA, ll.79-82, Statement of Stipulated Facts, doc. 15, p. 3, doc. 15-1.

*Disputed as to Defendants' contention that the parties' execution of the Inspection Notice amended the Property Condition Inspection Contingency deadline to November 5, 2021. Neither the BSA as quoted above at paragraph 41 nor the language of the Inspection Notice provide for any amendment to the Property Condition Inspection Contingency deadline of October 26, 2021 at 5:00 p.m. (Mountain Time). Undisputed that the portion of the Inspection Notice quoted above is correctly quoted.*

54. After October 17, 2021, Plaintiffs hired contractors to attempt to address the deficiencies identified in the Inspection Notice. Plaintiff's Statement of Undisputed Facts, doc. 27, ¶17.

*Undisputed that Plaintiffs hired contractors to address the problems and conditions identified in the Inspection Notice. Disputed that Plaintiffs hired contractors "to attempt to address the deficiencies" as the repairs were successfully completed, not only "attempted" to be completed. Plaintiffs' SUF (Doc. 27) ¶¶ 19-20; Doc. 27-6 at 35; Doc 34-1 at 102 (confirming successful repairs of evidence of moisture) and Doc. 27-6 at 14; Doc. 34-1 at 103 (confirming*

*successful mold remediation); Exhibit 2, Declaration of Cory Rensmon, ¶¶ 5, 9, 11.*

55. Plaintiffs hired contractors to perform simple construction remedies that are not at issue here, such as installation of the handrailing, extensions of the gutters, electrical wiring problems, etc. Ex. D, Goodwin Dep. 181:10-182:8.

*Undisputed.*

56. Pursuant to the Inspection Notice, Plaintiffs hired Cory Rensmon of Advanced Restoration to address the mold and moisture problems, as well as to address problems related to the siding and flashing that were thought to cause the moisture infiltration. Ex. D, Goodwin Dep. 86:14-21, 180:11-14. The Duseks have never had any sort of contract or communications with Cory Rensmon. Ex. A, M. Dusek Decl., ¶ 8.

*Undisputed.*

57. The Buy/Sell Agreement also includes a Personal Visitation Contingency. It provides: "Buyer reserves the right to visit the property during the inspection period." BSA, ll.244-245 SSF, doc. 15, p. 3, doc. 15-1.

*Disputed that the BSA includes a "Personal Visitation Contingency." Under the quoted portion of the BSA, Duseks "reserve[d] the right to visit the property in person during the inspection period." Doc. 15-1 at ll. 244-245.*

58. This contingency was necessary because Duseks had not visited the Subject Property before signing the BSA. Ex. A, M. Dusek Decl. ¶¶5-6; Ex. B, R. Dusek Decl. ¶¶5-6.

*Disputed that the Duseks' right to visit the Property in person during the inspection period was a contingency for the reasons described above in response to paragraphs 37 and 57. The "right" granted to Duseks was not framed in terms of a "contingency."*

59. The BSA does not specify a date for the release of the Personal Visitation Contingency. BSA, ll.244-245 SSF, doc. 15, p. 3, doc. 15-1.

*Disputed. As described above in response to paragraphs 37, 57 and 58, Duseks' right to visit the Property was not a "contingency." Even if the Duseks' right to visit the Property is read as a contingency, then it also follows that any right to object must also occur within "the inspection period" which expired on October 26, 2021 at 5:00 p.m., Mountain Time. Doc. 27 at ¶ 10.*

60. Scott Darkenwald explained that the Personal Visitation Contingency broadly allowed the Duseks to terminate the BSA if they did not like anything about the Property when they visited.

> Q … What's the purpose of their visit to the property?
>
> A. To just see what they were spending $[**redacted**] on.

Q. At the time they visited the property on 10/19, could they have backed out of the deal?

A. Yes.

Q. Under what clause, to your understanding?

A. It was -- There was a contingency, I believe, in the buy-sell. Somebody's got to find that buy-sell.

Ex. E, Darkenwald Dep. 219:8-18

Q. Okay. So I'm clear in my head, on 10/19 when my clients visited the property, at that point they could have backed out of this deal --

A. Yes.

Q. -- as far as you're concerned?

A. Yeah.

Q. For any reason at all.

A. Yes.

Ex. E, Darkenwald Dep. 221:23-222:5.

*Undisputed as to Mr. Darkenwald's deposition testimony being quoted correctly but disputed as to the effect of his testimony which cannot modify the clear and unambiguous terms of the BSA. Further, pursuant to the parol evidence rule, extrinsic evidence is inadmissible to vary the terms of a written agreement. Mont. Code Ann. § 28-2-905(1). As described above in response to paragraphs 37, 57 and 58, Duseks' right to visit the Property was not a "contingency."*

61. When the Personal Visitation Contingency was added to the standard form realtor buy-sell agreement without any release date, Scott Darkenwald explained to the Duseks that it broadly allowed them to terminate the BSA for any reason at all, if they disliked the Property. In Scott's words, "If the wind blows wrong across the property, you're out." Ex. B, R. Dusek Decl., ¶5; Ex. C, M. Dusek Dep. 47:22-48:12.

*Disputed. As described above in response to paragraphs 37, 57 and 58, Duseks' right to visit the Property was not a "contingency." Even if the Duseks' right to visit the Property is read as a contingency, then it also follows that any right to object must also occur within "the inspection period" which expired on October 26, 2021 at 5:00 p.m., Mountain Time. Doc. 27 at ¶ 10. Further, Mr. Darkenwald denied making the statement ascribed to him as to the wind blowing wrong across the property. Exhibit 3, Deposition of Scott Darkenwald, 236:18-22.*

62. The Plaintiffs understood that the Personal Visitation allowed the Duseks to terminate the transaction if they did not like the Property when they visited it.

> Q Okay. Any other contingencies that you think applied to this transaction?
>
> A Other than the buyer visiting the property.

Ex. D, Goodwin Dep. 117:14-16

> Q (BY MR. COLEMAN) Do you have an understanding in your own mind of when the visitation contingency expired?
>
> A At the very latest the 26th, because that's what the contract states, that all contingencies expired on the 26th.

Ex. D, Goodwin Dep. 118:12-17.

> Q How, if at all, do you believe Exhibit 21 [the Inspection Notice] affects the so-called visitation contingency, the right of my clients to visit the property? Or does it?
>
> A Your clients visiting the property was not an inspection; however, they came to inspect the property. Again, these -- it's asking me -- you're asking me for a legal conclusion that I cannot give you.
>
> But my understanding is if they come to the property and say, We hate this; we're out of here, that's one thing. But they came and said, We love it; we're leaving even more excited than when we got here. And I'm told by the broker that Rachel had tears, and it was an amazingly, emotional experience; so that's great.
>
> So we had no reason to believe, nor did we get anything in writing saying, Being there we have objections, and here's what they are; prior to the 26th, we didn't get anything. So how would I have known that they were not happy? I had no way of knowing that. The only thing I can go by is the contract, which states that they have to let me know in writing by a certain date, and they didn't.
>
> Q And that certain date, if they were unhappy with what they saw when they looked at the property, you think they had an obligation to tell you in writing what that was by a certain date?
>
> A As per Exhibit 20 --
>
> MR. SIMPSON: Objection. Calls for a legal conclusion. Document speaks for itself.
>
> Go ahead.

A As per Exhibit 20, Line 171, "Buyer has to deliver written notice of buyer's disapproval of the property conditions on or before 10-26 at 5:00 p.m."

That's not my opinion; that's what we agreed to.

Q (BY MR. COLEMAN) I guess that goes back to my previous question, is it your understanding that my client's right to visit the property is somehow a part of the inspection contingency?

A I never thought about that. What I can tell you is that regardless if it is or isn't, "Buyer delivers written notification of buyer's disapproval of the property conditions on or before the 26th." That didn't happen.

Q So to try to summarize, you understand my clients were entitled to come visit the property before it closed, right?

A Of course.

Q And did you understand --

A They did.

Q And they did that, right?

A Yeah, they did.

Q If they didn't like what they saw, did you understand that they had the right to not close the transaction?

A If they didn't like what they saw, I was under the impression that the drop-dead date for any disapproval or for walking away was prior to the 26th.

Q And so to the extent they didn't like what they saw during their personal visitation, they needed to tell you in writing, is your position, by 10-26-21?

A Yes. But I don't think it's my position. It's Line 171 in the contract of Exhibit 20.

Ex. D, Goodwin Dep. 119:24-122:9.

*Disputed as to Duseks' interpretation and effect of Ms. Goodwin's testimony. Ms. Goodwin testified to her understanding that if Duseks had an objection based upon their visit to the Property, they had to make that objection in writing by October 26, 2021, and they did not give such notice in a timely fashion. Further, pursuant to the parol evidence rule, extrinsic evidence is inadmissible to vary the terms of a written agreement. Mont. Code Ann. § 28-2-905(1).*

63. The Duseks personally visited the Property on October 19, 2021. During their visit, they observed that there was excessive road noise/traffic visibility on the Property and generally found it to be less desirable than they had been led to believe. Ex. A, M. Dusek Decl. ¶6; Ex. B, R. Dusek Decl., ¶6; Ex. C, M. Dusek Dep. at 115:18-117:19.

*Undisputed as to Duseks visiting the Property on October 19, 2021. Disputed as to the Duseks finding it less desirable than they had been led to believe. Duseks told Mr. Darkenwald in a follow-up call after the visit that they were more excited about the purchase than when they came to the Property. Exhibit 3, Depo. S. Darkenwald, 84:12-23, 120:6-9.*

64. When the Duseks visited the Property, the Property Condition Inspection Contingency, the Well Permitting and Water Rights Contingency, and the Personal Visitation Contingency were still in effect. BSA, ll.172, 240, 244-245,

SSF, doc. 15, p. 3, doc. 15-1; Inspection Notice, ll.82, SSF, doc. 15, p. 3, doc. 15-2. Near the conclusion of the Duseks' visit with Scott Darkenwald, Scott suggested that they take some time to walk around the house and the property alone. Before the Duseks did that, he asked whether they were satisfied and prepared to release their contingencies early, before the contingency release dates. The Duseks told Scott that they were not prepared to release any contingencies at that time. After Scott's departure, during their private walk around the property, the Duseks were underwhelmed. The traffic noise and visibility were much more invasive than they had been led to believe. Matt Dusek mentioned this to Scott Darkenwald during their phone call the following day. Ex. A, M. Dusek Decl., ¶6. In follow-up conversations, Duseks stated that they understood that their contingencies remained in effect and that they were moving forward on the basis of the existence of the contingencies; they expressly declined to release those contingencies early. Ex. A, M. Dusek Decl., ¶6; Ex. B, R. Dusek Decl., ¶6.

*Disputed. Under the Property Inspection Contingency section of the BSA, Duseks were required to give Glacier Bear a single notice of all objections they had to the Property ("***If Buyer elects to negotiate*** *a resolution of the conditions noted, <u>the notice must contain all of Buyer's objections and requested remedies</u>.") Doc. 15-1, ll. 176-178 (bold in original, underlining added). Duseks had already provided their Inspection Notice to Glacier Bear on or about October 15, 2021,*

*prior to their visit to the Property. See ¶ 45, supra. Thus, to the extent Duseks had a right to raise an objection based upon their personal visit to the Property, they were required to provide that objection in the Inspection Notice. Next, Duseks' deadline to object to water rights and well permitting was based upon the same deadline for the Inspection Contingency as "Water Rights" was specifically listed in the Inspection Contingency of the BSA at ll. 166. Duseks had been provided with a copy of the water rights abstract for the Property on October 12, 2021, but had not raised any objection thereto in the Inspection Notice. Doc. 27, ¶¶ 8, 10, 11 and 12. Further, the water rights, well log and well permitting deadline of November 3, 2021, was included to provide additional time for Glacier Bear to formalize water rights for the Property rather than for Duseks to raise an objection based upon those issues. Id., ¶ 7. As described above in response to paragraphs 37, 57 and 58, Duseks' right to visit the Property was not a "contingency."*

*Contrary to Duseks' contention that they were "underwhelmed" by the Property, Duseks told Mr. Darkenwald in a call that "they left more excited than when they came." Exhibit 3, Depo. S. Darknenwald, 84:12-23, 120:6-9. They also told Mr. Darkenwald that "[t]he house was better than we thought it would be." Id., 119-120.*

65. Following the work by Advanced Restoration, D. Quinn Construction performed two separate re-inspections and prepared two separate reports. One

report was prepared by David Quinn and is dated October 26, 2021 and entitled "Limited Microbial Investigation" (the "Moisture and Mold Reinspection Report"). Ex. A, M. Dusek Decl. ¶13, Ex. 34. The other report was prepared by David's son, Kelly Quinn, and is dated October 27, 2021 and entitled "Building Inspection Analysis Report" (the "General Reinspection Report"). Ex. A, M. Dusek Decl. ¶14, Ex. 35.

*Disputed. David Quinn of D. Quinn. Construction, Inc., performed a "Limited Microbial Inspection" on October 25, 2021, for Advanced Restoration, prior to the time that Advanced Restoration had completed its work on the Property. Exhibit 2, Decl. of Cory Rensmon, ¶¶ 6-7. Undisputed as to the remainder of this paragraph.*

66. On October 25, 2021, Scott Darkenwald sent the Duseks a text message indicating that David Quinn was performing testing for residual mold and moisture and that a report would be forthcoming. Scott's text message acknowledged that the Property Condition Inspection Contingency remained unsatisfied. Ex. A, M. Dusek Decl., ¶11, Ex. 36. Scott wrote:

> Hi. We should have the inspection results all done by tomorrow late afternoon.
> That would wrap up your contingencies if all is well.
> Where are you on the LLC business ?
> Once that is decided we could close early if you like.
> Scott

*Id.*

*Disputed as to Duseks' contention that Mr. Darkenwald's text message acknowledged that the Property Condition Inspection Contingency remained open. Mr. Darkenwald's text message could not alter the explicit terms of the BSA or the Inspection Notice pursuant to which Glacier Bear agreed to remedy the nine conditions listed in the Inspection Notice.*

67. On October 26, 2021, Scott Darkenwald contacted Matt Dusek to let him know that the Moisture and Mold Reinspection Report would be forthcoming the following morning, and that Matt should speak with David Quinn directly because mold is a highly technical and serious matter in which Scott had no expertise. Ex. A, M. Dusek Decl., ¶11. Scott Darkenwald told Gail Goodwin that the Moisture and Mold Reinspection Report was just "a lot of technical, scientific mumbo-jumbo" to him. Ex. D, Goodwin Dep. 86:22-87:12.

*Undisputed.*

68. On October 27, 2021, David Quinn sent a copy of his Moisture and Mold Reinspection Report to Matt Dusek and Scott Darkenwald, among others. Ex. A, M. Dusek Decl., ¶13, Ex. 34. Also on October 27, 2021, the Duseks received a copy of Kelly Quinn's General Reinspection Report. Ex. A, M. Dusek Decl., ¶14, Ex. 35.

*Undisputed.*

69. Kelly Quinn's General Reinspection Report expressly covers only those matters that were open and visible to the naked eye. It disclaims, "This is a **visual** evaluation of reasonably accessible areas of the structure." Ex. A, M. Dusek Decl., ¶14, Ex. 35, p. 10 (emphasis original).

*Undisputed.*

70. Kelly Quinn's General Reinspection Report expressly does not analyze the mold remediation, except to the extent that mold might remain visibly present. It makes clear:

> Also note this visual inspection does not include surface mold, which is not visible at the time of inspection. These surface molds require a special type of equipment to detect. Note surface molds produce fruiting bodies and, when mature, produce millions of tiny spores (seeds) that are present in the air.

Ex. A, M. Dusek Decl., ¶15, Ex. 35, p. 10.

*Disputed. Kelly Quinn's Report of* October 27, 2021, *specifically provides, "Note the water stains and possible surface fungal growth that was found at main level closet under the stairs during the original inspection does appear to have been properly treated and remidiated (sic). The insulation and vapor barrier was yet to be installed to allow for visual inspectio (sic) and was scheduled to be done." Doc. 34-1 at 103.*

71. The list of "Exclusions" to Kelly Quinn's General Reinspection Report expressly limits its scope of work as follows:

> **Scope of work shall not extend to or include or be applicable to:**
>
> … 2. Defects in areas inaccessible to inspectors view.
>
> … 14. Mold/fungi which is not plainly visible.

Ex. A, M. Dusek Decl., ¶15, Ex. 35, p. 8 (emphasis original).

*Disputed as to point 14, which states in full, "14. Mold/fungi which is not plainly visible to inspection." Doc. 34-1 at 93.*

72. Kelly Quinn's General Reinspection Report further includes a "General Exclusions" section that provides:

> … 21. Any component or system which, was not observed. …
>
> … 24. Determine the presence of any suspected hazardous substance including but not limited to: toxins, contaminants in soil, carcinogens, water, air and noise."

Ex. A, M. Dusek Decl., ¶15, Ex. 35, p. 9. At the end of these exclusions, Kelly Quinn's General Reinspection Report reiterates:

> Note: Inspections done in accordance with the above standards are visual only.

Ex. A, M. Dusek Decl., ¶15, Ex. 35, p. 9.

*Undisputed.*

73. David Quinn's Moisture and Mold Reinspection Report was performed specifically "to confirm remediation" of the mold and moisture problems, which the Kelly Quinn General Reinspection Report expressly did not cover. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 1. David Quinn's Moisture and Mold

Reinspection Report served as the “clearance test” referred to in the Inspection Notice. Ex. D, Goodwin Dep. 158:23-25 (“Q The clearance testing was the test performed by D. Quinn and the lab that he hired? A That is correct.”) David Quinn is a Certified Residential Mold Inspector. Ex. A, M. Dusek Decl., ¶13, Ex. 34, p. 10.

*Disputed. Kelly Quinn’s Reinspection Report covered mold and specifically provides, “Note the water stains and possible surface fungal growth that was found at main level closet under the stairs during the original inspection does appear to have been properly treated and remidiated (sic). The insulation and vapor barrier was yet to be installed to allow for visual inspectio (sic) and was scheduled to be done.” Doc. 34-1 at 103. With respect to the “evidence of moisture,” his report provides, “Note evidence of moisture and water stains located main level closet under the stair area during the original inspection as (sic) been corrected and was dry at time of inspection with the flashing and siding issue having been corrected.” Id. at 102. Further, Kelly Quinn found that both conditions were “satisfactory.” Id. at 102-103. In addition, Advanced Restoration had not completed its work when David Quinn performed his inspection and issued his Limited Microbial Report, so that report was not based upon Advanced Restoration’s finished work product. Exhibit 2, Decl. of Cory Rensmon, ¶¶ 6-7.*

74. Quoting the EPA, the David Quinn Moisture and Mold Reinspection Report describes the purpose of mold remediation as follows:

The Purpose of Remediation

- "The purpose of mold remediation is to remove the mold to prevent human exposure and damage to building materials and furnishings. It is necessary to clean up mold contamination, not just to kill the mold. Dead mold is still allergenic, and some dead molds are potentially toxic. The use of biocide, such as chlorine bleach, is not recommended as a routine practice during mold remediation, although there may be instances where professional judgment may indicate its use."

– EPA Mold Remediation in Schools and Commercial Buildings (emphasis added by Quinn)

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 1.

*Undisputed that David Quinn's Limited Microbial Investigation contains the above quotation.*

75. David Quinn performed a visual inspection of the remediation, took moisture measurements, and performed air sampling. Ex. A, M. Dusek Decl., ¶13, Ex. 34.

*Undisputed.*

76. The air samples taken by David Quinn were analyzed on October 26, 2021 by Eurofins EMLab P&K, a third-party laboratory that reported its results back to David Quinn. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 10-22.

*Undisputed.*

77. David Quinn's report concluded that mold spores and the moisture causing the mold spores remained present at the Property even after Advanced Restoration had performed its remediation work. Ex. A, M. Dusek Decl., ¶13, Ex. 34.

*Disputed. David Quinn's Limited Microbial Investigation was conducted before Advanced Restoration had completed its work. Exhibit 2, Decl. of Cory Rensmon, ¶¶ 6-7. After Advanced Restoration completed its work, Kelly Quinn conducted a re-inspection in which he concluded that the mold and moisture had been successfully remediated. Doc. 34-1 at 102-103.*

78. David Quinn noted that the closet and storage areas still retained moisture.

> **Upon entering the closet/storage no noticeable odor was observed. A closer inspection of this area did not reveal any visual evidence of microbial growth although wet/damp conditions existed of the OSB (Oriented Strand Board) siding and/or by prior remediation, delamination of the OSB (Oriented Strand Board siding and/or no metal z-bar channel flashing installed at upper and lower horizontal wood trim, caulking only.**

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 3 (emphasis original).

*Disputed to the extent David Quinn's Limited Microbial Inspection is incorrectly quoted. The portion of Mr. Quinn's report reads:* ***Upon entering the closet/storage no noticeable musty odor was observed. A closer inspection of this area did not reveal any visual evidence of microbial growth although wet/damp***

***conditions existed of the OSB (Oriented Strand Board) shear wall siding/paneling, possibly caused by prior remediation, delamination of the OSB (Oriented Strand Board) siding and/or no metal z-bar channel flashing installed at upper and lower horizontal wood trim, caulking only."*** *Doc. 134-1 at 65.*

79. David Quinn noted that the stairwell drywall continued to retain moisture.

> **Also, note based on the visible observations and moisture readings it appears that the upper stairwell interior drywall is still retaining excess absorbed moisture from a past on-going water intrusion which could also contain microbial growth.**

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 3 (emphasis original).

*Undisputed that David Quinn's Limited Microbial Investigation report contains the above quote.*

80. David Quinn further added the caveat that his Moisture and Mold Reinspection Report did not intend to identify every instance of possible mold growth.

> Note that this limited investigation is not intended to identify every area of microbial growth in the residence, but to provide a general overview of its condition related to prior fungal growth found in closet/storage under stairs. Since it was not possible for our company to investigate the losses at the time of occurrence, it was necessary to rely on visual determinations, supplied information from the current home owners and laboratory analysis.

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 3.

*Undisputed that David Quinn's Limited Microbial Investigation contains the above statement. Disputed to the extent that Duseks contend that there was microbial growth elsewhere on the Property, or that there were other areas on the Property that Glacier Bear agreed to remediate as the Inspection Notice only required remediation of mold in the closet/storage area under the stairs. See Doc. 15-2 at 3, ll. 66-67 (Inspection Notice) which refers specifically to "Section 5, Item 20" of the Original Inspection Report which disclosed "possible surface fungal growth found at main level closet under the stairs[.]" Doc. 34-1 at 29.*

81. David Quinn's moisture measurements showed elevated moisture content in 8 of the 12 areas tested. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 5.

*Undisputed that David Quinn's Limited Microbial Investigation notes elevated moisture readings in 8 of 12 locations tested. Disputed to the extent Duseks contend that David Quinn's findings were conducted after Advanced Restoration had completed its work. Exhibit 2, Decl. of Cory Rensmon, ¶¶ 6-7. After Advanced Restoration completed its work, Kelly Quinn conducted a re-inspection in which he concluded that the mold and moisture had been successfully remediated. Doc. 34-1 at 102-103; Exhibit 2, Decl. of Cory Rensmon, ¶¶ 9, 11.*

82. David Quinn used a Surveymaster Moisture Protimeter to determine whether the closet/storage area continued to retain excessive absorbed moisture, where water staining was present before Advanced Restoration performed its work.

> Twelve individual locations were measured during this inspection. The moisture meter uses an analog scale with relative readings from 0% to 99". On these scales, readings from 0% to 16% are considered normal, 17% to 22% are considered damp, and 23% to 99% are considered substantially wet. Note four locations tested had readings in the 6% to 14% range indicating normal levels. However, six locations in the OSB (Oriented Strand Board) siding/shear wall paneling had readings ranging from **41% to 92%** indicating substantially wet. Also, note two locations at upper stairwell interior drywall had readings ranging from **20% to 22%** indicating damp moisture levels and appear to be still retaining excess absorbed moisture from a past on-going water intrusion.

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 5 (emphasis original).

*Undisputed that David Quinn's Limited Microbial Investigation contains the above quoted language. Disputed to the extent Duseks contend that David Quinn's findings were conducted after Advanced Restoration had completed its work. Exhibit 2, Decl. of Cory Rensmon, ¶¶ 6-7. After Advanced Restoration completed its work, Kelly Quinn conducted a re-inspection in which he concluded that the mold and moisture had been successfully remediated. Doc. 34-1 at 102-103; Exhibit 2, Decl. of Cory Rensmon, ¶¶ 9, 11.*

83. From these measurements, David Quinn concluded that moisture remained in the areas where mold was present.

> Based on the visible observations and moisture readings it appears that the closet/storage OSB (Oriented Strand Board) siding/shear wall paneling under stairs and upper stairwell interior drywall system are either still retaining excess absorbed moisture from a past ongoing water intrusion, or they [sic] still experiencing another form of moisture possibly from recent remediation work in the attic space.

Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 5.

*Undisputed that David Quinn's Limited Microbial Investigation contains the above quoted language. Disputed to the extent Duseks contend that David Quinn's findings were conducted after Advanced Restoration had completed its work. Exhibit 2, Decl. of Cory Rensmon, ¶¶ 6-7. After Advanced Restoration completed its work, Kelly Quinn conducted a re-inspection in which he concluded that the mold and moisture had been successfully remediated. Doc. 34-1 at 102-103; Exhibit 2, Decl. of Cory Rensmon, ¶¶ 9, 11.*

84. David Quinn also performed mold spore tests of both air and surface fungus. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 6. Two indoor areas were tested for both air and surface fungus, plus an outdoor air measurement was taken. *Id.*

*Undisputed.*

85. Eurofin's analysis cautioned that "active fungal growth in indoor environments is inappropriate and may lead to exposure and adverse health effects." Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 14.

*Undisputed that the Eurofin report contained the above-quoted statement. Disputed to the extent that the David Quinn Limited Microbial Inspection contained any definitive finding of "active fungal growth" within the main house on the Property. See generally Doc. 34-1.*

86. Eurofin's analysis revealed elevated levels of certain types of mold spores for both airborne tests. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 10-22. Eurofin's analysis further explained that in the MoldSCORE Spore Trap analysis report found "Final MoldScores" in the amount of 167 and 189 from two separate indoor tests collected; with the explanation the ratings between 150 and 250 indicate a moderate likelihood of indoor fungal growth. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 19-20.

*Disputed to the extent that the Eurofin report does not use the term "elevated levels."*

87. Particularly, both indoor air tests revealed the continued presence of the toxic Stachybotrys and Penicillium/Apsergillus spores, which the report explains are both potential water intrusion indicators and molds capable of mycotoxin production. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 14, 19-20. Neither of these types of mold spores were detected in the outdoor "control" sample of the air, meaning they originated inside the home. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 19-20.

*Disputed to the extent Duseks contend that there were high levels of Stachybotrys which originated indoors. The Eurofins report found a MoldSCORE of 121 for Stachybotrys, and notes that "A rating less than 150 indicates a low probability of spores originating inside." Doc. 34 at 81-82.*

88. David Quinn's Moisture and Mold Reinspection Report noted these results in his report, namely that both indoor air samples continued to show elevated levels of certain types of mold spores. Ex. A, M. Dusek Decl., ¶13, Ex. 34 at 7.

*Disputed. David Quinn's Limited Microbial Inspection found "1. low levels of fungal spores (Penicillium/Aspergillus) present in the closet/storage suspect air sample # 2 when compared to the baseline (outside) sample possible left-over accumulated dust and debris spores frequently present in high numbers after remediation;" "2. low levels of fungal spores (Penicillium/Aspergillus) present in the living area off stairs suspect air sample # 3 when compared to the baseline (outside) sample possible left-over accumulated dust and debris spores frequently present in high numbers after remediation;" "Additionally, in this case there are: 3.* ***no elevated fungal spores*** *present on the closet/storage exterior wall system under stairs swab surface sample #4 and that the <u>surface remediation process was successful.</u> 4.* ***no elevated fungal spores*** *present on the garage exterior wall framing and shear paneling system under stairs swab surface sample #5 and that the <u>surface remediation process was successful.</u> The laboratory data also reported: 5.* ***no elevated hyphal fragments*** *on the swab suspect sample #4; this typically indicates potential sources of moisture and/or microbial growth. 6.* ***no elevated hyphal fragments*** *on the swab suspect sample #5; this typically indicates*

*potential sources of moisture and/or microbial growth." Doc. 34-1 at 69; Exhibit 4, Declaration of David Quinn, ¶ 6.*

89. Upon receiving David Quinn's Moisture and Mold Reinspection Report on October 27, 2021, the Duseks spoke with David Quinn, as suggested by Scott Darkenwald. Ex. A, M. Dusek Decl., ¶15. David Quinn confirmed and explained the statements in his Moisture and Mold Reinspection Report. *Id.* David Quinn suggested that they might want to again re-test the property in six months, to see if it was able to pass a clearance test. *Id.* Based on that conversation and on the Moisture and Mold Reinspection Report, itself, the Duseks concluded that both moisture and mold remained in the living area of the Subject Property, despite the efforts by Advanced Restoration to remediate the problems. *Id.*

*Disputed to the extent that Duseks contend that the Property did not pass a mold clearance test. First, as described above in response to ¶ 88, David Quinn's Limited Microbial Investigation concluded that "the surface remediation process was successful." Next, Kelly Quinn's Reinspection Report, which was completed after Advanced Restoration had completed its work, confirmed that the mold had been successfully remediated, and that the condition was now "satisfactory." Doc. 34-1 at 102-103; Exhibit 2, Declaration of Cory Rensmon, ¶¶ 9, 11; Exhibit 5, Declaration of Kelly Quinn, ¶¶ 5-7; Exhibit 4, Declaration of David Quinn, ¶ 6.*

90. Following the conversation with David Quinn, the Duseks had a follow-up conversation with Scott Darkenwald concerning David Quinn's Moisture and Mold Reinspection Report. Ex. A, M. Dusek Decl., ¶16. They specifically discussed the potential health risks for people who might use the Property, including themselves, their relatives, friends, potential renters, and others. *Id.* They particularly discussed the potential for health risks to those with allergies, such as Matt himself, some family members, and some friends. *Id.* They also discussed David Quinn's statement that the Property would need to be again re-tested for moisture and mold in six months. *Id.*

> Q. What did Matt tell you about his discussion with David Quinn?
>
> A. That he understood more than he did when he started. That it was complicated, you know, 'cause it's very scientific, and -- but that he was comfortable. There was no sense that he wasn't comfortable with what he heard from David Quinn in terms of not wanting to go forward. And again, the only -- the -- the takeaway I got was that Quinn recommended that he might want to retest in six months.
>
> Q. Okay. Did you ever speak with David Quinn about the mold?
>
> A. No.

Ex. E, Darkenwald Dep. 173:11-24.

> Q. What was your understanding needed to be done in six months? I think I heard you say that a minute ago.
>
> A. Just to retest and a clearance test.
>
> Q. Why would there be need to be more work in six months?

Ex. E, Darkenwald Dep. 176:1-4.

> Q. What was -- What was your understanding of what needed to be done in six months after -- say after the date of this report?
>
> A. Just another clearance test taken.

Ex. E, Darkenwald Dep. 177:2-5.

*Disputed to the extent Duseks contend that David Quinn said that "the Property would need to be again re-tested for moisture and mold in six months." Mr. Quinn's Limited Microbial Inspection contains no such statement.*

91. Based on David Quinn's Moisture and Mold Reinspection Report, the moisture was not remediated as required by the Inspection Notice. Ex. A, M. Dusek Decl., ¶13, Ex. 34.

*Disputed. First, as described above in response to ¶ 88, David Quinn's Limited Microbial Investigation concluded that "the surface remediation process was successful." Next, Kelly Quinn's Reinspection Report, which was completed after Advanced Restoration had completed its work, confirmed that the mold had been successfully remediated. Doc. 34-1 at 102-103; Exhibit 2, Declaration of Cory Rensmon, ¶¶ 9, 11; Exhibit 5, Declaration of Kelly Quinn, ¶¶ 5-6.*

92. Based on David Quinn's Moisture and Mold Reinspection Report, the mold was not remediated and did not pass a clearance test, as required by the Inspection Notice. Ex. A, M. Dusek Decl., ¶13, Ex. 34.

*Disputed. First, as described above in response to ¶ 88, David Quinn's Limited Microbial Investigation concluded that "the surface remediation process was successful." Next, Kelly Quinn's Reinspection Report, which was completed after Advanced Restoration had completed its work, confirmed that the mold had been successfully remediated, and that the condition was now "satisfactory." Doc. 34-1 at 102-103; Exhibit 2, Declaration of Cory Rensmon, ¶¶ 9, 11; Exhibit 5, Declaration Kelly Quinn, ¶¶ 5, 7; Exhibit 4, Declaration of David Quinn, ¶ 6.*

93. In the BSA, the parties agreed to the importance of proper water rights ownership.

> WATER RIGHT OWNERSHIP UPDATE DISCLOSURE: By Montana law, failure of the parties at closing or transfer of real property to pay the required fee to the Montana Department of Natural Resources and Conservation for updating water right ownership may result in the transferee of the property being subject to a penalty. Additionally, in the case of water rights being exempted, severed, or divided, the failure of the parties to comply with section 85-2-424, MCA, could result in a penalty against the transferee and rejection of the deed for recording.

BSA, ll.278-82, Statement of Stipulated Facts, doc. 15, p. 3; doc. 15-1.

*Undisputed that the above-quoted clause appears in the BSA (at page 6, rather than page 3), but disputed to the extent Duseks contend this statutorily mandated language (per Mont. Code Ann. § 85-2-424(7)) placed any additional emphasis of "the importance of proper water rights ownership" with respect to this transaction.*

94. Due to the existence of a stream on the Property, the parties also took note of the following disclosure, contained in the Buy Sell Agreement:

> NATURAL WATER BODIES AND LAND PRESERVATION DISCLOSURE: Buyers of property in the State of Montana should be aware that some properties contain or are adjacent to streams, rivers. wetlands, floodplains and other water bodies. It is the general policy of the State of Montana that natural water bodies and the lands immediately adjacent to them are to be protected and preserved to be available in their natural or existing state, and to prohibit unauthorized projects related thereto. Property owners should consult their local soil conservation board, a land use professional, or other qualified advisor, regarding any applicable local, state or federal regulations, including permitting or other approvals, before working in or around any streams, rivers, wetlands, floodplains or other water bodies, including vegetation removal.

BSA, ll.284-290, SSF, doc. 15, p. 3; doc. 15-1.

*Undisputed that the BSA included the above-quoted provision at page 6, not page 3, as part of the standard form BSA, but disputed that the clause was included "due to the existence of a stream on the Property" as there is no such recitation in the BSA, nor any other evidence as to why this clause was included in the BSA, nor do Duseks cite any such evidence.*

95. The BSA also included a Well Permitting and Water Rights Contingency, which the parties separately added to the standard realtor form buy-sell agreement, along with a separate release date for this contingency. It provides:

> This Agreement is contingent upon:
>
> All well related permitting, well log recording, and any associated water rights to be in place prior to closing. Reasonable extension for contingency and closing to be granted upon written request.
>
> Release Date: 11/03/2021 at 5:00 p.m. (Mountain Time)

BSA, ll.237-39, SSF, doc. 15, p. 3; doc. 15-1.

*Undisputed that the above-quoted language appears in the BSA at page 5, not page 3, and that it was separately added to the standard form BSA.*

96. The release date for the Well Permitting and Water Rights Contingency was 5:00 p.m. November 3, 2021. BSA, l.240, SSF, doc. 15, p. 3; doc. 15-1.

*Disputed to the extent that Duseks contend that they had until November 3, 2021, to raise objections to water rights appurtenant to the Property. The BSA at Property Inspection Contingency provided that they had until October 26, 2021, to note objections to various conditions of the Property, including "Water Rights." Doc. 15-1 at 3-4, ll. 139-178 (ll. 166 specifically addresses "Water Rights.")*

97. On October 12, 2021, a General Abstract "Provisional Permit, Version 1 Original Right" was issued by the State of Montana Department of Natural Resources and Conservation to Gail Goodwin indicating an enforceable Priority Date of September 3, 2021. Ex. D, Goodwin Dep. 74:25-75:14, Ex. 15.

*Undisputed.*

98. Exhibit 15 is a true, correct, and complete copy of the "General Abstract for the Provisional Permit. Ex. A, M. Dusek Decl., ¶18; Ex. C. Goodwin Dep. Ex. 15. The Duseks received Exhibit 15 on October 12, 2021. This is the only document relating to the well permitting or water rights that was provided to the Duseks. *Id.*

*Undisputed.*

99. Water rights on the Subject Property were first sought by the Plaintiffs when the Property was listed for sale, because the well was never previously permitted by the State of Montana, despite its operation for years. Ex. D, Goodwin Dep. 8:5-20. Plaintiffs constructed the residence in 2013 and immediately built and used an unpermitted well on the Subject Property. Ex. D, Goodwin Dep. 8:7-20.

*Undisputed. However, Ms. Goodwin filed an application for water rights for the Property immediately upon discovering that the form had not been filed by the well driller in 2013. Exhibit 1, Decl. G. Goodwin, ¶ 6.*

100. The Provisional Permit sets forth limitations on the water rights for the Subject Property. Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16.

*Undisputed.*

101. Plaintiffs did not ever provide the Duseks with the Provisional Permit or its explanatory cover letter from the DNRC. Ex. A, M. Dusek Decl., ¶¶17-18.

*Disputed. Duseks received the Provisional Permit through discovery after the present lawsuit was filed. See ¶ 104, below.*

102. The General Abstract names Gail Goodwin as the owner of the Provisional Permit, rather than naming the Property owner, Glacier Bear Retreat, LLC. Ex. A, M. Dusek Decl., ¶18, Ex. 38.

*Undisputed.*

103. The General Abstract explains that the provisional rights cannot become permanent water rights without further action by the landowner. Here, that requires certain regulatory approvals by the Montana Department of Natural Resources ("DNRC"). Ex. A, M. Dusek Decl., ¶18, Ex. 38.

*Disputed. The General Abstract contains no such explanation or instructions. See Doc. 34-4 at 55-56. Further, Ms. Goodwin understood from DNRC that all that was required to complete the permitting process was to submit form 617 by the deadline of December 31, 2022. Exhibit 1, Decl. G. Goodwin, ¶ 6. In consultation with Travis Wilson of DNRC, Ms. Goodwin completed and filed form 617 with Montana DNRC on or about June 30, 2022. Id. A copy of the completed form 617 is attached to Ms. Goodwin's Declaration as Exhibit B.*

104. The Provisional Permit and cover letter – not provided to the Duseks until this litigation – explain the additional burden required of the provisional rightsholder to possibly obtain a permanent water right for the Property, including

the filing of a Form 617. Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16. The consequence of the failure of the rightsholder to pursue these rights through DNRC "will result in the termination of [the buyer's] provisional permit." Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16.

*Disputed to the extent Duseks contend the Provisional Permit and cover letter "explain the additional burden of the provisional rights holder to <u>possibly</u> obtain a <u>permanent water right</u> for the Property" (emphasis added) as the Provisional Permit and cover letter do not use the words "possibly" or "permanent water right." Instead, the Provisional Permit provides, in relevant part: "COMPLETION DEADLINE THE DEADLINE TO COMPLETE THIS PERMIT AND FILE A PROJECTION COMPLETION NOTICE (FORM 617) IS <u>DECEMBER 31, 2022</u>. IF YOU CANNOT MEET THE DEADLINE, FILE A FORM 607, APPLICATION FOR EXTENSION OF TIME, BY <u>DECEMBER 31, 2022</u>. OTHERWISE, THE PERMIT IS VOID." Doc. 34-4 at 59 (all caps and underlining in original).*

105. The Provisional Permit to Appropriate Water issued on October 12, 2021 in the name of Gail Goodwin contains the following notice

> **COMPLETION DEADLINE**
>
> THE DEADLINE TO COMPLETE THIS PERMIT AND FILE A PROJECT COMPLETION NOTICE (FORM 617) IS **<u>DECEMBER 31, 2022</u>**. IF YOU CANNOT MEET THE DEADLINE, FILE A

> FORM 607, APPLICATION FOR EXTENSION OF TIME BY **DECEMBER 31, 2022**. OTHERWISE, THE PERMIT IS VOID.

Ex. D, Goodwin Dep. 74:25-75:14, Ex. 16 (capitalization, underscoring, emphasis original).

*Undisputed*.

106. The compiling of a Form 617 is a significant undertaking in that the Instructions for Project Completion Notice for Permitted Water Development (Form No. 617) states:

> This form must be completed by a person experienced in the design, construction, or operation of the appropriation works. This may include, but is not limited to, hydrologists, water resource consultants, irrigation specialists, engineers, or the permittee if experienced in water measurement and legal land descriptions. If the form is not completed properly or corrected within the time allowed by the Department, the permit may be subject to revocation pursuant to Section 85-2-314, MCA.

Ex. D, Goodwin Dep. 67:3-22, Ex. 12 at 5. Under PART A GENERAL INFORMATION paragraph 2 carries the additional name change requirement due to the fact that the Provisional Permit was issued in Gail Goodwin's name individually:

> 2. Name the current owner of the permit (permittee), mailing address and daytime phone number. If the current owner is different that the owner listed on the permit or in the DNRC records, a Water Right Ownership Update Form No. 608 must be filed to update the DNRC ownership records

Ex. D, Goodwin Dep. 67:3-22, Ex. 12 at 5.

*Disputed to the extent of Duseks' commentary that completing the form 617 "is a significant undertaking." Ms. Goodwin understood from DNRC that all that was required to complete the permitting process was to submit the appropriate form by the deadline of December 31, 2022. Ms. Goodwin completed and submitted form 617 to DNRC on or about June 30, 2022. Exhibit 1, Decl. G. Goodwin, ¶ 6. Otherwise undisputed.*

107. Plaintiffs understood that the Duseks were concerned about the provisional nature of the water permit, but believed that their concern went away after October 12, 2021, notwithstanding the fact that the Duseks did not receive a copy of the Provisional Permit and cover letter or the well log.

> Q Did Scott Darkenwald ever share with you the fact that my clients were concerned about the water rights and the provisional nature of them?
>
> A Prior to October 12, yes, but not after October 12, no.

Ex. D, Goodwin Dep. 76:18-22.

*Disputed. Prior to October 12, 2021, no permit, provisional or otherwise had been issued or provided to Duseks, so Duseks could not have had a concern about the "provisional nature" of those rights prior to that date. See ¶ 98, above.*

108. Goodwin, herself, admitted that she did not understand the difference between a Provisional Permit and permanent water rights, but believed there was

nothing more she could have done to obtain permanent rights, because the delay in filing put her “at the mercy of DNRC.”

> Q As you sit here today, can you tell me what the difference is between provisional water rights and permanent water rights?
>
> A I cannot, and I'm not sure anyone at DNRC can either, other than to say we did everything we could possibly have done and have to this day as well, and we're at the mercy of DNRC.

Ex. D, Goodwin Dep. 123:10-19.

*Disputed to the extent Duseks allege that there was a “delay” in filing. Duseks provide no citation or explanation for the basis of this contention. Further, Ms. Goodwin took steps to file for the water rights as soon as she learned that the well driller had not completed the paperwork. Further, Ms. Goodwin was advised by DNRC personnel that all water rights permits issued after 1973 are “provisional.” Exhibit 1, Decl. of G. Goodwin, ¶ 6.*

109. Due to Plaintiffs’ delay in seeking water rights, approval of permanent water rights could not have been obtained by the November 3, 2021 deadline. Ex. D, Goodwin Dep. 123:10-19. Plaintiffs did not obtain permanent water rights by November 3, 2021. To date, Plaintiffs still have not obtained permanent water rights.

> Q Is there a permanent water right in the property right now?
>
> A I can't answer that.

Ex. D, Goodwin Dep. 7:10-12.

*Disputed to the extent Duseks claim that Plaintiffs "delay[ed] in seeking water rights[.]" Further, Ms. Goodwin took steps to file for the water rights as soon as she learned that the well driller had not completed the paperwork. Further, Ms. Goodwin was advised by DNRC personnel that all water rights permits issued after 1973 are "provisional." Exhibit 1, Decl. of G. Goodwin, ¶ 6. Duseks provide no citation or explanation for the basis of this contention. Undisputed as to the balance.*

110. The General Abstract notes that the provisional water permit is subordinate to any rights obtained prior to September 3, 2021, and that the owner of the Property may be subject to a call by senior water users. Ex. A, M. Dusek Decl., ¶18, Ex. 38. It states:

> **CLARK FORK RIVER BASIN LAW**
>
> THIS PROVISIONAL WATER USE PERMIT HAS A PRIORITY DATE THAT IS JUNIOR TO THE RIGHTS OF SENIOR WATER RIGHT HOLDERS IN THE CLARK FORK RIVER BASIN. IN ACCORDANCE WITH MONTANA LAW, YOU MAY BE SUBJECT TO A CALL BY SENIOR WATER RIGHT HOLDERS, IN WHICH CASE YOU MAY BE REQUIRED TO DISCONTINUE YOUR USE OF WATER FOR THE PERIOD OF THE CALL.

*Id.* (capitalization original).

*Disputed to the extent that that General Abstract does not use the term "subordinate." Otherwise, undisputed.*

111. The General Abstract and Provisional Permit indicate that the water rights are subject to prior senior rights claimed by tribal governments and may be subject to exercise, possibly resulting in complete defeasance.

> **CONFEDERATED SALISH AND KOOTENAI TRIBES - RESERVED WATER RIGHTS**
>
> THIS RIGHT IS SUBJECT TO ALL PRIOR INDIAN RESERVED WATER RIGHTS OF THE CONFEDERATED SALISH AND KOOTENAI TRIBES IN THE SOURCE OF SUPPLY. IT IS THE TRIBE'S POSITION THAT THE EXERCISE OF JUNIOR WATER RIGHTS EITHER WITHIN OR OUTSIDE OF THE EXTERIOR BOUNDARIES OF THE FLATHEAD INDIAN RESERVATION MAY AFFECT THE RESERVED WATER RIGHTS OF THE TRIBE WITHIN THE EXTERIOR BOUNDARIES OF THE RESERVATION. IT IS THE TRIBE'S POSITION THAT ECONOMIC INVESTMENTS MADE IN RELIANCE UPON THIS RIGHT DO NOT CREATE IN THE APPROPRIATOR ANY EQUITY OR VESTED RIGHT AGAINST THE TRIBES. THE APPROPRIATOR IS HEREBY NOTIFIED THAT ANY FINANCIAL OUTLAY OR WORK INVESTED IN A PROJECT PURSUANT TO THIS RIGHT IS AT APPROPRIATOR'S RISK. THE ISSUANCE OF THIS RIGHT DOES NOT REDUCE THE APPROPRIATOR'S LIABILITY FOR DAMAGE CAUSED BY THE EXERCISE OF THE RIGHT. IT DOES NOT MAKE THE DEPARTMENT LIABLE FOR DAMAGE CAUSED BY THE EXERCISE OF THE RIGHT. NOR IS THE DEPARTMENT LIABLE FOR ANY LOSS TO THE APPROPRIATOR CAUSED BY THE EXERCISE OF SENIOR RESERVED WATER RIGHTS.

Ex. A, M. Dusek Decl., ¶18, Ex. 38 (capitalization original).

*Disputed to the extent Duseks contend "that the water rights are subject to prior senior rights claimed by tribal governments and may be subject to exercise, possibly resulting in complete defeasance." No such language in the General*

*Abstract or Provisional Permit, as quoted above, discusses or warns of "complete defeasance." Undisputed that the foregoing language is correctly quoted.*

112. Scott Darkenwald informed the Plaintiffs that it was "critical" that the well log be recorded and disclosed to the Duseks, and "that's to protect the Duseks."

> Q. Do you recall having any conversation with either Matt or Rachel before they signed the buy-sell that there was some question about -- or some issue with water rights that needed to be addressed on the property?
>
> A. Yes.
>
> Q. Tell me about that discussion.
>
> A. Well, Gail told me right after we had agreed to take the listing, she said -- she called me and said -- I don't -- she may have texted me,
>
> I don't remember -- and said when the well was drilled, the well log was not recorded. And so I said to her we will have to disclose that right away to whomever looks at the property.
>
> So in the buy-sell where it talks about water rights? Where's that? On lines -- this is 399 and then lines 237 through 238, essentially, that's my language, and that's to protect the Duseks, because at that point -- at that -- it was critical that that well log be recorded.

Ex. E, Darkenwald Dep. 44:9-45:3.

*Undisputed.*

113. The Duseks did not receive any well log before they terminated the transaction. Ex. A, M. Dusek Decl., ¶17, Ex. 37. Exhibit 37 is a true, correct, and complete copy of the well log for the Subject Property, which is date-stamped

November 1, 2021. *Id.* The Duseks did not receive a copy of this well log until discovery in this litigation. *Id.*

*Disputed. See Exhibit 3, Depo. S. Darkenwald, 45:4-13.*

114. The Provisional Permit has a priority date that is junior to all other rights issued prior to its September 3, 2021 issuance date, and could result in discontinuance in favor of senior users. Ex. A, M. Dusek Decl., ¶18, Ex. 38. It provides that, "in accordance with Montana Law, you may be subject to a call by senior water right holders, in which case you may be required to discontinue your use of water for the period of the call." *Id.*

*Undisputed.*

115. On October 28, 2021, Scott Darkenwald told the Duseks that Plaintiffs had concluded their efforts to satisfy the contingencies and were asked to review the efforts and decide whether or not to proceed to closing. Ex. C, M. Dusek Dep. 103:2-104:1.

*Undisputed.*

116. On October 28, 2021, Tracy Rossi sent the Duseks a form "Notice of Release of Contingencies" document, with the email notation, "Hi Matt, Here is a draft for your review of the Notice of Release of Contingencies. Thanks! Tracy." Ex. A, M. Dusek Decl. ¶18, Ex. 38; Ex. E, Darkenwald Dep. 112:2-10.

*Undisputed.*

117. The Notice of Release of Contingencies specifically asked Duseks to release all outstanding contingencies to the BSA, including the three contingencies at issue in this litigation. It stated:

> The following contingency(ies) is/are released, satisfied, or waived as of the date indicated below and are of no further force and effect.
>
> All contingencies in the buy-sell dated 10/4/2021 are released including inspection contingency, & remedies, title contingency, insurance contingency, corner pins, personal visit and well & water rights contingencies have all been satisfied & released as of 10/28/2021.
>
> Earnest money is now non-refundable as long as seller performs per the buy-sell dated 10/4/2021.

Ex. A, M. Dusek Decl. ¶19, Ex. 39.

*Disputed to the extent Duseks contend the draft Notice of Release of Contingencies asked them to release "all outstanding contingencies to the BSA, including the three contingencies at issue in this litigation" as the Notice does not use the word "outstanding." Undisputed as to the quotation from the Notice set forth above.*

118. Plaintiffs knew that Scott would be requesting the Duseks to sign a written release of contingencies, because they requested it. The previous day, Gail Goodwin texted Scott Darkenwald to explain that "My goal for the day is to have a signed agreement with Matt removing all contingencies and if he chooses, moving the closing date sooner. Just thought I'd put that out there for you to weave your

magic to make it happen. :)" Ex. D, Goodwin Dep. 165:23-166:24, Ex. 2 at Glacier Bear 0192. Scott Darkenwald explained:

> Q. And was that -- was that -- what was the purpose of that? That notice of release of contingencies?
>
> A. That was -- Gail was asking for a notice of release of contingencies, so -- and I didn't want to do that until I was sure that I had gone -- one, that all were released; and two, that I had gone through the entire contract with Matt and Rachel. So there's another page in here where I went through the entire contract, and then I noted that I went through it line by line with Matt and Rachel before we sent them this notice of release and contingencies and said, you know, "Do you concur that this was done?" You know, "Are there any questions?"

Ex. E, Darkenwald Dep. 113:2-16; *see also* Ex. E, Darkenwald Dep. 124:14-20; 207:16-211:23.

*Disputed. Ms. Goodwin testified that she didn't understand the need for the Notice of Release of Contingencies:*

> *Q Did you agree with Scott that it would be good to get my client to sign off in writing that they were releasing the contingencies?*
>
> *A It wasn't a matter of agreeing or disagreeing. I told him I didn't understand because it had already been done, and he told me that's just the way he did things.*

*Q Did you tell him, No need to send out a contingency release on the 27th because these things were already passed, and the contract is hard at this point?*

*A I did in text messages at some point. I said, Why are you even doing this, and does Matt know, and does he realize that it's a moot point as of 5:00 p.m. -- I think it was probably on the 29th that -- I switched to text to document it in writing.*

*Q What was on the 29th --*

*A My texts.*

*Q -- the texts or the date that it went hard?*

*A Both.*

*Exhibit 6, Deposition G. Goodwin, 166:25-167:17; Exhibit 1, Decl. G. Goodwin, ¶ 9 and Exhibit C thereto.*

119. On October 30, 2021, the Duseks informed Scott Darkenwald orally and in writing that they would not release the contingencies and would not close the transaction. Specifically, they cited their disapproval of the Property Conditions; Well Related Permitting/Water Rights and Personal Inspection/Property Visitation contingencies. Plaintiff's Statement of Undisputed Facts, doc. 27, ¶23. On October 30, 2021, Mr. Dusek emailed two letters dated October 30, 2021, to Mr. Darkenwald purporting to terminate the BSA and

demanding a return of Duseks' earnest money. *Id.* Duseks explained their reasons for terminating the BSA as follows:

> As we are unable to come to written agreement in satisfaction of the conditions noted, and as we did not withdraw, in writing, our disapproval of the conditions noted on or before the stipulated Resolution Date (10/29/2021 at 5:00 PM MT), we expect that the earnest money shall be returned to us and the Agreement then terminated.

*Id.*

> [W]e hereby serve notice of our disapproval of the Property conditions and do not wish to proceed with the purchase – we elect to immediately terminate the Agreement.
>
> In this decision, we are specifically relying on our reserved rights under the agreement to contingencies based on:
>
> **Well Related Permitting/Water Rights** (line 273)
>
> We don't find the water rights of the property to our satisfaction.
>
> **Additional Provisions – Personal Inspection/Property Visitation** (line 245)
>
> We don't find the visibility and noise of traffic on Camas Rd. adjacent to the Property to our satisfaction.

*Id.*

*While Plaintiffs dispute Duseks' right to terminate the BSA for the reasons set forth in their Brief in Support of Motion for Partial Summary Judgment and in opposition to Duseks' Motion, they do not otherwise dispute the facts set forth in this paragraph.*

120. The Duseks' written notice of their refusal to release the Property Condition Inspection Contingency was timely because it was made before the extended deadline of November 5, 2021. BSA, ll.132-184, SSF, doc. 15, p. 3, doc. 15-1; Inspection Notice, SSF, doc. 15, p. 3, doc. 15-2.

*Disputed. Duseks' notice was untimely because there was no "extended deadline of November 5, 2021" for the Property Inspection Contingency. Plaintiffs incorporate their response to ¶ 50, above, as if fully set forth herein.*

121. The Duseks' written notice of their refusal to release the Well Permitting and Water Rights Contingency was timely because it was made in writing before the November 3, 2021 deadline. BSA, ll.132-137, 236-240, SSF, doc. 15, p. 3, doc. 15-1.

*Disputed. "Water Rights" were specifically included in the Property Inspection Contingency, which granted Duseks a deadline of October 26, 2021 to raise any objection to the water rights. Doc. 15-1 at 4-5, ll. 139-178. The "release date" of November 3, 2021, was specifically intended to give Glacier Bear sufficient time for "[a]ll well related permitting, well log recording, and any associated water rights to be in place prior to closing." Moreover, it also provided Glacier Bear the option for "[r]easonable extension for contingency and closing to be granted upon reasonable request." Doc. 15-1 at 6, ll. 237-240. Duseks never notified Glacier Bear of any objection to the water rights, well log or*

*well related permitting, or sought any additional information on those matters prior to sending their October 30, 2021 letters purporting to terminate the BSA. Exhibit 1, Decl. G. Goodwin, ¶¶ 4-5.*

122. The Duseks' written notice of their refusal to release the Personal Visitation Contingency was timely because it had no release date in advance of closing. BSA, ll.132-7, 244-245, SSF, doc. 15, p. 3, doc. 15-1.

*Disputed. The BSA does not include a "Personal Visitation Contingency." Under the BSA, Duseks "reserve[d] the right to visit the property in person during the inspection period." Doc. 15-1 at ll. 244-245. Under the Property Inspection Contingency portion of the BSA, Duseks were required to give Glacier Bear a single notice of all objections they had to the Property ("**If Buyer elects to negotiate** a resolution of the conditions noted, the notice must contain all of Buyer's objections and requested remedies.") Doc. 15-1, ll. 176-178 (bold in original). Duseks had already provided their Inspection Notice to Glacier Bear on or about October 15, 2021, prior to their visit to the Property. See ¶ 45, supra. Thus, to the extent Duseks had a right to raise an objection based upon their personal visit to the Property, they were required to provide that objection in the Inspection Notice and no later than October 26, 2021, by 5:00 p.m., Mountain Time. Their failure to give such notice until October 30, 2021 was therefore untimely.*

Plaintiffs' Additional Facts in Opposition to Defendants' Motion:

123. Glacier Bear incorporates by this reference those facts set forth in its Statement of Undisputed Facts filed in support of its Motion for Partial Summary Judgment, Doc. 27.

124. Glacier Bear hired Advanced Restoration and Maintenance ("ARM") to perform the mold remediation and repair the moisture as required by the Inspection Notice. Exhibit 2, Declaration of Cory Rensmon, ¶ 3.

125. Cory Rensmon, owner and founder of ARM, is certified in Microbial Remediation by the Restoration Sciences Academy. *Id.*, ¶ 2.

126. Mr. Rensmon was personally present for the work on the Property for the duration of the project, and supervised work on the project. *Id.*, ¶ 4.

127. ARM performed the mold mitigation and water damage repairs in accordance with its customary business practices and industry standards. ARM took every step necessary in performing that work to make sure the mold was mitigated to the maximum degree possible. *Id.*, ¶ 5.

128. Per his usual business practice, Mr. Rensmon hired David Quinn of D. Quinn Construction to inspect the mold mitigation and moisture repair work that ARM had performed at the Glacier Bear property. Mr. Quinn performed his inspection on October 25, 2021. After he performed the inspection, Mr. Quinn called Mr. Rensmon, either the evening of October 25 or morning of October 26, to

report that there was still moisture in the main closet level in the Oriented Strand Board ("OSB"). Mr. Quinn later provided Mr. Rensmon with his report labeled "Limited Microbial Inspection" dated October 26, 2021. *Id.*, ¶ 6.

129. After being notified by Mr. Quinn that there was still moisture in the OSB, over the course of approximately 27 hours from the morning of October 26, 2021 to the morning of October 27, 2021, ARM located the source of the moisture – missing flashing on the roof wall joint. ARM installed the missing kick out flashing and sealed the area with water/ice moisture membrane and tore out the OSB in which Mr. Quinn had found moisture and replaced it with new OSB and new studs. This work completely removed and replaced all of the wood material in which Mr. Quinn had found elevated moisture readings. *Id.*, ¶ 7.

130. Kelly Quinn of D. Quinn Construction, Inc., who conducted the original inspection which found the mold and moisture, returned to the Property with Scott Darkenwald to reinspect the Property on October 27, 2021, after ARM had completed its work. David Quinn did not return to the Property and his report did not address the condition of the Property after ARM had completed its work. *Id.*, ¶ 8.

131. ARM has worked with D. Quinn Construction, Inc., hundreds of times prior to the time that it conducted the Limited Microbial Inspection. Based on this experience, Mr. Rensmon is familiar with how D. Quinn Construction, Inc.,

authors its reports, and the terminology in its reports. Based upon his training and experience, including his experience with D. Quinn Construction, Inc., Mr. Rensmon is familiar with the terminology used in its reports with respect to mold remediation. D. Quinn Construction, Inc., and David Quinn concluded in the Limited Microbial Investigation that the "surface remediation process was successful" in the closet/storage exterior wall system under the stairs, which means that the mold remediation conducted by ARM was successful. *Id.*, ¶ 9.

132. Glacier Bear retreat paid $25,244 paid to ARM for the mold and moisture remediation work. *Id.*, ¶ 10.

133. The mold and moisture remediation work performed by ARM was successfully completed in accordance with ARM's ordinary business practices. Had there been any remaining mold or moisture to remediate, D. Quinn Construction, Inc., would have notified Mr. Rensmon. Mr. Rensmon reviewed D. Quinn Construction, Inc.'s Building and Inspection Analysis Report dated October 27, 2021, and it confirms that ARM successfully performed the mold and moisture remediation work which it had contracted to perform. *Id.*, ¶ 11.

134. The timing of Duseks' service of the Inspection Notice before they visited the Property was entirely their own doing. Duseks were originally scheduled to visit the Property on October 12, 2021. However, they chose to reschedule their visit because the private plane they intended to charter for the trip

from California to Montana was already booked when Mr. Dusek attempted to confirm the reservations. Exhibit 1, Decl. G. Goodwin, ¶ 7; Exhibit 7, Text Exchange Between M. Dusek and S. Darkenwald.

135. Glacier Bear understood that the water rights contingency was satisfied when Ms. Goodwin forwarded all documents she had received from the DNRC, including the well log, the permit and the cover letter, to Mr. Darkenwald, and he advised that the Duseks had signed off on the issue. Exhibit 1, Decl. G. Goodwin, ¶ 4.

136. Mr. and Mrs. Dusek never requested any additional water rights information for the Property beyond the information that Ms. Goodwin provided to Mr. Darkenwald. *Id.*, ¶ 5.

137. Although the water rights for the Property were in her name, Ms. Goodwin intended to transfer those water rights to Mr. and Mrs. Dusek at the closing of the BSA. She remains ready, willing and able to transfer those water rights if the Court orders the Duseks to close on the BSA. *Id.*, ¶ 3.

138. When Ms. Goodwin discovered that the contractor who dug the well for the Property had not completed the paperwork for the water rights and recorded the well log, she contacted DNRC about the matter in early September 2021. She did not delay this process at all. When she contacted the DNRC about water rights for the Property in early September 2021, she was told that the well log for the well

on the Property was in the DNRC's file but hadn't been recorded. Ms. Goodwin filed the application for water rights on September 3, 2021, and received a provisional permit on October 12, 2021. DNRC was fully aware of the existence of a well serving the Property. Ms. Goodwin was never advised that the well was unlawful or that she could not use it to serve the Property. Further, she understood from DNRC that all that was required to complete the permitting process was to submit the appropriate form by the deadline of December 31, 2022. *Id.*, ¶ 6.

139. Ms. Goodwin completed the form 617 for the water rights permit for the Property with the assistance of a DNRC representative, Travis Wilson, and submitted it to DNRC on or about June 30, 2022. A copy of the form 617 completed by Ms. Goodwin is attached as to Ms. Goodwin's Declaration as Exhibit B.

140. A complete copy of Ms. Goodwin's water rights application, permit and related documents downloaded from DNRC's website is attached to Ms. Goodwin's Declaration as Exhibit A.

Dated this 23rd day of September, 2022.

Hall & Evans, LLC

By /s/Fred Simpson
Fred Simpson