# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

GLACIER BEAR RETREAT, LLC,
GAIL L. GOODWIN and DARRYL C. SLATTENGREN,
Plaintiffs/Counterclaim Defendants,
vs.
MATT DUSEK AND RACHEL DUSEK,
Defendants/ Counterclaimants.

Cause No. CV 22-19-M-KLD

---

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION
OF
SCOTT DARKENWALD

---

BE IT REMEMBERED, that the videoconference deposition upon oral examination of Scott Darkenwald, appearing at the instance of the Plaintiffs and Counterclaim Defendants, was taken at 211 North Higgins Avenue, Suite 303, Missoula, Montana, on Thursday, May 26, 2022, beginning at the hour of 10:12 a.m., pursuant to the Federal

that's my language, and that's to protect the Duseks, because at that point -- at that -- it was critical that that well log be recorded.

Q. And I'm jumping ahead a little bit here, but were the -- were the water rights subsequently -- after this agreement was signed, were they documented correctly?

A. Yes.

Q. Okay.

A. By DNRC, supplied to everybody.

Q. Okay. And the well log -- the well log was provided as well.

A. Exactly.

Q. Okay. And -- And you -- Strike that.

You discussed the issue with the water rights with Mr. and Mrs. Dusek.

A. Correct.

Q. And what, to the best of your recollection, did you tell her?

A. I said I was surprised at how quickly I -- I thought potentially that the water rights could delay closing. Dealing with the state can sometimes not be the fastest thing in the world, and I was surprised that we got resolution as quickly as we did. At some point -- and I don't

Mrs. Dusek and you present during their visit to the property?

A. I think Tracy was there, but I'm not positive. I wanted her to meet them, so my -- my gut is that Tracy was there.

Q. Who locked up after they finished?

A. I don't remember. One of -- One of -- I would have went back or their caretaker would have went back or --

Q. Okay.

A. -- I -- I don't remember.

Q. Was there a follow-up call the next day or that night?

A. Yes, there was a follow-up call because I can remember -- and there's a note in -- within here where Matt mentioned that he -- there was more noise on Camas Road than they expected; that the house was better than they expected; that the property wasn't as detailed out as they expected; but that they -- but that they were more excited than when -- about the purchase than when they came. I mean, they left more excited than when they came.

Q. There weren't any spoilers.

A. There weren't any spoilers, yeah.

A. Well, because I hadn't heard from him for two days, I knew something was up, and I -- I was -- I was surprised that the water rights, the well-related permitting water rights, because that had never even been a conversation except the one time when he asked about the word "provisional," but he never -- that was not -- you know, usually that would be a bigger issue where he -- you know, "Let's look into this, let's hire a water rights lawyer," that sort of thing.
Q. This was the first time you'd heard from this that it was a problem.
A. Yes, that it's a problem.
Q. And he -- did he explain to you what the nature of the problem was?
A. No.
Q. What about the visibility and noise of traffic on Camas Road? What was your understanding as to the deadline for him to raise that issue?
A. During the inspection period, but -- or his personal visit.
Q. Yeah.
A. You know, and -- and after his personal visit, again, his comments were "There was more

noise from Camas Road than we expected"; "The property wasn't as detailed out as we thought it would be"; "The house is better than we thought it would be."

Those were the three takeaways.

Q. "And were more excited than we were before."

A. "And we were more excited than we were before."

Q. Did you have any discussion with Matt and/or Rachel on the 30th of October?

A. Hm-mmm.

Q. No? You have to say yes or no.

A. Oh, no. I'm sorry.

MR. CLARK: Answer verbally.

BY MR. SIMPSON:

Q. Did you talk with him at any time after the 30th of October?

A. No.

Q. You haven't talked to them to this day?

A. No.

Q. Okay. Have you had any other written exchanges with them beyond these letters?

A. Not -- Whatever is in the text --

Q. Yeah.

number of opportunities to get out of this deal if he didn't like the property?

A. Well, when we went through the listing -- when we did the buy-sell, I would have gone through absolutely with both sides, and I did tell -- I did tell Matt that, you know, that period of -- of -- whenever that was that they -- you know, when you have inspection and then you have inspection notice, until you -- until you have inspection and they meet that, you have basically a free look at the property. You can walk for any reason you want preinspection.

Q. But once the inspection's done, those are released?

A. And once the inspection's initiated, that sort of starts the contingency timelines, unless they're specifically written into the contract.

Q. Do you ever tell Matt or Rachel that they could back out of this deal if they didn't like the way the wind blew across the property?

A. Prior to the inspect -- I didn't use those words, but prior to the inspection they could have walked for any number -- they could have just called and said, "My lawyer said don't do the deal. My accountant said don't do the