Shane P. Coleman
BILLSTEIN, MONSON & SMALL PLLC
1555 Campus Drive, Suite 201
Billings, MT 59102
Telephone: 406.656.6551
shane@bmslawmt.com

ATTORNEYS FOR DEFENDANTS
MATT AND RACHEL DUSEK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,<br><br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>MATT DUSEK and RACHEL DUSEK,<br><br>Defendants/Counterclaimants. | Case No. 9:22-cv-00019-DLC-KLD<br><br>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

The undisputed facts demonstrate that three independent contingencies under the BSA were not met. The only post-remediation laboratory testing that was performed showed that Property failed the only mold clearance test, and it still retained excessive moisture. The Plaintiffs did not have “in place” “all well related permitting, well log recording, and any associated water rights” “prior to closing;” and further, they do not yet have such rights in place. Finally, the Duseks were entitled to personally visit the Property, and all parties acknowledged that they could terminate the BSA if they did not like what they observed.

Each of these three contingencies was in place when the Duseks expressly refused to sign the Notice of Release of Contingencies sent to them on October 28, 2021 and when the Duseks terminated the BSA on October 30, 2021. Because the Duseks refused to release the contingencies before the respective release dates, the BSA terminated, which requires the return of the Duseks’ earnest money.

# ARGUMENT

## I. The Property undeniably did not pass a mold clearance test and retained moisture.

### A. The Property failed the only "clearance test" performed post-remediation.

The Parties expressly agreed that the Property must "pass a clearance test" for mold, post-remediation. SUF ¶49.[1] The moisture and mold problems were not satisfied by simply hiring someone to try to remediate them. Nor was it sufficient for the person performing the remediation efforts to judge the quality of his own work. The remediation efforts needed to actually succeed, objectively, in removing the mold and moisture. Regarding mold, the Inspection Notice expressly required, "All mold to be remediated and pass a clearance test," as a part of the remediation. SUF ¶49. Plaintiffs admit this. SGI ¶49.

Only one clearance test was performed after Advanced Restoration tried to remediate the mold and moisture. David Quinn, a Certified Residential Mold Inspector, took air and surface samples on October 25, 2021. SUF ¶75; SGI ¶75. He sent those samples to the Eurofins Arizona laboratory for testing. SUF ¶76; SGI ¶76. The results of that laboratory testing demonstrated that elevated levels of mold remained on the Property, despite Advanced Restoration's efforts.

[1] As used herein, "SUF" refers to Defendants' Statement of Undisputed Facts, doc. 34. "SGI" refers to Plaintiffs' Statement of Disputed Facts, doc. 36.

David Quinn was the only person hired to take post-remediation mold samples for testing. SUF ¶73. The testing of his samples, analyzed by the Arizona laboratory, was the only mold "clearance test" referenced in the Inspection Notice. Plaintiffs admitted this fact earlier, notwithstanding their present objections. Gail Goodwin testified:

> Q The clearance testing was the test performed by D. Quinn and the lab that he hired?
>
> A That is correct.

SUF ¶73. Having previously agreed that David Quinn and the Eurofins Arizona laboratory were to perform the "mold clearance test," Plaintiffs cannot now suggest that some other measure be used to determine whether the remediation passed this test. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony").

**B. Likewise, the only post-remediation test revealed continued moisture on the Property.**

The only tests for moisture post-remediation were performed by David Quinn. His report unequivocally found elevated levels of moisture in 8 of the 12 samples that he tested. SUF ¶82. Moreover, the post-remediation report prepared by Kelly Quinn did not take any moisture measurements. As to both mold and moisture, Plaintiffs admit that Kelly Quinn's General Reinspection Report was merely a "**visual** evaluation of reasonably accessible areas of the structure."

SUF ¶69 (emphasis original). He took no measurements of moisture levels and collected no samples for mold testing. Plaintiffs did not remediate the moisture according to any testing that was provided to the Duseks.

### C. Subsequent remediation efforts performed after the failed clearance test are irrelevant.

The fact that Advanced Restoration may have returned to the Property after the results of the clearance test to attempt to remediate its work is irrelevant for at least three reasons.

First, the Property was never re-tested following completion of the additional work. No evidence suggests that David Quinn or anyone else ever captured additional air and surface samples to be analyzed at the Arizona laboratory or elsewhere. Even if that further remediation work happened without the Duseks' knowledge, there is (1) no evidence that such further work was successful, (2) no evidence that further mold testing was performed, and (3) no evidence that the Property later "passed a clearance test," as required by the Inspection Notice.

Second, no evidence of any such additional work or mold testing was ever provided to the Duseks. To the contrary, the only mold test report provided to the Duseks was David Quinn's report dated October 26, 2021. SUF ¶65. It was provided to the Duseks on October 27, 2021. SUF ¶68. On October 28, 2021, Darkenwald asked the Duseks to sign the Notice of Release of Contingencies.

SUF ¶116. This Release included the Property Condition Inspection Contingency. SUF ¶117. Work that may or may not have occurred without the Duseks' knowledge, which may or may not have succeeded in remediating the mold, is irrelevant. Moreover, David Quinn recommended that the Property be re-tested in six months to see if it then was able to pass a clearance test. SUF ¶¶89-90.

Third, the BSA terminated under its own terms on October 29, 2021, absent agreement by the Duseks. Regarding the Property Condition Inspection Contingency, the BSA provides:

> If the parties enter into a written agreement in satisfaction of the conditions noted, this contingency shall be of no further force or effect. If the parties cannot come to written agreement in satisfaction of the conditions noted or if the Buyer does not withdraw, in writing, his/her disapproval of the condition noted, on or before (Resolution Date) 10/29/2021 at 5:00 p.m. (Mountain Time), the earnest money shall be returned to the Buyer, and the Agreement then terminated.

SUF ¶41. Mold remediation – specifically "pass[ing] a clearance test" was a "condition[] noted" specifically in the Inspection Notice. SUF ¶49. The Duseks did not enter into any "written agreement in satisfaction of the" noted mold contamination, because the issue was never satisfied. The Property failed the only mold test that was performed post-remediation efforts and delivered to the Duseks. SUF ¶¶75, 84, 86. Nor did the Duseks ever "withdraw, in writing [their] disapproval of the condition noted." SUF ¶41. Darkenwald specifically asked the Duseks to withdraw their disapproval of this condition, when he asked them to sign

the Release of Contingencies form on October 28, 2021. SUF ¶116. Plaintiffs endorsed Darkenwald asking Duseks to release these contingencies; the previous day, Gail Goodwin's "goal for the day is to have a signed agreement with Matt removing all contingencies…." SUF ¶118. The Duseks refused to sign the Release of Contingencies, and did not ever sign any "agreement in satisfaction" of the mold-clearance-test issue, so the BSA expired by its own terms on October 29, 2021 at 5:00 p.m. SUF ¶41.

The Duseks notified Plaintiffs of their objection to these property conditions before the release date, and Plaintiffs failed to remediate the mold and moisture problems by the extended deadline to do so. The Duseks' termination notice was timely under the Property Condition Inspection Contingency.

## II. Plaintiffs undeniably failed to secure all well permitting and associated water rights for the Property.

### A. Plaintiffs were required to ensure that all well permitting and associated water rights be completed by Closing – November 9, 2021.

The Well Permitting and Water Rights Contingency expressly required Plaintiffs to ensure that "all well related permitting, well log recording, and any associated water rights be in place prior to closing." SUF ¶95. The parties specifically added this language to the standard form BSA, after it was apparent that Plaintiffs had been operating an unpermitted well on the Property for 8 years. SUF ¶99.

The contingency language is clear. Far from agreeing that the issuance of a provisional permit to appropriate water would suffice, the Parties required that "all well related permitting" be in place before closing. SUF ¶95. They also required that "any associated water rights" be in place before closing. *Id.* This undeniably did not happen.

The separately added Well Permitting and Water Rights Contingency (with its own separate "release date") was not subsumed within the general Property Condition Inspection Contingency, as a matter of Montana law. Plaintiffs' Statement of Genuine Issues (SGI ¶96) contends that the Well Permitting and Water Rights Contingency had a release date of October 26, 2021, despite the plain text added by the Parties to the form buy-sell agreement:

> "Release Date: 11/3/2021."

SUF ¶95. This argument is contrary to Montana statute and case law. *See* Mont. Code Ann. §28-3-205; *see also Estate of Lahren*, 268 Mont. 284, 288, 886 P.2d 412, (1994); *Ideal Mut. Ins. Co. v. Patzer*, 624 F. Supp. 426 (D. Mont. 1985). The Parties' specifically added language, including the specifically added "Release Date: 11/3/2021" controls over the general language of the realtors' form buy-sell agreement, to the extent of any conflict.

The Parties assigned November 3, 2021 as the release date for this contingency. SUF ¶95. The Duseks did not ever release this contingency; in fact,

they expressly refused to sign the Notice of Release of Contingencies sent to them on October 28, 2021. The Duseks' termination notice dated October 30, 2021 was timely because it came before the November 3, 2021 release date.

### B. Plaintiffs' own conduct demonstrates that "all well related permitting" and "any associated water rights" were not "in place prior to closing."

To this day, the Individual Plaintiffs have not completed the well permitting and water rights acquisition that was required to be "in place prior to closing." They deny there was anything further that could have been done, but as recently as June 30, 2022, Plaintiff Gail Goodwin, as Managing Member for Glacier Bear Retreat, LLC, submitted the required Form 617 to the Montana DNRC to complete the well permit. SGI ¶103. The completed permit was to be "in place prior to closing," not merely applied-for 8 months following termination of the BSA. SUF ¶95. Moreover, the provisional permit, itself, indicates that the water rights, if any, will not date back to the original construction of the well 8 years earlier, but instead will be subordinate to all intervening applicants. SUF ¶114. Plaintiffs hope that the well permitting will be processed by DNRC eventually, though not likely until after December 31, 2022. SGI ¶103. Plaintiffs do not argue that these rights were – or could have been – "in place prior to closing." Thus, even without the Duseks' express termination of the BSA, the transaction would not have closed

because Plaintiffs were unable to have "in place" "all well related permitting" and "any associated water rights" by the November 9, 2021 closing date.

### C. Plaintiffs' well-driller's potential culpability in seeking water rights 8 years earlier is irrelevant.

Plaintiffs repeatedly blame their well-driller for not obtaining their water rights 8 years earlier. *See*, *e.g.*, SGI ¶109. Relative fault between Plaintiffs and their contractor for this delay is irrelevant, because the Well Permitting and Water Rights Contingency has no "intent" requirement. Plaintiffs' alleged diligence in seeking provisional water rights beginning when they listed the Property for sale is likewise irrelevant. No one suggests that the Duseks caused Plaintiffs' well to operate unpermitted for 8 years. Regardless of who should be blamed for Plaintiff not obtaining well permits and water rights 8 years prior, the undisputed fact is that the well was not permitted, and the water rights were not secured as required by the BSA.

## III. The Personal Visitation Contingency was a contingency that did not expire before closing.

### A. All parties and their dual agent understood that the Duseks' personal visitation and approval was a contingency to closing.

Plaintiffs' read of the BSA would render the Personal Visitation Contingency meaningless. They argue that the Duseks had the right to visit the Property, but no remedy – i.e., the "right to visit does not amount to the right to withdraw approval based upon the visit." Doc. 35 at 18. Montana law is clear that

"[t] he whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Mont. Code Ann. §28-3-202. That requires interpreting the BSA "so as to give effect to all its provisions and not omit language which has been included." *Milltown Add. HOA v. Geery*, 15 P.3d 458, 2000 MT 341, 303 Mont. 195 (Mont. 2000). Here, Personal Visitation Contingency was not meaningless, but rather it was crucial. The Parties added this language to the standard form BSA, because the Duseks agreed to sign the BSA before even observing the Property in person.

Moreover, even the Plaintiffs do not believe this contingency to be meaningless. As Plaintiffs' Brief notes, the Court's role "is to ascertain and effectuate the parties' mutual intentions…." *A.M. Welles, Inc. v. Mont. Materials, Inc.*, 2015 MT 38, ¶ 8, 378 Mont. 173, 342 P.3d 987 (citations omitted); see also Mont. Code Ann. §28-3-201 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.") "The most elemental principle of contract construction provides that a contract must be construed according to the intentions of the parties at the time the contract is executed." *Maxwell v. Sisters of Charity of Providence*, 645 F. Supp. 937 (D. Mont. 1986).

The Parties' intentions are clear. Plaintiffs previously admitted that they understood that the Personal Visitation Contingency allowed the Duseks to

terminate the BSA if they did not like the Property when they visited it. Goodwin characterized the Duseks' right to visit the Property as a "contingency."

> Q Okay. Any other contingencies that you think applied to this transaction?
>
> A Other than the buyer visiting the property.

SUF ¶62. Substantively, she understood that the BSA allowed the Duseks to terminate the BSA if they did not like the Property when they visited it.

> Q So to try to summarize, you understand my clients were entitled to come visit the property before it closed, right?
>
> A Of course.
>
> Q And did you understand --
>
> A They did.
>
> Q And they did that, right?
>
> A Yeah, they did.
>
> Q If they didn't like what they saw, did you understand that they had the right to not close the transaction?
>
> A If they didn't like what they saw, I was under the impression that the drop-dead date for any disapproval or for walking away was prior to the 26th.
>
> Q And so to the extent they didn't like what they saw during their personal visitation, they needed to tell you in writing, is your position, by 10-26-21?
>
> A Yes. But I don't think it's my position. It's Line 171 in the contract of Exhibit 20.

SUF ¶62.

Plaintiffs' position is not that the Personal Visitation Contingency was not a "contingency." Rather, they assert that this contingency is part of the Property

Condition Inspection Contingency and, therefore, should have had an October 26 release date. SUF ¶62. They further suggest that the Duseks are not genuine in their dislike of the Property when they visited. Neither of these bear on whether this is a "contingency."

**B. The Personal Visitation Contingency applied until closing.**

Nothing in the BSA ties the Personal Visitation Contingency to the Property Condition Inspection Contingency. The standard realtor form buy-sell agreement includes several stock contingencies that may be selected by the Parties. SUF ¶¶33-37. It also contemplates that additional contingencies may be added to the standard form, as the Parties did here. *Id.*

Here, the Parties affirmatively added the Personal Visitation Contingency to the form agreement, but they did not add any release date. SUF ¶57. Nor did they add any language suggesting that this contingency should be a part of the stock Property Condition Inspection Continency. *Id.* Even if the Parties' separately added language conflicted with the realtors' form buy-sell agreement (and it does not), the specific language added by the Parties would govern over the general language of the form. *See* Mont. Code Ann. §28-3-205; *see also Estate of Lahren*, 268 Mont. 284, 288, 886 P.2d 412, (1994); *Ideal Mut. Ins. Co. v. Patzer*, 624 F. Supp. 426 (D. Mont. 1985). Contingencies under the BSA are released only if the buyers expressly waive or release the contingency, or if the respective contingency

release date passes. Here, there is no specified release date for the personal visitation contingency, and the Duseks did not ever waive that contingency. Thus, this contingency remained in effect until closing. With a November 9, 2021 closing date, the Duseks' termination of the BSA under this contingency on October 30, 2021 was timely.

## CONCLUSION

All three of these contingencies remained in effect when Scott Darkenwald informed the Duseks that Plaintiffs had finished addressing all of the items related to the contingencies and asked the Duseks to sign the Notice of Release of these contingencies on October 28, 2021. The Duseks expressly declined to do so and affirmatively terminated the BSA on October 30, 2021. When the Duseks refused to release these contingencies, the BSA terminated under its own terms.

> If a party has notified the other party on or before the release date that a contingency is not released, waived, or satisfied, this Agreement is terminated, and the earnest money will be returned to the Buyer, unless the parties negotiate other terms or provisions.

The Duseks did not release any of these three contingencies. To the contrary, the Duseks expressly notified the Plaintiffs before the respective release dates that these contingencies were not released waived or satisfied. The BSA entitles the Duseks to the return of their earnest money.

Dated this 7th day of October, 2022.

By:/s/ *Shane P. Coleman*
Shane P. Coleman
BILLSTEIN, MONSON & SMALL, PLLC

ATTORNEYS FOR DEFENDANTS MATT DUSEK AND RACHEL DUSEK

## CERTIFICATE OF COMPLIANCE

The undersigned, Shane P. Coleman, certifies that this Brief complies with the requirements of Rule 7.1(d)(2). The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman font typeface consisting of 14 characters per inch. The total word count is 3,185, excluding caption and certificates of service and compliance, table of contents and authorities, and exhibit index. The undersigned relies on the word count of the word processing system used to prepare this document.

By:/s/ *Shane P. Coleman*
Shane P. Coleman
BILLSTEIN, MONSON & SMALL, PLLC

ATTORNEYS FOR DEFENDANTS MATT DUSEK AND RACHEL DUSEK