# Exhibit 1

*Glacier Bear Retreat, LLC, et al. v*
*Matt Dusek, et al.*

---

*Scott Darkenwald*
*May 26, 2022*

---

*Charles Fisher Court Reporting*
*442 East Mendenhall*
*Bozeman, MT  59715*
*(406) 587-9016*
*maindesk@fishercourtreporting.com*

**Min-U-Script® with Word Index**

this --
**Q. Yeah.**
A. -- yes.
**Q. Yeah.**
A. Typically when something goes under contract, it -- it's almost like being off the market.
**Q. I take it after you advised the small handful of folks that contacted you after this property went under contract, that it was under contract, you didn't hear anything further from them.**
A. No.
**Q. After a property goes under contract and it's off the market effectively for a significant period of time, does that make it harder to remarket the property later because you've scared off interest?**
A. Possibly. Because people want to know why the deal unwound.
**Q. Okay. Just so we've got the documents that everybody signed at -- at the get-go on the record, would you please turn to page 1283 and 1284.**
**Hopefully they're in the correct order.**



**If they're not, I apologize.**
A. Is 1283 a buyer-broker?
**Q. Correct.**
A. I see it.
**Q. What -- What's that document?**
A. That just basically is an agreement between us and -- and Duseks that we were representing the Duseks.
**Q. And so you've got a listing agreement with Gail and Darryl on the one hand, and you've got a buyer-broker agreement with the Duseks on the other.**
A. Correct.
**Q. In this transaction, is it fair to say you were acting as a dual agent?**
A. Correct.
**Q. And for -- for the layperson, what does a dual agent mean in the real estate world?**
A. For a layperson it means that we represent both sides.
**Q. Are there limitations on your representation of the buyer and your representation of the seller in a dual agency transaction?**
A. Absolutely.



**Q. Could you explain what those limitations are?**
A. You have to build a complete Chinese firewall in your communications with each. When you are talking with the seller, those conversations are confidential between you and the seller. It's all -- And when you're talking with the buyer, those conversations are confidential with a buyer unless one of the parties asks you to tell the other side X or Y.
**Q. Tell me what you recall about the discussion with the Duseks leading up to the execution of the buy-sell agreement.**
A. We talked about comps, price, very much about the uniqueness to the property being fee simple inside a over million-acre national park. They -- The Duseks have an affinity for Glacier Park. That would have been, you know, the -- the most significant substance of those conversations.
**Q. What did you tell them with respect to comps?**
A. I told them there were no comps.
**Q. Hard -- Hard to gauge a price on this.**
A. Right.
**Q. Okay. Did they make -- Well, do you**



**recall what their first offer was?**
A. I actually don't. I mean, the one that -- the -- We didn't have a -- an offer/counteroffer. We basically, you know, verbally came to a number, and then just wrote the contract so it was clean.
**Q. Okay. And I'll refer you to the buy-sell agreement, and it should be in volume No. 1 of those binders. So you're on --**
A. This one?
**Q. Yeah. If you could turn to volume 1 and turn to page -- should be pages 078 through 087.**
A. This is about the inspection?
**Q. No, it should be the buy-sell agreement.**
**MR. CLARK:** Did you say 078?
**MR. SIMPSON:** 078, yeah.
**BY MR. SIMPSON:**
**Q. Scott, just take a second there to review that and confirm that that's the buy-sell that was executed between the sellers and buyers in this case.**
A. Correct.
**Q. And the date of that document is?**
A. 10/4/21.
**Q. And it was apparently signed on 10/5/21.**

Page 37

**Does that look accurate?**
A. Yes.
**Q. What was the sale price?**
A. [redacted].
**Q. What was the amount of the earnest money that the Duseks were putting down?**
A. [redacted].
**Q. And what was their requirement with respect to -- was there financing or cash at closing?**
A. Cash.
**Q. Prior to the Duseks signing this, did you go through this document, the buy-sell agreement, with them line by line?**
A. Yes. I don't recall how we did that, whether we sent them a draft to look at or just sent them a copy for them to look through and then ask me questions on what they did or did not understand.
**Q. Do you know if the Duseks were represented by counsel at the time that they signed the buy-sell agreement?**
A. I do not believe they were, but I don't know.
**Q. Okay. Do you have a -- a practice or**

Page 38

**procedure when you've got -- when you're a buyer's agent about going through a buy-sell agreement with them before they sign it?**
A. Yes.
**Q. And what -- what is your standard practice?**
A. My standard is just to go through it with them, highlight what are, you know, sort of the critical areas, and -- and also highlight what was -- is just draft language in every buy-sell. It's standard practice for me with out-of-state buyers to recommend that they use a Montana buy-sell agreement because the court system understands the Montana buy-sell agreements, and it's much cleaner if you get into a situation like this because the Montana judicial system understands these documents, have been through them many times. And if -- For instance, if a California attorney drafts the buy-sell, it will -- it complicates the deal considerably.
**Q. Did you follow that practice with the Duseks in this case?**
A. I assume I did because I do with everybody.
**Q. Okay. Do you happen to know -- Well,**

Page 39

**first of all, is this a Montana Association of Realtors form buy-sell agreement?**
A. It is, yeah.
**Q. Do you know who drafted that?**
A. Well --
**Q. The form, not the fill-in-the-blanks part.**
A. Yeah. I have a sense that -- My understanding is that there's a committee, a forms committee, contract committee, I'm not sure what it's called. The lawyers that weigh heavy in on that are Zane Sullivan and Jamie Bowditch, and so they obviously know the documents as well as anyone.
**Q. Who actually filled in the blanks on this document with the -- who -- who came up with the information to fill in those blanks?**
A. Well, it would be in conjunction with my clients. Tracy would be doing the actual typing.
**Q. Data entry.**
A. Data entry.
**Q. Okay.**
A. I would normally be doing the -- the verbal entry.
**Q. Okay. It's a -- It's a collaboration**

Page 40

**between yourself and Tracy and then the -- the client.**
A. Whichever client I'm working with, correct.
**Q. Okay. I want to direct your attention to another copy of this buy-sell agreement, Scott, because it's got some notes on it, and it's -- it's in that same binder you're in, and it starts at page GSIR SDT 395. It's about two-thirds of the way back in that binder.**
A. Okay. I got it here.
**Q. Okay. You're at the page.**
A. Yes.
**Q. Is that your handwriting in red ink on this page?**
A. It is.
**Q. Okay. Same thing throughout this document, the handwriting in red ink is yours?**
A. Any written on any of these would be mine.
**Q. And the highlighting, is that yours as well?**
A. That's mine as well.
**MR. COLEMAN:** Can I clarify what -- when you say "this document," which pages are we

Page 225

**Q. Yes.**
A. -- should be the last one.
**Q. The last one?**
A. The last one.
**Q. Okay. When -- So it was the 25th when Matt first said "We might not close on this property"?**
A. Yep, that was the first I heard of it.
**Q. Why are the notes dated the 26th?**
A. I don't know. I'm assuming that when he told me, I got Tom and Angie together and said here's what's happening, and then just my nature is to sit down and make notes, and so I -- I don't know. I can't tell you why I wrote it the next day.
**Q. On -- On the 26th -- Well, the 25th, let's talk about --**
A. Right.
**Q. -- that day first.**
A. Right.
**Q. The Duseks could have walked away from this deal at that point, right?**
A. No, I think that at that point they were beyond.
**Q. Okay.**

Page 226

A. And I told him that in that -- and I told him that twice, and I told him to have his lawyer -- get advice from his lawyer on seller's remedies. And I also had time in that period to talk to Tom Burk, Angie Friedner, Jamie Bowditch and -- and see if I was reading that wrong. That if I thought all the contingencies were gone and he was exposed to seller's remedies, as his agent, I felt it was incumbent upon me to tell him he better -- you know, if -- that everybody on our side thought the contingencies were past, and if he wanted to have a lawyer look at it to get a different opinion, go for it.
**Q. Okay. That -- That was on the 25th?**
A. That would have been on the 25th.
**Q. Okay. And then who else was on the call? Was Rachel on that call?**
A. No, it was just Matt.
**Q. And then did he call you back the next day?**
A. Yes. He must -- He must have.
**Q. And did he have a change of heart, then, you're saying --**
A. Yes.
**Q. -- and he said, "I intend to close on**

Page 227

**this transaction."**
A. He said, "I intend to close on the transaction."
And I said, "Can I tell Gail?"
And he said, "Yes."
**Q. Did you ever tell him that he better have good lawyers because he was going to get sued over this deal?**
A. Yeah, yeah, I told him twice. I told him twice on the 25th to have -- I said -- and I said, "This is not just my opinion. This is my opinion, Tom Burk's opinion, Angie Friedner's opinion, and Jamie's opinion."
**Q. Does Tom have any notes on this matter?**
A. Probably not.
**Q. Does he have any emails on this matter?**
A. I don't know.
**Q. Do you know if he maintains any sort of a hard copy file on this matter?**
A. I don't know.
**Q. When you received the subpoena from plaintiff's counsel, did you ask Tom or anybody else other than Tracy whether they had documents relative --**
A. I did not.

Page 228

**Q. -- to this? What specifically did you ask Jamie Bowditch to look at with respect to the contingencies?**
A. The -- The inspection notice, if at -- if -- if the inspection notice had been met and those contingencies were now released.
**Q. Okay. At what point -- I want to talk about the mold contingency specifically, but at what point was the mold contingency satisfied, in your mind?**
A. Let's see if I have this. I'd have to go back through, but it would have been when -- when Matt talked with David Quinn and came back, and I asked him if -- was he okay going forward. I mean, I'm not sure of my exact words, but he talked to Quinn, Quinn apparently gave him enough of a comfort level to go forward, and so, to me, at that point those were -- those were -- those contingencies were released. And the fact that Gail had until closing, I think, to -- to remedy or --
**Q. Let me --**
A. Okay.
**Q. -- ask it differently. I don't want to pin you down to dates. I know we have a date, I**