# Exhibit 2

**In The Matter Of:**

*GLACIER BEAR RETREAT, LLC, ET AL. v.*

*MATT DUSEK and RACHEL DUSEK*

---

*DEPOSITION OF GAIL GOODWIN*

*Vol. II*

*July 6, 2022*

---

*Hazlett Reporting & Legal Video Services*

*140 Second Avenue West, Suite B*

*Kalispell, Montana 59901*

*Phone (406) 752-4645*

*deposheri@gmail.com ~ kalispellcourtreporter.com*

Original File 070622gg.txt

**Min-U-Script® with Word Index**

Page 130

discussions about the 29th?
A No. I'm asking when you said "something needs to happen," do you mean I needed to do something or the buyer needed to do something?
Q By anyone, anything that needed to respond to an Inspection Notice by the 29th of October.
A Not that I can recall, sitting here in front of you, without going back and reading through emails. I do know that the 29th was the -- as Scott always called it -- drop-dead date for everything.
Q What was your understanding of what Scott meant by that?
A My understanding was that everything had to be resolved or clearly brought to our attention and then resolved prior to the 29th, and that money went hard as of 5:00 p.m. Montana time on the 29th.
Q It was the deadline, according to you, of any problems that my clients had with the property that needed to be raised in writing by then?
A I'm gonna re-clarify, if I can, your question.
Q Sure.
A It was my understanding that everything had to be raised and resolved by the 29th, but that was the day that everything went hard as per the contract.
Q Raised and resolved by my client?

Page 131

A Raised, obviously, by your client, and resolved by me. So if they had an issue with mold mitigation, we had to resolve it by then. I realize that we had longer, but that, again, was the drop-dead date when things went hard.
Q So you --
A On the 29th at 5:00 p.m. Montana time, I was on the phone with Scott Darkenwald, Angie, and Tom Burk, and during that phone conversation, they told me, Congratulations, your deal is done; everything is hard; we're moving forward to closing. I had no reason -- and may I say something to Matt on the record?
Q Sure.
THE DEPONENT: Matt, yesterday you made a comment that -- something about the 25th, a conversation you had with Scott and that you know he broke the law when he talked to me; I had no idea that you were even considering walking away from this until I got your letter. No idea.
Q (BY MR. COLEMAN) I want to turn your attention back to Exhibit 20, Line 171 and -2. Do you still have that there? It's the buy-sell agreement.
A I'm sorry. What line?
Q Line 171 and 172. What I want to make sure I understand is I thought you told me earlier that you

Page 132

understood the 26th was the drop-dead date, but I thought I heard you just say now that the 29th was the drop-dead date.
A There were two dates here. And, again, I'm not an attorney. So I think that these could be interpreted -- regardless, both of them are prior to when we received anything from your client.
Q Did Scott Darkenwald tell you that the 26th was the key date on which all of my clients' contingencies evaporated?
A I'm not sure if Scott ever said that, but that was my understanding from the contract.
Q Did Scott Darkenwald ever tell you that October 29 was the deadline on which all of my clients' contingencies evaporated?
A Yes.
Q By phone or by text or by both?
A Definitely by phone, and -- because I was on the phone with him when that deadline came and went, and also by text the day or two before when Scott was frantically trying to reach the Duseks when they went dark for a day and a half or two days. And during that time, if you look at the texts back and forth, I said something to -- in one of my texts to the effect of, They do realize that tomorrow at 5:00 is the deadline for everything, correct?

Page 133

And Scott came back and said, Yes.
Q How did Scott know that my clients realized the 29th was the alleged deadline for them to do something?
MR. SIMPSON: Objection, foundation.
A I have no way of knowing that or answering that.
Q (BY MR. COLEMAN) What I'm really getting at is did he tell you, for instance, that he spoke with my clients and said, Hey, there's a deadline tomorrow; you need to do something or else you're stuck?
A He never told me that, but it's blatantly stated in the contract.
Q Which date is blatantly stated, the 26th or the 29th?
A Both.
Q But which one is blatantly clear that it applies here?
MR. SIMPSON: Objection, legal conclusion.
A I'm gonna go with what Fred said.
Q (BY MR. COLEMAN) I'm still in Exhibit 24 --
A 24, hang on.
Q We have a few more questions. I'm fast-forwarding to what appears to be a time after this date deal falls apart, at Glacier Bear 72 at the top. Let me know when you have that, please.
A Okay.

Page 170

A He hadn't gotten it in writing. Keep in mind on all of these times, they're Atlantic standard; they're four hours ahead of Matt's time.
Q Sure. But let's call it -- the contract doesn't work off of either of those times, right?
A No. But I just wanted you to know when I'm talking to him at 7:00 in the evening, it's 3:30 his time. 7:30, it was 3:30.
Q And 4:30 Mountain Time?
A Correct.
Q So 4:30 Mountain Time on the 27th, he says he's not yet talked to Matt because he hasn't yet gotten the report, right?
A That's what the text says.
Q And he further writes later that evening, it appears, "I'm meeting with Matt tomorrow at 11:00." Do you see that?
A I do.
Q But, again -- and the purpose of that was to go through the inspection remedies, correct?
A That's what the text says.
Q Was that your understanding of the purpose of Scott's meeting the following morning?
A Scott just texted me that. I didn't think about, Do I believe him? That's just what he texted me.

Page 171

Q The next page, 194, again, somebody's time -- I'll take your word for it that that's your time because you printed it out. So at 2:48 p.m., which is what time here? I'm sorry. I can't do that math. Is that 11:48?
A 11:48 Montana time.
Q You asked of Scott, "How did your call with Matt go at 11:00 today?" Do you see that?
A I do.
Q And he responds, "I'm working on a document to have signed, releasing contingencies and EM" -- earnest money maybe -- "going hard." Do you see that?
A I do.
Q Is that your understanding of what was "going hard"?
A Yes.
Q Did you have any discussions with Scott at the same time or around the same time of this text exchange?
A There was no need, because we were texting.
Q Did you ever ask him at that time, Why do we need to have a signed document releasing contingencies if the 26th had already passed?
A I already asked him that and got the same answer every time I asked.
Q Later in that same page you've written to him, I'm here if you want to chat -- I'm paraphrasing. "If you're busy drafting the agreement to release the contingencies, please continue to do that, as that is the number one priority." Do you see that?

Page 172

A I do.
Q Was that your number one priority at that time?
A My number one priority was getting Scott to say, You are good to go; go buy the airplane. And that's what Scott told me he needed to do to dot his I's and cross his T's. He also told that he sent it to them for discussion purposes only and that he never expected anyone to sign it, and I had never even seen it nor did I have any idea what was in it.
Q Have you ever seen any contingency release documents in writing in your experience buying and selling Montana real estate?
A No. But I have seen amendments to contracts moving dates for things sooner, which is my understanding of what Scott was writing.
Q So tell me what happens, then, from the time -- and feel free to look at the text messages if that helps you here -- but from now through the end of the 29th. And what I'm getting at is beyond what I can read for myself and your text messages and Scott Darkenwald's responses, what other conversations, if any, did you have with them, at the time, about what happens at the end of the day on October 29, 2021?

Page 173

A At the 5:00 Montana time, October 29, we were on the phone. I had my entire Montana team -- I flew them down to Villa Calypso in St. John, and they were at my home. And we were all waiting to just celebrate knowing that this was done, and we could move forward with Darryl's retirement, so many other things that were contingent upon this.
And at 5:00 -- all day long Scott would just -- he would call or text and just say, I still haven't heard from him; I have no idea what's happening. We were all stumped, would be the best thing, of why this silence, Scott especially, when he thought he had a good relationship, and he couldn't understand why he was being ghosted. And we just did not understand.
And so that's why at the end of the day, prior to that 5:00, there was a phone call with Tom Burk -- I don't remember if Angie was on the call or not, but I know Tom and Scott and I were on the call -- Teryn and Les, they were there outside waiting for me to come out with a bottle of champagne -- and they said, We still haven't heard from him, but as per the contract, the earnest money is hard; it was now nonrefundable, and they are going forward with the contract.
You can see, if you read through these text