IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN, and DARRYL C. SLATTENGREN, | CV 22-19-M-KLD |
| Plaintiffs/ Counterclaim Defendants, | ORDER |
| vs. | |
| MATT DUSEK AND RACHEL DUSEK, | |
| Defendants/ Counterclaimants. | |

This suit for specific performance for breach of a buy-sell agreement for the sale of real property in Glacier National Park comes before the Court on cross-motions for summary judgment by Plaintiffs/Counterclaim Defendants Glacier Bear Retreat, LLC, Gail Goodwin, and Darryl Slattengren (collectively, "Glacier Bear") and Defendants/Counterclaimants Matt and Rachel Dusek ("the Duseks"). (Docs. 25 and 32). For the reasons set forth below, Glacier Bear's motion is granted and the Duseks' cross-motion is denied.

## I.  **Background**

Glacier Bear Retreat, LLC owns the parcel of real property at issue in this case, located at 348 Grist Road in West Glacier, Flathead County, Montana, within the exterior boundaries of Glacier National Park ("the Property"). (Doc. 29, ¶ 1). Individual plaintiffs, Goodwin and Slattengren, a married couple and the sole members of Glacier Bear Retreat (Doc. 29, ¶ 2), listed the Property for sale on September 1, 2021, with real estate broker Scott Darkenwald of Glacier Sotheby's International Realty. (Doc. 29, ¶ 3).

On October 5, 2021, the parties entered into a buy-sell agreement ("BSA") and the Duseks deposited a portion of the purchase price into escrow with the balance due in cash at closing on or before November 9, 2021. (Doc. 29, ¶ 4). Darkenwald and Tracey Rossi, also of Glacier Sotheby's, acted as dual agents, representing both the Duseks ("Buyer") and Glacier Bear ("Seller") in the transaction. (Docs. 36, ¶ 29).

The BSA included a number of contingencies to closing, several of which are at issue in this case. The following general "Contingencies" paragraph applied to all contingencies in the BSA:

> The contingencies set forth in this Agreement or on attached addenda shall be deemed to have been released, waived, or satisfied, and the Agreement shall continue to closing, unless, by 5:00 p.m. (Mountain Time) on the date specified for each contingency, the party requesting that contingency has notified the other party or the other party's Broker/Salesperson in writing that the contingency is not released,

waived, or satisfied. If a party has notified the other party on or before
the release date that a contingency is not released, waived, or satisfied,
this Agreement is terminated, and the earnest money will be returned
to the Buyer, unless the Parties negotiate other terms or provisions.

(Doc. 27-4, at 3).

Under the general Contingencies umbrella, the BSA included the following

"Inspection Contingency":

This Agreement is contingent upon Buyer's acceptance of any
Property conditions that Buyer deems appropriate, including but not
limited to any inspections or advice listed below. Buyer agrees to
acquire, at Buyer's own expense, independent inspections or advice
from qualified inspectors or advisors of Buyer's choice . . . .

(Doc. 27-4, at 3–4). Listed below and relevant to this dispute, the Inspection

Contingency expressly applied to inspections or advice regarding home/property

inspection, mold, and water rights. (Doc. 27-4, at 3–4). The Inspection

Contingency further provided:

Unless Buyer delivers written notice(s) of Buyer's disapproval of the
Property conditions on or before (Notice Date) 10/26/2021 at 5:00
p.m. (Mountain Time), this inspection contingency shall be of no
further force or effect. **If Buyer disapproves** of the Property
condition, Buyer shall deliver written notice to the Seller or the
Seller's Broker/Salesperson on or before the date specified above,
together with a copy of ONLY that portion of the inspection or report
upon which the disapproval is based. Buyer shall also state whether
Buyer elects to immediately terminate the Agreement or negotiate a
resolution of the conditions noted. **If Buyer elects to negotiate** a
resolution of the conditions noted, the notice must contain all of
Buyer's objections and requested remedies.

If the parties enter into a written agreement in satisfaction of the
conditions noted, this contingency shall be of no further force or

3

effect. If the parties cannot come to written agreement in satisfaction
of the conditions noted or if the Buyer does not withdraw, in writing,
his/her disapproval of the condition noted, on or before (Resolution
Date) 10/29/2021 at 5:00 p.m. (Mountain Time), the earnest money
shall be returned to the Buyer, and the Agreement then terminated.

(Doc. 27-4, at 4) (emphasis in original).

Also under the general Contingencies umbrella in the BSA, the parties added

a contingency to account for outstanding issues related to the Property's well and

water rights, which arose when Goodwin discovered, after listing the Property, that

the well log had not been recorded and water rights had not been filed for when the

well was drilled in 2013. (Doc. 29-5, at 9–10). This water rights and well-related

contingency stated, "This Agreement is contingent upon All well related

permitting, well log recording, and any associated water rights to be in place prior

to closing," and noted a "Release Date" of November 3, 2021, at 5:00 p.m. (MST).

(Doc. 27-4, at 5).

On October 12, 2021, the Montana Department of Natural Resources and

Conservation ("DNRC") issued Goodwin a provisional water rights permit with an

enforceable priority date of September 3, 2021. (Doc. 36, ¶ 97). Goodwin testified

that when she inquired about the term "provisional," she was told by a DNRC

representative that all water rights permits issued after 1973 are provisional. (Doc.

36-1, ¶ 6). Darkenwald forwarded the water right "General Abstract" to the Duseks

that same day. (Doc. 36, ¶ 98). The Duseks testified that they did not receive the

4

actual provisional permit, the accompanying cover letter, or additional instructions from the DNRC until discovery in this litigation. (Docs. 36, ¶¶ 98, 101).

The Duseks retained D. Quinn Construction, Inc., of Kalispell, to perform a property condition inspection and tests for radon and drinking water quality. (Doc. 36, ¶ 42). On October 13, 2021, Kelly Quinn provided a report ("First Inspection Report"), which identified nine property conditions requiring immediate attention, including "Evidence of moisture" and "Mold build-up" under the stairs in the main level closet, "possibly caused by inadequate siding flashing although unable to confirm without further testing." (Doc. 36, ¶¶ 43–44). The report suggested "consulting a licenced Certified (AmIAQ) Mold Inspector," noted "this visual inspection does not include surface fungal growth, which are not visible at time of inspection," and recommended "contacting a qualified mold remediation contractor at this time for further evaluation." (Doc. 36, ¶ 44).

On October 15, 2021, the Duseks signed an "Inspection Notice," giving Glacier Bear written notice of their disapproval of the property conditions noted in the First Inspection Report and intent to negotiate a resolution of the conditions noted. (Doc. 36, ¶ 45). The Inspection Notice specified disapproval of all nine items identified in the First Inspection Report, including drainage issues, the siding condition, flashing, evidence of moisture, mold build-up, stairs, valley flashing, insulation, and evidence of a leaking waste pipe. (Doc. 36, ¶ 46). Water rights were

not listed among the disapproved of property conditions in the Inspection Notice. (Doc. 29, ¶ 12). Regarding the issues of mold and moisture retention, the Inspection Notice required Glacier Bear to "remedy [the evidence of moisture] to suggestion in inspection report" and required "[a]ll mold to be remediated and pass a clearance test," specifying Cory Rensmon of Advanced Restoration and Maintenance should complete the work. (Doc. 36, ¶¶ 48–49).

The Inspection Notice stated, "If the Seller and Buyer agree to the remedies specified above, this document shall constitute an amendment to the Buy-Sell Agreement referred to above and shall be an integral part of this transaction." The Inspection Notice provided Glacier Bear until 5:00 p.m. on November 5, 2021, to "complete all agreed upon resolution(s) to the condition(s) and problem(s) identified above." (Doc. 27-8, at 2).

After discussing the problems and remedies articulated in the Inspection Notice, Goodwin directed Darkenwald to "fix whatever needs to be fixed, or we'll – we will fix whatever needs to be fixed." (Doc. 29, ¶ 14). Goodwin and Slattengren signed and dated the Inspection Notice on October 17, 2021, and the Duseks received the fully-executed document on October 18, 2021. (Doc. 29, ¶ 15). Glacier Bear hired Rensmon to address the mold and moisture problems, as well as the issues related to the siding and flashing, which seemed to be the likely

causes of the moisture infiltration. (Doc. 36, ¶ 56). Other contractors were hired to address problems not at issue in this case. (Doc. 36, ¶ 55).

Rensmon began working at the Property on October 19, 2021. (Doc. 36-2, ¶ 4). Certified AmIAQ mold inspector David Quinn of D. Quinn Construction, Inc. inspected the work on October 25, 2021, and informed Rensmon there was still evidence of moisture on some of the oriented strand board sheathing ("OSB") in the closet under the stairs. (Docs. 36-2, ¶ 6; 36-4, ¶ 5). On October 26, 2021, Advanced Restoration and Maintenance returned to the Property. (Doc. 36-2, ¶ 7). Rensmon testified as follows:

> After being notified by David Quinn that there was still moisture in the OSB, over the course of approximately 27 hours from the morning of October 26, 2021[,] to the morning of October 27, 2021, Advanced Restoration and Maintenance was able to locate the source, missing flashing on the roof wall joint. Advanced Restoration and Maintenance installed the missing kick out flashing and sealed the area with water/ice moisture membrane and tore out the OSB in which David Quinn had found moisture and replaced it with new OSB and new studs. This work completely removed and replaced all of the wood material in which David Quinn had found elevated moisture readings.

(Doc. 36-2, ¶ 7).

David Quinn prepared his "Limited Microbial Investigation" report, dated October 26, 2021. (Doc. 36, ¶ 65). The Duseks received the Limited Microbial Investigation report on October 27, 2021. (Doc. 36, ¶ 68). The Limited Microbial Investigation report concluded that there were "low levels of fungal spores" in the air samples from the closet/storage and the living area near the stairs, noting

"possible left-over accumulated dust and debris spores [are] frequently present in high numbers after remediation." (Doc. 34-1, at 69). Additionally, the report concluded that the surface remediation process on the closet/storage exterior wall system under stairs was "successful." (Doc. 34-1, at 69).

Also on October 27, 2021, the Duseks received a copy of Kelly Quinn's second "Building Inspection Analysis Report" ("Reinspection Report"), dated October 27, 2021, documenting the re-inspection he performed after Advanced Restoration and Maintenance had completed its work on October 26, 2021. (Docs. 36, ¶ 68; 36-5, ¶ 5). Like the First Inspection Report, the Reinspection Report disclaimed, "This is a **visual** evaluation of reasonably accessible areas of the structure," and notes the visual inspection does not include any surface mold not visible at the time of inspection. (Doc. 36, ¶¶ 69–70) (emphasis in original). The Reinspection Report concluded that "evidence of moisture and water stains located main closet level under the stair area during the original inspection as [sic] been corrected and was dry at time of inspection with flashing and siding issue having been corrected." (Doc. 36-5, ¶ 6). Further, the Reinspection Report stated, "the water stains and possible surface fungal growth that was found at main level closet under the stairs during the original inspection does appear to have been properly treated and remidiated [sic]." (Doc. 36-5, ¶ 7). Both conditions were deemed

"satisfactory," meaning the "item condition is good to adequate for the age of structure." (Doc. 36-5, ¶¶ 6–7).

Finally, because the Duseks lived in California and had not visited the Property prior to executing the BSA, the agreement included an "additional provision" that reserved the Duseks "the right to visit the property in person during the inspection period." (Doc. 27-4, at 5). The Duseks personally visited the property on October 19, 2021, several days after signing the Inspection Notice. (Doc. 36, ¶ 63).

On October 30, 2021, Matt Dusek sent two letters via email to Darkenwald, purporting to terminate the BSA and demanding a return of the Duseks' earnest money. (Doc. 29, ¶ 23). The first letter stated as follows:

> As we are unable to come to a written agreement in satisfaction of the conditions noted, and as we did not withdraw, in writing, our disapproval of the conditions noted on or before the stipulated Resolution Date (10/29/2021 at 5:00 PM MT), we expect that the earnest money shall be returned to us and the Agreement then terminated.

The second letter provided the following additional grounds for termination:

> [W]e hereby serve notice of our disapproval of the Property conditions and do not wish to proceed with the purchase – we elect to immediately terminate the Agreement.

> In this decision, we are specifically relying on our reserved rights under the agreement to contingencies based on:

> **Well Related Permitting / Water Rights (line 273)**
> We don't find the water rights of the property to our satisfaction.

**Additional Provisions – Personal Inspection/Property
Visitation (line 245)**
We don't find the visibility and noise of traffic on Camas Rd.
adjacent to the Property to our satisfaction.

(Doc. 27-6, 65–66). These letters were the first written notice to Glacier Bear that

the Duseks disapproved of the Property's water rights and traffic noise/visibility

and that they intended not to close on the transaction. (Doc. 29, ¶¶ 23–25).

On November 1, 2021, legal counsel for Goodwin and Slattengren sent

Darkenwald an email expressing their intentions to proceed to closing. (Doc. 27-1).

The parties failed to close on the purchase of the Property on the closing date of

November 9, 2021. (Doc. 1-1, ¶ 12).

On December 22, 2021, Glacier Bear filed a complaint in state district court,

asserting the Duseks had breached by untimely withdrawing from the BSA and

seeking specific performance of the agreement. (Doc. 1-1). The Duseks removed

the case to federal court (Doc. 1), and lodged counterclaims for breach of contract

and breach of the implied covenant of good faith and fair dealing, asserting that as

a result of Glacier Bear's failure to satisfy the contingencies in the BSA, the parties

did not close and the Duseks are entitled to the return of their earnest money under

the BSA, as amended.[1] (Doc. 4). Both parties claim entitlement to costs and

attorney's fees. (Docs. 1,¶ 16; 4, at 8).

------

[1] The Duseks do not seek summary judgment on their counterclaim for breach of
the implied covenant of good faith and fair dealing. (Doc. 28, at 3).

The Court will address each issue in turn and include additional facts relevant to each issue as needed.

## II. <u>Legal Standard</u>

Under Rule 56(c), a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate by affidavits, depositions, answers to interrogatories or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986).

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). The non-moving party may not rest upon the mere allegations or denials of the pleadings. *Anderson*, 477 U.S. at 248. Further, inadmissible hearsay is insufficient to raise a genuine issue of material fact. *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990).

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249–50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020–21 (9th Cir. 2007).

When presented with cross-motions for summary judgment on the same matters, the court must "evaluate each motion separately, giving the non-moving party the benefit of all reasonable inferences." *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

Where, as here, a contract dispute is in federal court based on diversity jurisdiction, the Court applies the substantive law of Montana, the forum state. 28 U.S.C. § 1652; *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

## III.  Discussion

### A. Breach of Contract

The construction and interpretation of a written contract is a question of law. *Wurl v. Polson Sch. Dist. No. 23*, 127 P.3d 436, 441 (Mont. 2006). "Where the terms of a contract are clear and unambiguous, the duty of the court is to apply the language as written to the facts of the case, and decide the case accordingly." *King*

*Resources, Inc. v. Oliver*, 59 P.3d 1172, 1177 (Mont. 2002). Mere disagreement by the parties over the meaning of a contract does not necessarily create an ambiguity; rather, "[a]n ambiguity exists where the language of a contract, as a whole, reasonably is subject to two different interpretations." *Wurl*, 127 P.3d at 442.

Here, the parties do not dispute the BSA, as amended by the Inspection Notice, is a valid, binding contract.[2] Additionally, neither party claims the language of the BSA, as amended by the Inspection Notice, is ambiguous. Rather, this dispute centers around the interpretation of the BSA, which is a question of law.

Glacier Bear argues it is entitled to summary judgment because the undisputed facts in the record establish the Duseks breached the BSA by sending written notice of their decision to terminate the agreement after all applicable contingency deadlines had expired. The Duseks contend the BSA terminated on its own terms when they gave Glacier Bear notice on October 30, 2021, that three separate contingencies to the contract were not met.

The Court will address each disputed provision to the BSA in turn.

---

[2] The Duseks point out that Goodwin and Slattengren signed the BSA and Inspection Notice, not Glacier Bear; however, this distinction is immaterial. As sole members of Glacier Bear, Goodwin and Slattengren, by initiating this lawsuit, have offered to perform the contract. *Ingalls v. Brady*, 591 P.2d 200, 203 (Mont. 1979) (noting that Montana Code Annotated § 27-1-417 provides a party who has not signed a contract may, by offering to perform, compel specific performance from the party who has signed).

### 1. Inspection Contingency

First, the Duseks argue that because David Quinn's Moisture and Mold report found evidence of fungal spores in two indoor air samples, the Property failed to pass the "clearance test" required by the Inspection Notice. Relying on language in Kelly Quinn's Reinspection Report, which disclaims liability for any surface fungal growth not visible at the time of inspection, the Duseks claim Kelly Quinn's report "expressly does not analyze the mold remediation." They maintain that, after a phone call with David Quinn during which he allegedly suggested the Property might pass a mold clearance test if it were retested six months later, the Duseks concluded that mold and moisture issues remained, despite the remediation efforts. Based on these concerns, the Duseks decided to terminate the BSA because, they argue, the Inspection Contingency was not satisfied, nor could it have been satisfied by the release date of November 5, 2021.

Glacier Bear counters that the Duseks have failed to present any admissible evidence sufficient to raise a genuine issue of material fact as to the adequacy of the moisture and mold remediation work. Glacier Bear maintains the Inspection Contingency in the BSA was resolved once the parties executed the Inspection Notice, which established the parties had "enter[ed] into a written agreement in satisfaction of the conditions noted" such that the Inspection Contingency "shall be of no further force or effect." Citing *Halcro v. Moon*, 733 P.2d 1305 (1987),

14

Glacier Bear argues that as an issue "incidental and subordinate" to the main purpose of the BSA, if the Duseks were concerned the mold and moisture remediation was unsatisfactory, under the contract's plain language, their remedy was to seek damages, not to avoid their obligations to purchase the Property.

In *Halcro*, the Montana Supreme Court granted specific performance to the seller after the buyer sought to rescind a contract to buy the seller's home because he believed the house had substantial plumbing problems; however, the undisputed evidence established that was not the case. 733 P.2d at 1307. The court reasoned:

> A breach which goes to only part of the consideration, is incidental and subordinate to the main purpose of the contract, and may be compensated in damages does not warrant a recission of the contract; the injured party is still bound to perform his part of the agreement, and his only remedy for the breach consists of the damages he has suffered therefrom.

*Halcro*, 733 P.2d at 1307 (quoting *Johnson v. Meiers*, 164 P.2d 1012, 1014 (Mont. 1946)).

The Court agrees with Glacier Bear. The undisputed evidence shows that, in accordance with the terms of the Inspection Contingency, the parties entered into a "written agreement in satisfaction of the conditions noted" when they signed the Inspection Notice containing all of the Duseks' objections and requested remedies. Therefore, as of October 17, 2021, the Inspection Contingency in the BSA was "of no further force or effect." The plain language of the Inspection Notice provided Glacier Bear until November 5, 2021, to "remedy [the evidence of moisture] to

suggestion in inspection report" and "[a]ll mold to be remediated and pass a clearance test." (Doc. 27-8, at 2). The Duseks' decision to unilaterally terminate the agreement prior to the November 5, 2021 deadline was a breach of the amended BSA and the agreed upon terms set forth in the Inspection Notice.

Similar to the dispute in *Halcro*, the Duseks have not established the moisture and mold issues in this case were so substantial as to warrant a recission of the contract. Despite the Duseks' claim to the contrary, the Court finds that Kelly Quinn's Reinspection Report did in fact analyze the surface mold at issue in the Inspection Notice. The Inspection Notice plainly references the First Inspection Report, which not only contains identical disclaimer language regarding hidden evidence of surface mold (Doc. 29-1, at 21), but is also entirely premised on evidence of moisture and water stains displaying *visible* surface fungal growth discovered during Kelly Quinn's first inspection. (Doc. 34-1, at 16–17).

The Duseks' proposition that David Quinn's Moisture and Mold report could be the only relevant clearance test is similarly unpersuasive. Not only did David Quinn conduct his mold inspection before Advanced Restoration and Maintenance completed its restoration work, but his report explained that air samples frequently record fungal spores in high numbers after remediation. (Doc. 34-1, at 69). Therefore, David Quinn's inspection confirmed Kelly Quinn's conclusions, finding that low levels of fungal spores were indeed present, but his

16

indoor air testing was unlikely to ever show no evidence of ambient fungal spores under the Inspection Notice timeline, even if "all mold" was properly remediated. Kelly Quinn's initial visual inspection discovered the moisture and potential mold issue, and his re-inspection is a relevant, valid analysis of whether that particular issue was properly remediated under the terms of the Inspection Notice.

It is undisputed that Kelly Quinn's Reinspection Report concluded "the water stains and possible surface fungal growth . . . does appear to have been properly treated and remidiated [sic]," and in the Moisture and Mold report, David Quinn concluded that the surface remediation process on the area was "successful." (Docs. 34-1, at 69, 102–03). Affidavits from Rensmon, Kelly Quinn, and David Quinn corroborate these conclusions. (Docs. 36-2, ¶ 11; 36-4, ¶ 6; 36-5, ¶¶ 6–7). To dispute that the moisture and mold issue was properly remediated, the Duseks rely exclusively on hearsay statements David Quinn allegedly made during a phone call with Matt Dusek. (Doc. 36, ¶ 89). As inadmissible evidence is insufficient to raise a genuine issue of fact, *Skillsky*, 893 F.2d at 1091, even when viewing the evidence in the light most favorable to the Duseks, the Duseks cannot establish that the moisture and mold-related remediation work was a material breach warranting their decision to unilaterally terminate the BSA prior to the Inspection Notice's November 5, 2021 deadline. Additionally, if the Duseks were

unhappy with the moisture and mold remediation work, their remedy was to seek damages, not avoid their obligations under the BSA. *Halcro*, 733 P.2d at 1307.

Accordingly, the Court finds that the Duseks' decision to unilaterally terminate the agreement prior to the Inspection Notice's November 5, 2021 deadline was a breach of the BSA, and the Duseks have failed to raise a genuine issue of material fact as to the adequacy of the moisture and mold remediation work to justify their untimely withdrawal.

## 2. Water Rights and Well-related Contingency

Next, the Duseks contend the separate release date for the water rights and well-related contingency provided them with the option to withdraw from the BSA if they were not satisfied with any water rights or well-related issues until the contingency's express deadline of November 3, 2021. (Doc. 34, ¶ 121). The Duseks further assert the provisional (i.e. not "permanent") nature of the water rights permit raised significant concerns.[3] (Doc. 34, ¶ 109).

---

[3] The Duseks point out that Glacier Bear Retreat, LLC ("GBR") was not a party to the BSA, and DNRC issued the provisional water rights permit for the Property to Gail Goodwin, individually, not to GBR. They imply that this discrepancy added to their uncertainty about the water rights issue and contributed to their decision to withdraw from the BSA. However, because "a water right is appurtenant to the land where the water is used," without an express reservation of that right by the grantor, it "passes with the conveyance of the land." *Axtell v. M.S. Consulting*, 955 P.2d 1362, 1368 (Mont. 1998). Here, it is undisputed that there was no express reservation in the BSA, which stated, conversely, that "[a]ll water . . . and any legal entitlement to water, including . . . certificates of water rights [and] permits to appropriate water . . . are included with the Property." (Doc. 27-4, at 6). Further,

Glacier Bear argues the water rights and well-related contingency was intended to provide Glacier Bear additional time to formalize the water rights attendant on the Property, which was completed on October 12, 2021, when the DNRC issued a provisional water rights permit. (Doc. 27, ¶ 7). Glacier Bear maintains that the BSA did not mandate that any particular classification ("permanent" as opposed to provisional) of water right be conveyed with the Property, only that the Duseks were entitled to receive "any [water rights] associated" with the Property. Finally, Glacier Bear argues the Duseks forfeited their right to object to the Property's water rights under the Inspection Contingency when they failed to notify Glacier Bear that they were unhappy with that Property condition in the Inspection Notice.

At the core of the parties' dispute over water rights is the question of whether the provisional water right issued by DNRC on October 12, 2021, meant that "any associated water rights" for the Property were "in place" on October 30, 2021. The Court finds they undisputedly were.

"Generally, a water right is appurtenant to the land where it is used, 'and, as such, passes with the conveyance of the land . . . even though the grant does not

_____

Goodwin testified that she stood ready and willing to transfer the entirety of the Property and its associated water rights to the Duseks at closing. (Doc. 36-1, ¶ 3). Thus, this water right ownership issue does not create a significant hurdle that would justify the Duseks' decision to untimely withdraw from the BSA.

specifically mention the water right.'" *Axtell*, 955 P.2d at 1368 (quoting *Maclay v. Missoula Irrigation Dist.*, 3 P.2d 286, 290 (Mont. 1931)). Stated differently, "water rights accompany the land if the property is transferred without an express reservation of the appurtenant water rights." *Roland v. Davis*, 302 P.3d 91, 94 (Mont. 2003). Under the Montana Water Use Act, Title 85, chapter 2 of the Montana Code Annotated, all water rights permits issued after June 30, 1973, are provisional until the basin has been fully adjudicated. Mont. Code Ann. § 85-2-101(5)–(6). A provisional permit is subject to reduction, modification, or revocation by the department once the general adjudication is complete. Mont. Code Ann. § 85-2-101(5).

DNRC issued the water rights permit for the Property in this case pursuant to the United States National Park Service–Montana water rights compact, Mont. Code Ann. § 85-20-401, which was executed on January 31, 1994, and covers the allocation of water rights for National Park Service lands, including within the boundaries of Glacier National Park. (Doc. 36-1, at 9–11). The basins including and surrounding Glacier National Park have yet to be fully adjudicated. *Water Adjudication Status*, MONT. DNRC, https://dnrc.mt.gov/Water-Resources/Water-Rights/Adjudication (last visited Jan. 13, 2023).

The Duseks argue that the limited information Glacier Bear provided them "revealed significant water rights issues." (Doc. 33, at 22). However, that argument

is not supported by Montana law and a reasonable reading of the undisputed facts in the record. The water rights and well-related contingency in the BSA required Glacier Bear to ensure that "all well-related permitting, well log recording, and *any* associated water rights" were in place prior to closing. (Doc. 27-4, at 5) (emphasis added). Webster's defines "any" as "one, some, or all indiscriminately of whatever quantity[.]" *Any*, Webster's International Dictionary, Third Ed. Nothing in the BSA guaranteed the Duseks "permanent" water rights. The clear and unambiguous terms of the BSA required that "any" water rights associated with the property be in place prior to closing, and if Glacier Bear had learned that it would be unable to put in place *any* water rights by the release date of November 3, 2021, the parties agreed they could negotiate a reasonable extension. (Doc. 27-4, at 5).

The undisputed facts show that as of October 12, 2021, Goodwin received confirmation of the only water rights that DNRC was able to grant under Montana law, (Doc 36-1); as the basin has yet to be fully adjudicated, the only water rights associated with the Property are provisional. Mont. Code Ann. § 85-2-101(6)(a) ("all permits issued are provisional"). It is undisputed that Glacier Bear, through Darkenwald, provided the Duseks with the DNRC water rights General Abstract on October 12, 2021, and that the Duseks did not, in writing or otherwise, request additional water rights documentation from Glacier Bear, or additional water rights information from anyone other than Darkenwald. (Doc. 29, ¶ 8). As "water rights"

were expressly included under the listed Property conditions in the Inspection

Contingency, as discussed above, the Duseks' opportunity to disapprove of this

Property condition expired when they neglected to include it in the Inspection

Notice. (Doc. 27-4, at 5).

While not included as a justification in the Duseks' letter withdrawing from

the BSA, the Duseks also take issue with the fact that they were not provided with

the well log. Glacier Bear argues that nothing in the BSA requires that the Duseks

be "provided with" the well log, only that the well log be "in place."

The Court finds the Duseks' argument on this point unavailing and

ultimately immaterial to the dispute. For one, the record contains multiple copies

of the well log recording, including one from Montana's Ground-Water

Information Center with a date stamp of November 1, 2021, (Doc. 27-6, at 7–8),

and another that was attached to Goodwin's water rights application filed with

DNRC on September 3, 2021. (Doc. 36-1, at 13–15). Further, the Duseks do not

respond to Glacier Bear's assertion that, at all times relevant to this dispute, the

well log was available as a public document online. (Doc. 36, ¶¶ 136–38).

Additionally, it is undisputed that the Duseks never requested a copy of the well

log report before sending their termination letters on October 30, 2021 (Doc. 36, ¶¶

135–36, 140), and the water rights and well-related contingency provided a release

date of November 3, 2021, for Glacier Bear to have the well log recording in place

22

(Doc. 27-4, at 5). Thus, the Duseks' decision to terminate the agreement without notice, based, in part, on new assertions of well log-related concerns prior to the November 3, 2021 deadline was premature, and is insufficient to raise a genuine issue material to this dispute.

Accordingly, because all well-related permitting, the well-log recording, and any water rights associated with the Property were in place prior to closing, the Duseks' decision to withdrawal from the BSA based on allegedly unsatisfactory water rights and well-related issues was a breach, and no genuine issues of material fact exist to preclude summary judgment in favor of Glacier Bear on this issue.

### 3. Personal Visitation Provision

Finally, the Duseks contend the "Personal Visitation Contingency" was not satisfied because, upon visiting the Property, they found it did not meet their expectations. Glacier Bear argues the BSA plainly did not contain a Personal Visitation Contingency. The Court agrees with Glacier Bear.

The plain language of the BSA establishes that, under a section entitled "ADDITIONAL PROVISIONS," the Duseks reserved the right to visit the Property in-person "during the inspection period." (Doc. 27-4, at 5). A reasonable reading of that clause in the context of the BSA does not grant the Duseks the right to withdraw from the BSA for any reason related to that in-person visit after the Inspection Contingency expired. Considered in conjunction with the terms and

23

timelines laid out under the general Contingencies and the Inspection Contingency clauses, it is clear to the Court that the Duseks were able to withdraw from the BSA due to finding unacceptable "any Property conditions" they deemed "appropriate" until either electing to negotiate a resolution by delivering written notice of all objections to Glacier Bear on or before October 26, 2021, or by terminating the agreement if negotiations fail and the objections were not withdrawn in writing by October 29, 2021. (Doc. 27-4, at 4–6).

As discussed above, this right to withdraw from the BSA based on *any* property conditions expired when the parties executed the Inspection Notice, which presumably contained "*all* of Buyer's objections and requested remedies." (Doc. 27-4, at 5) (emphasis added). As road noise and traffic visibility on Camas Road were not included in the Dusek's written objections in the Inspection Notice, their attempt to withdraw from the BSA based on these concerns was untimely.

Accordingly, the Duseks' decision to untimely withdraw based on observations made during their personal visit breached the BSA, and no genuine issues of material fact exist to preclude summary judgment in favor of Glacier Bear on this issue.

### B. Specific Performance

Glacier Bear argues it is entitled to specific performance of the Duseks' obligation under the BSA to pay Glacier Bear the cash due at closing, plus the

24

earnest money on deposit with the escrow agent in return for a warranty deed to the

Property. The Duseks do not advance any argument on this issue.

Under "Seller's Remedies," the BSA provides:

If the Seller accepts the offer contained in this Agreement and Buyer
refuses or neglects to consummate the transaction anticipated by this
Agreement within the time period provided in this Agreement, the
Seller may:

> (1) Declare the earnest money paid by Buyer to be forfeited
> whereupon the rights and duties of the Buyer and Seller under
> this Agreement shall be terminated; **OR**

> (2) Demand that Buyer specifically perform Buyer's duties and
> obligations under this Agreement; **OR**

> (3) Demand that Buyer pay monetary damages for Buyer's
> failure to perform the terms of this Agreement.

(Doc. 29, ¶ 27) (emphasis in original).

Specific performance is an equitable remedy that requires performance of a

contract based on the contract's precise terms. *Double AA Corp. v. Newland & Co.*,

905 P.2d 138, 141 (Mont. 1995) (citing *Seifert v. Seifert*, 568 P.2d 155, 156 (Mont.

1977). The inquiry must be "whether, in equity and good conscience, the court

should specifically enforce the contract" and "specific performance will be ordered

only on equitable grounds in view of all the conditions surrounding the particular

case." *Seifert*, 568 P.2d at 156. The Montana Supreme Court has stated, "specific

performance will be granted when it is apparent . . . that it will serve the ends of

justice, and it will be withheld when . . . it appears that it will produce hardships or

injustice to either party." *Double AA Corp.*, 905 P.2d at 141 (quoting *Siefert*, 568 P.2d at 157).

Contracts for the sale of real property are specifically enforceable. *McDonald v. Cosman*, 6 P.3d 956, 958 (Mont. 2000) (citing Mont. Code Ann. § 27-1-419, which states, "It is to be presumed that the breach of an agreement to transfer real property cannot be adequately relieved by pecuniary compensation and that the breach of an agreement to transfer personal property can be thus relieved."); *Boyne USA, Inc. v. Spanish Peaks Dev., LLC*, 292 P.3d 432, 444 (Mont. 2013).

Before granting specific performance, a court must consider the contract itself and the relationship of the parties, as well as other factors, such as whether the execution of the contract was unfavorable to the defendant because of lack of advice, and the difference in the parties' business experience and knowledge. *Double AA Corp.*, 905 P.2d at 141. Additionally, Montana law requires a party to perform all material conditions precedent before specific performance may be enforced. *Hillstrom v. O'Neill*, 736 P.2d 126, 128 (Mont. 1987) (citing Mont. Code Ann. § 27-1-416).

Montana Code Annotated § 27-1-415 forbids specific performance against a party if "his assent was obtained by misrepresentations, concealment, circumvention, or unfair practices of any party to whom performance would

26

become due under the contract," or "if his assent was given under the influence of mistake, misapprehension, or surprise." Specific performance is also improper if the circumstances show that specific performance would impose a considerable hardship. *Stovall v. Watt*, 610 P.2d 164, 167–68 (Mont. 1980).

In *Double AA Corporation*, the court denied specific performance against a "somewhat unsophisticated trustee" who consented to the sale of her family ranch because of her erroneous belief regarding potential tax liability, which the plaintiff knew about, or should have known about, before the sale. 905 P.2d at 141–42. The court recognized that, "[w]hile a misapprehension or mistake regarding taxes is insufficient to avoid a contract, such a misunderstanding or mistake, in light of the surrounding circumstances, may be a sufficient reason to deny specific performance as an adequate remedy." *Double AA Corp.*, 905 P.2d at 142 (internal citations omitted). The court concluded that, under the facts of the case, specific performance would impose a greater hardship on the seller than denial would impose on the buyer. *Double AA Corp.*, 905 P.2d at 142.

On the other hand, in *Halcro*, the Montana Supreme Court affirmed the district court's grant of specific performance to the seller of real property when the parties had expressly agreed in writing that specific performance was an available remedy and the seller had materially performed under the contract. 733 P.2d at 1307. The court rejected the buyer's arguments that he was entitled to rescind the

27

contract due to mistake of fact and failure of consideration based on the water problems in the house, because the court held those defenses, like the buyer's unsubstantiated claim that the seller had materially breached the contract by failing to repair a problem with the plumbing, required the buyer to show "that the water problems in the house were so substantial as to defeat the object of the contract." *Halcro*, 733 P.2d at 1306.

Here, the BSA, as written and signed by the parties, unambiguously supports specific performance, as option (2) expressly provides, "the Seller may demand that Buyer specifically perform." (Doc. 29, ¶ 27). Like the seller in *Halcro*, as the party seeking specific performance, Glacier Bear has shown it performed all conditions precedent to the BSA and the Duseks' untimely objections were not so substantial as to defeat the object of the contract. Further, unlike the seller in *Double AA Corporation*, the Duseks do not allege any hardship or dispute that they have the financial resources to close on the purchase of the Property if so ordered by the Court. (Doc. 29, ¶ 26).

Accordingly, the Court finds the essential terms of the parties' agreement are contained in the BSA and it is specifically enforceable. *Hillstrom*, 736 P.2d at 129. As Glacier Bear stood ready and willing to perform under the specific terms of the parties' agreement and the Duseks, the breaching party, have not argued that they

are unable to close on the purchase of the Property if so ordered by the Court, Glacier Bear is entitled to specific performance under the BSA.

**C. Attorney's Fees**

The Buy-Sell Agreement provides that "[i]n any action brought by the Buyer or Seller to enforce any of the terms of this Agreement, the prevailing party in such action shall be entitled to such reasonable attorney fees as the court or arbitrator shall determine just." (Doc. 27-4, at 9). The Duseks do not present any argument on this issue. Accordingly, as the prevailing party in this action, Glacier Bear is entitled to recover its reasonable attorney's fees under the BSA.

**IV.   <u>Conclusion</u>**

For reasons discussed above, the Court concludes that the Duseks' decision to withdraw from the BSA after the expiration of the Inspection Contingency resulted in a material breach of the agreement. Under the express terms of the BSA, Glacier Bear is entitled to specific performance and reasonable attorney's fees. Accordingly,

IT IS ORDERED that Glacier Bear's Motion for Summary Judgment (Doc. 25) is GRANTED and the Duseks' Cross-Motion for Summary Judgment (Doc. 32) is DENIED.

IT IS FURTHER ORDERED that the final pretrial conference scheduled for January 30, 2023, and the jury trial scheduled for February 13, 2023, are

VACATED. All other pending motions and outstanding deadlines are terminated as MOOT.

DATED this 17th day of January, 2023.

_____
Kathleen L. DeSoto
United States Magistrate Judge