# Exhibit 3

## Goodwin Depostion

**(exerpts)**

**In The Matter Of:**

*GLACIER BEAR RETREAT, LLC, ET AL. v.*
*MATT DUSEK and RACHEL DUSEK*

---

*DEPOSITION OF GAIL GOODWIN*
*Vol. I*
*July 5, 2022*

---

*Hazlett Reporting & Legal Video Services*
*140 Second Avenue West, Suite B*
*Kalispell, Montana 59901*
*Phone (406) 752-4645*
*deposheri@gmail.com ~ kalispellcourtreporter.com*

Original File 070522gg.txt
**Min-U-Script® with Word Index**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

Cause No. CV 22-19-M-KLD

GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,

Plaintiffs/Counterclaim Defendants,

vs.

MATT DUSEK AND RACHEL DUSEK,

Defendants/Counterclaimants.

DEPOSITION OF GAIL GOODWIN
VOLUME I
July 5, 2022

Pursuant to Notice and the Federal Rules of Civil Procedure, this deposition was taken by Defendants/Counterclaimants at 530 West 19th Street, Whitefish, Montana, at 3:37 p.m., before Sheri J. Hazlett, Registered Professional Reporter and Notary Public of the State of Montana.



A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFFS/COUNTERCLAIM DEFENDANTS:

FRED SIMPSON, ESQ.
Jenks & Simpson, P.C.
1821 South Avenue West
Suite 204
Missoula, Montana 59801
fsimpson@jenkssimpson.legal

APPEARING ON BEHALF OF THE DEFENDANTS/COUNTERCLAIMANTS:

SHANE P. COLEMAN, ESQ.
Billstein, Monson & Small, PLLC
1555 Campus Way
Suite 201
Billings, Montana 59102
shane@bmslawmt.com

MARK V. ANDERSON, ESQ. (VIA VIDEOCONFERENCE)
Handler Thayer, LLP
191 North Upper Wacker Drive
Suite 2300
Chicago, Illinois 60606
manderson@handlerthayer.com

ALSO PRESENT:

RACHEL DUSEK
MATT DUSEK
DARRYL SLATTENGREN



I N D E X


| EXAMINATION | PAGE |
| --- | --- |
| BY MR. COLEMAN | 4 |




GAIL GOODWIN,
being first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

**BY MR. COLEMAN:**

Q Please state your name and address for the record.
**A Gail Goodwin. Address is 14305 214th Way, Woodinville, Washington 98077. Can you tell we moved there just a few weeks ago?**
Q That was gonna be my next question, actually.
**A Exactly.**
Q Have you ever had your deposition taken before?
**A No.**
Q But you have had the opportunity to watch the last two depositions, as well as Mr. Darkenwald's?
**A I have.**
Q So you've seen the general rules. I'll reiterate a couple of things. If I ask a question that you don't understand -- and I likely will; if we have an hour or so, it's bound to happen -- let me know, and I'll try to rephrase it. Fair enough?
**A Fair.**
Q And otherwise, we'll cover the other rules that might get broken by you or me as we go through if it

What -- does he have any other listings for you right now?
**A Scott Strellnauer?**
Q Yes.
**A Neither Scotts do.**
Q Okay.
**A The only property I have listed right now is Glacier Bear Retreat.**
Q Since we're already on this document, I want to keep going down to Interrogatory No. 3. Do you see that on the middle of Page 8?
**A Okay.**
Q And with reference to this or otherwise, I'd like you to tell me what your damages are that you think you have in this case.
**A I'm gonna read this to make sure that I agree with everything that, obviously, we put in here.**
Q Take your time.
**A Am I permitted to go off record and ask my attorney a question?**
Q No.
**A Okay.**
**MR. SIMPSON:** I'm gonna lodge an objection; to the extent it seeks a legal conclusion, we object.
**A So I can affirm that I agree with what's in here.**



Q (BY MR. COLEMAN) So let's talk about that. Fundamentally you're seeking a remedy from the court that would require my clients to purchase the property for $10 million. Is that fair?
**A Yes.**
Q Plus attorney fees and other transaction costs?
**A Yes.**
Q Alternatively, if for whatever reason the court does not order them to purchase the property, for instance, if someone else purchased the property before then and it was no longer available as a remedy, what damages did you seek from them in terms of monetary compensation?
**MR. SIMPSON:** Same objection; and also calls for speculation.
Go ahead.
**A I would consult with my attorney -- my legal counsel. And, again, I would guess -- and I'm saying "guess" -- that it would be the things that are listed in here.**
Q (BY MR. COLEMAN) Okay. Then let's go through those, then. First off, one of the first things that you say is you may supplement this as the investigation continues. Have you continued your investigation of your answer here?



**A I would say it's ongoing.**
Q And have you made any amendments to what it is you think you are seeking for damages in this case?
**A Not at this time.**
Q At the top of Page 9, you've written here that prior to signing the contract with the Duseks, Scott Darkenwald told you that he had interest from several different buyers. Again, I just want to clarify that I asked this right the last time, but do you know the identities of any of these individuals?
**A None.**
Q Do you know if they're interested in purchasing the property?
**A I don't.**
Q Do you know how interested any of them were in purchasing the property?
**A I do not.**
Q Second paragraph on Page 8, you've responded that you also seek the value of lost rents.
**MR. SIMPSON:** Do you mean on Page 9?
**MR. COLEMAN:** Sorry. Page 9, yeah.
**A Uh-huh.**
Q (BY MR. COLEMAN) Tell me what you mean by that.
**A At the time that this was written, we were not taking reservations this summer, because I was told by**



**Scott that the Duseks wanted to live there and did not want someone in the house.**
**Most of our reservations -- and one of the things that I'm hoping to talk to all of you about before the end of tomorrow is I already have reservations coming in for 2023 that I don't know what to do with. I'm trying to mitigate our damages, but at the same time I don't know if I take them or if I don't take them.**
**So that is an ongoing -- people love this property. They want to stay in this property. They realize that it's a limited amount of weeks that they can stay there, and they book it a year or more in advance.**
**I held off in doing so at Scott Darkenwald's request, because he relayed to me that the Duseks wanted that.**
Q And for what period of time did you stop taking reservations?
**A I'm not certain I can give you an exact date. Once it went under contract in October, we stopped taking them, up until -- again, I'd have to go back and look on my computer when it opened back up again. But I only opened it up a week at a time, thinking, Okay -- and asking my legal counsel, Is there any way this could be resolved by then; how do I mitigate my damages and not lose this money, but at the same time not upset a buyer,**

**depending on how this goes in the courts? So I feel like I'm walking a tightrope.**
Q How many reservations do you have on the property right now?
A **Future reservations?**
Q Future reservations.
A **Can I have a calendar? Where are we at?**
**MR. SIMPSON:** Is it okay if I pull up a calendar?
A **Hand me my phone. I can tell you exactly. I've got my whole reservation system on here. Six additional ones right now confirmed.**
Q (BY MR. COLEMAN) And those are all in the summer of 2022?
A **Correct.**
Q Are they all a week each?
A **They are consecutive, Saturday to Saturday through the 13th of August.**
Q How many reservations have you had already this year?
A **I'm looking. Four.**
Q And when were those, just roughly?
A **I'll tell you exactly. They start -- the first one started June 4, then June 11, June 18, June 25.**
Q What's the weekly rent on the place?



A **28,000 per week.**
Q For how long has it been 28,000 per week?
A **I'm not sure how to answer your question. You mean when did I raise the rate to that?**
Q Was it a lower amount at some point?
A **It started in 2013 at 6,000 a week, and the next year it jumped to 9,000 and then to 11,000, then to -- it continually goes up. Last year it was about 18,000. This year, because of the litigation, I didn't know, should I be renting this; should I not be renting this; how do I mitigate damages but not get in trouble at the same time? I'll put it at some outrageous sum that no one will book it at 4,000 a night, and they booked it, instantly with no questions.**
Q How far out are you taking reservations right now?
A **Right now not past the 13th of August.**
Q How did you arrive at that date?
A **I guessed. That's the honest answer. It's when could this possibly be resolved and would they want time there this summer? I'm trying to be considerate and kind at the same time mitigating damages, and I feel like I'm operating in a vacuum. Had I had it open this whole year, I'd be booked through the end of September and already booked through next summer, but people can't book it right**



**now just -- they just can't.**
Q Is it a summer-only rental?
A **No.**
Q Is it year-round?
A **We've had one family that comes up every year from Texas and rents it in March, like the second and third week of March. We've had others that have been there over Christmas and New Year's. Primarily it's May through the end of September.**
Q And, again, I'm looking back at lost rents. That's the gross number on this. What are your costs of operating this place?
A **Minimal.**
Q Okay. Tell me what you mean by that.
A **Well, there's a cleaning fee that's over and above the 28,000, and that pays the cleaning staff; so that's an in and an out, and it washes. And other than that, it's -- once we get the property ready, it's any ongoing maintenance or things like that, but they're very minor there in that I've built this house; we've maintained it very well, and there's not deferred maintenance or things that -- we've been very fortunate in taking good care of it.**
Q Do you have records or any way of calculating what the maintenance costs have been on an annual basis?



A **I do.**
Q What would you estimate those to be?
A **I do not know. Again, I've got like 20 properties I'm dealing with. They're not all in my head.**
Q Are they separated out by property --
A **Yes.**
Q -- location?
A **Well, they're separated out by owner, and this is Glacier Bear Retreat that owns it, and the books are run through that LLC.**
Q Are each of your individual properties that you're affiliated with owned by a different entity?
A **Some yes; some no. Snow Bear, for example, Goodwin Ventures owns the tree houses. Snow Bear Penthouses, LLC, owned the seven condos, which we now sold six and only have one left. If there are multiple units in the same LLC, then it makes sense to keep them all together. But each new property address has its own LLC here in Montana.**
Q Who does the books and records for Glacier Bear, LLC?
A **Kelly Mortensen, Frontier Figures.**
Q And for how long has that organization done the books and records?
A **Again, I would have to go back and look, but I'm**

**guessing more than three years.**
Q Do you have an idea of what the property taxes are annually at Glacier Bear?
**A My idea would be around 6,000 a year, but I could be wrong. Again, I didn't come with that stuff in my head, and there are too many properties I'm trying to keep straight.**
Q Maybe asked differently, to your knowledge, is the Montana cadastral website that will list the property, the assessed value and the taxes, is that accurate in respect to the amount of property taxes?
**A I don't know.**
Q Have you looked at that site ever?
**A I looked at it back when I was looking for land, but I was looking at it to find out owner names to go solicit buying their land. But I've never looked at it for taxes.**
Q Okay. And to be fair, one reason I ask that is I don't think it's accurate with respect to the owner names on this property. I think it lists you or you and your husband individually as the owners of it.
**A I think you are correct. And although we have this in an LLC and the title company found this in an LLC, when I listed this with Scott, I told him, This is in an LLC.**



**He said, No, it's not.**
**I said, No. I know it is, because I signed the paperwork. It's owned by Glacier Bear Retreat, LLC.**
**And he came back and said, No; the tax bills are in the name of you and Darryl personally; it won't make a difference; let's just get you guys signed. So we did.**
**And that's where that came in, is that I don't think cadastral is current.**
Q Have you been filing annual reports on the LLC?
**A Absolutely.**
Q As far as you know, everything is current on it?
**A Absolutely.**
Q Further down in your response, you state -- and please take a look at the context so I don't gloss over this.
**A Where are we?**
Q I'm still on Page 9 of your discovery responses.
**A Okay.**
Q "The listing broker advised it would be easier to market, show, and sell the property if wasn't rented." Who is that listing broker?
**A At the time that this was written?**
**THE DEPONENT:** What date did you do this, Fred?
**MR. SIMPSON:** Turn to the last page.
**A It was either Scott or Scott. It would have**



**been Scott Strellnauer.**
Q (BY MR. COLEMAN) Okay. And I was going to also point you to he's the same person that said you should not list it after April 15? I'm not trying to trip you up. I think that's the rest of the sentence I cut off.
**MR. SIMPSON:** After August 15.
Q (BY MR. COLEMAN) Sorry. After August 15?
**A Correct.**
Q Was that his advice?
**A That was a discussion of the two of us saying, When could this possibly settle, close, motion for summary judgment, whatever happens? Again, I was trying to be considerate that if the Duseks are buying this because they want to spend time there this summer and they don't want guests, I didn't want to put somebody in their house that they didn't want. Nor did I want to mess with the guest and say, I know you think you're coming next week, but guess what; we sold the house, and you're on your own to go find a place. That's horrible. I won't do that. And that's why I cut it off.**
Q How about before the Duseks made an offer, had you cut off taking rents back in 2021?
**A Not at all. We already had reservations through 2022. Many of them for this summer were made before the Duseks ever purchased the property.**



Q Okay. And at that point you had already raised it up to 28,000 a week?
**A Yes.**
Q You know, somewhere else -- and we can pull out the document, if it's relevant, tomorrow; I think it's in your actual original Complaint. I thought I saw some damage claims for the failure to close a plane transaction. Is that something for which you're seeking damages?
**A I am uncertain at this time.**
Q Have you, to your knowledge, hired a damages expert in this case?
**A Not to my knowledge at this time.**
Q Do you intend to?
**A I don't know.**
Q Have you made any sort of a calculation of what your potential damages were relative to a failed plane transaction?
**A Not that are finalized, no.**
Q Tell me substantively what's the story with the plane.
**A We had a plane under contract knowing that this was going to close, and had to back out and lost a substantial amount of money.**
Q In what form? Earnest money or something else?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

Cause No. CV 22-19-M-KLD

---

GLACIER BEAR RETREAT, LLC, GAIL L. GOODWIN and DARRYL C. SLATTENGREN,

Plaintiffs/Counterclaim Defendants,

vs.

MATT DUSEK AND RACHEL DUSEK,

Defendants/Counterclaimants.

---

DEPOSITION OF GAIL GOODWIN
VOLUME II
July 6, 2022

Pursuant to Notice and the Federal Rules of Civil Procedure, this deposition was taken by Defendants/Counterclaimants at 530 West 19th Street, Whitefish, Montana, at 8:51 a.m., before Sheri J. Hazlett, Registered Professional Reporter and Notary Public of the State of Montana.

A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFFS/COUNTERCLAIM DEFENDANTS:

FRED SIMPSON, ESQ.
Jenks & Simpson, P.C.
1821 South Avenue West
Suite 204
Missoula, Montana 59801
fsimpson@jenkssimpson.legal

APPEARING ON BEHALF OF THE DEFENDANTS/COUNTERCLAIMANTS:

SHANE P. COLEMAN, ESQ.
Billstein, Monson & Small, PLLC
1555 Campus Way
Suite 201
Billings, Montana 59102
shane@bmslawmt.com

MARK V. ANDERSON, ESQ. (VIA VIDEOCONFERENCE)
Handler Thayer, LLP
191 North Upper Wacker Drive
Suite 2300
Chicago, Illinois 60606
manderson@handlerthayer.com

ALSO PRESENT:

MATT DUSEK
RACHEL DUSEK (VIA VIDEOCONFERENCE)
DARRYL SLATTENGREN

on their expertise.

Q Their expertise that you understood it would be better to restart the MLS clock?

A Their expertise that they believed it would be better to restart the MLS clock.

MR. COLEMAN: Why don't we break for lunch.

(Recess taken 12:31 p.m. to 1:27 p.m.)

(Exhibits 26 and 27 marked.)

Q (BY MR. COLEMAN) I've handed you what's been marked Exhibit 26. Do you recognize that document?

A Yes.

Q What is that?

A It seems to be text messages between Teryn Teets and myself.

Q Are these all of the text messages for a certain period of time between you and Teryn?

A If they were printed out correctly for what I have submitted, then yes, they are.

Q Before the break you had mentioned that when the deal fell apart or when October 29 came, I think it was, that your entire staff was down with you in the Virgin Islands?

A Correct.

Q Who is that?

A The ones that were with me in the Virgin Islands

To: Teryn Teets

GLACIER BEAR 0244

Fri, Oct 1, 4:04 PM

Glacier guests just called and asked if they could stay a few more days. I need to talk to Darryl

Oh ok... let me know :)

Darryl said no, so the plan stays as is. Thank you. Will be there tomorrow afternoon.

I think he's right you guys could use a few days there :)

Teryn, I just talked with Scott, the Glacier Bear Retreat broker. He wants to shoot a video at Glacier Bear Retreat on Monday. That's the only time his video guy has available for the next 5 weeks!

So, just make the beds upstairs tomorrow, or take Catie or Becca or Selena with you. Let's make it look pretty. D and I won't mess up anything other than our room, so that will need to be cleaned on Monday. Cleaning crew could be there at 10am Monday. Video guy can start on the 2nd floor and shoot that and the guest house first, then come to the first floor.

Please do what you have to do to make this happen. Thank you!!!

The girls will probably love the hours!

I only have myself and Ry tomorrow but we can get it done :) and Monday if we need to come back not a problem

EXHIBIT 26 7-6-22 Goodwin
PENGAD 800-631-6989

Let's have a crew there on Monday to make sure the upstairs is beautiful too.

To: Teryn Teets

GLACIER BEAR 0259

Have fun at Glacier Bear Retreat!

We just got home from glacier stayed last night :) thank you for letting us stay Maci was in heaven.

I'll check to make sure nothing is behind

As long as Maci is happy, everything is good in the world. :-)

Basically. She was beyond excited to sleep in the top bunk!

The mold is all wrapped up now and new insulation sprayed in. It looks so good

Sat, Oct 30, 8:36 PM

Glacier buyer just walked away from our deal

What????

1 day after $ went hard

Too much noise from the Camus road

This is PRIVATE info

But I wanted to share it with you

I'm bummed

Shoot! I'm so sorry... that crazy to me that now they think there is to much noise??

And a bit pissed off

Yes